IN THE SUPREME COURT OF THE UNITED STATES

| | | |
|---|---|---|
| **JOSEPH FRANKLIN,** | ) | *Zink v. Lombardi* |
| | ) | No. 2:12-CV-4209-NKL |
| Petitioner, | ) | U.S. Dist. Ct., W.D. Mo. |
| | ) | First Amended Complaint |
| v. | ) | Exhibit 24 |
| | ) | This is a capital case |
| **GEORGE A. LOMBARDI, et al.,** | ) | |
| | ) | Execution of Plaintiff Joseph Franklin |
| Respondents. | ) | scheduled for November 20, 2013 |

## MOTION FOR STAY OF EXECUTION

Joseph Franklin moves this Court for a stay of execution pursuant to 28 U.S.C. §1651(a), 28 U.S.C. § 2102(f), and 28 U.S.C. § 2251. Only four weeks ago, the Missouri Department of Corrections announced a new lethal injection protocol—its third new method in as many months. This latest protocol has left Mr. Franklin and other death-sentenced prisoners scrambling to gather scientific evidence and present the accompanying legal claims in the district court, to which the state-affiliated Defendants removed this action from the Circuit Court of Cole County, Missouri. On November 8, 2013, the plaintiffs moved to amend their complaint in order to assert numerous claims against the new protocol. ECF Doc. 147. Throughout these proceedings, the Department's protocol has been a "frustratingly moving target." Stay Order, at 12. Because the state-affiliated defendants "keep changing the protocol that they intend to use," their conduct frustrated the prisoners' and the courts' ability to determine the merits of Plaintiffs' claims. *Id.* at 11. Defendants' conduct served to "disrupt and delay the litigation process and then complain that time is up." *Id.*

The district court's entry of a stay, then, was amply supported by both factual and

equitable considerations. The court carefully considered the breadth of unrefuted expert evidence presented by the prisoners, and granted a stay of execution because Joseph Franklin and his fellow plaintiffs showed a "substantial risk of serious harm," *Baze v. Rees*, 553 U.S. 35, 50 (2008), from the Missouri Department of Corrections' lethal injection protocol. The Eighth Circuit vacated the stay, reasoning that reasoning that Mr. Franklin has not presented sufficient evidence to warrant one, and citing *Brewer v. Landrigan*, 131 S. Ct. 445 (2010); *Baze*, 553 U.S. at 47-48; and *Whitaker v. Livingston*, 732 F.3d 465, 468-69 (5th Cir. 2013). The court denied Mr. Franklin's petition for rehearing en banc, over the votes of Judges Bye, Murphy, and Kelly.

Procedural difficulties aside, Defendants' execution method is fatally flawed. Defendants plan to execute Mr. Franklin with pentobarbital obtained from a "compounding pharmacy," and, in order to keep the identity of their compounding pharmacy a secret, the Defendants have dubiously named that supplier as a member of its "execution team" under Mo. Rev. Stat. § 546.720.2. *See* Stay Motion Ex. 1 (protocol) ¶ A, Ex. 2 (press release). The use of anonymously compounded pentobarbital puts Mr. Franklin at risk of an excruciatingly painful execution, according to pharmacy expert Dr. Larry D. Sasich and anesthesiologist Mark J.S. Heath. Compounded drugs are all but unregulated, and their ingredients come from an unsavory network of "grey market" suppliers whose unknown products subject the end-user to severe risks. *See* Affidavit of Larry D. Sasich (Exhibit 3), ¶¶ 9, 12, 14, 18-23; Declaration of Mark J.S. Heath, M.D. (Exhibit 4), ¶¶ 9-12. The use of anonymously-compounded pentobarbital creates substantial risks (a) that the drug will be sub-potent, super-potent, or even that that the

2

drug will not be pentobarbital at all, and that it would cause permanent brain damage without even killing the prisoner, (b) that the drug will be contaminated with allergens or pathogens, which would cause a "potentially painful and agonizing" anaphylactic reaction or an acute blood reaction, (c) that the drug will contain foreign particles that create a "substantial risk of pain and suffering" on injection or by causing a pulmonary embolism, and (d) that the drug will fail to reach or maintain the proper pH, resulting in severe burning on injection, a pulmonary embolism, or the multiplication of pathogens and the risks they carry. Ex. 3 ¶¶ 22, 28-30, 32-35; Ex. 4 ¶ 9. All told, the new method is "replete with flaws that present a substantial risk of causing severe and unacceptable levels of pain and suffering." *Id.* ¶ 17; Ex. 3 ¶ 46.

The Court should grant a stay for the same reasons considered by the district court. Mr. Franklin demonstrates a "significant possibility" of success on the merits, *Hill v. McDonough*, 547 U.S. 573, 584 (2006). The Eighth Circuit's order all but requires a prisoner to show a certainty of success. It is nothing more than a last-minute reweighing of evidence by a non-trial court, the effect of which is to foreclose the orderly resolution of a judicial dispute.

## FACTUAL BACKGROUND

### A. A brief history of recent protocols and litigation

1. On May 15, 2012, the Department of Corrections announced the world's first-ever execution protocol using propofol as a lethal agent. The protocol stated that "medical personnel" would oversee "nonmedical personnel" in injecting two grams of propofol into the prisoner. The two grams of propofol were divided into four syringes

3

containing 50 cc of the drug, with the first syringe also containing 10 cc of the analgesic lidocaine.

2. On June 26, 2012, Mr. Franklin and other death-sentenced prisoners filed a petition in the Circuit Court of Cole County, attacking the protocol under the Eighth and Fourteenth Amendments to the United States Constitutions as well as their Missouri analogues; the Ex Post Facto provisions of both Constitutions; the Supremacy Clause by virtue of the Food, Drug and Cosmetic Act; and the separation of powers guaranty of Mo. Const. art. II, § 1. Plaintiffs provided sworn expert evidence from Dr. Heath, who explained that propofol creates the risk of excruciating pain in medical settings, that the state-affiliated defendants intended to inject the condemned with approximately 15 times the clinical dosage of propofol, that the greater dosage of propofol heightened the risk of pain, and that neither lidocaine nor any other clinically-used technique could reliably prevent propofol-evoked pain—even from a clinical dosage administered solely by licensed, experienced health-care professionals. *See Zink et al. v. Lombardi et al*, Cole County Case No. 12-AC-CC00396, Petition, Ex. 3 ¶¶ 25-36.

3. On August 1, 2012, Defendants removed this case from the Cole County Circuit Court to United States District Court for the Western District of Missouri. Defendants later opposed the prisoners' motion to remand the case, which the district court denied October 9, 2012. *See* ECF Doc. 22.

4. On November 16, 2012, the district court partly granted and partly denied the defendants' motion to dismiss. ECF Doc. 31. Although the court dismissed the Supremacy Clause and separation-of-powers claims on the facts then before it, it declined

4

to dismiss the remaining claims in light of the risks the plaintiffs had documented. Defendants later moved for judgment on the pleadings, but the court adhered to its previous rulings in an order dated March 25, 2013. ECF Doc. 61, at 4-8.

5. On August 14, 2013, the Missouri Supreme Court ordered that Mr. Franklin be executed on November 20.

6. After the close of discovery in this case, and as the then-scheduled trial date of October 7, 2013 drew near, Defendants twice issued new protocols. The first such amendment, announced August 1, 2013, divided the propofol into two separate dosages. A second amendment, on September 24, 2013, reverted to a single dose of propofol but preceded it with a sedative and an analgesic.

7. On October 11, 2013, Missouri Governor Jay Nixon ordered the Department to delay the execution of plaintiff Allen Nicklasson, then scheduled for October 23. Governor Nixon also ordered the Department to adopt a different method of lethal injection. Later that day, Mr. Franklin moved the Missouri Supreme Court to vacate his execution date, arguing that the Department lacked an execution protocol, and that the court should decline to schedule an execution date until first hearing from the parties on the soundness and legality of whatever protocol the Department might adopt. The Missouri Supreme Court summarily overruled that motion on October 25.

8. On October 18, 2013, the Department issued its current execution protocol. Motion for Stay, Exhibit 1. The Department did not disclose its new protocol until October 22, 2013, to both the district court and the Missouri Supreme Court.

5

9. On November 8, 2013, Plaintiffs moved to file an amended complaint asserting a variety of federal- and state-law claims against the new protocol. ECF Doc. 147 Ex. A. Plaintiffs contend that the new protocol amounts to cruel and unusual punishment, that it operates as an *ex post facto* law by increasing the severity and painfulness of the prisoners' executions, and it violates the Eighth and Fourteenth Amendments by shielding the identity of Defendants' compounding pharmacy (and thus, critical information concerning the provenance and safety of Defendants' lethal drugs). ECF Doc. 147 at 1-7, 10-12. The amended complaint also includes state-law claims (a) that the protocol violates the manner-of-execution statute by designating a supplier of lethal injection drugs as a member of "execution team," which the statute defines as those who "provide ***direct*** support for the ***administration*** of lethal gas or lethal chemicals." Mo. Rev. Stat. § 546.720.2, (b) that the protocol violates binding state regulations that govern the practice of compounding pharmacies, and which exist to protect end-users of compounded products from the types of risks that the new protocol presents, and (c) that the protocol violates the state constitutional guaranty of separated powers by effectively precluding judicial review of its provisions. *See* ECF Doc. 147, at 7-9, 12-15.

10. On November 12, 2013, Mr. Franklin moved the Missouri Supreme Court to stay his execution in light of the prisoners' claims and supporting scientific evidence as against the Department's newly-announced pentobarbital protocol. The court summarily overruled that motion on November 18, 2013. Some forty-five minutes later, Mr. Franklin moved the district court for a stay, which it granted in a fourteen-page order on November 19, 2013. The state-affiliated defendants then moved the Eighth Circuit to

vacate the order, which the court did only minutes before Mr. Franklin's execution had been planned.

B. **Scientific evidence surrounding the current protocol**

*Dr. Dershwitz on pharmaceutical-grade pentobarbital*

11. On October 22, 2013, the state filed in the Missouri Supreme Court an opposition to Mr. Franklin's motion to vacate his execution date. Attached to the opposition was a "report" issued by Dr. Mark Dershwitz. Stay Motion Exhibit 5. The report endorses Defendants' October 18 protocol and opines that the prisoner will experience "a rapid and painless death" from being administered five grams of pentobarbital. Ex. 5 ¶ 9.

12. Dr. Dershwitz's report (like the state's opposition that it accompanied) does not mention the fact that Defendants plan to use *compounded* pentobarbital from an undisclosed supplier, and it does not contain or rely on any analysis of the purity, potency, identity, or effectiveness of Defendants' product. The report simply assumes the use of pharmaceutical grade, FDA-regulated pentobarbital, which the Department cannot obtain because the European manufacturer of the drug opposes its use in execution. *See* Ex. 1 (Sasich affidavit), at 44-45.

*Dr. Sasich on using compounded pentobarbital in executions*

13. On November 7, 2013, pharmacy expert Dr. Larry Sasich issued an affidavit addressing Missouri's plan to execute prisoners with pentobarbital compounded by an unknown pharmacy. Dr. Sasich explains that compounded drugs are unreliable because they are largely unregulated. Ex. 3 ¶¶ 9, 12, 14. Compounding pharmacies

represent "an emerging, substandard drug industry responsible for making large quantities of unregulated, unpredictable and potentially unsafe drugs." *Id.* ¶ 12. The drugs they make often contain counterfeit or substandard ingredients, and drug compounders often use poor practices; as a result, the process of compounding "often results in drugs which are contaminated, sub-potent or super-potent, or which do not have the strength, quality or purity . . . required for the safe and effective treatment of patients." *Id.* ¶ 14. Reputable suppliers of pharmaceutical ingredients generally sell directly only to FDA-approved manufacturers of finished products. *Id.* ¶ 21. That leaves compounding pharmacies to depend on the unregulated "grey market" in which ingredients may come from China, India, or other countries that do not reliably inspect pharmaceutical ingredients; the drugs may not even be what they purport to be, and it is all but impossible to trace the active ingredient to its original manufacturer in order to verify its quality. *Id.* ¶¶ 19-23. In light of these hazards, "The potential harm associated with the use of such contaminated or sub-potent drugs is extremely high." *Id.* ¶ 14. That harm is enhanced by the secrecy concerning the Department of Corrections' supplier, which creates even greater uncertainty as to the origins and quality of the drug's ingredients. *Id.* ¶ 18.

14. Dr. Sasich outlines four specific hazards from the use of compounded pentobarbital in executions. First, there is a "substantial risk" that the drug may be sub-potent or super-potent, either from (a) the fact that Missouri's protocol specifies no means of adjusting the measurements of the chemical to account for the drug's hygroscopic (water-absorbing) nature, (b) chemical degradation caused by impurities or

8

contamination, (c) a compounding error, or (d) the possibility that Defendants' drug is not actually pentobarbital. *Id.* ¶¶ 22, 32-35. Sub-potent pentobarbital risks "acute intoxication, life-threatening but not fatal respiratory depression, and/or paradoxical stimulation." *Id.* ¶ 34. Super-potent pentobarbital, meanwhile, may result in "suffocation and gasping for breath, before the loss of consciousness." *Id.* ¶ 35.

15. A second problem Dr. Sasich identifies is the danger that compounded pentobarbital will be contaminated with dangerous allergens, toxins, bacteria, or fungus—any of which could induce severe allergic or blood reactions that are "highly unpredictable, rapidly evolving and potentially painful and agonizing." *Id.* ¶¶ 28-30.

16. Particle contamination represents a third danger described by Dr. Sasich. The compounded pentobarbital may contain foreign particles that will either contaminate the solution or precipitate out of it, creating a "substantial risk of pain and suffering" on injection, as well as a risk of pulmonary embolism. *Id.* ¶¶ 30, 33.

17. Fourth and finally, Dr. Sasich observes, the dosage form of the drug may fail to reach or maintain the proper pH, which risks burning on injection, the precipitation of solid particles that could cause a pulmonary embolism, or the multiplication of bacteria and fungus that may "create instability and/or incompatibility with human blood." *Id.* ¶ 33. All told, Dr. Sasich concludes, compounded pentobarbital creates a "substantial risk of serious, unnecessary and substantial harm and mental anguish." *Id.* ¶ 46.

### *Dr. Heath on compounded pentobarbital*

18. Anesthesiologist Dr. Heath shares Dr. Sasich's concerns about compounded pentobarbital of unknown origin, including the concerns about contamination, deviations

9

in pH or concentration, or the use of a drug that lacks the correct chemical properties—all of which may result in pain on injection or only a partial or ineffective dosage of the drug. Ex. 4 ¶¶ 9-12.

19. Dr. Heath warns that sub-potent pentobarbital may even disable the prisoner severely but without actually killing him. It carries a risk that the prisoner "will be unconscious for an extended period of time while breathing inadequately, before waking up in a permanently brain-damaged state." *Id.* ¶ 9. At that point, it would be unthinkable for Defendants to inject more of their product in order to induce death, because the absence of death would prove that the executioners don't know the identity or potency of whatever substance they are injecting. *Id.* Dr. Heath observes more broadly that the new protocol is "replete with flaws that present a substantial risk of causing severe and unacceptable levels of pain and suffering during the execution." *Id.* ¶ 17.

## ARGUMENT

The Department of Corrections' new execution protocol is hopelessly defective, and the district court acted well within its discretion by granting a stay. Even assuming that the State has not waived the protections of federalism and comity by removing this case to a federal court, a stay *at most* requires Mr. Franklin to show "a significant possibility of success on the merits." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Two qualified scientists swear under oath that Defendants' new protocol places Mr. Franklin and the other prisoners at a substantial risk of severe pain. Ex. 3 (Sasich Aff.) ¶ 46; Ex. 4 (Heath Dec.) ¶ 17. Defendants offer no contrary expert evidence, other than a report that

10

does not even acknowledge the use of compounded pentobarbital. See Ex. 5 (Dershwitz report); Ex. 3 (Sasich Aff.) ¶¶ 44-45.

I.  **Mr. Franklin demonstrated a significant possibility of succeeding on the merits of his claims, and the Eighth Circuit's ruling exaggerates the strength of evidence needed to obtain a stay.**

The Department plans to administer a dangerous drug made by an undisclosed "compounding pharmacy," and thereby to inflict on the prisoners numerous medical risks that are readily identifiable, documented by expert evidence, and known to be severe. Ex. 3, 4. An execution method violates the Eighth Amendment when it creates "a substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (opinion of Roberts, C.J.); *Nooner v. Norris*, 594 F.3d 592, 599 (8th Cir. 2010).

Mr. Franklin documented numerous such risks from the use of compounded pentobarbital in executions, which creates the "substantial risk of serious, unnecessary and substantial harm and mental anguish." Ex. 3 (Sasich Aff.) ¶ 46. . As the district court explained:

> Here, Plaintiffs have provided testimony from two experts who have opined that the risk of harm is foreseeable and that substantial risk of harm exists with the use of unregulated, compound pentobarbital. Unlike the court in *Landrigan*, this Court need not speculate as to whether the risk of unnecessary pain is both real and very likely. The record in *Landrigan* contained no evidence to suggest the drug was unsafe. On the contrary, the current evidence presented before this Court suggests that the drug to be used by Defendants is unsafe. Defendants' expert's report does not address compound pentobarbital, and is therefore insufficient to rebut Plaintiffs' experts' opinions.

Order, at 8-9. The district court here determined that the risk of pain was "real" and "very likely," that the prisoners face a "significant risk of harm," and indeed, that Joseph

Franklin's last experience may be "permanent, irremediable cruel and unusual punishment in violation of the Eighth Amendment." Order at 9-12.

The evidence of record more than amply supports the district court's ruling. The State-affiliated defendants seek to execute Joseph Franklin with pentobarbital obtained from a "compounding pharmacy," and, in order to keep the identity of their compounding pharmacy a secret, they have named that supplier as a member of its "execution team" under Mo. Rev. Stat. § 546.720.2. *See* Stay Motion Ex. 1 (protocol) ¶ A, Ex. 2 (press release). The use of anonymously compounded pentobarbital puts Mr. Franklin at risk of an excruciatingly painful execution, according to pharmacy expert Dr. Larry D. Sasich and anesthesiologist Mark J.S. Heath. Compounded drugs are all but unregulated, and their ingredients come from an unsavory network of "grey market" suppliers whose unknown products subject the end-user to severe risks. *See* Affidavit of Larry D. Sasich (Stay Motion Exhibit 3), ¶¶ 9, 12, 14, 18-23; Declaration of Mark J.S. Heath, M.D. (Stay Motion Exhibit 4), ¶¶ 9-12. The use of anonymously-compounded pentobarbital creates substantial risks (a) that the drug will be sub-potent, super-potent, or even that that the drug will not be pentobarbital at all, and that it would cause permanent brain damage without even killing the prisoner, (b) that the drug will be contaminated with allergens or pathogens, which would cause a "potentially painful and agonizing" anaphylactic reaction or an acute blood reaction, (c) that the drug will contain foreign particles that create a "substantial risk of pain and suffering" on injection or by causing a pulmonary embolism, and (d) that the drug will fail to reach or maintain the proper pH, resulting in severe burning on injection, a pulmonary embolism, or the multiplication of pathogens

12

and the risks they carry. Ex. 3 ¶¶ 22, 28-30, 32-35; Ex. 4 ¶ 9. All told, the new method is "replete with flaws that present a substantial risk of causing severe and unacceptable levels of pain and suffering." *Id.* ¶ 17; Ex. 3 ¶ 46.

Defendants offer no expert evidence to the contrary. The one report they cite is from Dr. Mark Dershwitz, who concludes that pentobarbital will cause a "quick and painless death," but whose report speaks of FDA-approved pentobarbital rather than the compounded drug that Defendants plan to administer. See Stay Order at 7. In short, Mr. Franklin presents abundant, non-speculative, and unrefuted evidence from two qualified scientists that Missouri's method of execution risks severe pain.

Neither does Defendants' laboratory report carry the day as a matter of law, so as to extinguish Mr. Franklin's claims. *See* Motion to Vacate, at 12. For one thing, a mere "percentage purity" number does not prove that Defendants' anonymously-compounded drug will reliably work as hoped on execution night. The purity of the drug is only ***one*** of the hazards identified in Mr. Franklin's motion for stay and the accompanying scientific evidence from Dr. Sasich and Dr. Heath. A percentage-purity number says nothing about the well-documented danger of contamination from allergens, particulate matter, or pathogens—any of which are likely to cause severe pain during an execution, whether from anaphylactic shock, a blood reaction, a pulmonary embolism, or otherwise. *See* Ex. 3 (Sasich Aff.) ¶¶ 28-30, 33. For another, the Department's lab report is methodologically flawed according to the only expert evidence of record. The district court correctly observed that the methods used by the laboratory "are not validated," that the laboratory is not accredited by the FDA or any association recognized by the FDA, and the report

13

fails to disclose whether the drugs contain contaminants. Stay Order, at 9-10.

The district court carefully considered Plaintiffs' abundant evidence, compared it to Defendants' sparse evidence, and correctly ruled that the Mr. Franklin and the other prisoners "have provided proof of more than hypothetical risk," based on two expert reports opining that compounded pentobarbital presents substantial risks of contamination and other dangers that suggest a "high risk" of "prolonged, unnecessary pain beyond that which is required to achieve death." Stay Order, at 9-11 The district court was also correct to distinguish the cases on which the Eighth Circuit relied, specifically, *Landrigan v. Brewer*, 131 S. Ct. 445 (2010), and *Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013). *See* Stay Order at 8-9. *Landigran* stands for the proposition that a speculative Eighth Amendment claim does not justify a stay of execution. But it does not mean that the Plaintiffs' evidence in this case is, in fact, speculative. To the contrary, "Plaintiffs have provided testimony from two experts who have opined that the risk of harm is foreseeable and that substantial risk of harm exists with the use of unregulated, compound pentobarbital," the court explained. Stay Order at 8. "Unlike the court in *Landrigan*, this Court need not speculate as to whether the risk of unnecessary pain is both real and very likely." *Id.*

The Eighth Circuit's ruling to the contrary was error. If Mr. Franklin has not offered "sufficient evidence to show a likelihood of success on the merits to support a stay of execution," Order, at 1, then a stay is all but impossible to obtain without certain proof of severe harm, as opposed to a substantial risk. *Brewer* and *Baze* stand for the proposition that a prisoner must do more than speculate in order to show "a substantial

14

risk of serious harm." But neither case supports the panel's ruling that that the prisoners must offer more than the detailed and comprehensive showing in the record here. As the district court explained: "Plaintiffs have provided testimony from two experts who have opined that the risk of harm is foreseeable and that substantial risk of harm exists with the use of unregulated, compound pentobarbital." Stay Order, at 8.

## II. The remaining factors weigh in favor of a stay, as the district court correctly determined.

The district court also considered "the relative harm to the parties" and "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nooner v. Norris*, 491 F.3d 804, 808 (8th Cir. 2007)—factors that are consistent with the Court's opinion in *Hill v. McDonough*, 547 U.S. 573, 584 (2006). The Eighth Circuit emphasized the State's "strong interest in enforcing its criminal judgments without undue interference from the federal courts," Order at 1, citing *Hill*, 547 U.S. at 584. But the district court gave the State its equitable due, noting that any harm to the state-affiliated defendants is "entirely self-inflicted." It observed that Defendants chose an untested method of lethal injection in 2012, changed the method three times after more than year of litigation and full discovery, then changed the method again only five days before Mr. Franklin's scheduled execution. Stay Order, at 12. The State's hands were, and remain, unclean: "In the face of such a grave consequence as that of the death penalty, this Court declines to reward Defendants' attempts to prevent Plaintiffs from fully litigating their claims." *Id.* at 13.

Neither did the district court ignore equity's presumption against staying an execution in which the prisoner could have brought the claim earlier without needing a

15

stay. *See Hill*, 547 U.S. at 574-75. Once again, the district court cast appropriate blame on the State itself:

> The Department first announced a new protocol instituting the use of propofol in May 2012. Franklin subsequently filed a challenge to this protocol in June 2012 in the Circuit Court of Cole County. On August 2, 2013, after more than thirteen months of litigation and shortly after the close of discovery, Defendants notified Franklin and other Plaintiffs that the protocol had been changed to address Plaintiffs' original concerns. On August 19, after Plaintiffs' expert reviewed the amended protocol and determined that serious concerns still existed, Franklin sought a thirty-day extension to the Court's scheduling order so that he could seek leave to amend his complaint. The Department again changed the protocol on September 24 and October 18, a month before Franklin's scheduled execution date. Franklin sought to file an amended complaint on November 8. After each protocol change, Franklin has gathered and presented scientific analysis of the protocol without delay. Throughout this litigation, the details of the execution protocol have been illusive at best. In fact, the most recent change occurred just four days ago on November 15, when the Department indicated changes to its approach on intravenous access.

Stay Order, at 13.

## **CONCLUSION**

Joseph Franklin asserts viable legal claims against a new protocol that is, according to the scientific evidence of record, "replete with flaws that present a substantial risk of causing severe and unacceptable levels of pain and suffering." Ex. 2 (Heath Dec.) ¶ 17; Ex. 1 (Sasich Aff.) ¶ 46. The district court stayed Mr. Franklin's execution after a painstaking consideration of the evidence and circumstances. The Eighth Circuit's ruling in vacating the stay makes that particular remedy all but impossible to obtain. This Court should stay Mr. Franklin's execution so that his viable claims may proceed.

Respectfully submitted,

/s/     Jennifer Herndon
Jennifer Herndon, No. 37921
224 Hwy. 67 North, #122
Florissant, MO 63031
314-831-5531
314-831-5645 FAX
jenniferherndon@me.com

/s/     Joseph W. Luby
Joseph W. Luby, No. 48951
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, MO 64113
816-363-2795
816-363-2799 FAX
jluby@dplclinic.com

*Attorneys for Petitioner Joseph Franklin*

**CERTIFICATE OF SERVICE**

    I hereby certify that, on this 20th day of November, 2013, a true and correct copy of the foregoing was forwarded for transmission via electronic mail to opposing counsel as follows:

Michael J. Spillane, mike.spillane@ago.mo.gov

Stephen D. Hawke, stephen.hawke@ago.mo.gov

Susan D. Boresi, susan.boresi@ago.mo.gov
Office of the Attorney General
P.O. Box 899
Jefferson City, Missouri 65101.

                                            /s/   Joseph W. Luby
                                            Joseph W. Luby

                                            *Attorney for Petitioner Joseph Franklin*

18

Case 2:12-cv-04209-BP   Document 183-24   Filed 12/03/13   Page 18 of 18