IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| DAVID ZINK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 12-4209-CV-C-BP |
| | ) | |
| v. | ) | |
| | ) | **THIS IS A CAPITAL CASE** |
| GEORGE A. LOMBARDI, *et ai.*, | ) | |
| | ) | **Execution scheduled for** |
| Defendants. | ) | **12:01 a.m. Feb. 26, 2014** |
| | ) | |

## PLAINTIFF MICHAEL TAYLOR'S MOTION FOR
## STAY OF EXECUTION
## BASED ON ABSENCE OF LAWFUL MEANS OF EXECUTION

Plaintiff Michael Taylor herein moves the Court for a stay of his execution, which is scheduled for 12:01 a.m. on February 26, 2014, based on there being no means of carrying out the execution lawfully.

Missouri's execution protocol uses compounded pentobarbital. The state's supplier of that drug has not provided the dose for Taylor's execution and decided yesterday it will not do so. (Exhibit A)

Missouri has identified no lawful means of executing Taylor next week. Any pentobarbital Missouri previously acquired is now expired. Though Missouri has indicated it has midazolam and hydromorphone, its execution protocol does not permit administration of those drugs; even if it did, Taylor would warrant a stay because those drugs have already inflicted unconstitutional pain and suffering in an execution and the states using them have thus temporarily halted executions. In any event, switching the protocol or the pentobarbital supplier now – a week before the scheduled execution – would violate Taylor's right to due process of law.

At this time, there are no lawful means of going forward on February 26th.

1

## ARGUMENT

### There are No Lawful Means of Carrying out an Execution on February 26th

Missouri has no usable pentobarbital and it may not switch to midazolam and hydromorphone, which cause unconstitutional pain and suffering, or make any other changes at this late date without violating Taylor's right to due process.

### A.     Missouri Has No Usable Pentobarbital

When deposed on January 15, 2014, defendant Dormire said Missouri had 10 grams of compounded pentobarbital in its possession.  (Exhibit B at 105)  That supply expired by February 15, 2014 – at the latest – because it had an expiration date of 30 days after being compounded, and it was compounded sometime before Missouri obtained it.  (Exhibit B at 106)

On February 13, 2014, Governor Nixon responded to litigation Taylor had brought against the pharmacy that supplies Missouri with its pentobarbital.  The governor said "the Department of Corrections is prepared to carry out the execution on February 26th."  (Exhibit C)

Yesterday, however, Taylor and the pharmacy settled their litigation based on the pharmacy affirming it had not provided any drugs for Taylor's execution and agreeing it will not do so.  (Exhibit A)

The media speculated that Governor Nixon's comment on February 13th might have referred to the fact that Missouri has a supply of midazolam and hydromorphone.  (Exhibit C)

### B.     Missouri May Not Switch to Midazolam and Hydromorphone

The midazolam-hydromorphone combination has been used in only one execution, and it caused unconstitutional pain and suffering.

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 2 of 331

Ohio executed Dennis McGuire on January 16, 2014, injecting midazloam and hydromorphone into him at 10:27 a.m. At 10:31 a.m., "his stomach swelled up in an unusual way, as though he had a hernia." Between 10:33 a.m. and 10:44 a.m., "he struggled and gasped audibly for air." "Over those 11 minutes or more he was fighting for breath, [a witness] could see both of his fists were clenched the entire time." "Towards the end, the gasping faded into small puffs of his mouth. It was much like a fish lying along the shore puffing for that one gasp of air that would allow it to breathe." (Exhibit D) "The execution process took 24 minutes, and [] McGuire appeared to be gasping for air for 10 to 13 minutes. 'He gasped deeply. It was kind of a rattling, guttural sound. There was kind of a snorting through his nose. A couple of times, he definitely appeared to be choking.'" (Exhibit E)

The duration of McGuire's gasping and writhing far exceeded the predictions of even his lawyers, who had argued "McGuire will experience the agony and terror of air hunger as he struggles to breathe for five minutes after Defendants intravenously inject him with the execution drugs." *In Re: Ohio Execution Protocol Litigation*, S.D.Ohio No. 11-1016, Docket No. 383 at 1.

Ohio had dismissed this possibility, which in fact came to pass, by arguing that "people who stop breathing due to the effects of an opioid, but who do not lose consciousness, do not perceive this as uncomfortable." *Id.,* Docket No. 385 at 13. Ohio's expert, Dr. Mark Dershwitz, had agreed: "They do not have a sense of difficulty breathing. . . . They don't care." *Id*. (quoting deposition). Dr. Dershwitz is the state's expert here too.

The risks of repeating an unconstitutional execution require further review

3

of the midazolam-hydromorphone combination before it is used again, as Ohio and the only other state contemplating its use – Louisiana – have recognized.

On February 7, 2014, Ohio Governor John Kasich granted an eight-month reprieve to the man next scheduled to be executed by midazolam and hydromorphone so the state can properly study that combination, and McGuire's execution, before deciding whether to proceed. (Exhibit F)

Likewise, on February 3, 2014, Louisiana agreed to a 90-day stay for a man facing execution by midazolam and hydromorphone; both sides agreed the execution "should be delayed to further review the drug protocol." (Exhibit G)

Defendants here have already expressed their opposition to midazolam and hydromorphone. When asked whether Missouri would use that combination on Herbert Smulls, who was executed last month, lead defendant Lombardi said: "I'm testifying right now to tell you that will not be the case. We will not use those drugs." (Exhibit H at 21) Indeed: "There will be [no] use of it in an execution."[1] (Exhibit H at 21) Moreover, when defendant Dormire was asked about possibly switching to that combination for Smulls's execution, he noted the decision was Lombardi's but opined that doing so at that point would be "awfully quick"– and that was 14 days before Smulls's date. (Exhibit B at 147)

It is indeed "awfully quick" to inform a defendant of the manner of his execution 14 days ahead of time; it would be unconstitutional to do so here, just one week out, as that would deny Taylor meaningful notice of – and opportunity to challenge – the state's plan for ending his life.

---

[1] The court reporter accidentally omitted the "no" from that sentence, as reflected by the follow-up question plaintiffs' counsel then asked: "Why will there be no use of it in an execution?" (Exhibit H at 21)

**C.    Taylor's Right to Due Process Precludes Any Changes Now**

As plaintiffs have alleged in Counts VII and VIII of their Second Amended Complaint, defendants' constant and last-minute changes to the execution protocol – not to mention defendants' ongoing failure to meet their discovery obligations – violates plaintiffs' constitutional right to due process.

Missouri may not take Taylor's life without due process of law, meaning he has the right to meaningful notice of – and an opportunity to challenge – Missouri's plan for executing him.  Notice is a means "to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing,'" *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978), during which he has "an opportunity to present [his] objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  *See also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons . . . why proposed action should not be taken is a fundamental due process requirement.").  "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  *See also Mullane*, 339 U.S. at 314 ("The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.") (citations omitted).

If Missouri were to change its protocol now and still seek to execute Taylor a week from now, he would have no meaningful notice of – or opportunity to challenge – the protocol.  Likewise, the courts would have no time to meaningfully adjudicate the lawfulness of the new approach.  Courts have underscored the

importance of giving a defendant the ability to meaningfully challenge the proposed method of execution. *See Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012) (per curiam) ("[T]he district court committed reversible error in dismissing Arthur's Eighth Amendment claim without any opportunity for factual development, including discovery between the parties."); *Reynolds v. Strickland*, 583 F.3d 956, 957 (6th Cir. 2009) (granting stay where "serious and troubling difficulties" during past executions raised concerns over the "competence of the lethal injection team"); *Cooey v. Kasich*, 801 F. Supp. 2d 623, 655 (S.D.Ohio 2011) (granting stay where there was evidence of "a troubling pattern of disregarding the very protocol that is supposed to control and provide safeguards for the execution process"); *Moeller v. Weber*, 2011 WL 288516 at *1 (D.S.D. 2011) (refusing to curtail "discovery concerning the plan for carrying out executions in light of the shortage of sodium thiopental"); *Morales v. Cate*, 2010 WL 3835655 at *3 (N.D.Cal. 2010) (granting stay where condemned inmate raised questions about "the selection and training of the execution team, the mixing and delivery of the drugs used in executions, and the adequacy and accuracy of execution records"); *Chester v. Beard*, 657 F. Supp. 2d 534, 542-454 (M.D.Pa. 2009) (holding that condemned inmates' allegations of inadequately trained personnel and inadequate safeguards, if true, would demonstrate a substantial risk of serious harm, and giving inmates a chance to factually develop their claims); *Thorson v. Epps*, 2009 WL 1766806 at *1-*2 (N.D. Miss. 2009) (denying motion to dismiss condemned inmates' allegations of executioner incompetence, which, if true, "plausibly would entitle him to relief," and noting importance that "the factual record had been completely developed").

6

Plaintiffs sued in May 2012, and defendants removed this case to this Court on August 1, 2012. In the year-and-a-half since, there has been no final ruling on the merits of plaintiffs' challenges to Missouri's execution protocol. The protocol initially called for propofol; now, compounded pentobarbital is the drug. If over 18 months of litigation did not yield a ruling on the legality of those methods, the lawfulness of using midazolam and hydromorphone cannot be finally adjudicated in one week. Moreover, the evidence that already exists as to that method – the McGuire execution – indicates it is unconstitutional and thus may not be used.

Just as Missouri may not switch to that approach now and still proceed in one week, it may not announce some heretofore unknown approach or unveil some heretofore concealed supplier of compounded pentobarbital. Throughout this litigation, defendants have indicated they located only one pharmacy willing to supply them with compounded pentobarbital: though they approached three pharmacies, only one said it was willing to provide the drugs. (Exhibit B at 55-59) A Missouri official obtains 10 grams of compounded pentobarbital for each execution by driving to the pharmacy and paying for the drugs with cash. (Exhibit B at 109, 128) The 10 grams procured for the Smulls execution are now expired, and the pharmacy has not supplied the 10 grams for Taylor's execution and will not do so. (Exhibit A) Any revelation of an alternate supplier of compounded pentobarbital at this point would violate not only the requirement that defendants update their discovery responses, *see* Fed. R. Civ. P. 26(e), but, more importantly, it would violate Taylor's constitutional right to due process of law. Discovery on the previous supplier was made months ago, and information came to light that the supplier had been cited for violating various laws and regulations. (Exhibit I)

To introduce a new player now, one week before a scheduled execution in litigation that has been pending for over 18 months, would not afford Taylor or this Court a meaningful opportunity to assess whether that player may constitutionally play a role in ending Taylor's life.

<div align="center">*            *            *</div>

As two judges of the Eighth Circuit have recently reminded, "Missouri has a well-documented history of attempting to execute death row inmates before the federal courts can determine the constitutionality of the executions." (Exhibit J at 2) Missouri has no usable pentobarbital, and any attempt to procure some from an alternate supplier – or switch to midazolam and hydromorphone – would come too late to make the execution scheduled for a week from now constitutional. One defendant even said a change with twice that lead time wold be "awfully quick." (Exhibit B at 147)

This Court should follow Ohio's and Louisiana's example and issue a stay to ensure that no execution occurs without due process of law.

<div align="center"><u>**CONCLUSION**</u></div>

The Court should stay Taylor's execution until he has meaningful notice of – and opportunity to challenge – Missouri's plan to take his life.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: February 18, 2014      By  *s/ Matthew B. Larsen*
                                        MATTHEW B. LARSEN
                                        Deputy Federal Public Defender

<div align="center">8</div>

# EXHIBIT A



BIG STORY    TOP NEWS    SPECIAL COVERAGE    ARCHIVE    ESPAÑOL    VIDEO

Feb 17, 10:20 PM EST

# OKLA. PHARMACY WON'T GIVE DRUG FOR MO. EXECUTION

**BY TIM TALLEY**

**ASSOCIATED PRESS**

OKLAHOMA CITY (AP) -- An Oklahoma pharmacy has
agreed not to provide Missouri with a made-to-order
drug for an inmate's execution scheduled for later this
month, according to court documents filed Monday.

According to the documents, The Apothecary Shoppe,
of Tulsa, will not prepare or provide pentobarbital or
any other drug for use in Michael Taylor's execution.
The documents ask a judge to dismiss the case that
Taylor's lawyers had filed against the pharmacy seeking
to stop it from providing the
execution drug. A hearing is
scheduled for Tuesday.



AP Photo/Anonymous

**US VIDEO**

Taylor's attorney, Matt Hellman,

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 10 of 331

said that as part of the deal, the pharmacy acknowledged it has not already provided any drug to the Missouri Department of Corrections for the execution, which is scheduled for Feb. 26.

East Wins NBA All-Star Game, Irving Na…





The department and the Missouri attorney general's office did not immediately return calls Monday night seeking comment about the agreement or the status of Taylor's execution.



Missouri Gov. Jay Nixon indicated last week that the state has drugs to carry out Taylor's execution. Nixon, speaking at a news conference Thursday, did not directly answer "yes" or "no" when asked about availability of the execution drug but said, "In order to complete that ultimate responsibility, that's necessary. The Department of Corrections is prepared to carry out that execution."

Taylor pleaded guilty to abducting, raping and stabbing to death a 15-year-old Kansas City girl in 1989.

The Apothecary Shoppe has not acknowledged that it supplies a compounded version of pentobarbital to Missouri for use in lethal injections, as Taylor says, and says it can't because of a Missouri law requiring the identities of those on the state's execution team to be kept confidential.

A message left seeking comment from the pharmacy Monday night was not immediately returned.

In his lawsuit, Taylor alleged that Missouri turned to The Apothecary Shoppe to supply compounded pentobarbital because the only licensed manufacturer of the drug refuses to provide it for lethal injections. That company, Illinois-based Akorn Inc., agreed to that condition when it bought the exclusive rights to

W

Las

\#

1

2

3

## INTERACTIVES

 **INSIDE THE TEXAS DEATH CHAMBER**

 **SUPREME COURT ORAL ARGUMENTS: IS LETHAL INJECTION UNCONSTITUTIONAL?**

 **ICONIC TEXAS EXECUTIONS**

 **VIEWS ON THE DEATH PENALTY: A GLOBAL PERSPECTIVE**

 **DEATH PENALTY BY STATE**

the drug in January 2012 from a Danish company that had produced it under the trade name Nembutal.

Taylor contends that several recent executions in which compounded pentobarbital was used showed it would likely cause him "severe, unnecessary, lingering and ultimately inhumane pain."

Within 20 seconds of receiving his lethal injection on Jan. 9 at the Oklahoma State Penitentiary, 38-year-old Michael Lee Wilson said: "I feel my whole body burning." This statement describes "a sensation consistent with receipt of contaminated pentobarbital," Taylor alleges.

The lawsuit also cites the Oct. 15, 2012, execution in South Dakota of Eric Robert. Robert, 50 cleared his throat, gasped for air and then snored after receiving the lethal injection, which included compounded pentobarbital. His skin turned a purplish hue and his heart continued to beat for 10 minutes after he stopped breathing, the lawsuit contends. It took 20 minutes for authorities to finally declare Robert dead.

"These events are consistent with receipt of a contaminated or sub-potent compounded drug," the lawsuit says.

Taylor's lawsuit questions whether the Tulsa pharmacy can legally produce and deliver compounded pentobarbital. It says the pharmacy is not registered as a drug manufacturer with the U.S. Food & Drug Administration and alleges that it violates federal law each time it delivers the drug across state lines to Missouri corrections officials.

© 2014 THE ASSOCIATED PRESS. ALL RIGHTS RESERVED. THIS MATERIAL MAY NOT BE PUBLISHED, BROADCAST, REWRITTEN OR REDISTRIBUTED. Learn more about our PRIVACY POLICY and TERMS OF USE.

## DOCUMENTS

 **LETTER REQUESTING A STAY OF EXECUTION FOR CLAUDE JONES**

 **THEN-GOV. GEORGE W. BUSH'S REPLY TO JONE'S REPRIEVE REQUEST**

 **OHIO STRUGGLES TO GET ADVICE ON LETHAL INJECTION**

 **NEBRASKA SUPREME COURT'S RULING ON THE ELECTRIC CHAIR (02/08/08)**

## LATEST NEWS

OKLA. PHARMACY WON'T GIVE DRUG FOR MO. EXECUTION

ARKANSAS JUDGE GRANTS REQUEST TO BLOCK EXECUTIONS

FLA. MAN EXECUTED IN BOY'S RAPE, MURDER

WASHINGTON GOV. JAY INSLEE SUSPENDS DEATH PENALTY

DEATH PENALTY: WHICH STATES HAVE IT, WHICH DON'T?

## BUY AP PHOTO REPRINTS



## MULTIMEDIA

 **DRUG WAR INTERACTIVE**

## La

CO
CO

Feb

WO
OL

Feb

HU
FR

Feb

FIN
HO

Feb

ELI
OL

Feb

©2013 The Associated Press.
All rights reserved. TERMS under which this site is provided.
Learn more about our PRIVACY POLICY.

# EXHIBIT B

Page 1

1                 IN THE UNITED STATES DISTRICT COURT

                    WESTERN DISTRICT OF MISSOURI

2                         CENTRAL DIVISION

3

4   DAVID ZINK, et al.,           )

                                  )

5           Plaintiffs,           )

                                  ) No. 2:12-CV-4209-BP

6   vs.                           )

                                  )

7   GEORGE A. LOMBARDI, et al.,   )

                                  )

8           Defendants.           )

9

10               DEPOSITION OF DAVE DORMIRE

               Taken on behalf of the Plaintiffs

11                    January 15, 2014

12                 Julie K. Kearns, CCR 993

13

14

15

16

17

18

19

20

21

22

23

24

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 15 of 331
Appellate Case: 14-1193    Page: 1    Date Filed: 01/28/2014 Entry ID: 4118269

```
 1   QUESTIONS BY:                                 PAGE

 2   Ms. Carlyle                                    10

 3   Mr. Hansen                                    140

 4   Ms. Carlyle                                   143

 5

 6                   INDEX OF EXHIBITS

 7

                                                   PAGE
 8

 9   1 - CD of discovery provided 1/9/14            5

10   2 - CD of discovery provided 12/27/13          6

11   5 - Page 8 of Exhibit 13 of Amended Complaint  65

12   6 - Page 7 or Exhibit 13 of Amended Complaint  71

13   7 - Affidavit of Dave Dormire                 111

14   8 - Bates pages AGO002405 and AGO00247         26

15   9 - Bates pages AGO002587 and AGO002680        26

16

17           (Whereupon the exhibits 1, 2, 5, 6 and 7 were

18           attached to the original and copies.  Exhibits 8

19           and 9 retained by counsel.)

20

21

22

23

24

25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 16 of 331
Appellate Case: 14-1193    Page: 2    Date Filed: 01/28/2014 Entry ID: 4118269

```
 1              IN THE UNITED STATES DISTRICT COURT

                   WESTERN DISTRICT OF MISSOURI

 2                       CENTRAL DIVISION

 3

 4   DAVID ZINK, et al.,            )

                                    )

 5         Plaintiffs,              )

                                    ) No. 2:12-CV-4209-BP

 6   vs.                            )

                                    )

 7   GEORGE A. LOMBARDI, et al.,    )

                                    )

 8         Defendants.              )

 9

10              DEPOSITION OF DAVE DORMIRE, produced, sworn, and

11   examined on the 15th day of January, 2014, between the

12   hours of one o'clock in the afternoon and seven o'clock in

13   the evening of that day, at Missouri Department of

14   Corrections, 2729 Plaza Drive, Jefferson City, Missouri,

15   before Julie K. Kearns, a Certified Court Reporter within

16   and for the State of Missouri, in a certain cause now

17   pending before the Circuit Court of the County of St.

18   Louis in the State of Missouri, wherein DAVID ZINK, et al.

19   is the Plaintiff, and GEORGE A. LOMBARDI, et al. is the

20   Defendant.

21

22

23

24

25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 17 of 331
Appellate Case: 14-1193    Page: 3    Date Filed: 01/28/2014 Entry ID: 4118269

```
 1                    A P P E A R A N C E S

 2

 3      For the Plaintiffs:

 4        Elizabeth Unger Carlyle, Esq.

          ELIZABETH CARLYLE LAW OFFICE

 5        6011 OAK STREET

          Kansas City, Missouri  64113

 6

 7      For the Defendants:

 8        David Hansen, Esq.

          Michael Spillane, Esq.

 9        Susan Boresi, Esq.

          MISSOURI ATTORNEY GENERAL'S OFFICE

10        211 West High Street

          Jefferson City, Missouri  65102

11

12      The Court Reporter:

13        Ms. Julie K. Kearns

          Midwest Litigation Services

14        3432 West Truman Boulevard, Suite 207

          Jefferson City, Missouri  65109

15        (573)636-7551

16

17

18

19

20

21

22

23

24

25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 18 of 331
Appellate Case: 14-1193   Page: 4   Date Filed: 01/28/2014 Entry ID: 4118269

1       IT IS HEREBY STIPULATED AND AGREED, by and

2  between counsel for Plaintiff and counsel for Defendant,

3  that this deposition may be taken in shorthand by Julie K.

4  Kearns, a Certified Court Reporter, and afterwards

5  transcribed into typewriting; and the signature of the

6  witness is expressly reserved.

7                      * * * * *

8       (Deposition started at 1:21 P.M.)

9       (Witness sworn.)

10       MS. CARLYLE:  Okay.  Before we -- before I begin

11  to question Mr. Dormire, let me see if I can -- if we can

12  get the reporter to mark Exhibit 1, which is a CD

13  containing discovery provided to plaintiffs by defendants

14  on Joe -- I believe it was sent July 9 and received

15  July 10.  Here it is.  It's the one you sent me.

16       MR. HANSEN:  Okay.  I mean, I will take your

17  word that that contains what we --

18       MS. CARLYLE:  Okay.

19       MR. HANSEN:  You know, obviously it's going to

20  be --

21       MS. CARLYLE:  If you want to look at it, it is,

22  in fact, the disk you sent me and it's read only, but I

23  can't have done anything to it.  But I didn't --

24       MR. HANSEN:  All I'm saying, for the record, is

25  I have not -- we haven't opened this disk up, we haven't

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 19 of 331
Appellate Case: 14-1193   Page: 5   Date Filed: 01/28/2014 Entry ID: 4118269

1  looked at the entire disk.  I have no reason to dispute

2  your representation that this is that very disk, so --

3          MS. CARLYLE:  Okay.

4          MR. HANSEN:  -- with that understanding, I'll

5  acknowledge that that is what's been marked as Exhibit 1.

6          MS. CARLYLE:  1.

7          (Exhibit No. 1 marked for identification.)

8          (Off the record.)

9          MR. HANSEN:  Back on the record.  Just to be

10  clear I think you had said that that disk was sent to you

11  on -- plaintiffs on July 9 of this year, which obviously

12  is not possible.  You meant January 9; is that correct?

13          MS. CARLYLE:  I did, indeed.  It was sent on

14  January 9 and received on January 10.

15          MR. HANSEN:  Correct.

16          MS. CARLYLE:  Yeah.  And Exhibit 2 is listed on

17  my list here as a disk containing the documents provided

18  on -- goodness.  I have no idea why I said 12-17-2004 on

19  there.  That was late last night.  This was a disk of

20  discovery -- okay.  Let me start over here.  On

21  December 30, 2013 -- on December 27, 2013, Ms. Boresi

22  handed me a disk containing discovery documents.

23  Subsequently, based on the Court's order of December 30,

24  2013, that disk was returned to the Department of

25  Corrections.  Actually, she handed me two and both of them

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 20 of 331
Appellate Case: 14-1193     Page: 6     Date Filed: 01/28/2014   Entry ID: 4118269

1    have been returned.

2         Today I have been told that that disk will be

3    reissued with its original page numbers, but that

4    redactions have been made on documents that were not

5    present on the previous disk.  The disk that -- and we are

6    hoping that that disk will be available today and if it

7    is, it will be Exhibit 2.  Is that a fair statement of

8    what we have been talking about, Mr. Hansen?

9         MR. HANSEN:  It is.  I just want to clarify the

10   record a little bit as well.  The production of documents

11   that was made by the Department of Corrections on

12   December 27 was withdrawn and it was destroyed by our

13   office and I believe the plaintiffs were directed to

14   destroy their copies as well.

15         MS. CARLYLE:  Return or destroy, basically.

16         MR. HANSEN:  The Department of Corrections then

17   went through those documents to ensure that all the

18   confidential information that should have been redacted

19   was, in fact, redacted and we then produced another set of

20   documents on -- which is the disk that you have identified

21   as Exhibit 1.

22         Two days ago, I believe it was two days ago,

23   Mr. Luby sent a letter expressing some concern that there

24   were fewer pages or there were pages missing on the second

25   set that were on Exhibit 1.  We conducted an inquiry to

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 21 of 331
Appellate Case: 14-1193     Page: 7     Date Filed: 01/28/2014 Entry ID: 4118269

1  see whether that was the case. As I explained by e-mail

2  to the plaintiffs earlier this morning and as I explained

3  by telephone to Miss Carlyle last night and to Mr. Luby

4  yesterday, it was determined that the reason for the

5  different number of pages was that, in going through the

6  documents a second time, they identified duplicates and

7  blank pages and removed those pages, which resulted in a

8  different number of pages being produced.

9          In order to alleviate any concerns the

10  plaintiffs may have that some documents were missing, the

11  Department of Corrections last night went through the

12  original set that was produced on December 27, redacted

13  what was necessary in that set and we then have produced

14  that set for plaintiffs here this morning.

15          You -- we won't mark it as an exhibit, but you

16  have those pages, which are identified as pages beginning

17  with AG000639 all the way through AG002514. So we

18  produced a hard copy of all those documents today and then

19  we are working on right now scanning all those documents

20  so that they will be on a disk which will be provided to

21  you hopefully before the close of the deposition today,

22  and that disk is the disk that you are going to mark as

23  Exhibit 2; is that correct?

24          MS. CARLYLE: That's correct. I guess I have

25  one question for you because I'm a little confused. I

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 22 of 331
Appellate Case: 14-1193   Page: 8   Date Filed: 01/28/2014 Entry ID: 4118269

1   thought you said that the original discovery was withdrawn

2   and destroyed and then you said that you reviewed the

3   original discovery in order to make further redactions and

4   I'm a little confused about what it was that was destroyed

5   and what you then rereviewed a couple of days ago.

6           MR. HANSEN:  I said -- to be clear, I said that

7   our office destroyed the redacted copies.  So the Attorney

8   General's Office destroyed and deleted the files that we

9   had.

10          MS. BORESI:  The electronic copy.

11          MR. HANSEN:  The electronic copy.  The

12  Department of Corrections did maintain that original --

13  that original Bates-stamped numbered production that was

14  produced and then withdrawn.

15          MS. CARLYLE:  Okay.

16          MR. HANSEN:  So they had the disk, they had the

17  ability then to just print that off again, go through it

18  and redact it.  So it is the -- it is the same -- they are

19  the same pages, the same documents that were produced on

20  December 27 but then withdrawn.

21          MS. CARLYLE:  Thank you.

22                  DAVE DORMIRE,

23  of lawful age, being produced, sworn and examined on

24  behalf of the Plaintiffs, deposes and says:

25                  EXAMINATION

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 23 of 331
Appellate Case: 14-1193   Page: 9   Date Filed: 01/28/2014   Entry ID: 4118269

1    QUESTIONS BY MS. CARLYLE:

2        Q.    Okay.  Mr. Dormire, I think we're now finally

3    ready for you.

4        A.    Sure.

5        Q.    And as you know, I've taken your deposition

6    before and I think got some pretty -- some basic

7    information about you, so I won't ask about that again.

8    Let me go directly to some questions about the

9    interrogatory responses that have been filed on your

10   behalf.  Let me ask you what your -- well, did you draft

11   the responses to interrogatories that you signed?

12       A.    Your question is do I draft them sometimes?

13       Q.    Do you draft them -- do you draft the ones you

14   sign?  Did you draft the responses?

15       A.    Generally.  Generally, yes.

16       Q.    Okay.  So you draft -- it wasn't a matter of

17   someone drafting them for you and asking them to review

18   you -- review them, you drafted them yourself?

19       A.    It happens both ways, but generally I draft my

20   own interrogatories.

21       Q.    Okay.  Now, with respect to a number of them,

22   you stated that you have no knowledge of the answer.  What

23   steps, if any, did you take to find out the answers to

24   those interrogatories?

25       A.    On those -- when I answered that I had no -- if

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 24 of 331
Appellate Case: 14-1193   Page: 10   Date Filed: 01/28/2014 Entry ID: 4118269

1   I had no direct knowledge, I didn't take steps to obtain

2   additional information.

3       Q.   **Have you made any attempts to supplement your**

4   **responses to -- I understand that you just recently**

5   **responded to interrogatory set number one and -- number**

6   **three and number four.  First of all, have you ever**

7   **responded to interrogatories number two?**

8       A.   I don't know the numbers on those

9   interrogatories.  I'll remember the questions, but I don't

10  know the numbers of those.

11      Q.   **Okay.  Have you supplemented --**

12          MR. HANSEN:  I'm going to -- I just want to make

13  a point on the record.  It's my understanding that we

14  don't have interrogatory -- an interrogatory number two;

15  is that right?

16          MS. CARLYLE:  I'm sorry, I'll turn this off.  I

17  apologize.  So your position is that you were never served

18  with plaintiff's second set of interrogatories?

19          MR. HANSEN:  I'm not saying that.

20          MS. CARLYLE:  Okay.

21          MR. HANSEN:  What I'm saying is that we have

22  been unable to find or locate interrogatory number two.

23          MS. CARLYLE:  Okay.

24          MR. HANSEN:  If there exists an interrogatory

25  number two that you sent us that you would like to have

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 25 of 331
Appellate Case: 14-1193   Page: 11   Date Filed: 01/28/2014 Entry ID: 4118269

1  answered and you contend that has not been answered, if

2  you'd provide it to us, we'll do that.

3          MS. CARLYLE:  Okay.

4      **Q.  (By Ms. Carlyle) Have you supplemented your**

5  **responses to the interrogatory set number one?**

6          MR. HANSEN:  Objection, form of the question,

7  lack of foundation.

8      **Q.  (By Ms. Carlyle) Go ahead and answer if you --**

9      A.   I'm not -- I'm not sure that I understand.

10     **Q.   Okay.**

11     A.   If you asked me additional questions, I would

12  have answered those, to the best of my ability.

13     **Q.   Okay.  No, that's not what I'm -- that's not**

14  **what I'm asking about.  Once you have answered a set of**

15  **interrogatories, do you acknowledge that you are under an**

16  **obligation to supplement those answers with further**

17  **information if the information you provided changes?**

18          MR. HANSEN:  Again, I'm going to object to the

19  form of the question.  It calls for a legal conclusion

20  that I'm not sure this witness is qualified to answer.

21     A.   My answer to that would be I -- when I answer

22  interrogatories, I answer them to my knowledge at the

23  time.  I don't know exactly what the circumstance would be

24  where I would become aware of -- I might become aware of

25  something later, but if I -- I guess potentially if I

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 26 of 331
Appellate Case: 14-1193   Page: 12   Date Filed: 01/28/2014 Entry ID: 4118269

1  misanswered something and became knowledged, I would

2  acknowledge that.

3      Q.  (By Ms. Carlyle) No, I'm actually talking about

4  answering them later because things have changed.  For

5  example, if you said these are the dates -- as you did,

6  these are the dates of the trainings that we've had for

7  executions as of the time of this answer --

8      A.  I see.

9      Q.  -- and you're asked when are the trainings of

10 executions --

11     A.  Yes.

12     Q.  -- then later on, that answer would change if

13 you were to answer it that day because there would have

14 been more trainings.  Are you with me?

15     A.  Yes.

16     Q.  Okay.  So my question to you is have you ever

17 attempted to revise your answers not because you made a

18 mistake the first time, I'm not suggesting that, but to

19 take account of new information that's responsive to those

20 interrogatories that wasn't responsive at the time you

21 made your first responses?

22     A.  No.

23     Q.  Okay.  In response to the first question in the

24 third set of interrogatories, which was, "For the

25 execution protocol and affidavit issued on October 22 of

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 27 of 331
Appellate Case: 14-1193   Page: 13   Date Filed: 01/28/2014 Entry ID: 4118269

1  **2013, identify all persons involved in the lethal**

2  **injection protocol team describing in detail each person's**

3  **roles and tasks in developing a protocol."  That was the**

4  **question.**

5          MR. HANSEN:  Before you ask a specific question,

6  could I -- could you give me a minute to either find that

7  or get a copy of it?  Are you talking about Defendant

8  Dormire's answers to the third set of interrogatories?

9          MS. CARLYLE:  I am.  I'm on page six.

10          MR. HANSEN:  Okay.  Thank you.

11     Q.  **(By Ms. Carlyle) And the term "lethal injection**

12  **protocol team" is actually defined in the interrogatories.**

13  **It's defined on page seven and -- it's defined on page**

14  **four, it's definition seven.**

15          MR. HANSEN:  Can I just ask if you're going to

16  ask him questions about his interrogatory answers that we

17  get him a -- do you have a copy for him or that he can see

18  a copy of it?

19          MS. CARLYLE:  He can certainly see a copy of it.

20  I think -- yeah, let me give him this copy and I'll put it

21  up on my screen.

22          MR. HANSEN:  Okay.

23          MS. CARLYLE:  It will take me just a second.

24          MR. HANSEN:  Will you be using it as an exhibit

25  or are you just going to ask him a question?

1          MS. CARLYLE:  I'm just going to ask him a

2    question.

3        Q.  (By Ms. Carlyle) The question concerns the lethal

4    injection protocol team, and if you look at definition

5    seven on page four, that means any and all persons or

6    entities involved in the research into and assessment and

7    development of a lethal injection protocol for the

8    Missouri Department of Corrections from 2010 on.

9            In response to that -- to that interrogatory,

10   you said on page six that you are aware of Matt

11   Briesacher, Mr. Lombardi, yourself and Melissa Scheulen.

12   Are those the people who are currently involved in

13   developing lethal injection protocols or is that everybody

14   since 2010?

15       A.  It's not everyone since 2010.  It is the people

16   that were involved in the most recent protocol.

17       Q.  So Mr. Larkins wasn't involved in that protocol?

18       A.  Pardon?

19       Q.  Mr. Larkins, Steve Larkins wasn't involved in

20   that protocol?

21       A.  In this, no.

22       Q.  What about M3?

23       A.  M3, to my knowledge, was not involved in the

24   protocol.

25       Q.  Who -- let's see here.  You say in your

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 29 of 331
Appellate Case: 14-1193     Page: 15     Date Filed: 01/28/2014 Entry ID: 4118269

1    response, "The Department determined that the state of

2    Ohio's use of five grams of Pentobarbital represented the

3    best approach to resolving the request that we stop

4    utilizing Propofol."  The Department, of course, doesn't

5    make any determinations as an entity, so who made that

6    determination?

7        A.    Mr. Briesacher did most of the research on that.

8        Q.    Who decided, though?

9        A.    I believe the department director makes the

10   final decision on it.

11       Q.    That's Mr. Lombardi?

12       A.    Yes.

13           MS. CARLYLE:  Okay.  Now I think we have a minor

14   logistical problem in that he needs to look at a page

15   that's on Exhibit 1, which I actually have a paper set of

16   that exhibit in my car, which I can bring in and maybe

17   that's the thing to do.

18           MR. HANSEN:  I think it would be -- I think it

19   would be better and clearer to give him the actual

20   document, then mark it and attach it as an exhibit to the

21   deposition.

22           MS. CARLYLE:  Okay.

23           MR. HANSEN:  Rather than -- I think it would be

24   a lot easier for anybody that reads the deposition than

25   searching a disk, don't you?  I mean, that's what I would

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 30 of 331
Appellate Case: 14-1193   Page: 16   Date Filed: 01/28/2014 Entry ID: 4118269

1    suggest.

2            MS. CARLYLE:  I think everybody who is going to

3    look at it is going to look at -- pretty much is going to

4    look at it electronically, but in any event, okay.  So I

5    guess -- I mean, unless there's a paper copy in the

6    building, I can go get one.  Do you want me to do that or

7    is there one here?

8            MR. HANSEN:  Are you going to be using other

9    pages --

10           MS. CARLYLE:  Oh, yeah.

11           MR. HANSEN:  -- from that?  I'd say let's just

12    take a break for a minute and go get the papers.

13           MS. CARLYLE:  Okay.  I'll go do it.

14           (Break in proceedings.)

15       Q.  **(By Ms. Carlyle) Okay.  We're back on the record**

16    **and I have placed before Mr. Dormire a set of documents**

17    **which I am confident is a printout of the information**

18    **contained on Exhibit 1, which is the CD.  And I'd ask you,**

19    **if you will, Mr. Dormire, to pull out pages 2246 through**

20    **49.**

21           MR. HANSEN:  Did you say 2246?

22           MS. CARLYLE:  Yes.

23       A.  Okay.  I think I have those.

24       Q.  **(By Ms. Carlyle) Okay.**

25       A.  Yes.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 31 of 331
Appellate Case: 14-1193   Page: 17   Date Filed: 01/28/2014 Entry ID: 4118269

1    Q.   Let me ask you if this -- if the -- well, first

2    of all, let me ask you what this document is, I guess

3    would be the first question.

4    A.   This is labeled as Missouri Department of

5    Corrections, Preparation and Administration of Chemicals

6    for Lethal Injection.

7    Q.   Is it, in fact, a document that's been used now

8    as Department policy?

9    A.   Say that --

10    Q.   Is it, in fact, a document that's being used

11    now?  Does it reflect the current Department practice and

12    policy?

13        MR. HANSEN:  If you need a minute -- were you

14    asking if that's the execution protocol that's currently

15    in effect?

16        MS. CARLYLE:  I guess my question is -- well, we

17    can start with that.  That's a good first question.

18    Q.   (By Ms. Carlyle) Is that the execution protocol

19    that's currently in effect?

20    A.   No.

21    Q.   Okay.  Then what is it?

22    A.   It is -- I don't even know if it was one of the

23    ones we proposed -- we proposed -- it looks similar, but I

24    don't know that it is one of the ones that we submitted.

25    Q.   Submitted to?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 32 of 331
Appellate Case: 14-1193   Page: 18   Date Filed: 01/28/2014 Entry ID: 4118269

```
 1       A.   As an official protocol for our department.

 2       Q.   So you don't know whether this is the official

 3  execution protocol or not?

 4       A.   I know it's not the current one we have right

 5  now.

 6       Q.   Okay.  Let me draw your attention to page 2247,

 7  to the portion of the document that begins with small B

 8  and ask you to just go ahead and read from there down to

 9  intravenous lines.

10       A.   "If the department director determines that a

11  sufficient quantity" --

12       Q.   I'm sorry.  You don't need to read it out loud.

13       A.   Oh, I thought you were asking me to read it.

14       Q.   That's fair.  No, I won't put you through that.

15       A.   Okay.

16       Q.   Okay.  Is it fair to say that that subsection B

17  deals with an execution procedure which would utilize not

18  Pentobarbital, but Midazolam and Hydromorphone?

19       A.   Yes.

20       Q.   Is that something that the Department is now

21  prepared to do?

22       A.   No.

23       Q.   Okay.  Does the Department now maintain supplies

24  of Midazolam or Hydromorphone for execution purposes?

25       A.   No.
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 33 of 331
Appellate Case: 14-1193    Page: 19    Date Filed: 01/28/2014 Entry ID: 4118269

1          MR. HANSEN:  Hang on just a second, please.

2          MS. CARLYLE:  Sure.

3          MR. SPILLANE:  Go ahead.

4     **Q.   (By Ms. Carlyle) So can you -- what can you tell**

5  **me about how this -- or when was this document prepared?**

6          MR. HANSEN:  Objection.  Well, go ahead.

7     A.   I do not know the date.  Sorry.

8     **Q.   (By Ms. Carlyle) Do you know who prepared it?**

9     A.   It would have been prepared primarily by

10 Mr. Briesacher and my administrative assistant.

11    **Q.   Okay.  And actually, if you continue in your**

12 **pile of documents there and start looking at page**

13 **AGO002250.**

14         MR. HANSEN:  Sorry, I didn't hear the first part

15 of that.

16    **Q.   (By Ms. Carlyle) AGO2250 through 225 -- there**

17 **seems to be a lot of them -- 2267, do those appear to be**

18 **various versions of the same document?**

19    A.   Yes.

20    **Q.   Okay.  And does seeing that refresh your memory**

21 **at all about when or why this was prepared?**

22    A.   No.

23    **Q.   Going back to page 2246, which lists the**

24 **execution team members, do those -- do the execution team**

25 **members listed on that document include any supplier of**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 34 of 331
Appellate Case: 14-1193   Page: 20   Date Filed: 01/28/2014 Entry ID: 4118269

1    any chemical?

2        A.   On page 46?

3        Q.   2246.

4        A.   No.  It mentions manufacturer, distributor or

5    compounding pharmacy.

6        Q.   Right.  But under subsection A it says that

7    the -- it says who the execution team members are,

8    describes them, not -- doesn't give their names, but

9    describes them, correct?

10       A.   Oh, yes.

11       Q.   Okay.  And does it describe supplier of any sort

12   as a -- an execution team member?

13       A.   No.

14       Q.   Does it describe any testing laboratory as an

15   execution team member?

16       A.   No.

17       Q.   Does it describe any physician writing

18   prescription as an execution team member?

19       A.   No.

20       Q.   Now, the protocol that's in effect today

21   includes those persons as execution team members, persons

22   or entities as execution team members, doesn't it?

23       A.   Yes.

24       Q.   When was it decided to add those people to the

25   execution team designation?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 35 of 331
Appellate Case: 14-1193     Page: 21     Date Filed: 01/28/2014 Entry ID: 4118269

1      A.   I don't know the exact date.  It was during the

2  preparation for the last protocol.

3      Q.   Okay.  Who made that decision?

4      A.   That was a decision -- obviously, Mr. Briesacher

5  was involved, myself, Director Lombardi.

6      Q.   Okay.  Now, you've said that this -- that this

7  protocol we've been looking at that provides for an

8  alternative to Pentobarbital is not a protocol that's

9  currently in use by the Department; is that right?

10      A.   That's correct.  That's correct.

11      Q.   Does -- at this point does the Department of

12  Corrections have any, for want of a better term, backup

13  plan if Pentobarbital wasn't available?

14      A.   We don't have a formal plan, no.

15      Q.   Okay.  Do you have an informal plan?

16      A.   We always explore all options and watch what

17  other states are doing.

18      Q.   Has any decision been made as to what the next

19  plan would be?

20      A.   No.

21      Q.   Let's see here.  Mr. Dormire, I'm going to hand

22  you what's -- hand you a copy of your answers to

23  plaintiff's fourth set of interrogatories.

24      A.   Okay.

25      Q.   And -- wait a minute.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 36 of 331
Appellate Case: 14-1193    Page: 22    Date Filed: 01/28/2014 Entry ID: 4118269

EXHIBIT B

1            MR. HANSEN:  There's not a question on the

2    floor?

3            MS. CARLYLE:  There is not a question on the

4    floor.

5            MR. HANSEN:  I just wanted to make sure I didn't

6    miss something.

7            MS. CARLYLE:  I'm actually trying to pull up

8    what Mr. Dormire is looking at.  And I apologize.

9            MR. HANSEN:  You want to see my copy?

10           MS. CARLYLE:  I think I've got it.  Here we go,

11   but thank you.

12      **Q.  (By Ms. Carlyle) Okay.  Let me draw your**

13   **attention to the bottom of page five, which is -- which**

14   **the question was asked was there a non-public protocol for**

15   **the execution of Plaintiffs Joseph Franklin and Allen**

16   **Nicklasson and your answer was no.  This morning I was**

17   **given two sets of documents which I thought were**

18   **identified as the non-public protocols for the executions**

19   **of Allen Nicklasson and Joseph Franklin, so obviously**

20   **there's some misunderstanding here.  Is that what they are**

21   **or would you characterize this -- the documents I received**

22   **this morning as something else?  And if you'd like to look**

23   **at them, I think we're over here somewhere, right?**

24           MS. CARLYLE:  The documents you were showing me

25   this morning.

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 37 of 331
Appellate Case: 14-1193     Page: 23     Date Filed: 01/28/2014 Entry ID: 4118269

1          MR. HANSEN:  Yes.

2          THE WITNESS:  You're talking security procedures

3  versus protocol.

4          MS. CARLYLE:  Well, can you hand me what I

5  looked at this morning?

6          MR. HANSEN:  Yeah.  I'm not sure, Elizabeth.  I

7  suspect that the question may have been interpreted --

8          MS. CARLYLE:  Well, we'll see.

9          MR. HANSEN:  -- meaning a protocol using a

10  different drug as opposed to the --

11          MS. CARLYLE:  Okay.

12          MR. HANSEN:  I'm not sure the same terms were

13  being used by both parties.

14          MS. CARLYLE:  Well, we'll find out, won't we?

15      **Q.  (By Ms. Carlyle) And I guess we need to -- I**

16  **guess the only way to make -- for this to make any sense**

17  **is let's go ahead and mark those as Exhibits 8 and 9.**

18          MR. HANSEN:  And we do need to --

19          MS. CARLYLE:  And we need to --

20          MR. HANSEN:  -- acknowledge at this point that

21  this portion of the deposition should be marked as

22  confidential.

23          MS. CARLYLE:  Okay.

24          (Non-confidential portion of the transcript

25          ends.)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 38 of 331
Appellate Case: 14-1193     Page: 24     Date Filed: 01/28/2014 Entry ID: 4118269

 1 ████████████████████████████  ████████████████

 2 ██████████████.

 3     A.    ████████████████████████████.

 4     Q.  (By Ms. Carlyle) Well, do you have knowledge of

 5 it -- have you heard something about it?

 6     A.   I --

 7         MR. HANSEN:  I'm going to object to this

 8 question because it could potentially reveal the identity

 9 of the pharmacy, so --

10         MS. CARLYLE:  Well, I mean, I suppose if that's

11 true, anything could.  I mean, I could ask him -- you

12 know, I could -- you know, knowing whether -- there are

13 presumably any number of pharmacies that have supplied

14 prisons.

15         MR. HANSEN:  You can get that information from

16 other sources or from them, but you can't get it through

17 this witness.

18         MS. CARLYLE:  Okay.  So you're directing him not

19 to answer the question has the pharmacy provided execution

20 drugs for other prisons.

21         MR. HANSEN:  He's told you he personally doesn't

22 know.  Beyond that, I'm going to direct him not to answer

23 that question.

24         MS. CARLYLE:  Okay.

25         MR. HANSEN:  And I will note that we have

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 59 of 331
Appellate Case: 14-1193   Page: 45   Date Filed: 01/28/2014 Entry ID: 4118269

1  offered -- for the record, we have offered to make the

2  pharmacy available for a deposition and at this point you

3  have declined.  So you can get those answers directly from

4  that pharmacy as well.

5      MS. CARLYLE:  Okay.

6      Q.  (By Ms. Carlyle)  How did -- what steps did the

7  Department -- did you or anyone else at the Department of

8  Corrections, to your knowledge, take to determine the

9  reliability or -- you know, of the pharmacy?  The

10  reliability of the pharmacy, the quality of its work and

11  the likelihood that it would do what -- that it would

12  fulfill its contract.

13      A.  I know Mr. Briesacher did some research.  To

14  what extent, I do not know.

15      Q.  Okay.  It's beginning to look like we may end up

16  deposing Mr. Briesacher, but that's another day.  Did you

17  or anyone else in the Department of Corrections inspect

18  the pharmacy?

19      A.  I did not.

20      Q.  Did you or anyone -- well, did anyone for the

21  Department of Corrections inspect the pharmacy?

22      A.  I don't know of anyone else that inspected.

23      Q.  Would you expect to know if someone went to see

24  the pharmacy?

25      A.  I don't know that I'd know, but I don't have any

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 60 of 331
Appellate Case: 14-1193     Page: 46     Date Filed: 01/28/2014 Entry ID: 4118269

EXHIBIT B

1    personal knowledge that anyone did.

2        Q.   Well, did -- did you or -- did you conduct any

3    investigation into the pharmacy's licenses and

4    registration with governmental agencies?

5        A.   I did not do any investigation, no.

6        Q.   Did anyone in the Department of Corrections do

7    that?

8        A.   I can't speak for what Mr. Briesacher did.  I

9    know he did research.

10       Q.   Do you know whether the pharmacy has ever been

11   inspected by the federal Food and Drug Administration?

12       A.   I don't know that myself, no.

13       Q.   Do you know whether it's registered or plans to

14   register under the new drug compounding law under which it

15   could register as an outsourcing facility if it qualified

16   under the provisions of that law?

17       A.   I don't know that.

18       Q.   Does the pharmacy -- has the pharmacy

19   communicated to you that it adheres to the good

20   manufacturing practices promoted by the pharmacy industry?

21           MR. HANSEN:  Objection, form of the question,

22   lack of foundation.

23       A.   I don't -- I don't have any knowledge of that,

24   no.

25   ██  █████████████████████████████████████████

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 61 of 331
Appellate Case: 14-1193   Page: 47   Date Filed: 01/28/2014 Entry ID: 4118269

1　████████████████████████████████████

2　████████████████████████████?

3　　████　████████████████████

4　　　　Q.　**Can you explain the difference between**

5　**compounded Pentobarbital and manufactured Pentobarbital?**

6　　　　A.　The difference?

7　　　　Q.　**Uh-huh.**

8　　　　A.　Not in real specific terms, no.

9　　　　Q.　**Well, in whatever terms you can explain it in.**

10　　　　A.　Well, I have a general knowledge of what

11　compounding is and that is the mixing, compounding of

12　chemicals to produce the substance.

13　　　　Q.　**So is compounded Pentobarbital identical to**

14　**manufactured Pentobarbital?**

15　　　　A.　I don't know that.

16　　　　Q.　**Okay.  How many pharmacists or other individuals**

17　**at the compounding pharmacy are involved with the**

18　**compounding of the Pentobarbital?**

19　　　　　　MR. HANSEN:  Objection, form of the question,

20　lack of foundation.

21　　　　A.　I do not know.

22　　　　Q.　**(By Ms. Carlyle) Do you know whether there's more**

23　**than one?**

24　　　　A.　No, I don't.

25　　　　Q.　**Where do the active pharmaceutical ingredients**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com　　　**Phone: 1.800.280.3376**　　　**Fax: 314.644.1334**
Case 2:12-cv-04209-BP　Document 353　Filed 02/18/14　Page 62 of 331
Appellate Case: 14-1193　Page: 48　Date Filed: 01/28/2014 Entry ID: 4118269

1    in the compounded Pentobarbital come from?

2        A.    Pardon?

3        Q.    Where do the active pharmaceutical ingredients

4    in the Pentobarbital that's been delivered come from?

5        A.    I do not know.

6        Q.    Do you know whether they're from facilities

7    approved by the Food and Drug Administration?

8        A.    I do not know.

9        Q.    To your knowledge, has anyone at the Department

10   of Corrections made any effort to find out whether the

11   active pharmaceutical ingredients come from licensed and

12   approved facilities?

13       A.    Again, I do not know the research that was done.

14       Q.    So I'm clear, who does Mr. Briesacher report to

15   in the Department of Corrections?

16       A.    Mr. Briesacher is Chief Counsel.  I believe he

17   reports directly to Director Lombardi.

18       Q.    Thank you.  Let me ask you to pull out of your

19   piles over there page 1305 and I will get it, too.

20       A.    Okay.

21            MR. HANSEN:  And just so we're clear in the

22   record, he is pulling out a page number from what's been

23   identified as Exhibit 1, which is a disk in discovery.

24            MS. CARLYLE:  That's correct.  Thank you.  I

25   appreciate that.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 63 of 331
Appellate Case: 14-1193    Page: 49    Date Filed: 01/28/2014 Entry ID: 4118269

EXHIBIT B

1    Q.   (By Ms. Carlyle) Page 1305 of Exhibit 1.  Let me

2   ask you, first of all, to tell me what that is.

3    A.   That's a memorandum to myself from Gary Stoll,

4   Fiscal and Administrative Manager.

5    Q.   So Gary Stoll is the fiscal administrative

6   manager of what?

7    A.   For the Department of Corrections.

8    Q.   Okay.  Did you request that authorization from

9   Mr. Stoll?

10    A.   No.  He provided this to me.  I believe in -- he

11   provided this to me.

12    Q.   Right.  Did he provide it to you at your

13   request, though?

14    A.   No.

15    Q.   Okay.  The memorandum refers to the volatile

16   nature of the pharmaceutical market.  Can you tell me what

17   that means?

18    A.   The only way I can explain it is to say that

19   it's describing it's volatile in pricing and product

20   availability.

21    Q.   Do you think that a hospital would find the

22   market for Pentobarbital volatile?

23    A.   I don't --

24        MR. HANSEN:  Objection, form of the question,

25   lack of foundation, calls for speculation.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 64 of 331
Appellate Case: 14-1193    Page: 50    Date Filed: 01/28/2014 Entry ID: 4118269

EXHIBIT B

1      A.   I don't have a personal knowledge of that.

2      **Q.  (By Ms. Carlyle) If you did not have the**

3  **authorization provided in this memorandum, how would the**

4  **procedure for obtaining bids for the procurement of**

5  **pharmaceuticals be different than it was?**

6      A.   If I did not have this memo?

7      **Q.   Uh-huh.  What did the memo change, I guess is**

8  **what I'm asking?**

9      A.   I'm implying from here that it would require

10  written bids.

11      **Q.   You're implying -- you're --**

12      A.   I don't have personal knowledge, but it would --

13      **Q.   This memo talks about the -- that it's not**

14  **always possible to have written bids.  I would assume from**

15  **this memo that normally written bids are the procedure.**

16  **So you wouldn't be involved in getting such bids normally?**

17      A.   Normally I'm not, no.

18      MS. CARLYLE:  Okay.  Let me suggest at this

19  point that maybe we should take a break.

20      MR. HANSEN:  That's fine.  For the record, we've

21  been going just a little -- I guess an hour and a half.

22      MS. CARLYLE:  All right.

23      MR. HANSEN:  A good time for a break.

24      MS. CARLYLE:  I guess partly because I had

25  asked -- partly because I need a break and partly because

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 65 of 331
Appellate Case: 14-1193   Page: 51   Date Filed: 01/28/2014 Entry ID: 4118269

```
1    I had asked Mr. Dormire to fetch some documents and this

2    will give him an opportunity to do that because I was

3    about to start asking about them.

4            MR. HANSEN:  Okay.

5            MS. CARLYLE:  Okay.

6            (Break in proceedings.)

7        Q.  (By Ms. Carlyle) Let me ask you, Mr. Dormire,

8    were you able to locate the documents to answer the

9    question about who the other two pharmacies were that

10   weren't able to supply the Pentobarbital?

11       A.  Yes.

12   ██    ███████████████

13   ██    ████████████████████████████

14   ████████  ████████████████████████

15   █████████████████

16       Q.  Okay.  And how did you happen to be talking to

17   those two pharmacies?

18       A.  I looked up their phone number in the Yellow

19   Pages.

20       Q.  Okay.  What were you looking for in the Yellow

21   Pages?  What category were you --

22       A.  Just pharmacies.

23       Q.  Pharmacies, okay.  Let me ask you to pull out of

24   your set of documents there, which are the documents that

25   are paper copies of the documents on the disk which is
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14   Page 66 of 331
Appellate Case: 14-1193    Page: 52    Date Filed: 01/28/2014 Entry ID: 4118269

1    Exhibit 1, I'd ask you to look at page 1292, please.

2        A.   Okay.

3        Q.   Okay.  This document has some redactions,

4    doesn't it?

5        A.   Yes.

6        Q.   Can you tell us what categories of information

7    are redacted?  I'm not asking you to say what it said

8    before -- after -- before it was redacted, but what sort

9    of thing was redacted?  Was it names, was it numbers, what

10   was redacted?

11       A.   Names and phone numbers.

12       Q.   Names and phone numbers of what sort of --

13       A.   Of pharmacies.

14       Q.   Of pharmacies.  Okay.  So on this document you

15   redacted not only the pharmacy that gave you a bid, but

16   the pharmacies that didn't, correct?

17       A.   Yes.

18       Q.   Why did you do that?

19            MR. HANSEN:  I'll object to the form of the

20   question and lack of -- for lack of foundation at this

21   point.  Go ahead and answer that if you can.

22       A.   I didn't do the redaction on this one, but

23   I'm -- I can't give you a direct answer.

24       Q.   (By Ms. Carlyle) Okay.  Who did the redaction?

25       A.   Either my administrative assistant or

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 67 of 331
Appellate Case: 14-1193   Page: 53   Date Filed: 01/28/2014 Entry ID: 4118269

1    Mr. Briesacher.

2        **Q.   Did you review the redactions after they were**

3    **done to see if you agreed with them?**

4        A.   I did not review redactions to see if I agreed

5    with them, no.

6        **Q.   Did you review them at all?**

7        A.   I reviewed most of the paperwork that was

8    redacted, yes.

9        **Q.   Okay.  And what was the purpose of your review**

10   **if it wasn't to determine --**

11       A.   To try to ensure that we weren't releasing

12   information that we shouldn't.

13       **Q.   So did you feel there was any responsibility to**

14   **determine that information that should be available to the**

15   **other side should be -- should not be redacted?**

16       A.   My only purpose was to look to make sure we

17   weren't identifying the individuals that by statute we

18   can't identify.

19       **Q.   Was there anyone whose function it was to make**

20   **sure that all publicly -- all information that should be**

21   **available to the parties -- to the opposing parties was**

22   **made available and not redacted?**

23       A.   The purpose of the redaction that I saw was to

24   protect Social Security numbers and other identifying

25   information of individuals.

1     Q.    Well, we'll get to those, too.

2     A.    Okay.

3     Q.    But I guess what I'm saying is was there anyone

4  who approached the redaction task with the idea we

5  shouldn't redact anything we don't have to because these

6  are documents that would ordinarily be in the public

7  domain or at least be relevant to the parties?

8     A.    I don't know that I can answer that question.

9     Q.    Okay.  There is, however, some information

10  redacted on page 1292 which you've just given me, correct?

11     A.    Yes.

12     Q.    Now, the -- first of all, why don't you just say

13  for the record what is page 1292 a copy of?

14     A.    It is called a State of Missouri Office of

15  Administration Bid Record Form.

16     Q.    And is that a form that you filled out?

17     A.    Yes.

18     Q.    Is it a form you frequently fill out?

19     A.    No.

20     Q.    Why did you fill out -- why did you get the job

21  of filling out this one?

22     A.    I believe it was to keep as confidential the

23  information that we needed to keep confidential.

24     Q.    Okay.  So there are -- on this bid record there

25  are three pharmacies or three, I guess, contact attempts

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 69 of 331
Appellate Case: 14-1193   Page: 55   Date Filed: 01/28/2014 Entry ID: 4118269

1    listed, correct?

2        A.   Yes.

3        Q.   Two of them say that the Pentobarbital was not

4    available, correct?

5        A.   Correct.

6        Q.   And the third one provides a price of $8,000?

7        A.   Yes.

8        Q.   Was that the only bid you got for Pentobarbital?

9        A.   Yes.

10       Q.   Was there -- is there any requirement that you

11   have more than one bid before making such a purchase?

12       A.   We have to make contact with three potential

13   sellers.

14       Q.   But you don't have to obtain more than one

15   actual quote?

16       A.   No.

17       Q.   Okay.  Once you obtained this bid, did anyone

18   attempt to negotiate about price or anything else with

19   that pharmacy?

20       A.   I did not.

21       Q.   Did anyone else?

22       A.   I don't know that anyone else did.

23       Q.   Okay.  Let me ask you to pull up page 12 -- or

24   get in front of you page 1263.  While -- actually, there

25   are three pages I'd like for you to look at because I

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 70 of 331
Appellate Case: 14-1193     Page: 56     Date Filed: 01/28/2014 Entry ID: 4118269

1    think they're the same thing and we're going to try to

2    confirm that.  1263, 1283 and 1298.

3           MR. HANSEN:  63, 83?

4           MS. CARLYLE:  And 98.

5       A.   Okay.

6       Q.   (By Ms. Carlyle) Are those, in fact, three copies

7    of the same document?

8       A.   No.

9       Q.   Okay.  What are the differences or have I given

10   you the wrong page number, which I am capable of doing?

11      A.   Well, 1298 is a Confidential Execution Team

12   Member Receipt.

13      Q.   Oh, okay.  I'm sorry.  Hang on.

14      A.   1263 and 1283 are dated the same date and appear

15   to be worded the same, but they're not the same documents.

16      Q.   And, actually, the third one to look at is 1299.

17      A.   Okay.

18      Q.   So what are the differences between 1299, 1263

19   and 1298 (sic)?

20      A.   1299 has a different date on it.  It appears to

21   be worded the same.  All three are -- the format or the

22   wording -- the typing is different on each one, all three.

23      Q.   Okay.  Do you know -- I mean, what -- do you

24   have any sense about why those three documents that

25   basically seem to have the same information exist?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 71 of 331
Appellate Case: 14-1193    Page: 57    Date Filed: 01/28/2014 Entry ID: 4118269

1        A.    At least one of these appears to be probably a

2    faxed copy of one of them.

3        Q.    Okay.  Which one do you think is faxed?

4        A.    I believe 1283 is faxed.

5        Q.    Okay.  But, I mean, is it -- okay.  So there are

6    two -- and you're right, there are two dates.  1263 is

7    dated November 11 -- I'm sorry, 1283 is dated November 11

8    and 1299 is dated November 13.  So the name of the

9    contracting party and the contractor's signature and the

10   printed name and the DEA number are all redacted in all of

11   them, correct?

12       A.    Two of them say license number, one says DEA

13   number, but yes.

14       Q.    Okay.  So what -- I guess I'm -- I'm kind of

15   trying to figure out what I'm looking at.  Are they

16   different agreements with different people or different

17   entities?

18       A.    I believe 1263 and 1283 are probably the same

19   document, but this is just a fax copy.

20       Q.    Okay.  And 1299, what's it?

21       A.    1299 is certainly a different -- different dated

22   and different handwriting than the other two.

23       Q.    So is it an agreement with a different pharmacy?

24       A.    Different medical service provider.

25       Q.    Oh, I'm sorry.  1299 is a prescriber one, isn't

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 72 of 331
Appellate Case: 14-1193    Page: 58    Date Filed: 01/28/2014 Entry ID: 4118269

1    it?  Let's be clear.  1263 is a contract for providing

2    Pentobarbital, is it not?

3              MR. HANSEN:  I'm sorry, which one did you say?

4              MS. CARLYLE:  1263.

5        A.   Yes, yes.

6        Q.   (By Ms. Carlyle) As -- but 1299 is actually a

7    different -- is actually, as you pointed out, a contract

8    with a -- someone to provide prescriptions, correct?

9        A.   Yes.

10       Q.   And let's -- let's now, and I'm sorry to have

11   led you on that wild goose chase of 1299, but take a look

12   at 1301, please.

13       A.   Okay.

14       Q.   Is 1301 the same as 1263 and 1283?

15       A.   It looks similar to me.

16       Q.   Okay.  To your knowledge, how many contracts

17   with pharmacies for Pentobarbital were made?

18       A.   To my knowledge?

19       Q.   Uh-huh.

20       A.   One.

21       Q.   Okay.  Because it's been the same pharmacist all

22   three times, right?

23       A.   Yes.

24       Q.   Yes, okay.  Is that pharmacy licensed as either

25   a Missouri pharmacy or as an extraterritorial pharmacy

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 73 of 331
Appellate Case: 14-1193    Page: 59    Date Filed: 01/28/2014 Entry ID: 4118269

 1  **licensed to export drugs to Missouri?**

 2          MR. HANSEN:  I'm going to object to that

 3  question as calling for an answer that could reveal the

 4  identity of the pharmacy.

 5          MS. CARLYLE:  The question whether it's licensed

 6  either as a Missouri pharmacy or a pharmacy licensed to

 7  export drugs to Missouri could allow us to identify the

 8  pharmacy?

 9          MR. HANSEN:  If you want to say is it licensed,

10  that would be fine.

11          MS. CARLYLE:  That was the question.

12          MR. HANSEN:  But to narrow it down -- well, what

13  peaked my hearing was asking if it was in Missouri.

14          MS. CARLYLE:  No, I asked is it licensed as

15  either a Missouri pharmacy or an extraterritorial pharmacy

16  licensed to export drugs to Missouri.

17      A.   I --

18          MR. HANSEN:  Go ahead and answer.

19      A.   I have seen its license.  It is licensed.

20      Q.   **(By Ms. Carlyle) Is it licensed either as a**

21  **Missouri pharmacy or an extraterritorial pharmacy licensed**

22  **to export drugs to Missouri?**

23          MR. HANSEN:  We'll object to the form of that

24  question, lack of foundation.

25      A.   I don't know that I understand exactly how

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 74 of 331
Appellate Case: 14-1193    Page: 60    Date Filed: 01/28/2014 Entry ID: 4118269

1    you're asking the question, but it is --

2        **Q.   (By Ms. Carlyle) Well, let me explain.   There**

3    **are -- I am asking you whether it falls into one of two**

4    **categories.   One would be a Missouri pharmacy.   The other**

5    **would be a pharmacy somewhere else that had been licensed**

6    **by Missouri to allow it to sell drugs in Missouri.**

7            MR. HANSEN:  Again, I object to the form of the

8    question and lack of foundation.

9        A.   I do not know the answer to that question.

10       **Q.   (By Ms. Carlyle) Okay.   Did anyone at the**

11   **Department of Corrections make inquiry about whether any**

12   **professional complaints had been filed against the**

13   **pharmacy that supplies the Pentobarbital?**

14       A.   Again, I do not know the research Mr. Briesacher

15   did.

16       **Q.   Okay.   Do you think that if anyone did, it would**

17   **have been Mr. Briesacher?**

18       A.   Yes.

19       **Q.   Okay.   Let me ask you to take a look at page**

20   **1260, again, of Exhibit 1, the disk with the discovery**

21   **supplied in January 2014.**

22       A.   1260?

23       **Q.   1260.**

24       A.   Okay.

25       **Q.   Can you tell us what that is, please.**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 75 of 331
Appellate Case: 14-1193    Page: 61    Date Filed: 01/28/2014 Entry ID: 4118269

1      A.    That is a memo from myself to the pharmacy

2  indicating that they are to be known as pseudonym M6.

3      **Q.    Okay.  You say they are to be known.  Is it the**

4  **entity or a particular individual who is M6?**

5      A.    I addressed this to an individual.

6      **Q.    So is there a separate pseudonym for the concern**

7  **that the individual works for?**

8      A.    No.

9      **Q.    So you addressed it to an individual.  What sort**

10  **of individual is he or she?  What kind of job does that**

11  **individual do?**

12          MR. HANSEN:  Objection, form of the question in

13  that it lacks foundation.

14          MS. CARLYLE:  I mean, what I'm looking for is

15  something like a pharmacist, the head of the company, the

16  secretary, the clerk, you know.  I'm not looking for the

17  name of an individual, I'm just looking for a function of

18  the person to whom you assigned that M6 designation.

19          MR. HANSEN:  I'm objecting to the form of the

20  question.  It lacks foundation.  I think the question

21  should be do you know and then he can say yes or no.

22          MS. CARLYLE:  Okay.

23          MR. HANSEN:  I'm objecting to the form of the

24  question because it lacks foundation.

25          MS. CARLYLE:  Okay.  Well, Mr. Hansen, do you

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 76 of 331
Appellate Case: 14-1193   Page: 62   Date Filed: 01/28/2014 Entry ID: 4118269

1   really want me to start every question by do you know this

2   and then asking him what the answer is?  It's going to

3   take a lot longer if I do that.  If I ask him the question

4   and he says I don't know, that seems to me to serve the

5   same purpose, but we'll do it whichever way you want.

6           MR. HANSEN:  Where I believe it's appropriate, I

7   will make the objections.

8           MS. CARLYLE:  Okay.

9           MR. HANSEN:  Because sometimes if I don't, it

10  leads to an answer that is -- that might be inaccurate or

11  that might be misused.  So in the instance --

12          MS. CARLYLE:  Let me --

13          MR. HANSEN:  In the instances where I think that

14  it is necessary, I will make the objection.  I've -- a lot

15  of times I haven't made the objection for the very purpose

16  so we can move it along.

17      A.   He's a pharmacist.

18      Q.   (By Ms. Carlyle) Okay.  Let me ask you to take a

19  look at page 1261, please.

20      A.   Okay.

21      Q.   Now page 1261 actually contains three documents,

22  does it not?

23      A.   Yes.

24      Q.   Okay.  Can you describe generally what they are

25  so we'll know what we're talking about?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 77 of 331
Appellate Case: 14-1193    Page: 63    Date Filed: 01/28/2014 Entry ID: 4118269

1     A.    The first one is -- I would describe as permits,

2    retail pharmacy.  The second one is a certification of

3    registration.  The third one is a controlled substance

4    registration certificate.

5     Q.    Okay.  And did they all pertain to the same

6    business?

7     A.    Pardon?

8     Q.    Do they all pertain to the same business?

9     A.    Yes.

10    Q.    Because as a result of redactions, we can't tell

11    what business they pertain to, correct?

12    A.    Yes; yes.

13    Q.    Okay.  Will you tell us what state the pharmacy

14    is licensed in?

15         MR. HANSEN:  I'm going to object to that

16    question, it would be information that would lead to the

17    identity of the pharmacy, and I'll instruct him not to

18    answer that question.

19    Q.  (By Ms. Carlyle) Okay.  Just so it will be on the

20    record, the St. Louis public radio has reported that the

21    pharmacy is licensed in Oklahoma.  Are you willing to

22    confirm or deny that?

23         MR. HANSEN:  Same objection, same instruction.

24    Q.  (By Ms. Carlyle) Is the expiration date of the

25    license redacted in this -- this iteration of this

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 78 of 331
Appellate Case: 14-1193    Page: 64    Date Filed: 01/28/2014 Entry ID: 4118269

Page 65

1    document?  In this document on page 1261.

2          A.   Yes.

3          Q.   Okay.  Why was that redacted?

4          A.   I believe it was redacted because of attempts to

5    identify the pharmacy.

6               MS. CARLYLE:  Could you mark this as Exhibit 5,

7    please?

8               (Exhibit No. 5 marked for identification.)

9               MS. CARLYLE:  I'll show you what I've got

10   because I don't have another copy.

11              MR. HANSEN:  Okay.  I'll just clarify.  I saw it

12   was identified as amended complaint, but this is an

13   exhibit that was a page from the complaint.

14              MS. CARLYLE:  It was attached to the complaint,

15   yes.  I think it reflects actually on its -- at the bottom

16   of it.

17              MR. HANSEN:  Yes, I see that.

18              MS. CARLYLE:  But let me just say that it is

19   the -- it is page eight of Exhibit 13 to the amended

20   complaint filed in this case, I believe on December 3.

21   And I believe that's actually -- the filing date is

22   actually reflected on that document.

23              MR. HANSEN:  I'm not sure -- are you going to

24   ask him many questions about it or just briefly?  Because

25   I'm going to want a copy of it.  I don't have that handy

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 79 of 331
Appellate Case: 14-1193   Page: 65   Date Filed: 01/28/2014 Entry ID: 4118269

1   with me.

2          MS. CARLYLE:  Okay.

3          MR. HANSEN:  So I'm going to either want a copy

4   of it or I can wait to get it until later if it's going to

5   be a brief question.

6          MS. CARLYLE:  I'm going to ask him about the two

7   dates that are on here and not on there.

8          MR. HANSEN:  I suspected, but --

9          MS. CARLYLE:  Okay.

10     **Q.  (By Ms. Carlyle) Let me ask you whether**

11  **Exhibit 5, which I've just handed you, appears to be a --**

12  **basically the same -- contain the same three documents as**

13  **page 1261 that we've been looking at?**

14     A.   Yes.

15     **Q.   Okay.  Does Exhibit 5 indicate the expiration**

16  **date of the license at the top of the page?**

17     A.   Yes.

18

24     **Q.   Okay.  Are those two pieces of information**

25  **included on page 1261?**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    **Phone: 1.800.280.3376**    **Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 80 of 331
Appellate Case: 14-1193    Page: 66    Date Filed: 01/28/2014 Entry ID: 4118269

1       A.   No.

2       Q.   **So is it your position that even though this**

3   **document has been publicly filed in court and served on**

4   **your counsel, you are still entitled to redact it from**

5   **discovery you provide in this case?**

6            MR. HANSEN:  Objection to the form of the

7   question, calls for a legal conclusion.

8       A.   We are aware that people have attempted to

9   identify the pharmacist by using those dates, so yes.

10  ████  ███████████      ████████████████████

    ██  ███████████████████████  ██████████████████

    ██  ████████████████

    ██      ███    ███

14      Q.   **Let me just ask you to take a look at page 1287**

15  **and ask you whether that contains the same three documents**

16  **as 1261?**

17      A.   Yes, it appears to be the same.

18      Q.   **Okay.  If you'll look at page 1265, please.  And**

19  **can you tell me what those are, if you know?**

20      A.   Not from the redacted copy, I can't.

21      Q.   **Okay.**

22      A.   They say doctor or pharmacy and its expire date

23  and labeled as receptor.

24      Q.   **Or preceptor?**

25      A.   Preceptor, I'm sorry.  I missed the P.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        **Phone: 1.800.280.3376**        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 81 of 331
Appellate Case: 14-1193   Page: 67   Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.   Do you know whether those two cards, if we can

2  call them that, that are copied there, pertain to the same

3  person?

4      A.   No, I don't.

5      Q.   Could you look at the unredacted documents and

6  tell me what they are and whether they pertain to the same

7  person?

8      A.   I could.

9      Q.   Okay.  You want to do that now or shall we --

10          MS. CARLYLE:  What do you want to do?

11          MR. HANSEN:  Do you -- off the record.

12          MS. CARLYLE:  Sure.

13          (Off the record.)

14          MS. CARLYLE:  Back on the record.

15      Q.   (By Ms. Carlyle) So what --

16      A.   These cards are from two different pharmacists.

17      Q.   Are they pharmacists who work for the pharmacy

18  who --

19      A.   Yes.

20      Q.   -- which compounds the Pentobarbital?

21      A.   Yes.

22      Q.   Are you willing to tell me -- I mean, are they

23  issued by some government or an educational institution or

24  what, the cards?

25          MR. HANSEN:  I'm going to object to the form of

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 82 of 331
Appellate Case: 14-1193   Page: 68   Date Filed: 01/28/2014 Entry ID: 4118269

1    the question in that it lacks foundation.

2         A.   I just glanced at them real quickly, but they

3    are by government.

4         Q.   (By Ms. Carlyle) Okay.  And you've redacted the

5    date that they expire?  You're not willing to tell us

6    that?

7         A.   Right.

8         Q.   Okay.  So we can't tell by looking at what we

9    have whether they're current or not?

10        A.   No.

11        Q.   Are they current?

12        A.   Yes.

13        Q.   Could you take a look at page 1289 and tell me

14   if those are the same two documents?

15        A.   Okay.

16        Q.   Now, according -- I'll just tell you that

17   according to my notes in the December 27 version of this

18   discovery, the expiration date was not redacted, although

19   since I don't have that discovery, I don't know what it

20   was.  Was there -- were you -- did you participate in a

21   decision to redact that information, although it had not

22   been previously redacted?

23        A.   I didn't do the redaction, but I knew that we

24   are -- our intent was to try to redact those type -- that

25   sort of information, yes.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 83 of 331
Appellate Case: 14-1193    Page: 69    Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.   Can you take a look, please, at page 1307?  Does

2   that appear to be an e-mail?

3      A.   Pardon?

4      Q.   Does that appear to be an e-mail?

5      A.   Yes.

6      Q.   Okay.  And who's it from?  I mean, I know you're

7   not going to give me a name, but what sort of person is it

8   from?

9           MR. HANSEN:  Describe the category.

10     Q.   (By Ms. Carlyle) Describe the category of person

11   that it's from.

12     A.   I believe this to be an e-mail from the testing

13   laboratory.

14     ▮▮   ▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮   ▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮   ▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮

▮  ▮▮▮▮▮

22     A.   I'm -- this is not my e-mail, so --

23     Q.   Okay.  Okay.

24          MS. CARLYLE:  Could you mark this one for me as

25   Exhibit 6, please?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 84 of 331
Appellate Case: 14-1193   Page: 70   Date Filed: 01/28/2014 Entry ID: 4118269

1          (Exhibit No. 6 marked for identification.)

2          MR. HANSEN:  If I could see it before you hand

3  it to him, too, please.

4          MS. CARLYLE:  Sure.  I will do that.

5     **Q.  (By Ms. Carlyle) Before I do that, so do you have**

6  **any idea why the words on the line that begins "to follow**

7  **up on our phone conversation" were redacted?**

8     A.   No.

9     **Q.   Okay.  Are you aware that in previous versions**

10  **of this document provided as a Sunshine Law request, those**

11  **words were unredacted?**

12     A.   No.

13     **Q.   Mr. Dormire, I'm handing you a document which is**

14  **the page seven of the Exhibit 13 to the amended complaint**

15  **filed in this matter on December 3 of 2013.  And I'll ask**

16  **you whether that appears to be a copy of the same e-mail**

17  **that you're looking at on page 1307?**

18     A.   Yes, it appears to be the same.

19          MR. HANSEN:  I just want to look at one thing.

20          THE WITNESS:  Sure.

21  ████  ████████████████████████

████  ██████████████████████████████

████  ██████████████████████████████████

████  ████████████████

████   ████  ██████

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 85 of 331
Appellate Case: 14-1193   Page: 71   Date Filed: 01/28/2014 Entry ID: 4118269

1     Q.   Do you contend that the manufacturer of the raw

2  materials from which the compounded Pentobarbital is made

3  is a member of the execution team?

4     A.   The manufacturer?

5     Q.   Uh-huh.

6     A.   No.

7     Q.   Let me draw your attention to, let's see here,

8  page 1310 and 1312 and ask if you know what those

9  documents are?

10     A.   1310 is labels for Pentobarbital and 1312 is

11  also a label.

12     Q.   And are they -- is 1312 one of the same labels

13  in 1310 or can we tell?

14     A.   They are similar, yes.

15     Q.   Okay.  So what information is redacted?  I mean,

16  again, I'm not asking you to tell me what it says, but

17  what category of information has been redacted there?

18     A.   Name of the pharmacy, and its address, I assume,

19  phone numbers, probably.  I don't know --

20     Q.   Okay.

21     A.   -- what all was redacted there.

22     Q.   Okay.  Do those labels bear a date?

23     A.   Yes.  November 13, 2013.

24     Q.   And when was Joseph Franklin executed?

25     A.   I want to say the 20th, but I don't know that

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 86 of 331
Appellate Case: 14-1193   Page: 72   Date Filed: 01/28/2014 Entry ID: 4118269

1    I'm -- I don't know if I have a document in front of me

2    that shows what exact date.

15        Q.   **And while we're at it, let's take a look at**

16   **2048, 2049 and 2056.**

17            MR. HANSEN:  Can you say those one more time?

18            MS. CARLYLE:  2048, 49 and 56.

19            MR. HANSEN:  Thank you.

20        A.   48 -- if you will, one more time.

21        Q.   **(By Ms. Carlyle) 48, 49 and 56.**

22        A.   Okay.

23        Q.   **Tell me, please, what 2048 is.**

24        A.   2048 appears to be a letter addressed to

25   Mr. Briesacher.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 87 of 331
Appellate Case: 14-1193    Page: 73    Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.    And can you tell what sort of person or business

2  the letter is from?

3      A.    It's making reference to laboratory

4  accreditation, so I believe this is the testing

5  laboratory.

6      Q.    Okay.  And 2049 is an invoice, is it not?

7      A.    It appears like one.

8      Q.    Okay.  Let me look at one more thing here.

9  Okay.  Let's talk about execution training here.  When we

10  took your deposition last time and you acknowledged that

11  there had been some execution training that had been

12  occur -- that had occurred since you gave your

13  interrogatory answers in February of 2013, have you

14  provided your counsel or us with a list of training since

15  then?

16            MR. HANSEN:  Since which day?

17            MS. CARLYLE:  Since February of 2013.

18      A.    Mr. Briesacher is aware of training dates, but I

19  don't know that that's been provided to you.

20      Q.    (By Ms. Carlyle) Okay.  Are you able to provide a

21  list now?

22      A.    Not off the top of my head.

23            MR. HANSEN:  We'll get you a list of new

24  training.

25            MS. CARLYLE:  Okay.  What I need to know about

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 88 of 331
Appellate Case: 14-1193    Page: 74    Date Filed: 01/28/2014 Entry ID: 4118269

1    the training is when it was and who was present for each

2    training, where it was.  I mean, I guess -- let me put it

3    this way.  If you look at the -- if you look at the -- at

4    the first set of interrogatories, which is what we're

5    talking about supplementing, you'll see what information

6    we requested about each of the trainings and that's the

7    information we still want.  So if I have not successfully

8    remembered it because I'm not looking at them, my question

9    would be as to each of those trainings, please supply the

10   information requested in the first set of interrogatories

11   which were answered last February.

12            MR. HANSEN:  All right.

13       Q.   (By Ms. Carlyle) Have you been present for any

14   of -- any trainings that have occurred since the

15   Pentobarbital protocol went into effect?

16       A.   Yes.

17       Q.   Okay.  How many?

18       A.   One that I remember for sure.  I think just one.

19       Q.   And do you have some idea when that was?

20       A.   I -- I don't know the date.  It was a month to

21   month and a half prior to the execution, I believe.

22       Q.   So what -- can you kind of walk me through what

23   happened at that -- at that training in terms of what

24   category of people were there and what they all did and --

25       A.   The people that are normally there and

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 89 of 331
Appellate Case: 14-1193   Page: 75   Date Filed: 01/28/2014 Entry ID: 4118269

1  responsible for their jobs are there during that practice.

2  **Q.  But -- so I mean you -- you can use pseudonyms**

3  **if you want to, but I need you to tell me who those people**

4  **are.**

5  A.  Okay.  Well, certainly the warden is there and

6  the deputy warden and the medical personnel are there, the

7  non-medical personnel are there.

8  **Q.  So at this point we have, in terms of medical**

9  **personnel who are there, we have M3; is that correct?**

10  A.  Yes.

11  **Q.  We have M2?**

12  A.  Yes.

13  **Q.  And then there's non-medical 1 and 2?**

14  A.  Yes.

15  **Q.  By the way, before I forget to ask you this, who**

16  **is or was M4?**

17  MR. HANSEN:  Again, you're not asking the

18  identity, you're asking --

19  MS. CARLYLE:  No, I'm asking what sort of person

20  was M4.

21  A.  That dates past me.  I do not know.

22  **Q.  (By Ms. Carlyle) Okay.  Okay.  And so back to**

23  **training for a moment.  Okay.  The -- so the medical and**

24  **non-medical personnel are there and so do they, then, sort**

25  **of simulate what happens during an execution?**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 90 of 331
Appellate Case: 14-1193   Page: 76   Date Filed: 01/28/2014 Entry ID: 4118269

1    A.   Yes.

2    Q.   **So what do they do to simulate it?  I mean, sort**

3  **of tell me what happens.**

4    A.   Just about every process that we do on a normal

5  execution, they simulate what will occur and what they

6  would do.

7    Q.   **Well, I need you to tell me what that is.**

8    A.   The medical staff prepares syringes, the

9  non-medical staff practice what they would do in a

10  procedure with those syringes.

11    Q.   **Do they -- I mean, does someone get strapped**

12  **down to a gurney?**

13    A.   No.

14    Q.   **Okay.**

15    A.   We don't do that.

16    Q.   **Okay.  I mean, I know you don't administer the**

17  **drugs to them, but okay.  So when you say the medical --**

18  **the non-medical -- so the medical personnel don't practice**

19  **starting intravenous lines and so forth, do they?**

20    A.   No, they don't.

21    Q.   **Okay.  And the non-medical people don't practice**

22  **administering the drugs because there's no one or nothing**

23  **to administer them to.  So what --**

24    A.   They do practice with the syringes, though, yes.

25    Q.   **So what do they do with the syringes?**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 91 of 331
Appellate Case: 14-1193   Page: 77   Date Filed: 01/28/2014 Entry ID: 4118269

1      A.    It is discarded.

2      Q.    **No, I mean, what do they do with the syringes**

3  **during the training?**

4      A.    They --

5      Q.    **What physically do they do?**

6      A.    They push the syringes.

7      Q.    **Into what?**

8      A.    Into a bag that is discarded.

9      Q.    **So into a bag that would normally be connected**

10  **to a line that went into a person?**

11     A.    Yes.

12     Q.    **Okay.  And who supervises the training?**

13     A.    It is -- the medical staff are overseeing,

14  watching what the non-medical staff do.

15     Q.    **Okay.  The medical staff being M2 and M3?**

16     A.    Pardon?

17     Q.    **The medical staff being M2 and M3 or are there**

18  **other medical staff?**

19     A.    Yes, yes.  The warden is watching parts of the

20  aspect, I myself am watching parts of the aspect.

21     Q.    **So what are you watching?**

22     A.    Just that we're following the protocol and doing

23  the things we're supposed to do.

24     Q.    **Let me ask you to take a look at the -- at a**

25  **chronological log that -- there's one that begins at page**

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 92 of 331
Appellate Case: 14-1193   Page: 78   Date Filed: 01/28/2014 Entry ID: 4118269

1    676 and one that begins at page 689 and they're kind of

2    multi-page documents.

3        A.    Stuck together.  676 to --

4        Q.    686.  I'm sorry, wait a minute.  If I said 676,

5    that's what I meant.

6            MR. HANSEN:  Yeah, 676.

7            MS. CARLYLE:  676, yeah.

8        A.    To -- all the way to 686?

9        Q.    (By Ms. Carlyle) Well, I think there may be some

10   things in between.  Hang on just a second.  But there's

11   sort of a log that begins as 676, correct?

12       A.    Yes.

13       Q.    Okay.  And then there's another log that begins

14   at 689.  My question for you is can you explain to me what

15   those two logs -- how they -- you know, what they are,

16   whether they're -- who does them and why they do them and

17   so forth?

18       A.    These are -- these are logs by the officers --

19   the first one is by -- for sure by the officer at the

20   holding cell.

21       Q.    Okay.

22       A.    The second one appears to be the same sort of

23   thing, but not on that form.  There are -- without looking

24   at exact times and things, I don't know whether --

25       Q.    Well, I think there's actually some overlap, but

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 93 of 331
Appellate Case: 14-1193    Page: 79    Date Filed: 01/28/2014 Entry ID: 4118269

1  I'm just wondering why -- how it happens that we have one

2  set on a form and one set that's not and whether there are

3  different people who -- anyway, why that is, I guess.

4      A.   There are -- I know there are two officers

5  assigned to that post.

6      Q.   Okay.

7      A.   My opinion would be that both are filling out a

8  log themselves.

9      Q.   I see.  So one of them is using the form and one

10  of them isn't?

11     A.   Yes.

12     Q.   Okay.  Is there anything wrong with that as far

13  as your -- from a procedural standpoint?

14     A.   We ask them to fill out a log.  I don't -- we

15  have various forms that we call the term chronological

16  logs, so to see different logs doesn't surprise me.

17     Q.   Okay.  But what you're telling me -- if I

18  understand you correctly, maybe you can -- the two -- the

19  log that begins on 676 and the log that begins on 689,

20  it's not like they're file -- they're prepared by

21  different officers with different -- with assignments to

22  record different types of things?

23          MR. HANSEN:  I'm going to object to the form of

24  that question.  It's compound and so confusing.  You said

25  it's not filled out by two different officers.  I think I

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 94 of 331
Appellate Case: 14-1193   Page: 80   Date Filed: 01/28/2014 Entry ID: 4118269

1    understand what you meant, but --

2         **Q.  (By Ms. Carlyle) It is filled out by two**

3    **different officers.  I guess what I'm asking you, is it**

4    **two different officers with two different assignments to**

5    **record two different sets of information?**

6         A.   Just to start off, there are different -- quite

7    a few different dates.  One is November 19, one is

8    November 15, so four days apart.

9         **Q.   Right.  I guess --**

10        A.   This one for sure --

11        **Q.   I'm sorry, when you say this one, tell us which**

12   **one it is.**

13             MR. HANSEN:  Use the page number.

14        **Q.  (By Ms. Carlyle) Use the page number, please.**

15        A.   The 19th.

16             MR. HANSEN:  Down at the bottom.

17        **Q.  (By Ms. Carlyle) Down at the bottom, what page?**

18        A.   Oh, 676.

19        **Q.   Thank you.**

20        A.   That's dated November 19.  That is -- the post

21   is CP offender holding cell.

22        **Q.   Okay.**

23        A.   The second one doesn't identify the post, but

24   identifies the date as November 15, third shift.

25        **Q.   Okay.  And -- but do you think that the person**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        **Phone: 1.800.280.3376**        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 95 of 331
Appellate Case: 14-1193    Page: 81    Date Filed: 01/28/2014 Entry ID: 4118269

1    who completed 689 -- the log beginning on 689 was also an

2    officer in the holding cell or was he somewhere else?

3         A.    It appears he was at the holding cell as well,

4    yes.

5         Q.    Okay.

6         A.    He's making notations about Offender Franklin.

7         Q.    Okay.  And that's something that -- I mean, is

8    that something that's specific to the duties of someone in

9    the holding cell as opposed to -- as opposed to someone

10   who's just an officer when Mr. Franklin is not yet in the

11   holding cell?

12        A.    I believe our orders require a -- one officer to

13   track when an offender is in a holding cell status, so we

14   are required to do a chronological just specifically on

15   that offender.

16        Q.    Okay.  But if -- I mean, so these are both

17   holding cell logs, I guess is what we're saying?

18        A.    They appear to be that, yes.  I see references

19   to the holding cell in this other log, yes.

20        Q.    Okay.  Now, on page 689, it appears that there's

21   been something redacted?

22        A.    Yes.  Appears to be a phone number.

23        Q.    Okay.  What -- why did you redact the phone

24   number?

25        A.    I was aware they went through and redacted

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 96 of 331
Appellate Case: 14-1193    Page: 82    Date Filed: 01/28/2014 Entry ID: 4118269

Page 83

1    almost all the phone numbers of individuals.

2         **Q.    Why?**

3         A.    Just to protect their identity, I guess.

4         **Q.    Do you -- were -- I mean, you say they went**

5    **through and redacted.   What --**

6         A.    Well, I am aware my administrative assistant

7    went through and redacted phone numbers.  Any time there

8    were phone numbers, she redacted them.

9         **Q.    Okay.  Was she -- did you tell her to do that?**

10        A.    No.  I knew she was doing that, though.

11        **Q.    Okay.  Do you know if anyone told her to do**

12   **that?**

13        A.    I believe she consulted with Mr. Briesacher to

14   do that.

15        **Q.    Okay.  Let's go back -- let's look at page 662.**

16   **We have some redactions and they look like phone numbers**

17   **as well; is that correct?**

18        A.    Yes.

19        **Q.    There is a reference on page 62 next to the time**

20   **entry 4:54 that says code 21?**

21        A.    Yes.

22        **Q.    What's code 21?**

23        A.    That's a good count.

24        **Q.    What about 4:30, about code 20?**

25        A.    Code 20 is the announcement, radio announcement.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 97 of 331
Appellate Case: 14-1193   Page: 83   Date Filed: 01/28/2014 Entry ID: 4118269

1    Code 20 is to count.

2         Q.   **Is to count and code 21 is that the count is**

3    **cleared?**

4         A.   Yes.

5         Q.   **Code 21.  Okay.  I have a list of redactions**

6    **that I wanted to check on.  Just so we're --**

7              MR. HANSEN:  I'm just going to -- while we're

8    talking about it, my understanding is they redact because

9    their policy is to always redact phone numbers.  Most of

10   the things that are redacted are phone numbers.  If you

11   want the phone numbers for any specific one, we can get

12   you the phone numbers.

13             MS. CARLYLE:  They didn't redact them the first

14   time.

15             MR. HANSEN:  So --

16             MS. CARLYLE:  I guess, you know, just for the

17   record, our objection is you can't just redact your

18   documents because you feel like protecting somebody.

19   They're documents.  We ask that they be produced.

20             MR. HANSEN:  I'm telling you what they did.

21             MS. CARLYLE:  I understand what they did.

22             MR. HANSEN:  And I'm telling you if -- we -- if

23   you want all the phone numbers, we'll talk to them.  We

24   can probably get you all the phone numbers.

25             MS. CARLYLE:  I'd say everything that's redacted

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 98 of 331
Appellate Case: 14-1193    Page: 84    Date Filed: 01/28/2014 Entry ID: 4118269

1  in these documents that doesn't pertain to the identity of

2  the execution team we would like unredacted.

3          MR. HANSEN:  Okay.

4      **Q.  (By Ms. Carlyle) I guess I'm just -- I'm taking a**

5  **second to kind of go over these to determine if there are**

6  **any I really need to ask him for rather than ask him on**

7  **every page and did you redact phone numbers.  So if you**

8  **give me just a second, I think I can -- it may look like**

9  **we're not doing anything, but we'll actually speed things**

10 **up a little.**

11         MR. HANSEN:  And I -- while we're on the record,

12 since I just -- we just had this conversation about phone

13 numbers and providing those, I think I said that we would

14 provide those that aren't on the execution team or that

15 would reveal the execution team and my co-counsel has

16 pointed out that there may be some phone numbers that we

17 think are still protected as that they're protected as a

18 state secret, principally --

19         MR. SPILLANE:  The laboratory.

20         MR. HANSEN:  -- the testing lab.

21         MR. SPILLANE:  The laboratory is not a member of

22 the execution team, but they've been declared a state

23 secret.

24         MS. CARLYLE:  Okay.

25         MR. HANSEN:  I wanted to make that clear.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 99 of 331
Appellate Case: 14-1193   Page: 85   Date Filed: 01/28/2014 Entry ID: 4118269

1          MS. CARLYLE:  Okay.  And similarly, I mean, just

2     for example, on page 718, I think there's an address of

3     a -- of an offender witness that's redacted.  I mean, you

4     know, as I say, if it's not -- if there's not -- it

5     doesn't have to do with your state secret or execution

6     team privilege, we'd ask that all the redactions be

7     removed.

8          MS. BORESI:  And off the record.

9          (Off the record.)

10     **Q.   (By Ms. Carlyle) Let me -- let me show you again**

11     **your responses to the third set of interrogatories, and**

12     **I'm handing them to you open to page seven so you can see**

13     **them -- your response to interrogatory five.  You were**

14     **asked to specify the tasks each member of the medical**

15     **personnel will do and what you did there was to say**

16     **medical personnel will do this and medical personnel will**

17     **do that.  What we're trying to get at is what each member**

18     **does.  So if you can tell us now, of the tasks that you**

19     **set out there, who does what, please do that.**

20          A.   Okay.

21          MR. HANSEN:  Hang on just a second.  Did you --

22     again, you didn't identify this as an exhibit, right?

23          MS. CARLYLE:  No.  These are his responses to

24     interrogatories.

25          MR. HANSEN:  Right.  I just want to make sure

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 100 of 331
Appellate Case: 14-1193   Page: 86   Date Filed: 01/28/2014 Entry ID: 4118269

1    I've got this clear for the record.

2            MS. CARLYLE:  Okay.

3            MR. HANSEN:  Go ahead.

4       A.   M5 would prescribe.  M6 would supply, compound

5    and supply the Pentobarbital.  M2 and M3 together would

6    prepare and label the syringes.  And M2 and M3 would

7    together determine most appropriate location for

8    introduction of intravenous lines.

9       Q.   (By Ms. Carlyle) That's part of M2's job as well?

10      A.   M2 and M3 together.

11      Q.   Okay.  So who monitors?  Which of the two

12   monitors the prisoner during the execution?

13      A.   Oh, next page.

14      Q.   Okay.

15      A.   Both M3 and M2.  Both M2 and M3 evaluate the

16   prisoner to confirm death.  Both M3 and M2 are involved in

17   disposal of unused chemicals.  One of the medical

18   personnel, either M2 or M3, signs the sequence of chemical

19   form.  And either M2 or M3 would complete and sign the

20   chemical log indicating the quantities of chemicals used

21   and the quantities discarded.

22      Q.   Okay.  Let's take a look at page 722.

23      A.   There's that.

24      Q.   Thank you.

25           MR. HANSEN:  Again, for the record, we're going

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 101 of 331
Appellate Case: 14-1193   Page: 87   Date Filed: 01/28/2014 Entry ID: 4118269

Page 88

1   back to Exhibit 1.

2           MS. CARLYLE:  We're going back to Exhibit 1.

3   And I appreciate your saying that.  I keep forgetting to.

4           MR. HANSEN:  That's all right.  7 --

5           MS. CARLYLE:  We're going to take a look at page

6   722.

7       A.   Yes.

8       Q.   (By Ms. Carlyle) And 723.  While you're there,

9   you might as well grab them both.  Okay.  Page 722 is --

10  what is it?

11      A.    722 is the chemical log.

12      Q.    Okay.  And it has signatures, if you can call

13  them that, of M3 and M2, correct?

14      A.    That's correct.

15      Q.    Okay.  Signing as M3 and M2.  And then there are

16  two signatures showing that it's been approved.  Can you

17  tell me whose signatures those are?

18      A.    One is myself and one is Director Lombardi.

19      Q.    Okay.

20          MR. HANSEN:  Can we stop just for about 30

21  seconds?

22          MS. CARLYLE:  Sure.

23          (Off the record.)

24          MS. CARLYLE:  Okay.  Back on the record.

25      Q.    (By Ms. Carlyle) Does page 722 reflect that

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 102 of 331
Appellate Case: 14-1193   Page: 88   Date Filed: 01/28/2014 Entry ID: 4118269

1    Versed was used?

2        A.   Yes.

3        Q.   And what was that used for?

4        A.   I believe that was used as a sedative.

5        Q.   Is -- is Versed a part of the written execution

6    protocol?

7        A.   Not -- not named, no.

8        Q.   What's the purpose of a sedative during the

9    execution?

10       A.   We are -- our protocol directs us to offer a

11   sedative and then also allows the doctor to issue one if

12   he believes it's needed based on -- I don't know if it's

13   the doctor by themselves or the doctor with the director's

14   approval.

15       Q.   Well, what would be the criteria for deciding to

16   administer the sedative?

17       A.   First criteria is that the offender requests

18   one.

19       Q.   Right.  But after that, assuming the offender

20   doesn't request one?

21       A.   I don't have it in front of me, but there is a

22   notation about -- in protocol about a sedative can be

23   given.

24       Q.   I understand that there's a notation that a

25   sedative can be given.  I'm just asking why would a

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 103 of 331
Appellate Case: 14-1193   Page: 89   Date Filed: 01/28/2014 Entry ID: 4118269

Page 90

1  **sedative be given, other than at the request of the**

2  **offender?**

3      A.   I can think of scenarios where an offender would

4  be out of control and that would be needed, but I don't

5  know that.

6      Q.   **Okay.  So who administers the sedative?**

7      A.   M2, M3.

8      Q.   **Okay.  And is that administered -- how is it**

9  **administered?  Is it oral or injected or --**

10     A.   I don't know.

11     Q.   **Okay.  In relation to the execution itself, at**

12  **what time is it administered?**

13     A.   There's a specific time ahead of the execution

14  it's to be offered if the execution is on schedule.  Then

15  it's -- then I know there's -- I mean, less time if they

16  were not on schedule.  So it was sometime before.

17     Q.   **Okay.  Now, page 722 also reflects that -- if**

18  **I'm reading it correctly, that five grams of Pentobarbital**

19  **were used and five grams were returned.  Is that a fair**

20  **reading of page 722?**

21     A.   Yes.

22     Q.   **Where were they returned to?**

23     A.   They were not -- not -- they were returned to

24  the counter, I believe, but not -- certainly not returned

25  to a pharmacy.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 104 of 331
Appellate Case: 14-1193   Page: 90   Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.    Okay.  So do you have any idea why the notation

2  returned in the column called amount discarded was made?

3      A.    No.

4      Q.    In fact, was the unused -- what happened to the

5  unused Pentobarbital?

6      A.    They were destroyed.

7      Q.    Okay.  So it's not saved for the next execution?

8      A.    No.

9      Q.    Okay.  Let's take a look if we can at page 15 --

10  well, 1142, actually.

11      A.    Okay.

12      Q.    So I guess, first of all, my question is are

13  1142 and 723 the same thing?

14      A.    They appear to be.

15      Q.    Okay.

16      A.    Yes.

17      Q.    Okay.  And 1524 and 1541.

18          MR. HANSEN:  Off the record.

19          (Off the record.)

20      A.    Okay.

21      Q.    (By Ms. Carlyle) Both of those two documents

22  mention a -- a person named Wampler on 1524, he is

23  identified as CO1 Wampler and on 1541 he's identified as

24  Travis Wampler.  Are you aware of whether that person is

25  related to the family who was the victim of now executed

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 105 of 331
Appellate Case: 14-1193   Page: 91   Date Filed: 01/28/2014 Entry ID: 4118269

Page 92

1    **prisoner Richard Oxford?**

2         A.    I have no idea.

3         **Q.    Okay.**

4              MR. HANSEN:   What was the name, first name of

5    Oxford that you mentioned?

6              MS. CARLYLE:   Richard.

7              MR. HANSEN:   Richard Oxford?

8              MS. CARLYLE:   Yeah.

9         **Q.   (By Ms. Carlyle) Can you take a look, please, at**

10   **1334 and 1335?**

11        A.    Okay.

12        **Q.    Can you tell me what the difference is between**

13   **those two documents?**

14        A.    There's additional names.   This one appears to

15   be simply a state witness list and one appears to be both

16   a state witness list, an offender witness list and a

17   victim's witness list.

18        **Q.    Okay.**

19              MR. HANSEN:   I think I may have the wrong

20   numbers.   Which ones did you say?

21              MS. CARLYLE:   We're looking at 1334 -- what did

22   I say?   1334 and 1335.

23              MR. HANSEN:   I wrote down the right numbers, but

24   I'm looking at the wrong numbers.   If you'd hang on just a

25   second until I get to that page, I'd appreciate it.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 106 of 331
Appellate Case: 14-1193   Page: 92   Date Filed: 01/28/2014 Entry ID: 4118269

1          MS. CARLYLE:  Okay.

2     A.    The names appear -- as far as state witness,

3  they appear to be the same, as far as the names.

4     Q.   (By Ms. Carlyle) I see.  And let's take a look at

5  2043.  Okay.  What -- that's a photograph.  What's it a

6  photograph of?

7     A.    It's a photograph of four syringes.

8     Q.    Okay.  Can you tell me the nature of the

9  information that's redacted on those syringes?

10    A.    It would be the name of the pharmacy.

11    Q.    Okay.  Can you tell me what -- can you just tell

12  me what 2015 is, what it's for?

13          MR. HANSEN:  Which page?

14          MS. CARLYLE:  2015.

15          MR. HANSEN:  It would have been a lot easier if

16  you went to chronological order.

17          MS. CARLYLE:  I know.

18    A.    It is a count report.

19    Q.   (By Ms. Carlyle) 2015?

20    A.    What?

21    Q.    2015.

22    A.    I'm sorry.

23    Q.    That's okay.  I was going to say wait a minute.

24    A.    20 -- I'm sorry.

25    Q.    That's okay.  There are a lot of notes.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 107 of 331
Appellate Case: 14-1193   Page: 93   Date Filed: 01/28/2014 Entry ID: 4118269

1      A.   I've got to go back the other way.  That's it.

2      **Q.   I don't think so.**

3      A.   2015.

4           MR. HANSEN:  2015, yeah, that's what I have.

5           MS. CARLYLE:  Huh.

6      A.   That is a -- hang on a second, because that's

7  not what I have either.

8      **Q.  (By Ms. Carlyle) Yeah.  Well, it is, but it**

9  **doesn't have -- it was just cut off.  I think what**

10  **happened was the top was cut off because at the top of**

11  **mine, which you're welcome to see, it says State Witness**

12  **Briefing, DAI Director.**

13     A.   Yes, yes.  That is the statement I read to

14  the --

15          MR. HANSEN:  For the record, the only thing

16  missing is the bolded title that's centered at the top of

17  the page.

18          MS. CARLYLE:  Okay.  Okay.

19     A.   But that is the debriefing statement that I read

20  to them.

21     **Q.  (By Ms. Carlyle) The debriefing statement?**

22     A.   It's a -- sorry, a brief -- a briefing that I

23  read to the state's witnesses.

24     **Q.   Okay.  And when do you do that?**

25     A.   Prior to the execution.  Prior to moving them to

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 108 of 331
Appellate Case: 14-1193    Page: 94    Date Filed: 01/28/2014 Entry ID: 4118269

1    the area where they'll watch the execution.

2        Q.    I can't figure out why the sun is in my eyes

3    here, but is there anything --

4            MR. HANSEN:  Because it's setting.

5            MS. CARLYLE:  Yeah, right.  Yeah, there we go,

6    perfect.

7            MS. BORESI:  It was reflecting.

8            MS. CARLYLE:  Okay.

9            (Off the record.)

10           MS. CARLYLE:  Okay.  Back on the record.

11       Q.    (By Ms. Carlyle) So that -- does that mean that

12   for each execution, you're actually at the prison?

13       A.    Yes.

14       Q.    Do you witness the execution?

15       A.    Yes.

16       Q.    Okay.  And so you were -- this is -- this is a

17   statement that you read to all of the --

18       A.    State's witnesses.

19       Q.    Okay.  And who -- not by name, but what -- can

20   you tell me what the category of state's witness includes?

21   Who are those people?

22       A.    It is -- the last two times it has included some

23   media, but it is people that apply to be a state -- a

24   witness for the state.

25       Q.    Okay.  Are they a different group of people than

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 109 of 331
Appellate Case: 14-1193   Page: 95   Date Filed: 01/28/2014 Entry ID: 4118269

1    the people who are, say, families of the victim?

2        A.    Yes.

3        Q.    So those aren't state witnesses under this

4    category?

5        A.    Correct.

6        Q.    And people who are friends or relatives of the

7    person who's been executed, are they state witnesses?

8        A.    No.  They are separate.

9        Q.    Okay.  Well, speaking -- actually, that's an

10   interesting segue into what we're going to talk about

11   next, which is the witnesses to the Joseph Franklin

12   execution.  Are you aware that the -- that Mr. Franklin's

13   witnesses left the institution before the execution

14   occurred?

15       A.    Yes.

16       Q.    Okay.  You stated in the response to your -- to

17   the fourth interrogatories that you didn't know whether

18   anyone had tried to notify them or counsel at the specific

19   time when the execution was starting; is that correct?

20       A.    I don't remember that question on

21   interrogatories --

22       Q.    Okay.  Let's take a look at that.

23       A.    But I do not know that.  That's true.

24       Q.    I'm not sure what happened to the fourth ones.

25       A.    This one?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 110 of 331
Appellate Case: 14-1193    Page: 96    Date Filed: 01/28/2014 Entry ID: 4118269

1       Q.    Yep.  It's the answer to interrogatories six and

2    seven.

3       A.    Yeah, I do not know.  Right.

4       Q.    So who would know that?

5       A.    Whether an attempt was made?

6       Q.    Yes.

7       A.    Someone at the institution would know that.

8       Q.    You were at the institution?

9       A.    I was, I was.

10       Q.    Okay.

11       A.    I was not in the administration building.  I was

12    down at the -- in the support room.  So I --

13            MR. HANSEN:  Describe to her whoever that person

14    would be, the job title or if you know the name.

15            THE WITNESS:  It would be -- there would be one

16    or two people.  It could be the deputy warden level

17    responsible for at least -- I was aware they had left, but

18    I don't know whether they tried to contact them or asked

19    to be contacted.  I don't know any of that information.

20       Q.    (By Ms. Carlyle) Okay.  I know, but I'm trying to

21    figure out who does so we can ask that person.

22       A.    I do not know.

23       Q.    Okay.  You said might be the deputy warden?

24       A.    It could be a deputy warden, yes.

25       Q.    So who are the deputy wardens?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 111 of 331
Appellate Case: 14-1193   Page: 97   Date Filed: 01/28/2014 Entry ID: 4118269

```
1        A.   The two deputy wardens -- the one -- the one was

2   in the room with me, so I know it was not him.   The other

3   one is Jason Lewis.

4        Q.   And what was Jason Lewis's job on the day of the

5   execution?

6        A.   Specifically, I don't know.   He was coordinating

7   things, managing the security operation, things like that

8   and moving -- you know, he had some involvement with

9   moving witnesses and things like that.

10       Q.   Okay.   But he would be the person that you would

11  ask if you wanted the answer to that question?

12       A.   Yes.

13       Q.   Okay.   Did you ask him before you did your

14  interrogatory responses?

15       A.   No.

16       Q.   Okay.   Are you aware that Joseph Franklin had

17  requested someone to be there as a minister for him as a

18  witness?

19       A.   I'm not specifically aware of his requests, no.

20       Q.   Okay.   Let's take a look at page 1336.

21       A.   Okay.

22       Q.   Does that indicate that he's requested a

23  minister?

24       A.   It says ministerial counselor, Tom Cummins, just

25  the name on there.
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 112 of 331
Appellate Case: 14-1193   Page: 98   Date Filed: 01/28/2014 Entry ID: 4118269

1     Q.    Okay.  And was Mr. Cummins there when

2  Mr. Franklin was executed?

3     A.    I do not believe so.

4     Q.    In fact, none of Mr. Franklin's witnesses were

5  there, were they?

6     A.    No.

7     Q.    Who would have been in -- you know, physically

8  in a position to communicate with the witnesses when they

9  left?

10     A.    There were staff members assigned to stay with

11  them.  I don't know those names.

12     Q.    Okay.  If they had -- if the witnesses had said

13  to the staff members we are leaving, but we would like to

14  be contacted if things change, what would the re -- how

15  should the staff members have responded?

16     A.    How should -- they should have said give me a

17  phone number, I can call you.

18     Q.    Okay.  In the event there was a pretty short

19  interval between the expiration of the stay of execution

20  and the actual execution, correct?

21     A.    Pardon?

22     Q.    Mr. -- when Mr. Franklin was executed, he was

23  executed pretty quickly after the stay of execution was

24  vacated?

25          MR. HANSEN:  Objection, form of the question.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 113 of 331
Appellate Case: 14-1193   Page: 99   Date Filed: 01/28/2014 Entry ID: 4118269

1    It's ambiguous as to what quickly is.  You can answer to

2    the degree you can.

3        A.   I believe it was less than an hour, yes.

4        Q.  (By Ms. Carlyle) Okay.  Why was it decided to

5    obtain a prescription for the Pentobarbital?

6            MR. HANSEN:  I'm going to -- objection to the

7    form of the question in that it lacks foundation.

8        A.   I believe the pharmacy -- the pharmacy required

9    a prescription.

10       Q.  (By Ms. Carlyle) Okay.  And how did you -- how

11   did you, meaning the -- how did the Department of

12   Corrections determine who would write the prescription?

13       A.   Mr. Briesacher came up with the name of the

14   person that would -- the doctor that would do so.

15       Q.   Did you ask M3 to write the prescription?

16       A.   Pardon?

17       Q.   Did you ask M3 to write the prescription?

18       A.   I did not, no.

19       Q.   Did anyone, to your knowledge?

20       A.   I don't know that.

21       Q.   Would there be any reason, if M3 had been

22   willing to write the prescription, why you shouldn't?

23       A.   I don't know.

24       Q.   Okay.  Do you know how many -- do you know

25   anything about the process that Mr. Briesacher went

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 114 of 331
Appellate Case: 14-1193    Page: 100    Date Filed: 01/28/2014 Entry ID: 4118269

1    through to come up with a name?

2         A.    No.

3         Q.    Did you take bids for that job?

4         A.    I did not, no.

5         Q.    Did Mr. Briesacher?

6         A.    I don't know.

7         Q.    Is the person who writes the prescription

8    licensed in Missouri?

9              MR. HANSEN:  Hang on a second.  I am going to

10   object to that question for the reasons we've talked about

11   earlier about the fact that the answer to that question

12   could lead to information that would identify him and he's

13   been named as a member of the execution team and we've

14   asserted that that identity is a state secret.  So I'm

15   objecting to that question and instructing him not to

16   answer.

17             MS. CARLYLE:  Okay.

18        Q.    (By Ms. Carlyle) When does the prescriber's

19   medical license expire?  Can you give me that date?

20        A.    I do not have that in front of me.

21             MR. HANSEN:  I'm going to object to that

22   question.  I am unsure whether that information could lead

23   to the identity of the prescriber, but because similar

24   facts have apparently led to the discovery or purported

25   discovery of the identity of the pharmacy, I'm going to

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 115 of 331
Appellate Case: 14-1193    Page: 101    Date Filed: 01/28/2014 Entry ID: 4118269

Page 102

1    object.

2              MS. CARLYLE:  And direct him not to answer.

3              MR. HANSEN:  Direct him not to answer.  He

4    certainly can tell you whether or not he knows the answer

5    to that question, but I'm going to direct him not to

6    answer the question.

7         A.   I have seen the license, but I do not know the

8    date.

9         Q.   (By Ms. Carlyle) Okay.  Did the person who

10   prescribed the -- first of all, was it the same person who

11   prescribed the Pentobarbital for both Mr. Franklin and

12   Mr. Nicklasson?

13        A.   Yes.

14        Q.   Did that person examine Mr. Franklin or

15   Mr. Nicklasson before he wrote the prescription?

16             MR. HANSEN:  Objection to the form of the

17   question because it lacks foundation.

18        A.   No.

19        Q.   (By Ms. Carlyle) No, he didn't?

20        A.   No.

21        Q.   Did he examine Mr. Franklin or Mr. Nicklasson's

22   medical records before writing the prescription?

23        A.   No.

24        Q.   There are a bunch of copies of the

25   prescriptions, but let's take a look at 1254.  And is the

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 116 of 331
Appellate Case: 14-1193    Page: 102    Date Filed: 01/28/2014 Entry ID: 4118269

1   date on the prescription redacted?

2       A.   No.

3       Q.   **Can we see it?**

4       A.   I see it as 11-12 of '13.

5            MR. HANSEN:  I can see it on my copy.

6            MS. CARLYLE:  Can I come look at your copy?

7            MR. HANSEN:  Sure.  For the record, you're

8   looking at your monitor on your computer.

9            MS. CARLYLE:  I'm looking at my monitor on my

10  computer and it's not -- oh, I see.  Okay.  That's fine.

11      Q.   **(By Ms. Carlyle) And the other redactions, I**

12  **assume, are the -- are things that would identify the**

13  **prescriber; is that true?**

14      A.   Yes.

15      Q.   **The prescription that we have there says, "SIG**

16  **as ordered per death warrant;" is that a fair reading of**

17  **what's on there?**

18      A.   Yes.

19      Q.   **And whose language is that?  Who -- is that**

20  **something that the prescriber came up with to put on there**

21  **or something that the prescriber was directed to put on**

22  **there by you or someone else?**

23      A.   That is the prescriber's language.

24      Q.   **Okay.  Was -- as I said, there are lots of**

25  **copies in here.  Was there more than one prescription**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 117 of 331
Appellate Case: 14-1193    Page: 103    Date Filed: 01/28/2014 Entry ID: 4118269

1   issued for Mr. Franklin -- you know, per patient for

2   Mr. Franklin and Mr. Nicklasson?

3       A.   There were generally just the -- two, one for

4   five grams each.

5       Q.   There were two prescriptions, one for five grams

6   each?

7       A.   Yes.

8       Q.   Why were there two?

9       A.   That's the way we asked them to do it.

10      Q.   Why did you ask them to do it that way?

11      A.   That's -- that was the way we asked them.

12      Q.   But, I mean, they -- if you wanted 10 grams, why

13  didn't you ask them to issue a prescription for 10 grams?

14      A.   Mr. Briesacher would have to answer that

15  question.  That was the way he asked that it be done.

16      Q.   Okay.  Page 1262.  Is that the agreement between

17  the Department of Corrections and the prescriber?

18      A.   Yes.

19      Q.   Okay.  Paragraph two says, "The contractor will

20  provide the Department, upon request, with the requested

21  prescriptions in the name of the offender to be executed."

22  Does that give the prescriber any medical discretion to

23  refuse to issue a prescription?

24          MR. HANSEN:  Object to the form of that

25  question.  I think it's vague, confusing and calls perhaps

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 118 of 331
Appellate Case: 14-1193    Page: 104    Date Filed: 01/28/2014 Entry ID: 4118269

1    for a legal conclusion and an expert opinion.  Answer to

2    the degree you can.

3        A.   It simply says contractor will provide the

4    Department with the requested prescriptions.

5        Q.   (By Ms. Carlyle) Okay.  So in order to -- in

6    order to fulfill his contract when he's requested to do

7    so, he has to write the prescription?

8        A.   That's what it says.

9        Q.   Okay.  How much Pentobarbital -- compounded

10   Pentobarbital does the Department of Corrections have on

11   hand at the moment?

12       A.   Ten grams.

13       Q.   And is that for Mr. Smulls' execution?

14       A.   Yes.

15       Q.   Is new Pentobarbital ordered for each execution?

16       A.   Yes.

17       Q.   If that -- and that Pentobarbital is scheduled

18   to be used on January 29?

19       A.   Yes.

20       Q.   If Mr. Smulls -- if Mr. Smulls' execution

21   doesn't occur, what would happen to that Pentobarbital?

22       A.   It would be destroyed.

23       Q.   You indicated in your interrogatory response

24   that the pharmacy said to store the Pentobarbital at room

25   temperature?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 119 of 331
Appellate Case: 14-1193    Page: 105    Date Filed: 01/28/2014 Entry ID: 4118269

EXHIBIT B

1      A.   That's correct.

2      Q.   Okay.  First of all, to whom was that

3  communication made?

4      A.   To me.

5      Q.   Okay.  Was it in writing?

6      A.   No.  It was -- that was a verbal statement to me

7  when I asked how to store it.

8      Q.   Okay.  Recognizing that you're not going to --

9  let me put it this way.  Do you know who told you that?

10      A.   Yes.

11      Q.   Okay.  I understand you're not going to tell me

12  now, but if you were directed to -- if you were told that

13  the identity were not privileged, you wouldn't say I don't

14  know who told me that.  You know.

15      A.   Yes.

16      Q.   You also said that you had been told that the

17  Pentobarbital expires 30 days after compounding; is that

18  correct?

19      A.   Yes.

20      Q.   Is there a writing that reflects that?

21      A.   There's not a writing that I know of.  It is

22  in -- it is clearly reflected in the labels of the discard

23  date and what -- it confirms what I've been told, that it

24  is good for 30 days.

25      Q.   Okay.  But you -- were you also told that

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 120 of 331
Appellate Case: 14-1193    Page: 106    Date Filed: 01/28/2014 Entry ID: 4118269

1  **verbally?**

2      A.   By Mr. Briesacher.

3      Q.   **Okay.  You weren't told that by anyone at the**

4  **pharmacy?**

5      A.   It's -- I believe the subject came up in

6  conversations regarding the discard date and it was -- in

7  our conversations, it was generally assumed that we had

8  to -- I could not request the pharmacist to compound

9  Pentobarbital over 30 days before an execution date.

10     Q.   **Okay.  And do you know who you had that**

11 **conversation with?**

12     A.   Yes.

13     Q.   **Okay.  Has anyone explained to you why it lasts**

14 **30 days rather than some other length of time?**

15     A.   Not in great detail.  I know bits and pieces,

16 but not in great detail.

17     Q.   **What are the bits and pieces that you know?**

18     A.   Simply -- there's references to ensuring that

19 it's sterile, there's things like that, that it's -- my

20 understanding is that is a conservative estimate, that it

21 is still an appropriately prepared substance well beyond

22 that, but that's the day they picked to use by.

23     Q.   **Okay.**

24          MR. HANSEN:  Elizabeth, it is 5:15 and we've

25 been going a pretty good chunk here.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 121 of 331
Appellate Case: 14-1193   Page: 107   Date Filed: 01/28/2014 Entry ID: 4118269

Page 108

1          MS. CARLYLE:  True.

2          MR. HANSEN:  Could we take a quick five-minute

3    break?

4          MS. CARLYLE:  Let's go off the record for a

5    second.

6          (Off the record.)

7          MS. CARLYLE:  Okay.  Back on the record.

8    ██ ███████████████████████████████████████

██ ████████████████████████████████████████

10   ██████████████████████████

██  ██  ██

██  ██  ████  ████████████

██  ██  ███████████████████████

██  ███████████████████

██  ██  ████  ███████████████████████

██  ███████████████████████████

██  ██  ████

██  ██  ████  █████████████████████

██  ██  ███████████████████████

20         Q.   Okay.  Now, is there other compounded

21   Pentobarbital used for training?

22         A.   No.

23         Q.   Okay.  So the -- when the -- when the training

24   occurs, it's not done with Pentobarbital?

25         A.   The director can give us authority to use saline

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 122 of 331
Appellate Case: 14-1193   Page: 108   Date Filed: 01/28/2014 Entry ID: 4118269

1    solution.

2        Q.   And is that what's been happening with respect

3    to the --

4        A.   That is what happened the training we had prior

5    to the executions, yes.

6        Q.   Okay.  So has there only been one training prior

7    to the executions?

8        A.   Yes.

9        Q.   Okay.  Now, you've ordered -- you're ordering

10   Pentobarbital, I guess, in batches of ten grams, but

11   there's some additional Pentobarbital that's needed for

12   testing, isn't there?

13       A.   That's my understanding, yes.

14       Q.   Okay.  So what -- so what's the actual amount

15   that you get from the laboratory -- from the pharmacy?

16       A.   I get 10 grams.

17       Q.   Okay.  Okay.  So if we look at page 1311, let's

18   do that.  And is that -- is that the log of -- that -- of

19   the chain of custody for Pentobarbital before the

20   execution of Joseph Franklin?

21       A.   Yes.

22       Q.   Okay.  So it tells us that on November 19 at

23   2105, which I think is 9:05 P.M., isn't it?

24       A.   I think so, yes.

25       Q.   Mr. Spillane is nodding his head vigorously.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 123 of 331
Appellate Case: 14-1193   Page: 109   Date Filed: 01/28/2014 Entry ID: 4118269



1    **Okay.   That M3 received the Pentobarbital, correct?**

2        A.    That's correct.

3

11       **Q.    No, but I mean the Pentobarbital itself, is it**

12   **in syringes or bottles?**

13       A.    Oh, it's in syringes.

14       **Q.    So it comes to you in syringes?**

15       A.    Yes.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 124 of 331
Appellate Case: 14-1193   Page: 110   Date Filed: 01/28/2014 Entry ID: 4118269

1          MS. CARLYLE:  Would you mark that as 7 for us,

2   please?

3          (Exhibit No. 7 marked for identification.)

4          MR. HANSEN:  What is she marking, 7, did you

5   say?

6          MS. CARLYLE:  She is marking 7 and it is the

7   affidavit of Dave Dormire filed, according to the ECF

8   notations at the bottom, on December 3, but also, I think,

9   filed in the Missouri Supreme Court on November 15 of 2002

10  by the State.  Do you need to see it before I show it to

11  him?

12         MR. HANSEN:  Yeah, I do.

13         MS. CARLYLE:  Okay.

14         MR. HANSEN:  There you go.

15         MS. CARLYLE:  Okay.

16    **Q.  (By Ms. Carlyle) What was the -- the purpose of**

17  **this affidavit?**

18    A.   My memory was it was to talk about the issue of

19  a peripheral line versus a central line.

20    **Q.   Okay.  And why did you feel the need to talk**

21  **about that?**

22    A.   It was my understanding there was some confusion

23  over the way it was worded in our protocol.

24    **Q.   In paragraph six of the -- of your affidavit on**

25  **page one of Exhibit 7 you say, "If the prisoner's medical**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 125 of 331
Appellate Case: 14-1193     Page: 111     Date Filed: 01/28/2014 Entry ID: 4118269

1    condition allows, both the primary and secondary lines

2    will be inserted as peripheral lines."  What did you base

3    that statement on?  You're not going to insert -- I

4    understand you're not a physician, so you're not inserting

5    any lines.

6          A.    Sure, sure.  That was -- that was to allow the

7    medical personnel to determine the appropriate placement

8    of the line.

9          Q.    Well, the protocol itself says, and you quote it

10   in paragraph five, medical personnel shall determine the

11   most appropriate locations for intravenous lines, does it

12   not?

13         A.    It does.

14         Q.    Okay.  So was this intended to give them

15   additional criteria to use?

16         A.    My intent of this was to just simply clear up --

17   there must have been some -- I believe there was some

18   confusion over how it was worded, but this was to give

19   them clearer direction on it.

20         Q.    Okay.  Now, is this affidavit now part of the

21   execution protocol?

22         A.    Pardon?

23         Q.    Is this affidavit now part of the execution

24   protocol?

25         A.    I don't believe this affidavit itself is, no.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 126 of 331
Appellate Case: 14-1193    Page: 112    Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.    Okay.

2      A.    It may be worded that way, but I don't -- I

3  don't remember.

4      Q.    Okay.  Is there some reason why this statement

5  about the -- both lines being peripheral if the condition

6  allows isn't in the protocol?

7      A.    Pardon?

8      Q.    Why isn't that statement, "If the prisoner's

9  medical condition allows, both primary and secondary lines

10  will be inserted as peripheral lines," why isn't that

11  statement in the protocol?

12          MR. HANSEN:  Objection, form of the question in

13  that it lacks foundation.

14      A.    I can't answer exactly why it isn't written in

15  the protocol.  It has been communicated to the medical

16  personnel, but I can't answer that question.

17      Q.    (By Ms. Carlyle) Did you consult with a physician

18  before you prepared this affidavit?

19      A.    I didn't personally.  There was some discussion,

20  but I believe Mr. Briesacher did the consulting.

21      Q.    Okay.  Did you intend that this affidavit

22  supersede M3's medical judgment about the most appropriate

23  location for intravenous lines?

24      A.    No.

25      Q.    Okay.  Let's talk about the laboratory for a

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 127 of 331
Appellate Case: 14-1193   Page: 113   Date Filed: 01/28/2014 Entry ID: 4118269

1    **little bit.  Is the laboratory a different business than**

2    **the pharmacy?  Are the two connected, the two businesses?**

3              MR. HANSEN:  I'm going to object, again, for the

4    same reasons that you now have indicated that -- today

5    that you know who that pharmacy -- that you personally

6    know who that pharmacy is and the answer to that question

7    might identify who the lab is, which we asserted is --

8              MS. CARLYLE:  Well, I am under a court order,

9    Mr. Hansen, not to reveal that information and I don't

10   intend to and I've known it for some time.  So if you want

11   me to go get a lawyer who doesn't know who -- who didn't

12   read that to ask that question, I will.  But I think --

13             MR. HANSEN:  It's not a question of what you

14   know today.  It's a question of what is going to be in the

15   record.  And that's why I'm inserting the objection --

16             MS. CARLYLE:  Okay.  But what you just mentioned

17   was that you knew I knew.  That's not in the record.

18             MR. HANSEN:  I don't know if you know.  You told

19   me you know.

20             MS. CARLYLE:  I understand that.  But the words

21   that I know are not in the record and won't be.  I've told

22   you they won't be and they won't be and if they were, of

23   course, you'd have the right to have the record sealed and

24   we could argue about that.  But the fact is they're not.

25   So I think we're entitled to know, given the fact that

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 128 of 331
Appellate Case: 14-1193   Page: 114   Date Filed: 01/28/2014 Entry ID: 4118269

1  your position is that these drugs are validated by

2  testing, whether there is a connection between the

3  laboratory that tests them and the pharmacy that makes

4  them.  And that's what I'm asking.

5        MR. HANSEN:  Let me take a moment and discuss it

6  with my co-counsel and make a decision.  Okay.  We'll

7  withdraw the objection as you described your purpose.

8        MS. CARLYLE:  Okay.

9        MR. HANSEN:  And allow him to answer.

10     A.   Now I've got to ask you to restate.

11     **Q.   (By Ms. Carlyle) Fair enough.  The question is is**

12  **there a -- is there a business -- is there a connection**

13  **between the laboratory and the pharmacy other than that**

14  **the laboratory is doing testing for the pharmacy?  Is**

15  **there a business connection between the two entities?**

16     A.   I do not know.

17     **Q.   Okay.  How is the laboratory chosen?**

18     A.   I do not know that.

19     **Q.   There is a contract between the laboratory -- or**

20  **is there a contract between the laboratory and the**

21  **Department of Corrections?**

22     A.   I'm -- I do not know that.

23     **Q.   Okay.**

24        MS. CARLYLE:  Can we go off the record for a

25  second?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 129 of 331
Appellate Case: 14-1193    Page: 115    Date Filed: 01/28/2014 Entry ID: 4118269

EXHIBIT B

1          (Off the record.)

2      Q.  (By Ms. Carlyle) Okay.  Well -- okay.  I think

3  we'll kind of get to it because I think we had some

4  evidence of payments to the laboratory, but we'll see when

5  we get a little further on.  Take a look, please, at page

6  1294.  Can you tell me what sort of information is

7  redacted on that document?

8      A.  It appears to be a date that it's valid, a

9  certification number and another certification number.

10     Q.  Okay.

11         MR. HANSEN:  Can we take just a minute?

12         MS. CARLYLE:  Sure.

13         (Off the record.)

14     Q.  (By Ms. Carlyle) Do you -- are you familiar with

15  the business organization the American Association for

16  Laboratory Accreditation?

17     A.  Yeah.

18     Q.  Do you know whether anyone -- did you determine

19  whether accreditation by the American Association for

20  Laboratory Accreditation was a reflection of the quality

21  of a laboratory?

22     A.  I did not.

23     Q.  Okay.  Looking at page 1306, is the -- okay.  I

24  guess one thing that I find that's odd about this is that

25  it appears that there's no name on this accreditation

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 130 of 331
Appellate Case: 14-1193   Page: 116   Date Filed: 01/28/2014 Entry ID: 4118269

1    redacted or unredacted. Is that the case or was it

2    somehow redacted in white?

3         A.   I don't know the answer to that.

4         Q.   Is there a way to look at the unredacted

5    document and see?

6              MR. HANSEN: I don't know if you know if you

7    have it handy, but --

8         A.   I don't know that I have that document, but I

9    assume we do somewhere. I don't have it in my little --

10             MR. HANSEN: And I suspect Matt might know the

11   answer to that. Matt Briesacher might know the answer to

12   that question.

13        Q.   (By Ms. Carlyle) Is the accreditation reflected

14   on page 1306 and the accreditation reflected on page 1294

15   for the same laboratory?

16        A.   That would be my belief, yes.

17        Q.   Okay. And that would be the laboratory that's

18   been conducting the analysis reports that we have been

19   receiving?

20        A.   Yes.

21        Q.   Okay. Tell us how that -- how that testing

22   process works. Do -- does -- where does the laboratory

23   get the drugs to test? Do they get it from the DOC or

24   from the pharmacy or where?

25        A.   They are sent drugs from the pharmacist.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 131 of 331
Appellate Case: 14-1193   Page: 117   Date Filed: 01/28/2014 Entry ID: 4118269

1     Q.   Okay.  So when part -- when the drugs are sent

2  from the pharmacy for laboratory testing, are they the --

3  are they part of the same batch, for want of a better

4  word, then as the drugs that are going to be sent to the

5  DOC?

6     A.   That's my understanding.

7     Q.   Okay.  So who's responsible for getting the --

8  for getting the drugs to the -- I mean, is there a

9  particular person that you're aware of, even if you're not

10  willing to identify him or her, who's responsible for

11  transmitting the drugs to the laboratory?

12     A.   Yes.  It's M6.

13     Q.   Okay.  And is there a particular person at the

14  laboratory who is responsible for receiving them?

15     A.   I do not know that.

16     Q.   Does the -- is there someone at the laboratory

17  that has an M number?

18     A.   No.

19     Q.   Okay.  On page 1257, first of all there's a --

20  there is a redaction at the top that's listed as client.

21  Again, without -- I know you're probably not going to tell

22  me what's there, but what sort of -- is that the

23  pharmacist, the pharmacy, the -- what sort of thing --

24  what sort of information is crossed out there?

25     A.   I'm not sure.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376              Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 132 of 331
Appellate Case: 14-1193   Page: 118   Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.    Okay.  Why is the lot number crossed out?

2      A.    I don't know exactly.

3      Q.    Do you know what's crossed out at the lower

4  right-hand corner?

5      A.    Not specifically, no.

6      Q.    Okay.  On 1266, can you tell us the nature of

7  the information that's re -- well, why the item number and

8  loss number are redacted?

9      A.    No.

10      Q.    Do you notice on that document that it reflects

11  a manufacturing date of 2011 and an expiration date of

12  2016?

13      A.    Yes.

14      Q.    At the upper left-hand corner?

15      A.    Yes.

16      Q.    So what is -- is that -- does this document

17  reflect an analysis of compounded Pentobarbital?

18      A.    I can't tell you that.  I -- from the dates, I

19  would assume not.

20      Q.    Okay.  The bottom of that document says, "This

21  analysis is not to be construed as a warranty, expressed

22  or implied."  What does -- do you -- what does that mean

23  to you?

24      A.    I take it the way it's worded, it's not a

25  warranty.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 133 of 331
Appellate Case: 14-1193   Page: 119   Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.    Okay.  So essentially they're saying this is our

2  analysis, but we're not saying that -- we're not willing

3  to give you a warranty that it's true?

4      A.    I can't answer your question on that.

5      Q.    Do you know what laboratory or -- performed the

6  analysis reflected in 1266?

7      A.    I am aware of the name of the laboratory, yes.

8      Q.    Okay.  So is it -- is that the same laboratory

9  that's doing the other analyses?

10            MR. HANSEN:  I'm going to object to the form of

11  the question.  It's vague.  Just to clarify --

12            MS. CARLYLE:  Sure.

13            MR. HANSEN:  -- what you mean by the other.

14      Q.  (By Ms. Carlyle) Let me put it this way.  In the

15  collection of discovery that we've been given, there are

16  numerous analysis reports of various kinds.  I mean, maybe

17  this is an easy question.  Are they all performed by the

18  same laboratory?

19      A.    I would guess not.

20      Q.    Okay.

21            MR. HANSEN:  Are you talking about the ones

22  related to Pentobarbital?

23            MS. CARLYLE:  I don't think there are any

24  analyses -- I don't think there are any analyses that

25  aren't related to pentobarbital.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 134 of 331
Appellate Case: 14-1193   Page: 120   Date Filed: 01/28/2014 Entry ID: 4118269

```
 1              MR. HANSEN:  I think that's right, I'm just not

 2   entirely sure.

 3              MS. CARLYLE:  Well, I'm --

 4         Q.  (By Ms. Carlyle) Are all the analyses of

 5   Pentobarbital performed by the same laboratory?  And

 6   you're saying you don't think they are.

 7         A.   The analysis of the compounded Pentobarbital,

 8   yes.

 9         Q.   Okay.  But we're not sure, for example, looking

10   at this document, 1266, exactly -- whether that's an

11   analysis of compounded Pentobarbital or not?

12         A.   That's correct.

13         Q.   And we also don't know what -- whether -- what

14   lab prepared this report; is that true?

15         A.   I'm not sure, no.

16         Q.   Okay.  If you looked at an unredacted copy, do

17   you think that would shed some light on that?

18         A.   I don't know.

19         Q.   Okay.  Similar questions about 1268.  This is

20   entitled Certificate of Analysis and reflects a

21   manufacture date of May 11, 2013 and an expiration date

22   of -- maybe June 11, I don't know.

23              MR. HANSEN:  Which page are you on now?

24              MS. CARLYLE:  I'm on page 1268.

25         Q.   (By Ms. Carlyle) And an expiration date of 2018.
```

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 135 of 331
Appellate Case: 14-1193    Page: 121    Date Filed: 01/28/2014 Entry ID: 4118269

1  Do you think that -- I mean, I guess let me ask you, would

2  your responses about this one be the same as they were

3  about the -- about 1266?

4      A.   Yes.

5      Q.   Okay.  What about 1285?  Is that an analysis of

6  compounded Pentobarbital?

7      A.   I believe so.

8      Q.   Okay.  Now, the redacted material at the top,

9  would -- is that the name of the laboratory?

10     A.   Yes, I believe so.

11     Q.   Okay.  Then the client is redacted and what --

12  you know, what's that?  Is that the pharmacy or the

13  prescriber or --

14     A.   That would be my belief, that that's the

15  pharmacy.

16     Q.   So in this context, the laboratory sees its

17  client as the pharmacy?  It's performing --

18         MR. HANSEN:  Objection --

19     Q.   (By Ms. Carlyle) It's performing the analysis for

20  the pharmacy.

21         MR. HANSEN:  Object to the form of the question.

22  This witness doesn't know what the pharmacy sees the lab

23  as.  It calls for speculation on the part of this witness.

24         MS. CARLYLE:  Okay.  I'm actually -- what I

25  actually said was based on this document from the

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 136 of 331
Appellate Case: 14-1193     Page: 122     Date Filed: 01/28/2014 Entry ID: 4118269

1    laboratory, the laboratory appears to see the pharmacy as

2    its client.  I agree that the pharmacy doesn't know -- we

3    don't know what the pharmacy thinks.

4              MR. HANSEN:  Yeah, I object to the form of the

5    question.

6              MS. CARLYLE:  Okay.

7              MR. HANSEN:  Go ahead.

8         Q.   (By Ms. Carlyle) And then, once again, you don't

9    know why the lot number was removed?

10        A.   I do not.

11        Q.   And do you -- and you still don't know what's

12   redacted at the bottom right.

13        A.   No, I don't.

14        Q.   Okay.  Let's take a look at page 1295.  And this

15   is headed Microbiology Report.  What's this an analysis

16   of?

17        A.   I believe it is the Pentobarbital sodium

18   solution.

19        Q.   Okay.  What -- what batch of Pentobarbital

20   sodium solution is this an analysis of, can we tell?

21        A.   What batch?

22        Q.   I mean, is it Pentobarbital sodium that's

23   intended for DOC?

24        A.   That would be my belief, yes.

25        Q.   Okay.  And at the bottom of this report, it

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 137 of 331
Appellate Case: 14-1193    Page: 123    Date Filed: 01/28/2014 Entry ID: 4118269

1  says, "The results reported relate only to the sample that

2  was tested," correct?

3       A.   Yes.

4       Q.   Let's take a look at 2048.

5            MR. HANSEN:  You said 1208?

6            MS. CARLYLE:  2048.

7            MR. HANSEN:  2048.

8       Q.   (By Ms. Carlyle) Is this a -- this is a letter to

9  Mr. Briesacher.  Is it -- I think we've talked about it

10 before.  Is it -- does it reflect a bid by a laboratory?

11      A.   It says attached is the -- you will find the

12 requested quotation.

13      Q.   All right.  And does the fact that it's been

14 redacted mean that it was the -- it was a successful

15 quotation, that is, that it was one that was accepted or

16 would you have redacted it anyway?

17      A.   I can't answer that specific question.

18      Q.   Okay.  If you looked at the unredacted document,

19 could you tell if it was from the lab that's actually --

20 that's actually performing the testing?

21      A.   I believe so.

22           MS. CARLYLE:  Okay.  Okay.  Let's go off the

23 record for a minute here.

24           MR. HANSEN:  While we're still on the record,

25 just so it's reflected, I don't know if you'll put it in

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 138 of 331
Appellate Case: 14-1193    Page: 124    Date Filed: 01/28/2014 Entry ID: 4118269

 1    here, but it's 6:05 P.M. now, just so we remember.

 2              MS. CARLYLE:  Okay.

 3              (Off the record.)

 4         Q.  (By Ms. Carlyle) When did -- when did you get the

 5    Pentobarbital for Mr. Smulls' execution?

 6         A.    Yesterday.

 7         Q.    Okay.  Let's take a look at some money things.

 8    1295.  Okay.  1295 -- 1296.

 9         A.    1296.

10         Q.    1296, I'm sorry.

11         A.    Okay.

12         Q.    Okay.  1296 reflects a payment of $1,200 to --

13    for the Joseph Franklin execution; is that correct?

14         A.    Yes.

15         Q.    And are these documents used -- they're called

16    Confidential Execution Team Member Receipt.  Are those

17    used to pay those members of the execution team whose

18    identities the Department is protecting?

19         A.    Yes.

20         Q.    So the redacted material in the middle

21    presumably identifies the person who got the payment?

22         A.    Yes.

23         Q.    So this person obtained -- got $1,200 and that

24    was disbursed by Melissa Rohrbach?

25         A.    Rohrbach is the pronunciation.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 139 of 331
Appellate Case: 14-1193    Page: 125    Date Filed: 01/28/2014 Entry ID: 4118269

1    Q.   And does Miss Rohrbach work at -- work in this

2   office or does she work in ERDCC or --

3    A.   She works in our finance office downstairs.

4    Q.   Okay.  So what was the job of the person who got

5   $1,200?  Is that M2, M3?

6    A.   It's M2.

7    Q.   That's M2.  Okay.  Turning to 1297.

8    A.   Yes.

9    Q.   I guess this is -- this is a -- a voucher for

10  $3,000 for Joseph Franklin's execution.  Who gets $3,000?

11   A.   This is M3.

12   Q.   That's M3.  Okay.  Let's switch.  There's --

13  in -- let's look at 2058, I think.  2057?

14       MR. HANSEN:  2058, is that what --

15       MS. CARLYLE:  Actually, 2057.

16   A.   Okay.

17   Q.   (By Ms. Carlyle) Okay.  Who gets -- this is for

18  the -- this is a payment of $11,091 for the execution of

19  Allen Nicklasson.  Who gets that?

20   A.   That's the pharmacy.

21   Q.   Okay.  Now, the pharmacy's bid for the

22  pentobarbital was $8,000, was it not?

23   A.   That was correct.

24   Q.   So what's the extra $3,091 for?

25   A.   That was for testing.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 140 of 331
Appellate Case: 14-1193    Page: 126    Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.    Okay.  So the pharmacy collects the testing fee?

2      A.    Yes.

3      Q.    Okay.  Let's look at 1300.

4            MS. CARLYLE:  I promise by tomorrow I'll have

5      these all on one thing and I won't have to do this.

6            MS. BORESI:  You know M3 is going to be at a

7      remote location tomorrow and we won't have a way to get

8      documents to him.

9            MS. CARLYLE:  Okay.  He probably -- there

10     probably aren't a whole lot of documents he's going to

11     need, but that's an interesting issue.  I think last time

12     we got him some.

13           MS. BORESI:  But you did it like a week in

14     advance.

15           MS. CARLYLE:  Yeah.  If we'd have them a week in

16     advance, it would have been easier.

17     Q.    (By Ms. Carlyle) Okay.  1300 is what?  What is

18     1300?

19     A.    That's a -- the receipt at the pharmacy.

20     Q.    Okay.  And do we have -- and that's November 13;

21     is that right?  It's at the top.

22     A.    Oh, yes; yes.

23     Q.    I'm not trying to be tricky.  Is that a receipt

24     that -- well, let me just ask you this.  I mean, how does

25     the pharmacy get paid?  Does it -- do you send them a

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 141 of 331
Appellate Case: 14-1193   Page: 127   Date Filed: 01/28/2014 Entry ID: 4118269

Page 128

1    check or what happens?

2         A.   I take them cash.

3         Q.   You take them cash.  Okay.  Is that also true

4    for M2 and M3?

5         A.   Yes.

6         Q.   Okay.  And the -- so the $8,000 payment, the

7    $11,000 payment were cash payments?

8         A.   Yes.

9         Q.   1298.  1298 is a receipt for $300.  Who gets

10   $300?

11        A.   M5.

12        Q.   Okay.  And M5 is?

13        A.   The --

14        Q.   Prescriber?

15        A.   Prescriber.

16        Q.   Okay.  And who is Susan Wood?

17        A.   Susan is in our finance office.

18        Q.   Okay.  And is that -- so is that also a cash

19   payment?

20        A.   Yes.

21        Q.   Okay.  What -- is there a -- is there an

22   internal document that says that these people are to be

23   paid in cash?  How does that -- how does that happen?  Who

24   made the decision to pay them in cash, I guess is the

25   question?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 142 of 331
Appellate Case: 14-1193   Page: 128   Date Filed: 01/28/2014 Entry ID: 4118269

```
 1        A.    You're going back many, many years.  I don't --
 2   I don't know.
 3        Q.    Well, they -- you provide the Internal Revenue
 4   Service with proof that they've been paid, do you not?
 5        A.    I do not know.
 6        Q.    Okay.  So you don't know whether the Department
 7   of Corrections issues a 1099 for someone that it pays --
 8        A.    I don't know.
 9        Q.    -- $3,000 in cash?  Let's go back to here.
10   2494.
11              MR. HANSEN:  I'm sorry, what page?
12              MS. CARLYLE:  2494.
13        A.    Are you sure?
14        Q.    (By Ms. Carlyle) Maybe not, no.  It's not 2494.
15   It is --
16              MR. HANSEN:  There is no 2494, right?
17              MS. CARLYLE:  You're right.  Not anymore.  Let
18   me see something.  Well, okay.  I thought I fixed that
19   problem.
20        Q.    (By Ms. Carlyle) Well, actually, I tell you what
21   let's do, let's look in -- we knew we had this box here
22   for a reason.  Let's see what we've got here.  What I'm
23   doing -- okay.  Okay.  Okay.  I'm handing you Exhibit 2,
24   which is a disk containing numerous documents, pages 2492
25   through 2499.
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 143 of 331
Appellate Case: 14-1193    Page: 129    Date Filed: 01/28/2014 Entry ID: 4118269

1          MR. HANSEN:  I'm sorry, what did you say?

2          MS. CARLYLE:  2492 through 2499.

3          MR. HANSEN:  2492 to 2499.

4          THE WITNESS:  Do you want to see those?

5          MR. HANSEN:  What's that?

6          THE WITNESS:  Do you want to see those?

7          MR. HANSEN:  I do want to see those because I do

8    not have copies of those.  They're at my office because

9    they got scanned.  But we do need to at this point,

10   Elizabeth, identify the fact that the page numbers that

11   we're referring to now are not a part of Exhibit 1.

12         MS. CARLYLE:  That's why I said they were part

13   of Exhibit 2.

14         MR. HANSEN:  Oh, you did.  Okay.  I want to make

15   sure that was clear in the record.  Okay.

16         MS. CARLYLE:  Unfortunately, what's happening

17   here is that my computer does not want to read this disk.

18   I'll give it another try here.

19         MR. HANSEN:  Off the record.

20         (Off the record.)

21         (Exhibit No. 2 marked for identification.)

22     **Q.   (By Ms. Carlyle) 2492, can you tell us what 2492**

23   **is?**

24         MS. CARLYLE:  Wait a minute, he's still looking

25   at them.  I'm sorry.  Forgive me.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 144 of 331
Appellate Case: 14-1193   Page: 130   Date Filed: 01/28/2014 Entry ID: 4118269

1          A.    2492 is a memo from myself to Lenny Lenger, the

2     comptroller in the fiscal management unit.

3          Q.  **(By Ms. Carlyle) And what is it asking Mr. -- I'm**

4     **sorry, is it Mr. --**

5               MR. HANSEN:  You want to spell that for --

6          A.    Lenger.  Oh, Lenny, L-E-N-N-Y, Lenger,

7     L-E-N-G-E-R.

8          Q.  **(By Ms. Carlyle) And is that Mr. or Miss?**

9          A.    Mister.

10         Q.    **Mister, okay.  What are you asking Mr. Linger to**

11    **do for you?**

12         A.    I am requesting money for payment for execution

13    services to two contract providers and then again in the

14    second paragraph to four contract providers.

15         Q.    **Okay.**

16         A.    For varying amounts.

17         Q.    **Okay.  And are those the four contract providers**

18    **we've just -- well, who are the four contract providers by**

19    **function?**

20         A.    M2, M3, M2, M3, M5 and M6.

21         Q.    **Okay.  And so that's -- that's the way you --**

22    **you asked him to give you, you know, 16, $17,000 in cash?**

23         A.    (Witness nodding.)

24         Q.    **Okay.  Turning to page 2494, can you tell us**

25    **what that is?**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 145 of 331
Appellate Case: 14-1193   Page: 131   Date Filed: 01/28/2014 Entry ID: 4118269

1       A.    This -- this would appear to be a ledger that

2  they use.  I don't -- I'm not familiar with what this is.

3       Q.    Who's they?

4       A.    The fiscal management unit.

5       Q.    Okay.

6       A.    Yeah.

7       Q.    So you don't -- I mean, is there any -- who in

8  the fiscal manager -- management unit would I want to ask

9  if I wanted to know who that was?

10      A.    Mr. Lenger would know what this is.

11      Q.    Okay.  Okay.  Next page, 2095 -- 2495.  This

12 reflects $5,000 for medical consulting.  Who's being

13 consulted there?

14      A.    I'm -- I'm not up on these type of documents.  I

15 don't know.  I'm going to believe this was moving money

16 into an account, but I don't know that.

17      Q.    Okay.  So who -- so whose signature do we have

18 down on the bottom there?

19      A.    The signature at the bottom is Doug Nelson.

20      Q.    And who is Doug Nelson?

21      A.    Doug Nelson is the commissioner of Office of

22 Administration.

23      Q.    Okay.  And is that part of the Department of

24 Corrections or --

25      A.    No, no.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 146 of 331
Appellate Case: 14-1193   Page: 132   Date Filed: 01/28/2014 Entry ID: 4118269

1     Q.    Okay.  It's part of the State of Missouri?

2     A.    No, he is the -- he is the director of the

3 Office of Administration.  I'm believing that's his --

4           MR. HANSEN:  It's like GSA for the federal

5 government.

6           MS. CARLYLE:  Okay.

7           MR. HANSEN:  It's over -- the umbrella

8 organization for the state agencies.

9           MS. CARLYLE:  Okay.

10          THE WITNESS:  It says commissioner of

11 administration signatures.

12    Q.  (By Ms. Carlyle) So 2496 is a requisition, a

13 Department of Corrections requisition for $5,000?

14    A.    Yes.

15    Q.    Which, it looks like Melissa signed.

16    A.    And myself.

17    Q.    And yourself.  Okay.

18    A.    Yes.

19    Q.    And so what -- what were you doing there?

20    A.    I was moving money into the fund that we use for

21 this.

22    Q.    The fund that we use for?

23    A.    To pay for execution services.

24    Q.    Okay.  And then 2497, is that -- which is

25 $12,500?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 147 of 331
Appellate Case: 14-1193    Page: 133    Date Filed: 01/28/2014 Entry ID: 4118269

1      A.   It appears to be the same as that $5,000

2   document earlier.

3      **Q.   Okay.  So is the -- I notice that your**

4   **requisitions don't call it medical consulting.  Is medical**

5   **consulting just something Mr. Nelson's office seems to**

6   **have decided to call it?**

7      A.   I do not know who fills out these forms.

8      **Q.   Okay.  Because conducting an execution is not,**

9   **in fact, medical consulting, is it?**

10     A.   No, I wouldn't think so.

11     **Q.   So -- and then the -- the others I've showed you**

12  **are basically just other examples of the same thing, true?**

13     A.   Yes.

14     **Q.   Okay.  Go back to look for 1299, I think.  No,**

15  **actually, we don't need to look at 1299.  Okay.  Okay.**

16  **Actually, I've -- let's look at 2399.**

17            **MR. HANSEN:  99?**

18            MS. CARLYLE:  2399, yeah.

19     A.   Okay.

20     **Q.   (By Ms. Carlyle) Okay.  And what is this?**

21     A.   Inventory -- let's see.  Eastern Reception

22  Diagnostic Center, Chemical Control Record.  It says

23  capital punishment transactions.

24     **Q.   The only drug that's reflected on here is**

25  **Pentobarbital, right?**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      **Phone: 1.800.280.3376**      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 148 of 331
Appellate Case: 14-1193   Page: 134   Date Filed: 01/28/2014 Entry ID: 4118269

1      A.   Yes.

2      Q.   Okay.  And what units are those where it says

3  four, two and two?

4      A.   I -- it's labeled as 100M, slash, 50MG, slash,

5  ML.

6      Q.   Right.  But that's a concentration, is it not?

7      A.   I would believe it's a volume.  I don't --

8      Q.   Okay.  I guess I would read that as 100M

9  whatever they are per 50 milligram per milliliter.  Okay.

10  So who -- so I guess we're not sure exactly what the units

11  are.  But what we learned from another log was that

12  five grams were -- or five grams were destroyed after the

13  execution, correct?

14      A.   That's correct.

15          MR. HANSEN:  We're talking about 2399; is that

16  correct?

17          THE WITNESS:  Yes.

18          MS. CARLYLE:  Yes, yes.

19      Q.   (By Ms. Carlyle) Who are the witnesses on the

20  right there?

21      A.   Joe Hofmeister and Terry Russell are the first

22  two.

23      Q.   The third one looks like Johnston to me, but

24  maybe I'm misreading it.

25      A.   Joe Hofmeister is the first one, Terry Russell

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 149 of 331
Appellate Case: 14-1193   Page: 135   Date Filed: 01/28/2014 Entry ID: 4118269

1   is the second one.  Becky Johnston is the first witness on

2   the third item.

3       Q.   Oh, I see.  Wait a minute.

4       A.   Pardon?

5       Q.   **There are two sets of witnesses and I've got the**

6   **thing covered.  Okay.**

7       A.   And I do not know the second witness.

8       Q.   **You can't read that one?  That's a worse**

9   **signature than mine.  Okay.  So -- but I guess the sum**

10  **total of this is whatever those units are, the four, the**

11  **two and the two, by November 21, the Department no longer**

12  **had any Pentobarbital?**

13      A.   That's correct.

14      Q.   **Okay.  I actually only have a couple of more.**

15  **1303.  Okay.  Tell me what this is, please.**

16          MR. HANSEN:  Hang on a second.  Let me get

17  there.

18          MS. CARLYLE:  Oh, sure.

19          MS. BORESI:  What was the number, please?

20          MS. CARLYLE:  1303.

21      Q.   **(By Ms. Carlyle) This appears to be a handwritten**

22  **document, true?**

23      A.   You are correct.

24      Q.   **Do you know whose handwriting it is?**

25      A.   I do.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 150 of 331
Appellate Case: 14-1193    Page: 136    Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.    And whose is it?

2      A.    It is mine, my handwriting.

3      Q.    Well, then, what can you tell us about it?

4      A.    This is my notes that I used to remind myself of

5   all the documents that I needed to ensure I had.

6      Q.    Okay.  So what -- what was -- what's redacted on

7   these notes?

8      A.    Names and phone numbers.

9      Q.    Okay.

10      A.    Addresses.

11      Q.    And are they redacted -- are all those

12   redactions of people that you contend are shielded either

13   as execution team members or state secrets or are they --

14      A.    Yes.

15      Q.    Okay.  In the middle it says, "AG's want to run

16   a check."  Do you have any idea what that referred to?

17            MR. HANSEN:  Well, I'm going to object to the

18   form, foundation of that question.  I don't think it's

19   been -- he hasn't said what that says.  I mean, you might

20   ask him that first.

21      Q.    (By Ms. Carlyle) Okay.  Does it say, "AG's want

22   to run a check?"

23      A.    That was a note I made to myself indicating

24   that --

25            MR. HANSEN:  Just listen to the question.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 151 of 331
Appellate Case: 14-1193    Page: 137    Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.   (By Ms. Carlyle) Let me stop you just for a

2  second.

3      A.   Sure.

4      Q.   Does it appear to be "AG's want to run a check"?

5  Am I reading your handwriting correctly?

6      A.   Yes.

7      Q.   Now, if you remember what that was about, please

8  tell us.

9           MR. HANSEN:  Well, I'm going to object at this

10  point unless it relates to legal advice that we, as

11  representatives, told you, but -- can I talk to -- can we

12  talk?

13           MS. CARLYLE:  Sure.

14           MR. HANSEN:  Just for a moment.

15           THE WITNESS:  Sure.

16           (Off the record.)

17           MR. HANSEN:  Back on the record.  Withdraw the

18  objection.

19           MS. CARLYLE:  Okay.

20           MR. HANSEN:  You can go ahead and answer.

21      A.   That was a note to myself indicating that I was

22  to secure the licenses and things because my note was the

23  Attorney General's Office wanted to make sure that we run

24  checks on those individuals.

25      Q.   (By Ms. Carlyle) On what individuals?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 152 of 331
Appellate Case: 14-1193   Page: 138   Date Filed: 01/28/2014 Entry ID: 4118269

1        A.    The individuals that I was dealing with.

2        Q.    Okay.  And can you identify them by function?  I

3    understand you're not going to give me their names, but --

4              MR. HANSEN:  Give them the pseudonyms.

5        A.    The prescribing -- M5 and M6.

6        Q.  (By Ms. Carlyle) M5 and M6.  Okay.

7        A.    Yes.

8        Q.    And do you know what check they ran?

9        A.    I do not know what all Mr. Briesacher did.

10       Q.    Mr. Briesacher, just so we're clear, is not an

11   AG, is he?

12       A.    That's correct.

13             MR. SPILLANE:  Off the record.

14             (Off the record.)

15       Q.  (By Ms. Carlyle) Okay.  To clarify, does this

16   note mean that you were being directed by the Attorney

17   Generals to run checks or that you were obtaining this

18   information because the Attorney Generals wanted to run a

19   check?

20       A.    My -- I wrote that note because Mr. Briesacher

21   indicated that he wanted to run checks because he was

22   requested to do so by the Attorney General's Office.

23       Q.    Okay.  Then the only thing I think -- well, I

24   won't say that, but we're coming to the end.  Let's take a

25   look at 1304.  Can you tell me what that is?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376            Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 153 of 331
Appellate Case: 14-1193    Page: 139    Date Filed: 01/28/2014 Entry ID: 4118269

1      A.    That is the names, addresses, phone numbers and

2  fax numbers and DEA numbers for M5 and M6.

3      **Q.    Okay.  Under what -- are you involved in**

4  **determining whether prisoners who are awaiting execution**

5  **will be allowed to have confidential visits with their**

6  **attorneys or clergy or who makes that determination?**

7      A.    Generally the warden makes that determination.

8      **Q.    Okay.  Are there any written guidelines about**

9  **when a confidential -- and by confidential, I mean visit**

10  **with no one else in the room will be permitted?**

11      A.    I don't know specifically what all is written.

12      **Q.    Are you involved in the determination of when**

13  **the execution can proceed, that is when the determination**

14  **has been made that there's no legal reason why it can't**

15  **proceed?**

16      A.    No.

17      **Q.    Is that Mr. Lombardi's call?**

18      A.    Yes.

19          MS. CARLYLE:  Okay.  I believe I'm ready to pass

20  the witness if you want to ask him any more.

21          MR. HANSEN:  Very briefly.

22  EXAMINATION BY MR. HANSEN:

23      **Q.    We've been here a little over five hours, I**

24  **think, Mr. Dormire, so I just want to clarify --**

25      A.    Sure.

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 154 of 331
Appellate Case: 14-1193    Page: 140    Date Filed: 01/28/2014 Entry ID: 4118269

1          Q.    -- a couple of things.  Back -- right after we

2      started, a little after 1:30, you were asked a question

3      about a protocol that had been considered by the

4      Department and that is in Exhibit 1 and it's pages 2246 to

5      2249.  And I'd ask you to look specifically at page 2248.

6      Do you have that yet?

7          A.    2248, yes.

8          Q.    Actually, that's not the right page number.  Oh,

9      yeah, it is.  I'm at the wrong page number in my book

10     here.  And I'll ask you to look down under paragraph b2A

11     and you were asked a question -- I'm going to paraphrase

12     it without having the court reporter go all the way back

13     and read it, but you were asked a question about whether

14     the Department maintained Midazolam and Hydromorphone for

15     use in executions.  Do you remember being asked that

16     question?

17         A.    Yes.

18         Q.    And your answer was no, do you recall that?

19         A.    Yes.

20         Q.    Since you gave that answer, do you have any

21     information to include to correct that answer?

22         A.    Yes; yes.

23         Q.    And what is that?

24         A.    I was reminded that we had purchased those items

25     as a backup.  Yes.

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 155 of 331
Appellate Case: 14-1193   Page: 141   Date Filed: 01/28/2014 Entry ID: 4118269

Page 142

```
 1        Q.    At the time this was --

 2        A.    Being considered, yes, yes.

 3        Q.    All right.  And do you still -- do you still

 4   have those drugs in your inventory?

 5        A.    Yes.

 6        Q.    Are those drugs part of the protocol that has

 7   been adopted and is currently in use?

 8        A.    No.

 9        Q.    The only other question or topic I want to ask

10   you about is back about 3:30 or so, you were asked some

11   questions relating to M6 and M6 is the pseudonym for who

12   or what?

13        A.    It is -- on -- the contract is with the

14   pharmacy.

15        Q.    Okay.  But that M6 refers to the pharmacy?

16        A.    Yes.

17        Q.    And you were --

18        A.    Well --

19        Q.    -- shown a document in response to

20   Miss Carlyle's -- or along with Miss Carlyle's question

21   which is found at page 12 of 60.  And what is that

22   document?

23        A.    That is the naming of a pseudonym for team

24   member of M6.

25        Q.    That was the letter written to the pharmacy?
```

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 156 of 331
Appellate Case: 14-1193     Page: 142     Date Filed: 01/28/2014 Entry ID: 4118269

1      A.    Yes.

2      Q.    Informing them that that would be their moniker?

3      A.    Yes.

4      Q.    And what is the Department's position, does that

5   cover just an individual person or the pharmacy or what?

6      A.    We believe that covers the entire pharmacy.

7      Q.    Including its employees?

8      A.    Yes.

9           MR. HANSEN:  Okay.  That's all I have.

10          MS. CARLYLE:  Okay.  Well, unfortunately, it's

11   not going to be quite that simple.

12          MR. HANSEN:  I'm just saying that's all I have.

13   If you have more questions, ask away.

14          MS. CARLYLE:  Okay.

15   EXAMINATION BY MS. CARLYLE:

16      Q.    So when was it that you purchased Midazolam and

17   Hydromorphone for execution?

18      A.    I don't know the exact date.

19      Q.    Can you give me a year?

20      A.    Oh, it was in 2013.  It was while this protocol

21   was being considered.

22      Q.    So it's still available, so if you wanted to

23   change the protocol next week, you would have it available

24   for an execution; is that true?

25      A.    Yes; yes.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 157 of 331
Appellate Case: 14-1193   Page: 143   Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.    Okay.  How much Midazolam do you have on hand?

2      A.    I was told that it's enough for three

3   executions.  I don't know how much that is.

4      Q.    Okay.  And a similar quantity of Hydromorphone?

5      A.    Yes.

6      Q.    And can you give us the expiration date of the

7   Midazolam you have on hand?

8      A.    My understanding, it's later this spring, I

9   believe.

10      Q.    And similarly the expiration date of

11   Hydromorphone?

12      A.    I think it's about the same.

13      Q.    Okay.  And where are the documents that reflect

14   those purchases?  Well, who supplied the hydro -- the

15   Midazolam?

16      A.    Those would have been purchased by the business

17   manager at Bonne Terre.

18      Q.    Okay.  From whom?

19            MR. HANSEN:  Hang on a second.

20            THE WITNESS:  Yes.

21            MS. CARLYLE:  There's nothing that says the

22   suppliers of Midazolam for a backup drug are members of an

23   execution team.

24            MR. HANSEN:  Well, let me think about it.

25            MS. CARLYLE:  Okay.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 158 of 331
Appellate Case: 14-1193   Page: 144   Date Filed: 01/28/2014 Entry ID: 4118269

1          MR. HANSEN:  Go ahead and answer.

2     A.   Your question again?

3     Q.  **(By Ms. Carlyle) My question is who was the**

4  **supplier of the Midazolam?**

5     A.   Oh, I don't know.

6     Q.   **Okay.  Who does?**

7     A.   The institution at Bonne Terre, the business

8  manager.

9     Q.   **Is that Miss Johnston?**

10    A.   Yes.

11    Q.   **Do you know who the Hydromorphone came from?**

12    A.   No.  No, I don't.

13    Q.   **And would Miss Johnston know about that, too?**

14    A.   Yes.

15    Q.   **Okay.  So when you were asked about this earlier**

16  **today, you simply forgot that you had them?**

17    A.   I was probably informed, but it -- I didn't

18  believe at the time that we had gone ahead and purchased

19  them, but I was reminded that we had.

20    Q.   **So who decided that the -- that Midazolam and**

21  **Hydromorphone should be purchased for executions?**

22    A.   Specifically, I don't -- I don't know.  I would

23  assume that it -- that the final decision was Director

24  Lombardi.

25    Q.   **Was that something you recommended?**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 159 of 331
Appellate Case: 14-1193    Page: 145    Date Filed: 01/28/2014 Entry ID: 4118269

1      A.   I don't remember recommending it, no.

2      Q.   **Okay.  Was the decision -- well, I guess I'm**

3  **trying to get a little chronology here.  Was the -- were**

4  **the Midazolam and Hydromorphone purchased before the**

5  **protocol we were talking about, 2246 through 2249, was**

6  **drafted?**

7      A.   I do not know for sure.

8      Q.   **So you don't know whether -- let me think about**

9  **this for a minute.  Does the Department of Corrections**

10 **plan to use Midazolam and Hydromorphone for executions?**

11     A.   At this point, no.

12     Q.   **Who knows what the exact expiration date is?**

13     A.   Miss Johnston.

14     Q.   **Do you believe that in order to use Midazolam**

15 **and Hydromorphone for executions, it would be necessary**

16 **for the DOC to release a new public protocol?**

17     A.   Yes.

18     Q.   **How soon before such an execution do you think**

19 **such a protocol would need to be released?**

20     A.   I don't know that answer.

21     Q.   **24 hours?**

22     A.   No.

23          MR. HANSEN:  Objection to the form of the

24 question, foundation.  It's been answered, but go ahead.

25     A.   Yeah, no, certainly not 24 hours, but I can't

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 160 of 331
Appellate Case: 14-1193    Page: 146    Date Filed: 01/28/2014 Entry ID: 4118269

1  tell you how long.

2      Q.  (By Ms. Carlyle) Do you think -- are you -- do

3  you think it would be -- if you were to announce such a

4  protocol now, that it would be appropriate to use that

5  combination on Mr. Smulls on January 29?

6      A.  It's awfully quick, but I don't make those final

7  decisions.

8      Q.  Is that a decision Mr. Lombardi makes?

9      A.  Yes; yes.

10     Q.  Okay.  Let me just ask you a couple of things

11  about this -- about M6.  M6 you're now telling us is a

12  pseudonym for the pharmacy as a whole?

13     A.  We signed a -- we signed an agreement with the

14  pharmacy that we would keep them confidential.

15     Q.  Okay.  Did you sign an agreement that you would

16  keep the individual employees confidential?

17     A.  Not with each individual employee, no.

18     Q.  Okay.  How many individual employees at the

19  pharmacy have you dealt with?

20     A.  Have I dealt with?

21     Q.  Uh-huh.

22     A.  Primarily one, but there is a second one that is

23  somewhat involved.

24     Q.  And are you willing to reveal their names?

25     A.  No.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 161 of 331
Appellate Case: 14-1193   Page: 147   Date Filed: 01/28/2014 Entry ID: 4118269

1      Q.   **Why not?**

2      A.   I believe it would violate the agreement that we

3  have signed with them.

4           MS. CARLYLE:  Okay.  I think -- I don't think I

5  have any further questions.

6           MR. HANSEN:  No questions.

7           THE WITNESS:  Thank you.

8           MS. CARLYLE:  Oh, signature.

9           MR. HANSEN:  We'll waive presentment, like to

10  read it and sign.

11          MS. CARLYLE:  Okay.

12          MR. HANSEN:  1 through 7, I want a copy of the

13  disk to show what it is, but not the disk itself.  The

14  exhibits except 8 and 9, put the original with the

15  original deposition.

16          MS. CARLYLE:  I just want an electronic copy and

17  PDF format.

18          MR. HANSEN:  I just want an e-tran that will

19  have a copy of the exhibits.

20          (Proceedings concluded at 7:02 P.M.)

21

22

23

24

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 162 of 331
Appellate Case: 14-1193    Page: 148    Date Filed: 01/28/2014 Entry ID: 4118269

Page 149

1                    CERTIFICATE OF REPORTER

2             I, Julie K. Kearns, Certified Court Reporter

3      (MO), Certified Shorthand Reporter (IL), Registered

4      Professional Reporter and Certified Realtime Reporter

5      within and for the State of Missouri, do hereby certify

6      that the witness whose testimony appears in the foregoing

7      deposition was duly sworn by me; the testimony of said

8      witness was taken by me to the best of my ability and

9      thereafter reduced to typewriting under my direction; that

10     I am neither counsel for, related to, nor employed by any

11     of the parties to the action in which this deposition was

12     taken, and further that I am not a relative or employee of

13     any attorney or counsel employed by the parties thereto,

14     nor financially or otherwise interested in the outcome of

15     the action.

16

17

18             _____

19             Julie K. Kearns, CCR #993, CSR, RPR, CRR

20

21

22

23

24

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376                    Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 163 of 331
Appellate Case: 14-1193     Page: 149     Date Filed: 01/28/2014 Entry ID: 4118269

Page 150

```
 1                   Midwest Litigation Services

 2

 3                      January 20, 2014

 4

 5   David Hansen, Esq.
     MISSOURI ATTORNEY GENERAL'S OFFICE
 6   211 West High Street
     Jefferson City, Missouri  65102

 7

 8   In Re:  David Zink, et al. vs. George Lombardi, et al.

 9

     Dear Mr. Hansen:

10

     Please find enclosed your copy of the deposition of

11   DAVE DORMIRE, taken on January 15, 2014 in the

     above-referenced case.  Also enclosed is the original

12   signature page and errata sheets.

13   Please have the witness read your copy of the

     transcript, indicate any changes and/or corrections

14   desired on the errata sheets, and sign the signature

     page before a notary public.

15

     Please return the errata sheets and notarized signature

16   page to Ms. Carlyle for filing prior to trial date.

17   Thank you for your attention to this matter.

18   Sincerely,

19

20   Julie K. Kearns

21   CC:  Elizabeth Unger Carlyle, Esq.

22

23

24

25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 164 of 331
Appellate Case: 14-1193    Page: 150    Date Filed: 01/28/2014 Entry ID: 4118269

```
 1                    Errata Sheet
 2    Witness:  DAVE DORMIRE
 3    In Re:  David Zink, et al. vs. George Lombardi, et al.
 4    Upon reading the deposition and before subscribing
      thereto, the deponent indicated the following changes
 5    should be made:
 6    Page    Line    Should read:
      Reason assigned for change :
 7
      Page    Line    Should read:
 8    Reason assigned for change :
 9    Page    Line    Should read:
      Reason assigned for change :
10
      Page    Line    Should read:
11    Reason assigned for change :
12    Page    Line    Should read:
      Reason assigned for change :
13
      Page    Line    Should read:
14    Reason assigned for change :
15    Page    Line    Should read:
      Reason assigned for change :
16
      Page    Line    Should read:
17    Reason assigned for change :
18    Page    Line    Should read:
      Reason assigned for change :
19
      Page    Line    Should read:
20    Reason assigned for change :
21    Page    Line    Should read:
      Reason assigned for change :
22
23    Witness Signature:
24    Reporter:  Julie K. Kearns
25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 165 of 331
Appellate Case: 14-1193    Page: 151    Date Filed: 01/28/2014 Entry ID: 4118269

Page 152

1          I, DAVE DORMIRE, do hereby certify:

2          That I have read the foregoing deposition;

3          That I have made such changes in form and/or

4    substance to the within deposition as might be necessary

5    to render the same true and correct;

6          That having made such changes thereon, I hereby

7    subscribe my name to the deposition.

8          I declare under penalty of perjury that the

9    foregoing is true and correct.

10

11          Executed the _____ day of _____, 20___,

12    at _____.

13

14          _____.

15          DAVE DORMIRE

16

17    My Commission Expires: _____

18    Notary Public:         _____

19    JK

20

21

22

23

24

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 166 of 331
Appellate Case: 14-1193   Page: 152   Date Filed: 01/28/2014 Entry ID: 4118269

## A

**ability** 9:17
12:12 149:8
**able** 52:8,10
74:20
**above-referenc...**
150:11
**Absolutely** 25:19
**accepted** 124:15
**account** 13:19
132:16
**accreditation**
74:4 116:16,19
116:20,25
117:13,14
**acknowledge** 6:5
12:15 13:2
24:20
**acknowledged**
74:10
**acknowledging**
44:20
**action** 149:11,15
**active** 48:25 49:3
49:11
**activity** 39:14,15
**actual** 16:19 37:7
56:15 99:20
109:14
**add** 21:24
**additional** 11:2
12:11 92:14
109:11 112:15
**address** 72:18
86:2
**addressed** 62:5,9
73:24
**addresses** 137:10
140:1
**adheres** 47:19
**administer** 77:16
77:23 89:16
**administered**
90:8,9,12
**administering**
77:22
**administers** 90:6

**administration**
18:5 47:11 49:7
55:15 97:11
132:22 133:3
133:11
**administrative**
20:10 29:7,24
30:1 32:21 34:8
50:4,5 53:25
83:6
**adopted** 142:7
**advance** 43:6
127:14,16
**advice** 138:10
**advises** 39:12
**affidavit** 2:13
13:25 111:7,17
111:24 112:20
112:23,25
113:18,21
**afternoon** 3:12
**AG** 139:11
**age** 9:23
**agencies** 47:4
133:8
**ago** 7:22,22 9:5
**AGO002250**
20:13
**AGO002405**
2:14 26:1
**AGO00247** 2:14
**AGO002471**
26:6
**AGO002587**
2:15
**AGO002680**
2:15
**AGO2250** 20:16
**agree** 123:2
**agreed** 5:1 25:11
54:3,4
**agreement** 58:23
104:16 147:13
147:15 148:2
**agreements**
58:16
**AG's** 137:15,21

138:4
**AG000639** 8:17
**AG002514** 8:17
**ahead** 12:8 19:8
20:3,6 24:17
40:3 53:21
60:18 87:3
90:13 123:7
138:20 145:1
145:18 146:24
**al** 1:4,7 3:4,7,18
3:19 150:8,8
151:3,3
**allegedly** 44:8
**Allen** 23:15,19
27:9 39:12,16
126:19
**alleviate** 8:9
**allow** 43:22,22
60:7 61:6 112:6
115:9
**allowed** 25:4
43:14 140:5
**allows** 89:11
112:1 113:6,9
**alternative** 22:8
**ambiguous** 41:20
41:23 100:1
**amended** 2:11,12
65:12,19 71:14
**American** 116:15
116:19
**amount** 91:2
109:14
**amounts** 131:16
**analyses** 120:9
120:24,24
121:4
**analysis** 117:18
119:17,21
120:2,6,16
121:7,11,20
122:5,19
123:15,20
**and/or** 150:13
152:3
**announce** 147:3

**announcement**
83:25,25
**answer** 10:22
12:8,20,21,21
12:22 13:7,12
13:13 23:16
30:7 40:11
42:24 43:4,11
43:22,25 45:1
45:19,22 52:8
53:21,23 55:8
60:3,18 61:9
63:2,10 64:18
97:1 98:11
100:1 101:11
101:16 102:2,3
102:4,6 104:14
105:1 113:14
113:16 114:6
115:9 117:3,11
117:11 120:4
124:17 138:20
141:18,20,21
145:1 146:20
**answered** 10:25
12:1,1,12,14
27:21 43:18
75:11 146:24
**answering** 13:4
**answers** 10:23
12:16 13:17
14:8,16 22:22
36:21 42:19
46:3 74:13
**anybody** 16:24
**anymore** 129:17
**anyway** 80:3
124:16
**apart** 81:8
**apologize** 11:17
23:8
**apparently**
101:24
**appear** 20:17
33:22 34:2,21
57:14 70:2,4
82:18 91:14

93:2,3 132:1
138:4
**appears** 26:5
29:13 33:1 34:1
37:17,19 38:9
57:20 58:1
66:11 67:17
71:16,18 73:24
74:7 79:22 82:3
82:20,22 92:14
92:15 116:8,25
123:1 134:1
136:21 149:6
**application**
32:23
**apply** 95:23
**appreciate** 49:25
88:3 92:25
**approach** 16:3
**approached** 55:4
**appropriate** 63:6
87:7 112:7,11
113:22 147:4
**appropriately**
107:21
**approval** 89:14
**approved** 49:7
49:12 88:16
**area** 95:1
**areas** 27:20
**argue** 114:24
**Ashland** 52:13
52:13
**asked** 12:11 13:9
23:14 40:20
51:25 52:1
60:14 86:14
97:18 104:9,11
104:15 106:7
131:22 141:2
141:11,13,15
142:10 145:15
**asking** 10:17
12:14 18:14
19:13 41:21
51:8 52:3 53:7
60:13 61:1,3

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 167 of 331
Appellate Case: 14-1193   Page: 153   Date Filed: 01/28/2014 Entry ID: 4118269

63:2 72:16
76:17,18,19
81:3 89:25
115:4 131:3,10
**aspect** 78:20,20
**asserted** 101:14
114:7
**assessment** 15:6
**assigned** 62:18
80:5 99:10
151:6,8,9,11,12
151:14,15,17
151:18,20,21
**assignments**
80:21 81:4
**assistant** 20:10
29:7,24 30:2
32:21 34:8
53:25 83:6
**Association**
116:15,19
**assume** 51:14
72:18 103:12
117:9 119:19
145:23
**assumed** 107:7
**assuming** 30:9
33:3 89:19
**assumption**
110:20
**attach** 16:20
**attached** 2:18
65:14 124:11
**attaching** 38:14
**attempt** 56:18
97:5
**attempted** 13:17
67:8
**attempts** 11:3
55:25 65:4
**attend** 33:12
**attending** 34:2
**attention** 19:6
23:13 39:5 72:7
150:17
**attorney** 4:9 9:7
138:23 139:16

139:18,22
149:13 150:5
**attorneys** 140:6
**attorney's** 25:5
**authority** 28:18
39:18 108:25
**authorization**
50:8 51:3
**availability**
50:20
**available** 7:6
22:13 44:19
46:2 54:14,21
54:22 56:4
143:22,23
**awaiting** 140:4
**aware** 12:24,24
15:10 67:8 71:9
74:18 82:25
83:6 91:24
96:12 97:17
98:16,19 118:9
120:7
**awfully** 147:6

---

## B

**B** 19:7,16
**back** 6:9 17:15
20:23 34:18
68:14 76:22
83:15 88:1,2,24
94:1 95:10
108:7 129:1,9
134:14 138:17
141:1,12
142:10
**backup** 22:12
141:25 144:22
**badly** 32:19
**bag** 78:8,9
**base** 112:2
**based** 6:23 30:22
34:9 36:21
89:12 122:25
**basic** 10:6
**basically** 7:15
32:8 57:25

66:12 134:12
**batch** 118:3
123:19,21
**batches** 108:9
109:10
**Bates** 2:14,15
26:23
**Bates-stamped**
9:13 25:17,20
26:23
**bear** 72:22
**Becky** 136:1
**beginning** 8:16
46:15 82:1
**begins** 19:7
26:23 71:6
78:25 79:1,11
79:13 80:19,19
**behalf** 1:10 9:24
10:10
**belief** 117:16
122:14 123:24
**believe** 5:14 7:13
7:22 16:9 27:1
33:15 34:12
36:8 42:7 48:3
49:16 50:10
55:22 58:4,18
63:6 65:4,20,21
70:12 74:4
75:21 82:12
83:13 89:4
90:24 99:3
100:3,8 107:5
112:17,25
113:20 122:7
122:10 123:17
124:21 132:15
135:7 140:19
143:6 144:9
145:18 146:14
148:2
**believes** 89:12
**believing** 133:3
**best** 12:12 16:3
41:24 149:8
**better** 16:19
22:12 37:20,21

118:3
**beyond** 45:22
107:21
**bid** 40:11 53:15
55:15,24 56:8
56:11,17
124:10 126:21
**bids** 51:4,10,14
51:15,16 101:3
**big** 26:4
**bit** 7:10 114:1
**bits** 107:15,17
**blank** 8:7 32:8,10
70:20
**blanks** 31:3
**blocked** 35:7
**bolded** 94:16
**Bonne** 110:18,22
144:17 145:7
**book** 141:9
**Boresi** 4:9 6:21
9:10 86:8 95:7
127:6,13
136:19
**bottle** 38:24
**bottles** 110:12
**bottom** 23:13
65:15 81:16,17
111:8 119:20
123:12,25
132:18,19
**Boulevard** 4:14
**box** 110:10
129:21
**brand** 39:1
**break** 17:12,14
40:10 51:19,23
51:25 52:6
108:3
**brief** 66:5 94:22
**briefing** 94:12,22
**briefly** 65:24
140:21
**Briesacher** 15:11
16:7 20:10 22:4
42:1 46:13,16
47:8 48:3 49:14

49:16 54:1
61:14,17 73:25
74:18 83:13
100:13,25
101:5 104:14
107:2 113:20
117:11 124:9
139:9,10,20
**bring** 16:16
**building** 17:6
97:11
**bunch** 102:24
**business** 64:6,8
64:11 74:1
114:1 115:12
115:15 116:15
144:16 145:7
**businesses** 114:2
**buying** 41:3
**b2A** 141:10

---

## C

**C** 4:1
**call** 27:17 36:10
36:10,11 39:4
68:2 80:15
88:12 99:17
134:4,6 140:17
**called** 36:9 55:14
91:2 125:15
**calling** 60:3
**calls** 12:19 50:25
67:7 104:25
122:23
**capable** 57:10
**capital** 134:23
**capitals** 37:8,10
**car** 16:16
**cards** 68:1,16,24
**careful** 42:18
43:14,24
**Carlyle** 2:2,4 4:4
4:4 5:10,18,21
6:3,6,13,16
7:15 8:3,24
9:15,21 10:1
11:16,20,23

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 168 of 331
Appellate Case: 14-1193     Page: 154     Date Filed: 01/28/2014 Entry ID: 4118269

12:3,4,8 13:3
14:9,11,19,23
15:1,3 16:13,22
17:2,10,13,15
17:22,24 18:16
18:18 20:2,4,8
20:16 23:3,7,10
23:12,24 24:4,8
24:11,14,15,19
24:23 25:12,19
25:22,23 26:20
27:14 30:8,12
30:16 32:11,14
32:15 33:20
34:13,24,25
37:9 39:4,9,21
40:5,22 41:24
42:22 43:1,8,16
43:20 44:3,6,10
44:13,17,22,23
45:4,10,18,24
46:5,6 47:25
48:22 49:24
50:1 51:2,18,22
51:24 52:5,7
53:24 57:4,6
59:4,6 60:5,11
60:14,20 61:2
61:10 62:14,22
62:25 63:8,12
63:18 64:19,24
65:6,9,14,18
66:2,6,9,10
67:10 68:10,12
68:14,15 69:4
70:10,24 71:4,5
71:21 73:18,21
74:17,20,25
75:13 76:19,22
79:7,9 81:2,14
81:17 84:13,16
84:21,25 85:4
85:24 86:1,10
86:23 87:2,9
88:2,5,8,22,24
88:25 91:21
92:6,8,9,21

93:1,4,14,17,19
94:5,8,18,21
95:5,8,10,11
97:20 100:4,10
101:17,18
102:2,9,19
103:6,9,11
105:5 108:1,4,7
108:8 111:1,6
111:13,15,16
113:17 114:8
114:16,20
115:8,11,24
116:2,12,14
117:13 120:12
120:14,23
121:3,4,24,25
122:19,24
123:6,8 124:6,8
124:22 125:2,4
126:15,17
127:4,9,15,17
129:12,14,17
129:20 130:2
130:12,16,22
130:24 131:3,8
133:6,9,12
134:18,20
135:18,19
136:18,20,21
137:21 138:1
138:13,19,25
139:6,15
140:19 143:10
143:14,15
144:21,25
145:3 147:2
148:4,8,11,16
150:16,21
**Carlyle's** 142:20
142:20
**carried** 110:7
**carry** 110:10
**case** 8:1 65:20
67:5 117:1
150:11
**cash** 128:2,3,7,18

128:23,24
129:9 131:22
**categories** 53:6
61:4
**category** 52:21
70:9,10 72:17
75:24 95:20
96:4
**cause** 3:16
**cautiously** 44:2
**CC** 150:21
**CCR** 1:12 149:19
**CD** 2:9,10 5:12
17:18
**cell** 39:17 79:20
81:21 82:2,3,9
82:11,13,17,19
**Center** 28:15,17
134:22
**centered** 94:16
**central** 1:2 3:2
28:25 31:14
32:18 33:15
35:12,13 36:2
36:20,22 37:1,4
111:19
**certain** 3:16
**certainly** 14:19
58:21 76:5
90:24 102:4
146:25
**certificate** 64:4
121:20 149:1
**certification** 64:2
116:9,9
**Certified** 3:15
5:4 149:2,3,4
**certify** 149:5
152:1
**chain** 109:19
**change** 13:12
51:7 99:14
143:23 151:6,8
151:9,11,12,14
151:15,17,18
151:20,21
**changed** 13:4

**changes** 12:17
34:13,15,20
150:13 151:4
152:3,6
**changing** 30:22
34:8
**characterize**
23:21
**chase** 59:11
**check** 84:6 128:1
137:16,22
138:4 139:8,19
**checked** 31:4
**checklist** 30:11
30:21 31:4
**checks** 138:24
139:17,21
**check-off** 31:6
**chemical** 21:1
30:18 38:15,17
87:18,20 88:11
134:22
**chemicals** 18:5
30:11,17 31:8,9
38:14,16 48:12
87:17,20
**Chief** 49:16
**chosen** 115:17
**chronological**
29:21 30:23
31:11 34:6
78:25 80:15
82:14 93:16
**chronology**
34:14,16 146:3
**chunk** 107:25
**Circuit** 3:17
**circumstance**
12:23
**City** 3:14 4:5,10
4:14 52:15
110:16 150:6
**clarify** 7:9 65:11
120:11 139:15
140:24
**clear** 6:10 9:6
25:1,15 28:12

32:6 43:6 49:14
49:21 59:1
85:25 87:1
112:16 130:15
139:10
**cleared** 84:3
**clearer** 16:19
38:6 112:19
**clearly** 106:22
**clergy** 140:6
**clerk** 62:16
**client** 118:20
122:11,17
123:2
**close** 8:21
**code** 83:20,22,24
83:25 84:1,2,5
**collection** 120:15
**collects** 127:1
**column** 91:2
**combination**
147:5
**come** 33:15 49:1
49:4,11 101:1
103:6
**comes** 29:6
110:14
**coming** 139:24
**Commission**
152:17
**commissioner**
132:21 133:10
**communicate**
99:8
**communicated**
47:19 113:15
**communication**
106:3
**company** 62:15
**complaint** 2:11
2:12 65:12,13
65:14,20 71:14
**complaints** 61:12
**complete** 87:19
**completed** 37:3
82:1
**comply** 41:1

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 169 of 331
Appellate Case: 14-1193    Page: 155    Date Filed: 01/28/2014 Entry ID: 4118269

**compound** 80:24
87:4 107:8
**compounded**
48:1,5,13 49:1
72:2 105:9
108:20 119:17
121:7,11 122:6
**compounding**
21:5 42:11
47:14 48:1,11
48:11,17,18
106:17
**compounds**
42:15 68:20
**comptroller**
131:2
**computer** 103:8
103:10 130:17
**concentration**
135:6
**concern** 7:23
62:6
**concerns** 8:9
15:3
**concluded**
148:20
**conclusion** 12:19
25:10 67:7
105:1
**condition** 112:1
113:5,9
**conduct** 47:2
**conducted** 7:25
**conducting**
117:18 134:8
**confident** 17:17
**confidential** 7:18
24:22 39:9
44:20 55:22,23
57:11 125:16
140:5,9,9
147:14,16
**confirm** 32:25
33:9 57:2 64:22
87:16
**confirmed** 70:19
110:21

**confirms** 70:14
106:23
**confused** 8:25
9:4
**confusing** 80:24
104:25
**confusion** 111:22
112:18
**connected** 78:9
114:2
**connection** 115:2
115:12,15
**conservative**
107:20
**considered** 141:3
142:2 143:21
**construed** 119:21
**consult** 113:17
**consulted** 36:3
83:13 132:13
**consulting**
113:20 132:12
134:4,5,9
**contact** 41:7,18
42:9 55:25
56:12 97:18
**contacted** 39:23
40:4 97:19
99:14
**contain** 66:12
**contained** 17:18
**containers** 110:8
**containing** 5:13
6:17,22 129:24
**contains** 5:17
63:21 67:15
**contend** 12:1
72:1 137:12
**context** 122:16
**continue** 20:11
**contract** 46:12
59:1,7 105:6
115:19,20
131:13,14,17
131:18 142:13
**contracting** 58:9
**contractor**

104:19 105:3
**contractor's** 58:9
**contracts** 59:16
**control** 90:4
108:13 134:22
**controlled** 64:3
**conversation**
70:19 71:7
85:12 107:11
**conversations**
107:6,7
**coordinating**
98:6
**copied** 68:2
**copies** 2:18 7:14
9:7 33:22 52:25
57:6 102:24
103:25 130:8
**copy** 8:18 9:10
9:11 14:7,17,18
14:19,20 17:5
22:22 23:9
37:18,19,20
38:9,12 55:13
58:2,19 65:10
65:25 66:3
67:20 71:16
103:5,6 121:16
148:12,16,19
150:10,13
**corner** 66:21
119:4,14
**correct** 6:12,15
8:23,24 21:9
22:10,10 38:19
44:4 49:24
53:16 55:10
56:1,4,5 58:11
59:8 64:11 76:9
79:11 83:17
88:13,14 96:5
96:19 99:20
106:1,18 110:1
110:2,4,5,19
121:12 124:2
125:13 126:23
135:13,14,16

136:13,23
139:12 141:21
152:5,9
**Correctional**
28:14,16
**corrections** 3:14
6:25 7:11,16
8:11 9:12 15:8
18:5 22:12
37:14 39:11,19
39:25 41:6 42:9
46:8,17,21 47:6
48:2 49:10,15
50:7 61:11
100:12 104:17
105:10 115:21
129:7 132:24
133:13 146:9
150:13
**correctly** 80:18
90:18 138:5
**counsel** 2:19 5:2
5:2 49:16 67:4
74:14 96:18
149:10,13
**counselor** 98:24
**count** 83:23 84:1
84:2,2 93:18
**counter** 90:24
**County** 3:17
**couple** 9:5
136:14 141:1
147:10
**course** 16:4 27:9
31:1 114:23
**court** 1:1 3:1,15
3:17 4:12 5:4
67:3 111:9
114:8 141:12
149:2
**Court's** 6:23
**cover** 143:5
**covered** 136:6
**covers** 143:6
**co-counsel** 85:15
115:6
**CO1** 91:23

**CP** 81:21
**criteria** 89:15,17
112:15
**crossed** 118:24
119:1,3
**CRR** 149:19
**CSR** 149:19
**Cummins** 98:24
99:1
**current** 18:11
19:4 69:9,11
**currently** 15:12
18:14,19 22:9
142:7
**custody** 109:19
**cut** 94:9,10

---

**D**

**DAI** 94:12
**date** 20:7 22:1
57:14,20 64:24
65:21 66:16,18
66:20,22,23
67:22 69:5,18
72:22 73:2,3,3
73:4,5 75:20
81:24 101:19
102:8 103:1
106:23 107:6,9
108:14 116:8
119:11,11
121:21,21,25
143:18 144:6
144:10 146:12
150:16
**dated** 57:14 58:7
58:7,8,21 81:20
**dates** 13:5,6 58:6
66:7 67:9 74:18
76:21 81:7
119:18
**Dave** 1:10 2:13
3:10 9:22 27:11
38:23 111:7
150:11 151:2
152:1,15
**David** 1:4 3:4,18

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 170 of 331
Appellate Case: 14-1193   Page: 156   Date Filed: 01/28/2014 Entry ID: 4118269

4:8 33:7 150:5
150:8 151:3
**day** 3:11,13
13:13 31:12
46:16 74:16
98:4 107:22
152:11
**days** 7:22,22 9:5
81:8 106:17,24
107:9,14
**DEA** 58:10,12
140:2
**dealing** 139:1
**deals** 19:17
**dealt** 147:19,20
**Dear** 150:9
**death** 87:16
103:16
**Debbie** 32:21
**debriefing** 94:19
94:21
**December** 6:21
6:21,23 7:12
8:12 9:20 44:8
65:20 66:19
67:11 69:17
71:15 111:8
**decided** 16:8
21:24 35:21
100:4 134:6
145:20
**deciding** 89:15
**decision** 16:10
22:3,4,18 69:21
115:6 128:24
145:23 146:2
147:8
**decisions** 147:7
**declare** 152:8
**declared** 85:22
**declined** 46:3
**Defendant** 3:20
5:2 14:7
**defendants** 1:8
3:8 4:7 5:13
**defined** 14:12,13
14:13

**definition** 14:14
15:4
**degree** 45:1
100:2 105:2
**deleted** 9:8
**delivered** 41:15
49:4 110:21
**deny** 64:22
**department** 3:13
6:24 7:11,16
8:11 9:12 15:8
16:1,4,9 18:4,8
18:11 19:1,10
19:20,23 22:9
22:11 37:11,13
39:11,19,25
41:6 42:8 46:7
46:7,17,21 47:6
48:2 49:9,15
50:7 61:11
100:11 104:17
104:20 105:4
105:10 115:21
125:18 129:6
132:23 133:13
136:11 141:4
141:14 146:9
**Department's**
143:4
**deponent** 151:4
**deposes** 9:24
**deposing** 46:16
**deposition** 1:10
3:10 5:3,8 8:21
10:5 16:21,24
24:21 25:10
43:6 44:11 46:2
74:10 148:15
149:7,11
150:10 151:4
152:2,4,7
**deputy** 76:6
97:16,23,24,25
98:1
**describe** 21:11
21:14,17 63:24
64:1 70:9,10

97:13
**described** 27:15
29:15 115:7
**describes** 21:8,9
**describing** 14:2
50:19
**designation**
21:25 62:18
**designee** 39:12
39:20
**desired** 150:14
**destroy** 7:14,15
**destroyed** 7:12
9:2,4,7,8 91:6
105:22 135:12
**detail** 14:2
107:15,16
**details** 27:18
**determination**
16:6 140:6,7,12
140:13
**determinations**
16:5
**determine** 25:10
46:8 54:10,14
85:5 87:7
100:12 112:7
112:10 116:18
**determined** 8:4
16:1
**determines** 19:10
**determining**
140:4
**developing** 14:3
15:13
**development**
15:7
**Diagnostic** 28:14
28:16 134:22
**difference** 48:4,6
92:12
**differences** 57:9
57:18
**different** 8:5,8
24:10 51:5
57:20,22 58:16
58:16,16,21,21

58:22,23,24
59:7 68:16 80:3
80:16,21,21,22
80:25 81:3,4,4
81:5,6,7 95:25
114:1
**direct** 11:1 42:22
42:23 45:22
53:23 102:2,3,5
**directed** 7:13
103:21 106:12
139:16
**directing** 45:18
**direction** 112:19
149:9
**directions** 33:11
**directly** 10:8
46:3 49:17
**director** 16:9
19:10 22:5 29:6
29:10 32:20,24
36:10 39:11,19
49:17 88:18
94:12 108:25
133:2 145:23
**director's** 33:24
89:13
**directs** 89:10
**disbursed** 125:24
**discard** 106:22
107:6
**discarded** 78:1,8
87:21 91:2
**disclose** 42:20,20
**disclosing** 43:18
**disclosure** 44:7,8
**discovery** 2:9,10
5:13 6:20,22
9:1,3 25:5
49:23 61:20
67:5 69:18,19
101:24,25
120:15
**discretion** 104:22
**discuss** 115:5
**discussion**
113:19

**disk** 5:22,25 6:1
6:2,10,17,19,22
6:24 7:2,5,5,6
7:20 8:20,22,22
9:16 16:25
49:23 52:25
61:20 129:24
130:17 148:13
148:13
**disposal** 87:17
**dispute** 6:1
**distributor** 21:4
**DISTRICT** 1:1,1
3:1,1
**division** 1:2 3:2
35:19 37:11,12
**DOC** 117:23
118:5 123:23
146:16
**doctor** 67:22
89:11,13,13
100:14
**document** 16:20
18:2,7,10 19:7
20:5,18,25
32:17 53:3,14
57:7 58:19 65:1
65:1,22 67:3
71:10,13 73:1
116:7 117:5,8
119:10,16,20
121:10 122:25
124:18 128:22
134:2 136:22
142:19,22
**documents** 6:17
6:22 7:4,10,17
7:20 8:6,10,18
8:19 9:19 17:16
20:12 23:17,21
23:24 25:3
27:23,25,25
28:4,25 40:5
52:1,8,24,24,25
55:6 57:15,24
63:21 66:12
67:15 68:5

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 171 of 331
Appellate Case: 14-1193   Page: 157   Date Filed: 01/28/2014 Entry ID: 4118269

69:14 72:9 79:2
84:18,19 85:1
91:21 92:13
125:15 127:8
127:10 129:24
132:14 137:5
144:13
**doing** 22:17
44:21 57:10
78:22 83:10
85:9 115:14
120:9 129:23
133:19
**domain** 55:7
**Dormire** 1:10
2:13 3:10 5:11
9:22 10:2 17:16
17:19 22:21
23:8 25:16 52:1
52:7 71:13
111:7 140:24
150:11 151:2
152:1,15
**Dormire's** 14:8
44:11
**DORS** 37:7,8
**double-sided**
26:1,2,3,4,6,18
**Doug** 132:19,20
132:21
**downstairs** 126:3
**draft** 10:10,12,13
10:13,14,16,19
**drafted** 10:18
146:6
**drafting** 10:17
**draw** 19:6 23:12
72:7
**Drive** 3:14
**drug** 24:10 40:17
47:11,14 49:7
134:24 144:22
**drugs** 41:9,12
42:14 44:23
45:20 60:1,7,16
60:22 61:6
77:17,22 115:1

117:23,25
118:1,4,8,11
142:4,6
**duly** 149:7
**duplicates** 8:6
**duties** 82:8
**D-O-R-S** 37:8,9

_____
**E**
**E** 4:1,1
**earlier** 8:2 27:14
101:11 134:2
145:15
**easier** 16:24
93:15 127:16
**Eastern** 28:13,14
134:21
**easy** 120:17
**ECF** 111:7
**educational**
68:23
**effect** 18:15,19
21:20 75:15
**effort** 49:10
**eight** 65:19
**either** 14:6 40:24
53:25 59:24
60:6,15,20 66:3
87:18,19 94:7
137:12
**electronic** 9:10
9:11 148:16
**electronically**
17:4
**Elizabeth** 4:4,4
24:6 25:16
107:24 130:10
150:21
**employed** 149:10
149:13
**employee** 147:17
149:12
**employees** 143:7
147:16,18
**enclose** 32:23
**enclosed** 150:10
150:11

**ends** 24:25 34:9
**engage** 42:12
**ensure** 7:17
27:19 54:11
137:5
**ensuring** 107:18
**entire** 6:1 143:6
**entirely** 121:2
**entities** 15:6
21:22 58:17
115:15
**entitled** 67:4
114:25 121:20
**entity** 16:5 62:4
**entry** 39:6 83:20
**equipment** 30:11
**ERDCC** 28:12
126:2
**errata** 150:12,14
150:15 151:1
**escorted** 39:13
**Esq** 4:4,8,8,9
150:5,21
**essentially** 120:1
**established** 39:18
**estimate** 107:20
**et** 1:4,7 3:4,7,18
3:19 150:8,8
151:3,3
**evaluate** 87:15
**evening** 3:13
108:19
**event** 17:4 99:18
**everybody** 15:13
17:2
**evidence** 116:4
**exact** 22:1 40:25
73:2 79:24
143:18 146:12
**exactly** 12:23
36:13,14,24
44:12 60:25
113:14 119:2
121:10 135:10
**EXAMINATI...**
9:25 140:22
143:15

**examine** 102:14
102:21
**examined** 3:11
9:23
**example** 13:5
86:2 121:9
**examples** 134:12
**executed** 72:24
91:25 96:7 99:2
99:22,23
104:21 152:11
**execution** 13:25
18:14,18 19:3
19:17,24 20:24
20:24 21:7,12
21:15,18,21,22
21:25 23:15
26:13 28:1
29:22 31:12
32:22 34:7
38:15 39:13,15
39:16 41:4
44:24 45:19
57:11 72:3 74:9
74:11 75:21
76:25 77:5 85:2
85:14,15,22
86:5 87:12 89:5
89:9 90:11,13
90:14 91:7
94:25 95:1,12
95:14 96:12,13
96:19 98:5
99:19,20,23
101:13 105:13
105:15,20
107:9 108:14
108:19 109:20
112:21,23
125:5,13,16,17
126:10,18
131:12 133:23
134:8 135:13
137:13 140:4
140:13 143:17
143:24 144:23
146:18

**executions** 13:7
13:10 23:18
27:16 31:17
33:12 34:16
36:1 109:5,7
141:15 144:3
145:21 146:10
146:15
**exhibit** 2:11,12
5:12 6:5,7,16
7:7,21,25 8:15
8:23 14:24
16:15,16,20
17:18 25:8,11
25:13,18,24
26:21,23,24
31:22 32:16
38:22 49:23
50:1 53:1 61:20
65:6,8,13,19
66:11,15 70:25
71:1,14 86:22
88:1,2 111:3,25
129:23 130:11
130:13,21
141:4
**exhibits** 2:6,17
2:18 24:17
148:14,19
**exist** 27:23 57:25
**exists** 11:24 36:4
**expect** 46:23
**expert** 105:1
**expiration** 64:24
66:15 69:18
99:19 119:11
121:21,25
144:6,10
146:12
**expire** 67:22 69:5
101:19
**expired** 67:11
**expires** 106:17
152:17
**explain** 48:4,9
50:18 61:2
79:14

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 172 of 331
Appellate Case: 14-1193     Page: 158     Date Filed: 01/28/2014 Entry ID: 4118269

explained 8:1,2
  107:13
explore 22:16
export 60:1,7,16
  60:22
expressed 119:21
expressing 7:23
expressly 5:6
extent 46:14
extra 126:24
extraterritorial
  59:25 60:15,21
eyes 25:5 95:2
e-mail 8:1 70:2,4
  70:12,22 71:16
  71:23
e-tran 148:18

**F**

facilities 49:6,12
facility 47:15
fact 5:22 7:19
  18:7,10 41:22
  44:1 57:6 91:4
  99:4 101:11
  114:24,25
  124:13 130:10
  134:9
facts 101:24
fair 7:7 19:14,16
  25:5,12,12 90:19
  103:16 115:11
falls 61:3
familiar 44:7
  116:14 132:2
families 96:1
family 91:25
far 44:2 80:12
  93:2,3
fax 58:19 140:2
faxed 58:2,3,4
February 74:13
  74:17 75:11
federal 47:11
  133:4
fee 127:1
feel 54:13 84:18

111:20
fetch 52:1
fewer 7:24
figure 58:15 95:2
  97:21
file 80:20
filed 10:9 61:12
  65:20 67:3
  71:15 111:7,9
files 9:8
filing 65:21
  150:16
fill 36:20 55:18
  55:20 80:14
filled 35:18 55:16
  80:25 81:2
filling 31:2 55:21
  80:7
fills 36:24 134:7
final 16:10 25:20
  145:23 147:6
finally 10:2
finance 126:3
  128:17
financially
  149:14
find 10:23 11:22
  14:6 24:14
  49:10 50:21
  116:24 124:11
  150:10
finding 29:5
fine 34:19 51:20
  60:10 103:10
firm 29:24
first 11:6 13:18
  13:21,23 18:1,3
  18:17 20:14
  25:17,25 30:20
  35:21 38:3 39:8
  41:9 42:9 50:2
  55:12 64:1 75:4
  75:10 79:19
  84:13 89:17
  91:12 92:4
  102:10 106:2
  118:19 135:21

135:25 136:1
  137:20
fiscal 50:4,5
  131:2 132:4,8
five 16:2 23:13
  86:13 90:18,19
  104:4,5 112:10
  135:12,12
  140:23
five-minute
  108:2
fixed 129:18
floor 23:2,4
follow 70:19 71:6
following 37:18
  78:22 151:4
Food 47:11 49:7
foregoing 149:6
  152:2,9
forget 76:15
forgetting 88:3
Forgive 130:25
forgot 145:16
form 12:6,19
  30:17 33:1 35:9
  35:11,16,22
  36:19,25 37:19
  38:16,17 40:18
  41:19 44:25
  47:21 48:19
  50:24 53:19
  55:15,16,18
  60:23 61:7
  62:12,19,23
  67:6 68:25
  79:23 80:2,9,23
  87:19 99:25
  100:7 102:16
  104:24 113:12
  120:10 122:21
  123:4 137:18
  146:23 152:3
formal 22:14
format 29:7
  57:21 148:17
formatted 29:11
  33:5

forms 38:15
  80:15 134:7
form's 35:25
forth 31:16 77:19
  79:17
found 142:21
foundation 12:7
  40:19 45:1
  47:22 48:20
  50:25 53:20
  60:24 61:8
  62:13,20,24
  69:1 100:7
  102:17 113:13
  137:18 146:24
four 11:6 14:14
  15:5 81:8 93:7
  131:14,17,18
  135:3 136:10
fourth 22:23
  96:17,24
Franklin 23:15
  23:19 26:11,13
  34:16,19 41:10
  72:24 82:6,10
  96:11 98:16
  99:2,22 102:11
  102:14,21
  104:1,2 109:20
  125:13
Franklin's 96:12
  99:4 126:10
frequently 55:18
friends 96:6
front 34:14 56:24
  73:1 89:21
  101:20
fulfill 46:12
  105:6
function 54:19
  62:17 131:19
  139:2
fund 133:20,22
further 9:3 12:16
  116:5 148:5
  149:12

**G**

Gary 50:3,5
general 48:10
generally 10:15
  10:15,19 42:6
  42:12,15 63:24
  104:3 107:7
  140:7
Generals 139:17
  139:18
General's 4:9 9:8
  138:23 139:22
  150:5
George 1:7 3:7
  3:19 150:8
  151:3
getting 51:16
  118:7,8
give 14:6,20
  16:19 21:8 26:7
  44:14 52:2
  53:23 70:7 85:8
  99:16 101:19
  104:22 108:25
  112:14,18
  120:3 130:18
  131:22 139:3,4
  143:19 144:6
given 23:17 25:7
  29:12 55:10
  57:9 89:23,25
  90:1 114:25
  120:15
glanced 69:2
go 9:17 10:8 12:8
  17:6,12,13 19:8
  20:3,6 23:10
  24:17 26:18
  29:2 30:9 34:18
  39:22 40:3
  53:21 60:18
  83:15 85:5 87:3
  94:1 95:5 108:4
  111:14 114:11
  115:24 123:7
  124:22 129:9
  134:14 138:20

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 173 of 331
Appellate Case: 14-1193   Page: 159   Date Filed: 01/28/2014 Entry ID: 4118269

141:12 145:1
146:24
**going** 5:19 8:5,22
  11:12 12:18
  14:15,25 15:1
  17:2,3,3,8
  20:23 22:21
  25:11 30:5
  37:24 39:22
  41:19,22 42:17
  43:2,8 44:10,14
  44:25 45:7,22
  51:21 57:1 60:2
  63:2 64:15
  65:23,25 66:3,4
  66:6 68:25 70:7
  80:23 84:7
  87:25 88:2,5
  93:23 96:10
  100:6 101:9,21
  101:25 102:5
  106:8,11
  107:25 112:3
  114:3,14 118:4
  118:21 120:10
  127:6,10 129:1
  132:15 137:17
  138:9 139:3
  141:11 143:11
**good** 18:17 38:25
  39:3 47:19
  51:23 83:23
  106:24 107:25
**goodness** 6:18
**goose** 59:11
**government**
  68:23 69:3
  133:5
**governmental**
  47:4
**grab** 88:9
**grams** 16:2 90:18
  90:19 104:4,5
  104:12,13
  105:12 109:10
  109:16 135:12
  135:12

**granted** 39:18
**great** 25:22
  107:15,16
**group** 95:25
**GSA** 133:4
**guess** 8:24 12:25
  17:5 18:2,16
  24:15,16 35:20
  35:20 36:12
  38:6 51:7,21,24
  55:3,25 58:14
  70:18 75:2 80:3
  81:3,9 82:17
  83:3 84:16 85:4
  91:12 109:10
  110:20 116:24
  120:19 122:1
  126:9 128:24
  135:8,10 136:9
  146:2
**guidelines** 140:8
**gurney** 77:12

___

**H**
**half** 51:21 75:21
**halt** 39:16
**hand** 22:21,22
  24:4 71:2
  105:11 144:1,7
**handed** 6:22,25
  66:11
**handing** 71:13
  86:12 129:23
**handwriting**
  58:22 136:24
  137:2 138:5
**handwritten**
  136:21
**handy** 65:25
  117:7
**hand-carried**
  110:17
**hang** 20:1 57:13
  79:10 86:21
  92:24 94:6
  101:9 136:16
  144:19

**Hansen** 2:3 4:8
  5:16,19,24 6:4
  6:9,15 7:8,9,16
  9:6,11,16 11:12
  11:19,21,24
  12:6,18 14:5,10
  14:15,22,24
  16:18,23 17:8
  17:11,21 18:13
  20:1,6,14 23:1
  23:5,9 24:1,6,9
  24:12,18,20
  25:1,15,20
  26:15,17 27:11
  30:6,14 32:6,12
  33:17 34:11,23
  37:8 38:23 39:1
  39:7,10 40:1,3
  40:18 41:19
  42:17,25 43:5
  43:13,17,21
  44:5,9,12,16,18
  44:25 45:7,15
  45:21,25 47:21
  48:19 49:21
  50:24 51:20,23
  52:4 53:19 57:3
  59:3 60:2,9,12
  60:18,23 61:7
  62:12,19,23,25
  63:6,9,13 64:15
  64:23 65:11,17
  65:23 66:3,8
  67:6 68:11,25
  70:9 71:2,19
  73:17,19 74:16
  74:23 75:12
  76:17 79:6
  80:23 81:13,16
  84:7,15,20,22
  85:3,11,20,25
  86:21,25 87:3
  87:25 88:4,20
  91:18 92:4,7,19
  92:23 93:13,15
  94:4,15 95:4
  97:13 99:25

100:6 101:9,21
  102:3,16 103:5
  103:7 104:24
  107:24 108:2
  111:4,12,14
  113:12 114:3,9
  114:13,18
  115:5,9 116:11
  117:6,10
  120:10,13,21
  121:1,23
  122:18,21
  123:4,7 124:5,7
  124:24 126:14
  129:11,16
  130:1,3,5,7,14
  130:19 131:5
  133:4,7 134:17
  135:15 136:16
  137:17,25
  138:9,14,17,20
  139:4 140:21
  140:22 143:9
  143:12 144:19
  144:24 145:1
  146:23 148:6,9
  148:12,18
  150:5,9
**happen** 52:16
  105:21 128:23
**happened** 31:15
  73:4 75:23 91:4
  94:10 96:24
  109:4
**happening** 109:2
  130:16
**happens** 10:19
  76:25 77:3 80:1
  108:12 128:1
**hard** 8:18 27:2
**head** 62:15 74:22
  109:25
**headed** 123:15
**hear** 20:14
**heard** 45:5
**hearing** 60:13
**helpful** 29:3

**helping** 29:24
**High** 4:10 150:6
**history** 35:11
**Hofmeister**
  135:21,25
**Hold** 40:1
**holding** 39:17
  79:20 81:21
  82:2,3,9,11,13
  82:17,19
**hopefully** 8:21
**hoping** 7:6
**hospital** 50:21
**hour** 51:21 100:3
**hours** 3:12
  140:23 146:21
  146:25
**Huh** 94:5
**hydro** 144:14
**Hydromorphone**
  19:18,24
  141:14 143:17
  144:4,11
  145:11,21
  146:4,10,15

___

**I**
**idea** 6:18 25:22
  42:14 55:4 71:6
  75:19 91:1 92:2
  137:16
**identical** 48:13
**identification** 6:7
  25:14 65:8 71:1
  111:3 130:21
**identified** 7:20
  8:6,16 23:18
  29:12 49:23
  65:12 91:23,23
**identifies** 81:24
  125:21
**identify** 14:1
  25:17 26:10
  54:18 60:7 65:5
  67:9 81:23
  86:22 101:12
  103:12 114:7

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 174 of 331
Appellate Case: 14-1193   Page: 160   Date Filed: 01/28/2014 Entry ID: 4118269

118:10 130:10 139:2
**identifying** 54:17 54:24
**identities** 125:18
**identity** 42:21 43:19 45:8 60:4 64:17 76:18 83:3 85:1 101:14,23,25 106:13
**IL** 149:3
**implied** 119:22
**implying** 51:9,11
**inaccurate** 63:10
**inadvertent** 44:8
**inadvertently** 42:20
**include** 20:25 27:17 66:20 141:21
**included** 66:25 95:22
**includes** 21:21 95:20
**Including** 143:7
**INDEX** 2:6
**indicate** 66:15 98:22 150:13
**indicated** 105:23 114:4 139:21 151:4
**indicates** 40:12
**indicating** 32:24 62:2 87:20 137:23 138:21
**individual** 32:24 62:4,5,7,9,10 62:11,17 143:5 147:16,17,18
**individuals** 29:12 48:16 54:17,25 83:1 138:24,25 139:1
**industry** 47:20
**informal** 22:15
**information** 7:18

10:7 11:2 12:17 12:17 13:19 17:17 27:18 33:2,5,6,7 36:21 38:1 44:14 45:15 53:6 54:12,14 54:20,25 55:9 55:23 57:25 64:16 66:24 69:21,25 72:15 72:17 75:5,7,10 81:5 93:9 97:19 101:12,22 114:9 116:6 118:24 119:7 139:18 141:21
**informed** 41:3 145:17
**informing** 32:22 143:2
**ingredients** 48:25 49:3,11
**injected** 90:9
**injection** 14:2,11 15:4,7,13 18:6
**inquiry** 7:25 61:11
**insert** 112:3
**inserted** 112:2 113:10
**inserting** 112:4 114:15
**inspect** 46:17,21
**inspected** 46:22 47:11
**instance** 63:11
**instances** 63:13
**institution** 27:19 28:9,10,11 33:16,23 34:4 68:23 96:13 97:7,8 110:24 145:7
**instruct** 64:17
**instructing** 101:15

**instruction** 64:23
**intend** 113:21 114:10
**intended** 112:14 123:23
**intent** 69:24 112:16
**intention** 43:21
**interested** 149:14
**interesting** 96:10 127:11
**internal** 128:22 129:3
**interpreted** 24:7
**interrogatories** 10:11,20,24 11:7,9,18 12:15 12:22 13:20,24 14:8,12 22:23 75:4,10 86:11 86:24 96:17,21 97:1
**interrogatory** 10:9 11:5,14,14 11:22,24 12:5 14:16 15:9 30:7 74:13 86:13 98:14 105:23
**interval** 99:19
**intravenous** 19:9 77:19 87:8 112:11 113:23
**introduction** 87:8
**inventory** 134:21 142:4
**investigation** 47:3,5
**invoice** 74:6
**involved** 14:1 15:6,12,16,17 15:19,23 22:5 28:11 30:10,19 30:21 31:14 32:18 48:17 51:16 87:16 140:3,12

147:23
**involvement** 29:23 31:2 34:8 98:8
**issue** 43:24 89:11 104:13,23 111:18 127:11
**issued** 13:25 68:23 104:1
**issues** 43:17 129:7
**item** 119:7 136:2
**items** 141:24
**iteration** 64:25
**IV** 39:17

**J**

**January** 1:11 3:11 6:12,14,14 61:21 105:18 147:5 150:3,11
**Jason** 98:3,4
**Jefferson** 3:14 4:10,14 52:15 110:16 150:6
**JK** 152:19
**job** 28:3 36:11,14 37:5 55:20 62:10 87:9 97:14 98:4 101:3 126:4
**jobs** 76:1
**Joe** 5:14 135:21 135:25
**Johnston** 135:23 136:1 145:9,13 146:13
**Joseph** 23:15,19 26:13 72:24 96:11 98:16 109:20 125:13 126:10
**judge** 42:24
**judgment** 113:22
**Julie** 1:12 3:15 4:13 5:3 149:2 149:19 150:20

151:24
**July** 5:14,15 6:11
**June** 121:22

**K**

**K** 1:12 3:15 4:13 5:3 149:2,19 150:20 151:24
**Kansas** 4:5
**Kearns** 1:12 3:15 4:13 5:4 149:2 149:19 150:20 151:24
**keep** 55:22,23 88:3 147:14,16
**kind** 42:11 43:23 58:14 62:10 75:22 79:1 85:5 116:3
**kinds** 120:16
**knew** 69:23 83:10 114:17 114:17 129:21
**know** 5:19 10:5 11:8,10 12:23 18:22,24 19:2,4 20:7,8 22:1 25:21 28:22 32:3 33:23 35:23 36:9,13 39:10 41:20 42:1,4,6,10,13 44:3,3,5,7 45:12,12,22 46:9,13,14,22 46:23,25,25 47:9,10,12,13 47:17 48:15,21 48:22 49:5,6,8 49:13 55:8 56:22 57:23 60:25 61:9,14 62:16,21 63:1,4 63:25 67:19 68:1 69:19 70:6 71:21 72:8,19 72:25 73:1,4

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 175 of 331
Appellate Case: 14-1193   Page: 161   Date Filed: 01/28/2014 Entry ID: 4118269

74:19,25 75:20
76:21 77:16
79:15,24 80:4
83:11 84:16
86:4 89:12 90:5
90:10,15 93:17
96:17,23 97:3,4
97:7,14,18,19
97:20,22 98:2,6
98:8 99:7,11
100:20,23,24
100:24 101:6
102:7 104:1
106:9,14,14,21
107:10,15,17
114:5,6,11,14
114:18,18,19
114:21,25
115:16,18,22
116:18 117:3,6
117:6,8,10,11
118:15,21
119:2,3 120:5
121:13,18,22
122:12,22
123:2,3,9,11
124:25 127:6
129:2,5,6,8
131:22 132:9
132:10,15,16
134:7 136:7,24
139:8,9 140:11
143:18 144:3
145:5,11,13,22
146:7,8,20
**knowing** 45:12
**knowledge** 10:22
11:1 12:22
15:23 45:3,4
46:8 47:1,23,25
48:10 49:9 51:1
51:12 59:16,18
100:19
**knowledged** 13:1
**known** 62:2,3
114:10
**knows** 102:4

146:12

### L

**lab** 85:20 114:7
121:14 122:22
124:19
**label** 72:11 87:6
**labeled** 18:4
26:12 67:23
135:4
**labels** 72:10,12
72:22 106:22
**laboratory** 21:14
70:13,14 74:3,5
85:19,21
109:15 113:25
114:1 115:3,13
115:14,17,19
115:20 116:4
116:16,20,21
117:15,17,22
118:2,11,14,16
120:5,7,8,18
121:5 122:9,16
123:1,1 124:10
**lack** 12:7 40:19
45:1 47:22
48:20 50:25
53:20,20 60:24
61:8
**lacks** 62:13,20,24
69:1 100:7
102:17 113:13
**language** 103:19
103:23
**Larkins** 15:17,19
15:19
**lasts** 107:13
**late** 6:19
**law** 4:4 47:14,16
71:10
**lawful** 9:23
**lawyer** 114:11
**lead** 42:19 64:16
101:12,22
**leads** 63:10
**learned** 135:11

**leave** 36:18
**leaving** 99:13
**led** 59:11 101:24
**ledger** 132:1
**left** 96:13 97:17
99:9
**left-hand** 119:14
**legal** 12:19 39:14
39:15 67:7
105:1 138:10
140:14
**Lenger** 131:1,6,6
132:10
**length** 107:14
**Lenny** 131:1,6
**lethal** 14:1,11
15:3,7,13 18:6
**letter** 7:23 29:6
29:10,11,12,13
29:18 32:20,22
32:23 33:9
73:24 74:2
124:8 142:25
**let's** 15:25 17:11
22:21 24:17
25:23 30:8
38:21 59:1,10
59:10 72:7
73:15 74:9
83:15,15 87:22
91:9 93:4 96:22
98:20 102:25
108:4 109:17
113:25 123:14
124:4,22 125:7
126:12,13
127:3 129:9,21
129:21,22
134:16,21
139:24
**level** 97:16
**Lewis** 98:3
**Lewis's** 98:4
**license** 58:12
60:19 64:25
66:16,21 67:10
67:12 101:19

102:7
**licensed** 49:11
59:24 60:1,5,6
60:9,14,16,19
60:20,21 61:5
64:14,21 101:8
**licenses** 47:3
138:22
**licensing** 66:22
66:23
**light** 121:17
**likelihood** 46:11
**line** 39:17 71:6
78:10 111:19
111:19 112:8
151:6,7,9,10,12
151:13,15,16
151:18,19,21
**lines** 19:9 77:19
87:8 112:1,2,5
112:11 113:5,9
113:10,23
**Linger** 131:10
**list** 6:17 33:23
38:10,13 74:14
74:21,23 84:5
92:15,16,16,17
**listed** 6:16 20:25
31:6 56:1
118:20
**listen** 43:24
137:25
**lists** 20:23
**litigation** 4:13
43:7 150:1
**little** 7:10 8:25
9:4 27:1,4 29:5
35:6 51:21
85:10 114:1
116:5 117:9
140:23 141:2
146:3
**locate** 11:22 52:8
**location** 87:7
113:23 127:7
**locations** 112:11
**locked** 108:13,16

110:10
**log** 30:18 38:15
38:17 78:25
79:11,13 80:8
80:14,19,19
82:1,19 87:20
88:11 109:18
135:11
**logistical** 16:14
**logs** 79:15,18
80:16,16 82:17
**Lombardi** 1:7
3:7,19 15:11
16:11 22:5
29:10 32:24
49:17 88:18
145:24 147:8
150:8 151:3
**Lombardi's** 29:7
32:20 140:17
**long** 36:19 147:1
**longer** 63:3
136:11
**look** 5:21 15:4
16:14 17:3,3,4
23:22 25:4 27:3
34:17,18 35:6
39:7 46:15 53:1
54:16 56:25
57:16 59:11
61:19 63:19
67:14,18 68:5
69:13 70:1
71:19 73:15
74:8 75:3,3
78:24 83:15,16
85:8 87:22 88:5
91:9 92:9 93:4
96:22 98:20
102:25 103:6
109:17 116:5
117:4 123:14
124:4 125:7
126:13 127:3
129:21 134:14
134:15,16
139:25 141:5

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 176 of 331
Appellate Case: 14-1193   Page: 162   Date Filed: 01/28/2014 Entry ID: 4118269

141:10
**looked** 6:1 24:5
  52:18 121:16
  124:18
**looking** 20:12
  22:7 23:8 31:3
  35:4 52:20
  58:15 62:14,16
  62:17 66:13
  69:8 71:17 75:8
  79:23 92:21,24
  103:8,9 116:23
  121:9 130:24
**looks** 18:23
  36:16,16 59:15
  133:15 135:23
**lose** 27:13
**loss** 37:7 119:8
**lot** 16:24 20:17
  27:18 63:3,14
  93:15,25 119:1
  123:9 127:10
**lots** 103:24
**loud** 19:12
**Louis** 3:18 64:20
**lower** 119:3
**Luby** 7:23 8:3
**L-E-N-G-E-R**
  131:7
**L-E-N-N-Y**
  131:6

———————
**M**
**M** 30:5 118:17
**maintain** 9:12
  19:23 108:13
**maintained**
  141:14
**majority** 28:8
**making** 34:25
  56:11 74:3 82:6
**management**
  131:2 132:4,8
**manager** 50:4,6
  132:8 144:17
  145:8
**managing** 98:7

**manner** 41:21
**manufacture**
  121:21
**manufactured**
  48:5,14
**manufacturer**
  21:4 72:1,4
**manufacturing**
  47:20 119:11
**mark** 5:12 8:15
  8:22 16:20
  24:17 65:6
  70:24 111:1
**marked** 6:5,7
  24:21 25:3,7,13
  28:5 65:8 71:1
  111:3 130:21
**market** 50:16,22
**marking** 111:4,6
**material** 122:8
  125:20
**materials** 72:2
**Matt** 15:10
  117:10,11
**matter** 10:16
  71:15 150:17
**mean** 5:16 16:25
  17:5 30:20 36:9
  42:6 43:2 45:10
  45:11 57:23
  58:5 62:14
  68:22 70:6
  72:15 75:2 76:2
  77:2,11,16 78:2
  82:7,16 83:4
  86:1,3 90:15
  95:11 104:12
  108:15 110:11
  110:20 118:8
  119:22 120:13
  120:16 122:1
  123:22 124:14
  127:24 132:7
  137:19 139:16
  140:9
**meaning** 24:9
  100:11

**means** 15:5 43:9
  50:17
**meant** 6:12 79:5
  81:1
**media** 33:2,11,11
  33:13 95:23
**medical** 35:9,11
  36:2,10 58:24
  76:6,8,23 77:8
  77:17,18 78:13
  78:15,17,18
  86:14,16,16
  87:17 101:19
  102:22 104:22
  111:25 112:7
  112:10 113:9
  113:15,22
  132:12 134:4,4
  134:9
**Melissa** 15:11
  30:3 125:24
  133:15
**member** 21:12
  21:15,18 57:12
  72:3 85:21
  86:14,17
  101:13 125:16
  142:24
**members** 20:24
  20:25 21:7,21
  21:22 99:10,13
  99:15 125:17
  137:13 144:22
**memo** 38:13 51:6
  51:7,13,15 62:1
  131:1
**memorandum**
  50:3,15 51:3
**memory** 20:20
  111:18
**mention** 91:22
**mentioned** 92:5
  114:16
**mentions** 21:4
**Michael** 4:8
**Microbiology**
  123:15

**Midazolam**
  19:18,24
  141:14 143:16
  144:1,7,15,22
  145:4,20 146:4
  146:10,14
**middle** 125:20
  137:15
**Midwest** 4:13
  150:1
**milligram** 135:9
**milliliter** 135:9
**mine** 94:11 136:9
  137:2
**minister** 98:17
  98:23
**ministerial** 98:24
**minor** 16:13
**minute** 14:6
  17:12 18:13
  22:25 33:20
  38:22 70:18
  79:4 93:23
  116:11 124:23
  130:24 136:3
  146:9
**misanswered**
  13:1
**mislead** 44:13
**misreading**
  135:24
**missed** 33:4
  67:25
**missing** 7:24 8:10
  94:16
**Missouri** 1:1 3:1
  3:13,14,16,18
  4:5,9,10,14
  15:8 18:4 48:2
  52:14,15 55:14
  59:25 60:1,6,7
  60:13,15,16,21
  60:22 61:4,6,6
  101:8 111:9
  133:1 149:5
  150:5,6
**mistake** 13:18

**Mister** 131:9,10
**Misters** 41:10
**misunderstand...**
  23:20
**misused** 63:11
**mixed** 27:12
**mixing** 48:11
**ML** 135:5
**MO** 149:3
**moment** 76:23
  105:11 115:5
  138:14
**money** 125:7
  131:12 132:15
  133:20
**moniker** 143:2
**monitor** 103:8,9
**monitors** 87:11
  87:12
**month** 75:20,21
**morning** 8:2,14
  23:16,22,25
  24:5
**move** 63:16
**moved** 108:18
**moving** 94:25
  98:8,9 132:15
  133:20
**multi-page** 79:2
**M2** 76:11 78:15
  78:17 87:5,6,10
  87:15,15,16,18
  87:19 88:13,15
  90:7 126:5,6,7
  128:4 131:20
  131:20
**M2's** 87:9
**M3** 15:22,23 76:9
  78:15,17 87:5,6
  87:10,15,15,16
  87:18,19 88:13
  88:15 90:7
  100:15,17,21
  110:1,6,6,7,22
  126:5,11,12
  127:6 128:4
  131:20,20

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 177 of 331
Appellate Case: 14-1193   Page: 163   Date Filed: 01/28/2014 Entry ID: 4118269

**M3's** 113:22
**M4** 76:16,20
**M5** 87:4 128:11
128:12 131:20
139:5,6 140:2
**M6** 62:2,4,18
87:4 118:12
131:20 139:5,6
140:2 142:11
142:11,15,24
147:11,11

**N**

**N** 4:1
**name** 28:3 30:4
41:17 42:2 43:3
44:4,15 58:8,10
62:17 70:7
72:18 92:4,4
93:10 95:19
97:14 98:25
100:13 101:1
104:21 116:25
120:7 122:9
152:7
**named** 89:7
91:22 101:13
**names** 21:8 39:23
53:9,11,12
92:14 93:2,3
99:11 137:8
139:3 140:1
147:24
**naming** 142:23
**narrow** 60:12
**nature** 50:16
93:8 119:6
**necessary** 8:13
63:14 146:15
152:4
**need** 18:13 19:12
24:15,18,19
51:25 74:25
76:3 77:7 85:6
111:10,20
127:11 130:9
134:15 146:19

**needed** 40:20
55:23 89:12
90:4 109:11
137:5
**needs** 16:14
**negotiate** 56:18
**neither** 149:10
**Nelson** 132:19,20
132:21
**Nelson's** 134:5
**never** 11:17
**new** 13:19 30:22
34:9 39:1 47:14
67:12 74:23
105:15 146:16
**Nicklasson** 23:16
23:19 26:11
27:9 34:16
38:16 39:13,16
41:10 73:11
102:12,15
104:2 126:19
**Nicklasson's**
102:21
**night** 6:19 8:3,11
**nodding** 109:25
131:23
**Non-confidential**
24:24
**non-medical**
76:7,13,24 77:9
77:18,21 78:14
**non-public** 23:14
23:18 27:15,22
**normal** 77:4
**normally** 51:15
51:16,17 75:25
78:9
**Nos** 25:13
**notarized** 150:15
**notary** 150:14
152:18
**notation** 89:22
89:24 91:1
**notations** 31:15
33:25,25 34:1,3
82:6 111:8

**note** 45:25
137:23 138:21
138:22 139:16
139:20
**notes** 31:22 69:17
93:25 137:4,7
**notice** 119:10
134:3
**notify** 96:18
**notifying** 29:8
**November** 58:7,7
58:8 72:23 73:3
81:7,8,20,24
109:22 110:4
111:9 127:20
136:11
**number** 8:5,8
10:21 11:5,5,6
11:7,14,22,25
12:5 25:17,21
25:25 26:25
27:6,7 29:2
31:23 32:11,12
35:8 40:12 42:2
45:13 49:22
52:18 57:10
58:10,12,13
81:13,14 82:22
82:24 99:17
116:9,9 118:17
119:1,7,8 123:9
136:19 141:8,9
**numbered** 9:13
**numbers** 7:3
11:8,10 53:9,11
53:12 54:24
72:19 83:1,7,8
83:16 84:9,10
84:11,12,23,24
85:7,13,16
92:20,23,24
130:10 137:8
140:1,2,2
**numerous**
120:16 129:24
**nurse** 36:11 37:6

**O**

**OAK** 4:5
**object** 12:18
41:19,22 44:25
45:7 53:19 60:2
60:23 61:7
64:15 68:25
80:23 101:10
101:21 102:1
104:24 114:3
120:10 122:21
123:4 137:17
138:9
**objected** 43:14
**objecting** 62:19
62:23 101:15
**objection** 12:6
20:6 40:18
47:21 48:19
50:24 62:12
63:14,15 64:23
67:6 84:17
99:25 100:6
102:16 113:12
114:15 115:7
122:18 138:18
146:23
**objections** 63:7
**obligation** 12:16
**obtain** 11:1
56:14 100:5
**obtained** 56:17
125:23
**obtaining** 51:4
139:17
**obviously** 5:19
6:11 22:4 23:19
**occur** 30:23
31:11,12 74:12
77:5 105:21
**occurred** 74:12
75:14 96:14
**occurs** 108:24
**October** 13:25
**odd** 116:24
**offender** 35:11
38:15 81:21

82:6,13,15 86:3
89:17,19 90:2,3
92:16 104:21
**offer** 89:10
**offered** 46:1,1
90:14
**office** 4:4,9 7:13
9:7,8 28:25
31:14 32:18
33:5,16,24
35:12,13 36:2
36:20,22 37:1,4
40:9 55:14
108:14,16,18
126:2,3 128:17
130:8 132:21
133:3 134:5
138:23 139:22
150:5
**officer** 33:2,6,7
79:19 82:2,10
82:12
**officers** 79:18
80:4,21,25 81:3
81:4
**official** 19:1,2
**oh** 17:10 19:13
21:10 30:9
35:23 57:13
58:25 66:23
81:18 87:13
103:10 110:13
127:22 130:14
131:6 136:3,18
141:8 143:20
145:5 148:8
**Ohio's** 16:2
**okay** 5:10,16,18
6:3,20 9:15
10:2,16,21
11:11,20,23
12:3,10,13
13:16,23 14:10
14:22 16:13,22
17:4,13,15,23
17:24 18:21
19:6,15,16,23

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 178 of 331
Appellate Case: 14-1193   Page: 164   Date Filed: 01/28/2014 Entry ID: 4118269

20:11,20 21:11
22:3,6,15,24
23:12 24:11,23
25:23,24,25
26:7,14,19,20
26:23 27:8,21
27:25 28:10,24
29:9 30:8,8,19
31:7,14,20,20
31:25 32:4,5,14
32:15 33:8,14
33:19 34:5,6
35:3,3,20,24
36:6,15,23
37:16 38:4,6,8
38:8,11,21,21
39:4,9,10,21
40:11 41:7 42:4
42:8,11,14
43:20 44:1,22
45:18,24 46:5
46:15 48:16
49:20 50:8,15
51:18 52:4,5,16
52:20,23 53:2,3
53:14,24 54:9
55:2,9,24 56:17
56:23 57:5,9,13
57:17,23 58:3,5
58:5,14,20
59:13,16,21,24
61:10,16,19,24
62:3,22,25 63:8
63:18,20,24
64:5,13,19 65:3
65:11 66:2,9,15
66:20,24 67:10
67:18,21 68:9
69:4,8,15 70:6
70:14,23,23
71:9 72:15,20
72:22 73:22
74:6,8,9,20,25
75:17 76:5,22
76:22,23 77:14
77:16,17,21
78:12,15 79:13

79:21 80:6,12
80:17 81:22,25
82:5,7,16,20,23
83:9,11,15 84:5
85:3,24 86:1,20
87:2,11,14,22
88:9,12,15,19
88:24 90:6,8,11
90:17 91:1,7,9
91:11,15,17,20
92:3,11,18 93:1
93:5,8,11,23,25
94:18,18,24
95:8,10,16,19
95:25 96:9,16
96:22 97:10,20
97:23 98:10,13
98:16,20,21
99:1,12,18
100:4,10,24
101:17 102:9
103:10,24
104:16,19
105:5,9 106:2,5
106:8,11,25
107:3,10,13,23
108:7,12,15,18
108:20,23
109:6,9,14,17
109:17,22
110:1,8,16,20
110:24 111:13
111:15,20
112:14,20
113:1,4,21,25
114:16 115:6,8
115:17,23
116:2,2,10,23
116:23 117:17
117:21 118:1,7
118:13,19
119:1,6,20
120:1,8,20
121:9,16,19
122:5,8,11,24
123:6,14,19,25
124:18,22,22

125:2,7,8,11,12
126:4,7,12,16
126:17,21
127:1,3,9,17,20
128:3,6,12,16
128:18,21
129:6,18,23,23
129:23 130:14
130:15 131:10
131:15,17,21
131:24 132:5
132:11,11,17
132:23 133:1,6
133:9,17,24
134:3,8,14,15
134:15,19,20
135:2,8,9 136:6
136:9,14,15
137:6,9,15,21
138:19 139:2,6
139:15,23
140:3,8,19
142:15 143:9
143:10,14
144:1,4,13,18
144:25 145:6
145:15 146:2
147:10,15,18
148:4,11

**Oklahoma** 64:21
**once** 12:14 56:17
  123:8
**ones** 10:13 18:23
  18:24 92:20
  96:24 120:21
**open** 86:12
**opened** 5:25
**operation** 98:7
**opinion** 80:7
  105:1
**opportunity** 52:2
**opposed** 24:10
  82:9,9
**opposing** 54:21
**options** 22:16
**oral** 90:9
**order** 6:23 8:9

9:3 93:16 105:5
  105:6 114:8
  146:14
**ordered** 103:16
  105:15 109:9
**ordering** 109:9
**orders** 82:12
**ordinarily** 55:6
**organization**
  116:15 133:8
**original** 2:18 7:3
  8:12 9:1,3,12
  9:13 37:20,22
  148:14,15
  150:11
**outcome** 149:14
**outsourcing**
  47:15
**overlap** 79:25
**overseeing** 78:13
**Owen** 33:7
**Oxford** 92:1,5,7
**o'clock** 3:12,12

_____

**P**

**P** 4:1,1 67:25
**packet** 33:4
**page** 2:1,7,11,12
  7:3 14:9,13,13
  15:5,10 16:14
  19:6 20:12,23
  21:2 23:13
  25:25 26:5,6,12
  26:23,24,24,25
  27:3,6 29:2,22
  30:10,12,13
  31:22 32:7,8,10
  32:20,23 33:1,9
  33:10,19 34:6
  34:10,11 35:7,8
  37:17,18 38:9
  38:12,13,16,18
  39:5,6 40:12
  49:19,22 50:1
  53:1 55:10,13
  56:23,24 57:10
  61:19 63:19,21

65:1,13,19
66:13,16,25
67:14,18 69:13
70:1 71:14,17
72:8 78:25 79:1
81:13,14,17
82:20 83:15,19
85:7 86:2,12
87:13,22 88:5,9
88:25 90:17,20
91:9 92:25
93:13 94:17
98:20 104:16
109:17 111:25
116:5,23
117:14,14
118:19 121:23
121:24 123:14
129:11 130:10
131:24 132:11
145:5,8,9
142:21 150:12
150:14,16
151:6,7,9,10,12
151:13,15,16
151:18,19,21

**pages** 2:14,15
  7:24,24 8:5,7,7
  8:8,16,16 9:19
  17:9,19 29:4
  32:17,19 52:19
  52:21 56:25
  129:24 141:4
**paid** 127:25
  128:23 129:4
**paper** 16:15 17:5
  52:25
**papers** 17:12
**paperwork** 54:7
**paragraph**
  104:19 111:24
  112:10 131:14
  141:10
**paraphrase**
  141:11
**Pardon** 15:18
  49:2 64:7 70:3

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 179 of 331
Appellate Case: 14-1193     Page: 165     Date Filed: 01/28/2014 Entry ID: 4118269

78:16 99:21
100:16 112:22
113:7 136:4
**part** 20:14 37:13
87:9 89:5
112:20,23
118:1,3 122:23
130:11,12
132:23 133:1
142:6
**participate** 69:20
**participated** 28:4
**particular** 62:4
118:9,13
**parties** 24:13
54:21,21 55:7
149:11,13
**partly** 51:24,25
51:25
**parts** 28:24 78:19
78:20
**party** 58:9
**pass** 140:19
**patient** 104:1
**pay** 125:17
128:24 133:23
**payment** 125:12
125:21 126:18
128:6,7,19
131:12
**payments** 116:4
128:7
**pays** 129:7
**PDF** 148:17
**peaked** 60:13
**penalty** 152:8
**pending** 3:17
39:15
**pentobarbital**
16:2 19:18 22:8
22:13 39:24
48:1,5,5,13,14
48:18 49:1,4
50:22 52:10
56:3,8 59:2,17
61:13 68:20
72:2,10 73:7,10

75:15 87:5
90:18 91:5
100:5 102:11
105:9,10,15,17
105:21,24
106:17 107:9
108:10,21,24
109:10,11,19
110:1,3,11
119:17 120:22
120:25 121:5,7
121:11 122:6
123:17,19,22
125:5 126:22
134:25 136:12
**people** 15:12,15
21:24 34:2
44:19 58:16
67:8 75:24,25
76:3 77:21 80:3
95:21,23,25
96:1,6 97:16
128:22 137:12
**perfect** 95:6
**performed** 120:5
120:17 121:5
**performing**
122:17,19
124:20
**peripheral**
111:19 112:2
113:5,10
**perjury** 152:8
**permits** 64:1
**permitted** 140:10
**perpetuity** 44:19
**person** 36:2 37:4
42:8 62:18 68:3
68:7 70:7,10
74:1 76:19
78:10 81:25
91:22,24 96:7
97:13,21 98:10
100:14 101:7
102:9,10,14
108:8 110:3
118:9,13

125:21,23
126:4 143:5
**personal** 45:3
47:1 51:1,12
**personally** 45:21
113:19 114:5
**personnel** 36:20
76:6,7,9,24
77:18 86:15,16
86:16 87:18
112:7,10
113:16
**persons** 14:1
15:5 21:21,21
**person's** 14:2
**pertain** 64:5,8,11
68:2,6 85:1
**pertains** 26:11
**pharmaceutical**
48:25 49:3,11
50:16
**pharmaceuticals**
51:5
**pharmacies**
39:23 45:13
52:9,17,22,23
53:13,14,16
55:25 59:17
**pharmacist**
59:21 62:15
63:17 67:9
107:8 117:25
118:23
**pharmacists**
48:16 68:16,17
**pharmacy** 21:5
41:8,9,12,17,18
42:3,9,12,15,21
43:3,10 44:4,15
44:23 45:9,19
46:2,4,9,10,18
46:21,24 47:10
47:18,18,20
48:1,17 52:13
52:14 53:15
56:19 58:23
59:24,25,25

60:4,6,6,8,15
60:15,21,21
61:4,5,13 62:1
64:2,13,17,21
65:5 67:22
68:17 72:18
73:8,11,11
90:25 93:10
100:8,8 101:25
105:24 107:4
108:10 109:15
114:2,5,6 115:3
115:13,14
117:24 118:2
118:23 122:12
122:15,17,20
122:22 123:1,2
123:3 126:20
127:1,19,25
142:14,15,25
143:5,6 147:12
147:14,19
**pharmacy's** 47:3
126:21
**phone** 42:2 52:18
53:11,12 71:7
72:19 82:22,23
83:1,7,8,16
84:9,10,11,12
84:23,24 85:7
85:12,16 99:17
137:8 140:1
**photograph** 93:5
93:6,7
**physically** 78:5
99:7
**physician** 21:17
112:4 113:17
**pick** 73:8,10
**picked** 73:6
107:22
**pieces** 66:24
107:15,17
**pile** 20:12
**piles** 49:19
**place** 39:14
**placed** 17:16

**placement** 112:7
**Plaintiff** 3:19 5:2
**plaintiffs** 1:5,10
3:5 4:3 5:13
6:11 7:13 8:2
8:10,14 9:24
23:15
**plaintiff's** 11:18
22:23
**plan** 22:13,14,15
22:19 146:10
**plans** 47:13
**Plaza** 3:14
**please** 20:1 25:16
30:4 38:22 53:1
59:12 61:25
63:19 65:7
67:18 70:1,25
71:3 73:23 75:9
81:14 86:19
92:9 111:2
116:5 136:15
136:19 138:7
150:10,13,15
**point** 11:13
22:11 24:20
39:22 46:2
51:19 53:21
76:8 130:9
138:10 146:11
**pointed** 59:7
85:16
**pointless** 43:3
**policy** 18:8,12
84:9
**portion** 19:7
24:21,24 44:20
**portions** 25:2
**position** 11:17
25:2,9 36:3
67:2 99:8 115:1
143:4
**possible** 6:12
51:14
**post** 80:5 81:20
81:23
**potential** 56:12

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 180 of 331
Appellate Case: 14-1193    Page: 166    Date Filed: 01/28/2014 Entry ID: 4118269

potentially 12:25
42:18 45:8
practice 18:11
76:1 77:9,18,21
77:24
practices 47:20
preceptor 67:24
67:25
preparation 18:5
22:2 30:11
prepare 87:6
prepared 19:21
20:5,8,9,21
28:1,8,19 33:24
33:24 80:20
107:21 113:18
121:14
prepares 77:8
preparing 28:4
28:11 30:21
prescribe 87:4
prescribed
102:10,11
prescriber 58:25
101:23 103:13
103:20,21
104:17,22
122:13 128:14
128:15
prescriber's
101:18 103:23
prescribing
139:5
prescription
21:18 100:5,9
100:12,15,17
100:22 101:7
102:15,22
103:1,15,25
104:13,23
105:7
prescriptions
59:8 102:25
104:5,21 105:4
present 7:5 75:1
75:13
presentment

148:9
presumably
45:13 125:21
pretty 10:6 17:3
32:19 99:18,23
107:25
prevent 39:15
previous 7:5 71:9
previously 69:22
pre-execution
35:10
price 56:6,18
pricing 50:19
primarily 20:9
147:22
primary 112:1
113:9
principally 85:18
print 9:17
printed 58:10
printing 38:2
printout 17:17
prior 75:21 94:25
94:25 108:19
109:4,6 150:16
prison 44:24
95:12
prisoner 87:12
87:16 92:1
prisoners 140:4
prisoner's
111:25 113:8
prisons 44:24
45:14,20
privilege 86:6
privileged
106:13
probably 31:25
58:1,18 72:19
84:24 118:21
127:9,10
145:17
problem 16:14
27:5 43:2,10
129:19
procedural 80:13
procedure 19:17

26:13 51:4,15
77:10
procedures 24:2
27:17 29:21
proceed 44:2
140:13,15
proceedings
17:14 52:6
148:20
process 39:16
71:23 77:4
100:25 117:22
procurement
51:4
produce 48:12
produced 3:10
7:19 8:8,12,13
8:18 9:14,19,23
84:19
product 50:19
production 7:10
9:13
professional
61:12 149:4
progress 39:14
promise 127:4
promoted 47:20
pronunciation
125:25
proof 129:4
Propofol 16:4
proposed 18:23
18:23
protect 54:24
83:3
protected 25:4,9
85:17,17
protecting 44:16
84:18 125:18
protocol 13:25
14:2,3,12 15:4
15:7,16,17,20
15:24 18:14,18
19:1,3 21:20
22:2,7,8 23:14
24:3,9 27:22
30:23 34:9

75:15 78:22
89:6,10,22
111:23 112:9
112:21,24
113:6,11,15
141:3 142:6
143:20,23
146:5,16,19
147:4
protocols 15:13
23:18 25:3
27:15
provide 12:2
50:12 59:8 67:5
74:20 85:14
104:20 105:3
129:3
provided 2:9,10
5:13 6:17 8:20
12:17 45:19
50:10,11 51:3
67:11 71:10
74:14,19
provider 58:24
providers 131:13
131:14,17,18
provides 22:7
56:6
providing 39:24
59:1 85:13
provisions 47:16
pseudonym 62:2
62:6 142:11,23
147:12
pseudonyms
76:2 139:4
public 33:2,5,6,7
55:6 64:20
146:16 150:14
152:18
publicly 54:20
67:3
pull 17:19 23:7
49:18 52:23
56:23
pulling 49:22
punishment

134:23
purchase 56:11
purchased
141:24 143:16
144:16 145:18
145:21 146:4
purchases
144:14
purported
101:24
purpose 54:9,16
54:23 63:5,15
89:8 111:16
115:7
purposes 19:24
push 78:6
put 14:20 19:14
75:2 103:20,21
106:9 120:14
124:25 148:14
putting 35:14,14
P.M 5:8 109:23
125:1 148:20

---

**Q**

qualified 12:20
47:15
quality 46:10
116:20
quantities 87:20
87:21
quantity 19:11
40:20,23 144:4
question 5:11
8:25 10:12 12:6
12:19 13:16,23
14:4,5,25 15:2
15:3 18:3,16,17
23:1,3,14 24:7
32:17 35:21
36:12 40:11,18
41:20 42:23
43:25 44:10
45:1,8,19,23
47:21 48:19
50:24 52:9
53:20 55:8 60:3

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 181 of 331
Appellate Case: 14-1193    Page: 167    Date Filed: 01/24/2014 Entry ID: 4118269

60:5,11,24 61:1
61:8,9 62:12,20
62:20,24 63:1,3
64:16,18 66:5
67:7 69:1 70:18
75:8 79:14
80:24 91:12
96:20 98:11
99:25 100:7
101:10,11,15
101:22 102:5,6
102:17 104:15
104:25 113:12
113:16 114:6
114:12,13,14
115:11 117:12
120:4,11,17
122:21 123:5
124:17 128:25
137:18,25
141:2,11,13,16
142:9,20 145:2
145:3 146:24
**questions** 2:1
10:1,8 11:9
12:11 14:16
35:21,22 42:18
43:11,15,22,23
65:24 121:19
142:11 143:13
148:5,6
**quick** 34:17
108:2 147:6
**quickly** 69:2
99:23 100:1
**quite** 81:6 143:11
**quotation** 124:12
124:15
**quote** 56:15
112:9

———————————
**R**

**R** 4:1
**radio** 64:20
83:25
**raising** 43:23
**ran** 139:8

**raw** 72:1
**read** 5:22 19:8,12
19:13 27:2 39:5
39:5 94:13,19
94:23 95:17
114:12 130:17
135:8 136:8
141:13 148:10
150:13 151:6,7
151:9,10,12,13
151:15,16,18
151:19,21
152:2
**reading** 90:18,20
103:16 138:5
151:4
**reads** 16:24
**ready** 10:3
140:19
**real** 34:17 48:8
69:2
**really** 63:1 85:6
**Realtime** 149:4
**reason** 6:1 8:4
100:21 113:4
129:22 140:14
151:6,8,9,11,12
151:14,15,17
151:18,20,21
**reasons** 101:10
114:4
**recall** 141:18
**receipt** 57:12
125:16 127:19
127:23 128:9
**received** 5:14
6:14 23:21
108:9 110:1
**receiving** 117:19
118:14
**Reception** 28:14
28:16 134:21
**receptor** 67:23
**Recognizing**
106:8
**recommended**
145:25

**recommending**
146:1
**record** 5:24 6:8,9
7:10 11:13
17:15 25:2
28:12 29:20
30:1 33:17,18
40:2 44:3,6,11
44:16 46:1
49:22 51:20
55:13,15,24
64:20 68:11,13
68:14 80:22
81:5 84:17
85:11 86:8,9
87:1,25 88:23
88:24 91:18,19
94:15 95:9,10
103:7 108:4,6,7
114:15,17,21
114:23 115:24
116:1,13
124:23,24
125:3 130:15
130:19,20
134:22 138:16
138:17 139:13
139:14
**recorded** 44:18
**records** 102:22
**redact** 9:18 55:5
67:4 69:21,24
82:23 84:8,9,13
84:17 85:7
**redacted** 7:18,19
8:12 9:7 53:7,8
53:9,10,15 54:8
54:15,22 55:10
58:10 64:25
65:3,4 67:20
69:4,18,22
70:17 71:7
72:15,17,21
82:21,25 83:5,7
83:8 84:10,25
86:3 93:9 103:1
116:7 117:1,2

119:8 122:8,11
123:12 124:14
124:16 125:20
137:6,11
**redaction** 53:22
53:24 54:23
55:4 69:23
118:20
**redactions** 7:4
9:3 53:3 54:2,4
64:10 83:16
84:5 86:6
103:11 137:12
**reduced** 149:9
**reference** 32:21
74:3 83:19
**references** 82:18
107:18
**referred** 137:16
**referring** 31:5
130:11
**refers** 50:15
142:15
**reflect** 18:11
88:25 119:17
124:10 144:13
**reflected** 65:22
106:22 117:13
117:14 120:6
124:25 134:24
**reflecting** 95:7
**reflection** 116:20
**reflects** 65:15
90:17 106:20
119:10 121:20
125:12 132:12
**refresh** 20:20
**refuse** 104:23
**regarding** 107:6
**register** 47:14,15
**registered** 37:6
47:13 149:3
**registration** 47:4
64:3,4
**Rehabilitative**
35:19 37:12
**reissued** 7:3

**relate** 124:1
**related** 43:17
91:25 120:22
120:25 149:10
**relates** 138:10
**relating** 142:11
**relation** 90:11
**relative** 149:12
**relatives** 96:6
**release** 146:16
**released** 146:19
**releasing** 54:11
**relevant** 55:7
**reliability** 46:9
46:10
**remain** 39:17
**remember** 11:9
34:20,25 40:4
40:25 75:18
96:20 113:3
125:1 138:7
141:15 146:1
**remembered**
75:8
**remind** 137:4
**reminded** 141:24
145:19
**remote** 127:7
**removed** 8:7 86:7
123:9
**render** 152:5
**renewal** 66:20
**repeated** 33:22
**report** 49:14
93:18 121:14
123:15,25
**reported** 64:20
124:1
**reporter** 3:15
4:12 5:4,12
141:12 149:1,2
149:3,4,4
151:24
**reports** 49:17
117:18 120:16
**representation**
6:2

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 182 of 331
Appellate Case: 14-1193     Page: 168     Date Filed: 01/28/2014 Entry ID: 4118269

representatives
33:12 138:11
represented 16:2
request 16:3 41:1
50:8,13 71:10
89:20 90:1
104:20 107:8
requested 75:6
75:10 98:17,22
104:20 105:4,6
124:12 139:22
requesting
131:12
requests 89:17
98:19
require 43:25
51:9 82:12
required 82:14
100:8
requirement
56:10
requisition
133:12,13
requisitions
134:4
rereviewed 9:5
research 15:6
16:7 42:7 46:13
47:9 49:13
61:14
reserved 5:6
resolving 16:3
respect 10:21
109:2
responded 11:5,7
99:15
response 13:23
15:9 16:1 86:13
96:16 105:23
142:19
responses 10:9
10:11,14 11:4
12:5 13:21 25:6
86:11,23 98:14
122:2
responsibility
54:13

responsible 29:1
35:13,14 76:1
97:17 118:7,10
118:14
responsive 13:19
13:20
restate 115:10
result 64:10
resulted 8:7
results 124:1
retail 64:2
retained 2:19
25:11
return 7:15
150:15
returned 6:24
7:1 90:19,22,23
90:24 91:2
reveal 44:1 45:8
60:3 85:15
114:9 147:24
Revenue 129:3
review 10:17,18
54:2,4,6,9
reviewed 9:2
54:7
revise 13:17
Richard 92:1,6,7
right 8:19 11:15
19:4 21:6 22:9
23:23 26:21
30:9 31:10 35:3
43:4,5 44:9
50:12 51:22
58:6 59:22 69:7
75:12 81:9
86:22,25 88:4
89:19 92:23
95:5 97:3
114:23 121:1
123:12 124:13
127:21 129:16
129:17 134:25
135:6,20 141:1
141:8 142:3
right-hand 66:21
119:4

risk 43:18
RN 36:8
Rohrbach
125:24,25
126:1
role 71:22
roles 14:3
room 39:13
97:12 98:2
105:24 140:10
RPR 149:19
run 137:15,22
138:4,23
139:17,18,21
Russell 28:19,21
28:21 38:14
39:12 135:21
135:25

_____

**S**

S 4:1
safe 108:16
saline 108:25
sample 124:1
saved 91:7
saw 54:23 65:11
saying 5:24
11:19,21 27:22
36:19 55:3
82:17 88:3
120:1,2 121:6
143:12
says 9:24 21:6,7
25:24 40:14
58:12 63:4
72:16 83:20
94:11 98:24
103:15 104:19
105:3,8 112:9
119:20 124:1
124:11 128:22
133:10 134:22
135:2 137:15
137:19 144:21
scanned 130:9
scanning 8:19
scenarios 90:3

schedule 90:14
90:16
scheduled 105:17
Scheulen 15:11
30:3
Schnucks 52:14
screen 14:21
sealed 114:23
searching 16:25
second 7:24 8:6
11:18 14:23
20:1 26:12,15
38:2 39:7 40:1
64:2 79:10,22
81:23 85:5,8
86:21 92:25
94:6 101:9
108:5 115:25
131:14 136:1,7
136:16 138:2
144:19 147:22
secondary 112:1
113:9
seconds 88:21
secret 85:18,23
86:5 101:14
secretary 62:16
secrets 137:13
secure 138:22
security 24:2
27:18,19 54:24
98:7
sedative 89:4,8
89:11,16,22,25
90:1,6
see 5:11 8:1 13:8
14:17,19 15:25
22:21 23:9 24:8
26:15 27:3 30:8
34:20 35:8 38:1
38:4,6,21,21
43:13 44:19
46:23 54:3,4
65:17 71:2 72:7
75:5 80:9,16
82:18 86:12
93:4 94:11

103:3,4,5,10
111:10 116:4
117:5 123:1
129:18,22
130:4,6,7
134:21 136:3
seeing 20:20
seen 60:19 102:7
sees 122:16,22
segue 96:10
selection 32:25
33:10
sell 39:24 40:13
41:2 61:6
sellers 56:13
send 127:25
sense 24:16 57:24
sent 5:14,15,22
6:10,13 7:23
11:25 117:25
118:1,4
separate 62:6
96:8
sequence 29:22
29:25 30:17,22
31:8 34:7,9
38:14,16 87:18
serve 63:4
served 11:17
67:3
service 58:24
129:4
services 4:13
35:19 37:12
131:13 133:23
150:1
set 7:19,25 8:12
8:13,14 11:5,18
12:5,14 13:24
14:8 16:15
17:16 22:23
27:11 52:24
75:4,10 80:2,2
86:11,19
sets 23:17 27:25
81:5 136:5
setting 95:4

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 183 of 331
Appellate Case: 14-1193   Page: 169   Date Filed: 01/28/2014 Entry ID: 4118269

**seven** 3:12 14:13
  14:14 15:5
  71:14 86:12
  97:2
**shed** 121:17
**sheet** 40:11 151:1
**sheets** 150:12,14
  150:15
**shielded** 137:12
**shift** 81:24
**short** 99:18
**shorthand** 5:3
  149:3
**show** 33:13 40:6
  65:9 70:17
  86:10 111:10
  148:13
**showed** 134:11
**showing** 23:24
  88:16
**shown** 142:19
**shows** 73:2
**sic** 57:19
**side** 27:12 54:15
**SIG** 103:15
**Sigma-Aldrich**
  70:15 71:22
**sign** 10:14 87:19
  147:15 148:10
  150:14
**signature** 5:5
  58:9 132:17,19
  136:9 148:8
  150:12,14,15
  151:23
**signatures** 88:12
  88:16,17
  133:11
**signed** 10:11
  36:22 37:1
  133:15 147:13
  147:13 148:3
**Signing** 88:15
**signs** 87:18
**similar** 18:23
  29:11,18 59:15
  72:14 101:23

121:19 144:4
**similarly** 86:1
  144:10
**simple** 143:11
**simply** 92:15
  105:3 107:18
  112:16 145:16
**simulate** 76:25
  77:2,5
**Sincerely** 150:18
**six** 14:9 15:10
  97:1 111:24
**slash** 39:12,19
  135:4,4
**small** 19:7
**Smulls** 41:13
  73:13 105:13
  105:20,20
  125:5 147:5
**Social** 54:24
**sodium** 123:17
  123:20,22
**sold** 40:17
**solution** 109:1
  123:18,20
**somebody** 36:22
  84:18
**somewhat**
  147:23
**soon** 146:18
**sorry** 11:16
  19:12 20:7,14
  26:7 29:17
  33:20 37:11,24
  40:12 57:13
  58:7,25 59:3,10
  67:25 70:16,18
  79:4 81:11
  93:22,24 94:22
  125:10 129:11
  130:1,25 131:4
**sort** 21:11 37:4
  53:8,12 62:9
  69:25 70:7 74:1
  76:19,24 77:2
  79:11,22
  108:15 110:8

116:6 118:22
  118:23,24
**source** 70:15,16
  70:16,20,21
**sources** 45:16
**speak** 34:23 47:8
**speaking** 96:9
**specific** 14:5
  43:11 48:8 82:8
  84:11 90:13
  96:18 124:17
**specifically** 42:5
  82:14 98:6,19
  119:5 140:11
  141:5 145:22
**specify** 86:14
**speculation**
  50:25 122:23
**speed** 85:9
**spell** 30:4 131:5
**Spillane** 4:8 20:3
  85:19,21
  109:25 139:13
**spring** 144:8
**St** 3:17 64:20
**staff** 35:18 36:11
  77:8,9 78:13,14
  78:15,17,18
  99:10,13,15
**stand** 37:10
**standard** 70:15
  70:15,16,20,20
**standpoint** 80:13
**start** 6:20 18:17
  20:12 25:23
  34:11 52:3 63:1
  81:6
**started** 5:8 141:2
**starting** 77:19
  96:19
**starts** 32:16
**state** 3:16,18
  16:1 29:11,17
  32:25 33:2,2
  55:14 64:13
  85:18,22 86:5
  92:15,16 93:2

94:11 95:23,24
  96:3,7 101:14
  111:10 133:1,8
  137:13 149:5
**stated** 10:22 25:5
  96:16
**statement** 7:7
  94:13,19,21
  95:17 106:6
  112:3 113:4,8
  113:11
**states** 1:1 3:1
  22:17
**state's** 29:13
  33:23 38:10,12
  94:23 95:18,20
**status** 82:13
**statute** 54:17
**stay** 39:14 99:10
  99:19,23
**steps** 10:23 11:1
  46:6
**sterile** 107:19
**Steve** 15:19
**stick** 32:19
**STIPULATED**
  5:1
**Stoll** 50:3,5,9
**stop** 16:3 88:20
  138:1
**store** 105:24
  106:7
**strapped** 77:11
**Street** 4:5,10
  150:6
**stuck** 32:9 79:3
**subject** 107:5
**submitted** 18:24
  18:25
**subscribe** 152:7
**subscribing**
  151:4
**subsection** 19:16
  21:6
**Subsequently**
  6:23
**substance** 48:12

64:3 107:21
  152:4
**successful** 124:14
**successfully** 75:7
**sufficient** 19:11
**suggest** 17:1
  51:18
**suggesting** 13:18
**suggestion** 25:6
**Suite** 4:14
**sum** 136:9
**summary** 35:10
  35:10
**sun** 95:2
**Sunshine** 71:10
**supersede** 113:22
**supervises** 78:12
**supplement** 11:3
  12:16
**supplemented**
  11:11 12:4
**supplementing**
  75:5
**supplied** 41:8,12
  44:23 45:13
  61:21 144:14
**supplier** 20:25
  21:11 145:4
**suppliers** 144:22
**supplies** 19:23
  61:13
**supply** 35:12
  40:21,23,24
  41:9 52:10 75:9
  87:4,5
**support** 97:12
**suppose** 45:10
**supposed** 78:23
**Supreme** 111:9
**sure** 10:4 12:9,20
  20:2 23:5 24:6
  24:12 26:17
  27:5 34:24 43:5
  43:16,25 54:16
  54:20 65:23
  68:12 71:4,20
  75:18 79:19

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 184 of 331
Appellate Case: 14-1193   Page: 170   Date Filed: 01/28/2014 Entry ID: 4118269

81:10 86:25
88:22 96:24
103:7 112:6,6
116:12 118:25
120:12 121:2,9
121:15 129:13
130:15 135:10
136:18 138:3
138:13,15,23
140:25 146:7
**surprise** 80:16
**Susan** 4:9 128:16
128:17
**suspect** 24:7
117:10
**suspected** 66:8
**switch** 126:12
**sworn** 3:10 5:9
9:23 149:7
**syringes** 77:8,10
77:24,25 78:2,6
87:6 93:7,9
110:12,13,14
**systems** 44:24
**S-C-H-E-U-L-...**
30:6

─────────

**T**

**take** 5:16 10:23
11:1 13:19
14:23 17:12
42:24 46:8
51:19 59:11
61:19 63:3,18
67:14 69:13
70:1 73:15
78:24 87:22
88:5 91:9 92:9
93:4 96:22
98:20 101:3
102:25 108:2
115:5 116:5,11
119:24 123:14
124:4 125:7
128:2,3 139:24
**taken** 1:10 5:3
10:5 149:8,12

150:11
**talk** 74:9 84:23
96:10 111:18
111:20 113:25
138:11,12
**talked** 101:10
124:9
**talking** 7:8 13:3
14:7 24:2 25:21
28:12 52:16
63:25 75:5 84:8
120:21 135:15
146:5
**talks** 51:13
**task** 55:4
**tasks** 14:3 86:14
86:18
**team** 14:2,12
15:4 20:24,24
21:7,12,15,18
21:21,22,25
57:11 72:3 85:2
85:14,15,22
86:6 101:13
125:16,17
137:13 142:23
144:23
**telephone** 8:3
**tell** 20:4 26:10
28:3 29:2 36:13
36:24 37:23
41:5,5 43:4,12
50:2,16 53:6
61:25 64:10,13
67:19 68:6,22
69:5,8,13,16
72:13,16 73:23
74:1 76:3 77:3
77:7 81:11 83:9
86:18 88:17
92:12 93:8,11
93:11 95:20
102:4 106:11
116:6 117:21
118:21 119:6
119:18 123:20
124:19 129:20

130:22 131:24
136:15 137:3
138:8 139:25
147:1
**telling** 71:24
80:17 84:20,22
147:11
**tells** 109:22
**temperature**
105:25
**ten** 105:12
109:10
**term** 14:11 22:12
37:21 80:15
**terms** 24:12 41:1
48:8,9 75:23
76:8
**Terre** 110:18,22
144:17 145:7
**Terry** 39:12
135:21,25
**test** 117:23
**tested** 124:2
**testimony** 149:6
149:7
**testing** 21:14
70:12,14 74:4
85:20 109:12
115:2,14
117:21 118:2
124:20 126:25
127:1
**tests** 115:3
**thank** 9:21 14:10
23:11 49:18,24
73:19 81:19
87:24 148:7
150:17
**Thanks** 38:25
39:3
**thereon** 152:6
**thereto** 149:13
151:4
**thing** 16:17 53:9
57:1 71:19 74:8
79:23 91:13
94:15 116:24

118:23 127:5
134:12 136:6
139:23
**things** 13:4 27:20
29:5 30:23,23
31:9,11,13 34:2
78:23 79:10,24
80:22 84:10
85:9 98:7,7,9
99:14 103:12
107:19 125:7
138:22 141:1
147:10
**think** 6:10 10:2,6
14:20 16:13,18
16:18,23 17:2
17:23 23:10,23
26:3 27:14,16
32:6,6,7 37:21
37:25 39:21
42:23 43:11,18
44:1 50:21 57:1
58:3 61:16
62:20 63:13
65:15 75:18
79:9,25 80:25
81:25 85:8,13
85:17 86:2 90:3
92:19 94:2,9
104:25 109:23
109:24 110:21
111:8 114:12
114:25 116:2,3
120:23,24
121:1,6,17
122:1 124:9
126:13 127:11
134:10,14
137:18 139:23
140:24 144:12
144:24 146:8
146:18 147:2,3
148:4,4
**thinking** 44:14
**thinks** 123:3
**third** 13:24 14:8
56:6 57:16 64:3

81:24 86:11
135:23 136:2
**thought** 9:1
19:13 23:17
129:18
**three** 11:6 55:25
55:25 56:12,25
57:6,21,22,24
59:22 63:21
66:12 67:15
108:9 144:2
**time** 8:6 12:23
13:7,18,20 26:8
36:19 51:23
73:17,20 74:10
83:7,19 84:14
90:12,13,15
96:19 107:14
114:10 127:11
142:1 145:18
**times** 59:22
63:15 79:24
95:22
**title** 36:6,11,14
37:5,7 94:16
97:14
**titled** 33:11
**today** 7:2,6 8:18
8:21 21:20
114:4,14
145:16
**told** 7:2 40:22
45:21 48:3
83:11 106:9,12
106:14,16,23
106:25 107:3
114:18,21
138:11 144:2
**Tom** 98:24
**tomorrow** 127:4
127:7
**top** 26:25 29:4
39:6 66:16
74:22 94:10,10
94:16 118:20
122:8 127:21
**topic** 142:9

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 185 of 331
Appellate Case: 14-1193   Page: 171   Date Filed: 01/28/2014 Entry ID: 4118269

**total** 136:10
**totally** 35:7
**track** 27:13
  82:13
**training** 74:9,11
  74:14,18,24
  75:1,2,23 76:23
  78:3,12 108:21
  108:23 109:4,6
**trainings** 13:6,9
  13:14 75:6,9,14
**transactions**
  134:23
**transcribed** 5:5
**transcript** 24:24
  150:13
**transmitting**
  118:11
**Travis** 91:24
**trial** 150:16
**tricky** 127:23
**tried** 43:13 96:18
  97:18
**trouble** 26:4 29:5
**true** 45:11 96:23
  103:13 108:1
  120:3 121:14
  128:3 134:12
  136:22 143:24
  152:5,9
**Truman** 4:14
**try** 54:11 57:1
  69:24 130:18
**trying** 23:7 42:17
  58:15 86:17
  97:20 127:23
  146:3
**turn** 11:16 32:15
**Turning** 126:7
  131:24
**two** 6:25 7:22,22
  11:7,14,22,25
  23:17 35:21
  39:23 40:4 52:9
  52:17 56:3 58:6
  58:6,12,22 61:3
  66:6,24 68:1,16

69:14 79:15
80:4,18,25 81:2
81:4,4,5 87:11
88:16 91:21
92:13 95:22
97:16 98:1
104:3,5,8,19
114:2,2 115:15
131:13 135:3,3
135:22 136:5
136:11,11
**type** 42:14 69:24
  132:14
**types** 80:22
**typewriting** 5:5
  149:9
**typing** 38:5
  57:22

**U**

**Uh-huh** 48:7
  51:7 59:19 72:5
  147:21
**ultimately** 41:8
**umbrella** 133:7
**unable** 11:22
**unavailable**
  40:13,14,15,16
**understand** 11:4
  12:9 43:1 44:17
  60:25 80:18
  81:1 84:21
  89:24 106:11
  112:4 114:20
  139:3
**understanding**
  6:4 11:13 84:8
  107:20 109:13
  111:22 118:6
  144:8
**unfortunately**
  130:16 143:10
**Unger** 4:4 150:21
**unit** 131:2 132:4
  132:8
**UNITED** 1:1 3:1
**units** 135:2,10

136:10
**unredacted** 68:5
  70:17 71:11
  85:2 117:1,4
  121:16 124:18
**unsure** 101:22
**unused** 87:17
  91:4,5
**upper** 66:21
  119:14
**use** 16:2 22:9
  41:4 76:2 81:13
  81:14 107:22
  108:25 112:15
  132:2 133:20
  133:22 141:15
  142:7 146:10
  146:14 147:4
**utilize** 19:17
**utilized** 35:25
**utilizing** 16:4

**V**

**vacated** 99:24
**vague** 41:20,23
  104:25 120:11
**valid** 116:8
**validated** 115:1
**Vance** 32:21
**various** 20:18
  27:20 80:15
  120:16
**varying** 131:16
**vast** 28:8
**vendor** 70:20
**verbal** 106:6
**verbally** 107:1
**verified** 70:20
**Versed** 89:1,5
**version** 69:17
  70:17
**versions** 20:18
  71:9
**versus** 24:3
  111:19
**victim** 91:25 96:1
**victim's** 29:19

33:10 92:17
**vigorously**
  109:25
**violate** 148:2
**visit** 140:9
**visits** 140:5
**volatile** 50:15,19
  50:22
**volume** 135:7
**voucher** 126:9
**vs** 1:6 3:6 150:8
  151:3

**W**

**wait** 22:25 33:20
  66:4 79:4 93:23
  130:24 136:3
**waive** 148:9
**waiving** 25:8
**walk** 75:22
**Wampler** 91:22
  91:23,24
**want** 5:21 7:9
  11:12 17:6
  22:12 23:9 25:1
  25:6,6 26:17
  27:3 29:1 34:18
  37:21 38:23
  39:2 42:22
  43:24 44:13
  60:9 63:1,5
  65:25 66:3 68:9
  68:10 71:19
  72:25 75:7 76:3
  84:11,23 86:25
  114:10 118:3
  130:4,6,7,14,17
  131:5 132:8
  137:15,21
  138:4 140:20
  140:24 142:9
  148:12,16,18
**wanted** 23:5 84:6
  85:25 98:11
  104:12 132:9
  138:23 139:18
  139:21 143:22

**warden** 28:19,21
  28:21 38:13
  76:5,6 78:19
  97:16,23,24
  140:7
**wardens** 97:25
  98:1
**warrant** 103:16
**warranty** 119:21
  119:25 120:3
**wasn't** 10:16
  13:20 15:17,19
  22:13 28:7
  54:10
**watch** 22:16 95:1
**watching** 78:14
  78:19,20,21
**water** 38:23,24
**way** 8:17 24:16
  31:6 33:4 50:18
  63:5 75:3 76:15
  79:8 94:1 104:9
  104:10,11,15
  106:9 111:23
  113:2 117:4
  119:24 120:14
  127:7 131:21
  141:12
**ways** 10:19
**week** 127:13,15
  143:23
**welcome** 94:11
**went** 7:17 8:11
  46:23 75:15
  78:10 82:25
  83:4,7 93:16
  100:25
**weren't** 27:22
  52:10 54:11,17
  107:3
**West** 4:10,14
  150:6
**WESTERN** 1:1
  3:1
**we'll** 12:2 24:8
  24:14 25:9 44:2
  55:1 60:23 63:5

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 186 of 331
Appellate Case: 14-1193   Page: 172   Date Filed: 01/28/2014 Entry ID: 4118269

63:25 74:23 84:23 85:9 115:6 116:3,4 148:9
**we're** 10:2 17:15 23:23 25:8,15 25:21 39:9 44:1 44:20 49:21 57:1 63:25 73:15 75:4 78:22,23 82:17 84:6,7 85:9,11 86:17 87:25 88:2,5 92:21 96:10 114:25 120:2,2 121:9 124:24 130:11 135:10,15 139:10,24
**we've** 13:6 22:7 25:7 28:4 31:20 43:5,10 51:20 66:13 101:10 101:13 107:24 120:15 124:9 129:22 131:18 140:23
**whichever** 63:5
**white** 117:2
**wild** 59:11
**willing** 64:21 68:22 69:5 100:22 118:10 120:2 147:24
**withdraw** 115:7 138:17
**withdrawn** 7:12 9:1,14,20
**witness** 5:6,9 12:20 24:2 26:16,19 29:11 29:18,19 32:9 32:13,25 33:3 33:10,23 34:12 38:13,25 39:3 45:17 71:20 86:3 92:15,16

92:16,17 93:2 94:11 95:14,20 95:24 97:15 98:18 122:22 122:23 130:4,6 131:23 133:10 135:17 136:1,7 138:15 140:20 144:20 148:7 149:6,8 150:13 151:2,23
**witnesses** 29:8,13 38:10 94:23 95:18 96:3,7,11 96:13 98:9 99:4 99:8,12 135:19 136:5
**witnessing** 32:22
**wondering** 80:1
**Wood** 128:16
**word** 5:17 118:4
**worded** 57:15,21 111:23 112:18 113:2 119:24
**wording** 57:22
**words** 71:6,11 114:20
**work** 46:10 68:17 126:1,1,2
**working** 8:19
**works** 37:6 62:7 117:22 126:3
**worse** 136:8
**wouldn't** 28:22 51:16 106:13 134:10
**write** 31:9,22 100:12,15,17 100:22 105:7
**writes** 101:7
**writing** 21:17 31:15 44:19 102:22 106:5 106:20,21
**written** 31:21 33:25 51:10,14 51:15 89:5

113:14 140:8 140:11 142:25
**wrong** 31:21,23 31:25 57:10 80:12 92:19,24 141:9
**wrote** 31:25 92:23 102:15 139:20

---

**Y**

**yeah** 6:16 14:20 17:10 24:6 25:22 31:24 32:9 35:20 36:16 40:15 79:6,7 92:8 94:4,8 95:5,5 97:3 108:17 111:12 116:17 123:4 127:15 132:6 134:18 141:9 146:25
**year** 6:11 143:19
**years** 129:1
**Yellow** 52:18,20
**Yep** 97:1
**yesterday** 8:4 125:6

---

**Z**

**Zink** 1:4 3:4,18 150:8 151:3

---

**$**

**$1,200** 125:12,23 126:5
**$11,000** 128:7
**$11,091** 126:18
**$12,500** 133:25
**$17,000** 131:22
**$3,000** 126:10,10 129:9
**$3,091** 126:24
**$300** 128:9,10
**$5,000** 132:12 133:13 134:1

**$8,000** 56:6 126:22 128:6

---

**#**

**#993** 149:19

---

**1**

**1** 2:9,17 5:12 6:5 6:6,7 7:21,25 16:15 17:18 49:23 50:1 53:1 61:20 76:13 88:1,2 130:11 141:4 148:12
**1/9/14** 2:9
**1:21** 5:8
**1:30** 141:2
**10** 2:2 5:15 6:14 104:12,13 109:16
**100M** 135:4,8
**1099** 129:7
**11** 58:7,7 121:21 121:22
**11-12** 103:4
**11-16-2012** 66:23
**11:15** 39:6
**111** 2:13
**1142** 91:10,13
**12** 56:23 142:21
**12-17-2004** 6:18
**12/27/13** 2:10
**1208** 124:5
**1254** 102:25
**1257** 118:19
**1260** 61:20,22,23
**1261** 63:19,21 65:1 66:13,25 67:16
**1262** 104:16
**1263** 56:24 57:2 57:14,18 58:6 58:18 59:1,4,14
**1265** 67:18
**1266** 119:6 120:6 121:10 122:3
**1268** 121:19,24

**1283** 57:2,14 58:4,7,18 59:14
**1285** 122:5
**1287** 67:14
**1289** 69:13
**1292** 53:1 55:10 55:13
**1294** 116:6 117:14
**1295** 123:14 125:8,8
**1296** 125:8,9,10 125:12
**1297** 126:7
**1298** 57:2,11,19 128:9,9
**1299** 57:16,18,20 58:8,20,21,25 59:6,11 134:14 134:15
**13** 2:11,12 58:8 65:19 71:14 72:23 73:3 103:4 110:4 127:20
**13th** 110:17
**1300** 127:3,17,18
**1301** 59:12,14
**1303** 136:15,20
**1304** 139:25
**1305** 49:19 50:1
**1306** 116:23 117:14
**1307** 70:1 71:17
**1310** 72:8,10,13
**1311** 109:17
**1312** 72:8,10,12
**1334** 92:10,21,22
**1335** 92:10,22
**1336** 98:20
**140** 2:3
**143** 2:4
**15** 1:11 81:8,24 91:9 111:9 150:11
**15th** 3:11
**1524** 91:17,22

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 187 of 331
Appellate Case: 14-1193   Page: 173   Date Filed: 01/28/2014 Entry ID: 4118269

**1541** 91:17,23
**16** 131:22
**19** 81:7,20
  109:22
**19th** 81:15
  110:17,17

_____

**2**

**2** 2:10,17 6:16
  7:7 8:23 27:1
  76:13 129:23
  130:13,21
**2:12-CV-4209-...**
  1:5 3:5
**20** 83:24,25 84:1
  93:24 150:3
  152:11
**20th** 72:25
**2002** 111:9
**2010** 15:8,14,15
**2011** 119:11
**2013** 6:21,21,24
  14:1 66:19
  67:11 71:15
  72:23 73:3
  74:13,17
  121:21 143:20
**2014** 1:11 3:11
  61:21 150:3,11
**2015** 93:12,14,19
  93:21 94:3,4
**2016** 119:12
**2018** 121:25
**2043** 93:5
**2048** 73:16,18,23
  73:24 124:4,6,7
**2049** 73:16 74:6
**2056** 73:16
**2057** 126:13,15
**2058** 126:13,14
**207** 4:14
**2095** 132:11
**21** 83:20,22 84:2
  84:5 136:11
**2105** 109:23
**211** 4:10 150:6
**22** 13:25

**2246** 17:19,21
  20:23 21:3
  141:4 146:5
**2247** 19:6
**2248** 141:5,7
**2249** 141:5 146:5
**225** 20:16
**2267** 20:17
**2399** 134:16,18
  135:15
**24** 29:6 146:21
  146:25
**2405** 26:9
**2417** 29:6
**2418** 29:10,16
**2420** 29:13,18
**2464** 29:22
**2471** 26:9 30:14
  30:15,16 31:22
**2473** 30:17
**2474** 30:18 31:20
**2475** 32:7
**2476** 31:24 32:7
  32:12
**2492** 129:24
  130:2,3,22,22
  131:1
**2494** 129:10,12
  129:14,16
  131:24
**2495** 132:11
**2496** 133:12
**2497** 133:24
**2499** 129:25
  130:2,3
**2587** 26:24 32:16
**2597** 32:20
**2598** 32:23
**2599** 33:1
**26** 2:14,15 27:6
**2600** 33:9
**2601** 33:10
**2609** 33:19,20
**2610** 33:19
**2611** 33:19
**2612** 33:19,21
**2651** 34:6,12

**2652** 39:5
**2656** 34:10 35:4
**2657** 35:9 36:18
  37:17,22
**2658** 37:18,21
**2675** 38:9,13
**2676** 38:12
**2679** 27:4 38:16
**2680** 26:25 27:1
  27:7 38:17,18
**27** 6:21 7:12 8:12
  9:20 44:8 69:17
**2729** 3:14
**29** 105:18 147:5

_____

**3**

**3** 65:20 71:15
  111:8
**3:30** 142:10
**30** 6:21,23 88:20
  106:17,24
  107:9,14
**31** 66:19 67:11
**3432** 4:14

_____

**4**

**4:30** 83:24
**4:54** 83:20
**46** 21:2
**48** 73:20,21
**49** 17:20 73:18
  73:21

_____

**5**

**5** 2:9,11,17 65:6
  65:8 66:11,15
**5:15** 107:24
**50** 135:9
**50MG** 135:4
**56** 73:18,21
**573)636-7551**
  4:15

_____

**6**

**6** 2:10,12,17
  70:25 71:1
**6:05** 125:1
**60** 30:12 142:21

**6011** 4:5
**62** 83:19
**63** 57:3
**64** 30:10,13
**64113** 4:5
**65** 2:11
**65102** 4:10 150:6
**65109** 4:14
**662** 83:15
**676** 79:1,3,4,6,7
  79:11 80:19
  81:18
**686** 79:4,8
**689** 79:1,14
  80:19 82:1,1,20
**69** 29:22

_____

**7**

**7** 2:12,13,17 88:4
  111:1,3,4,6,25
  148:12
**7:02** 148:20
**71** 2:12
**718** 86:2
**722** 87:22 88:6,9
  88:11,25 90:17
  90:20
**723** 88:8 91:13

_____

**8**

**8** 2:11,14,18
  24:17 25:13,24
  26:21 28:5
  31:22 148:14
**83** 57:3

_____

**9**

**9** 2:15,19 5:14
  6:11,12,14
  24:17 25:13
  26:23,24 28:5
  32:16 38:22
  148:14
**9:05** 109:23
**98** 57:4
**99** 134:17
**993** 1:12

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 188 of 331
Appellate Case: 14-1193   Page: 174   Date Filed: 01/28/2014 Entry ID: 4118269

# EXHIBIT C


Politics & Issues
**Report For EPA Says Underground Landfill Fire Poses Little Risk**


Red Light Cameras
**St. Louis Gets Green Light To Turn Red Light Cameras On For Now**


Other News
**The Rundown: Highlights Of The Week Of Feb. 10**

---

**Death Penalty**          5:25 PM FRI FEBRUARY 14, 2014

# Judge Orders Pharmacy Not To Sell Execution Drug To Missouri, For Now

By **CHRIS MCDANIEL** (/PEOPLE/CHRIS-MCDANIEL)

**Update: Governor says the state is prepared to proceed regardless.**
(#update)

**Update: Pharmacy hopes documents will be secret** (#update2)

A federal judge has ordered an Oklahoma-based pharmacy not to sell the Missouri Department of Corrections its execution drug, at least until a hearing scheduled for next week.


[http://mediad.publicbroadcasting.net/p/kwmu/files/201402/Apothecary_Shoppe.png]
(http://mediad.publicbroadcasting.net/p/kwmu/files/201402/Apothecary_Shoppe.png)
Enlarge image
*Credit via Google Maps*

A Missouri inmate scheduled to be executed Feb. 26 sued the pharmacy, hoping to stop the supply of the drug that would soon be injected into him.

The Apothecary Shoppe, a Tulsa-based compounding pharmacy, has supplied pentobarbital for three recent executions in Missouri but became registered to sell here only last week.

"[The Apothecary Shoppe] is temporarily restrained from issuing compounded pentobarbital to the state of Missouri Department of Corrections for use in plaintiff's execution by lethal injection," Judge Terrence Kern in Oklahoma wrote.

He set a hearing for Feb. 18 for both sides to make their case.

The state's controversial execution methods (and secrecy) were the impetus behind a legislative hearing in which state officials testified and for multiple bills aiming to curtail the Department of Corrections' power.

The lawsuit, filed by inmate Michael Taylor's attorneys on Tuesday, raises many of the same issues on which we've previously reported. (http://news.stlpublicradio.org/post/investigation-missouris-execution-drug-source-raises-legal-ethical-questions) Missouri is now relying on a compounding pharmacy to mix the execution drug. Compounding pharmacies are not regulated by the Food and Drug Administration, and their products have a significantly higher failure rate than those made by manufacturers.

In fact, a law prohibits pharmacies from creating a copy of an FDA-approved drug, like pentobarbital.

"[The Apothecary Shoppe] cannot produce this drug so that it's safe and effective, and there are all kinds of risks associated with that," attorney Carrie Apfel said in an

Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 190 of 331

interview. "The drug can be sub-potent, which means it's not powerful enough to do what it's supposed to do. It could be adulterated or have a contaminant in it."

Apfel and her fellow attorneys are arguing that the drug's injection would violate the Eighth Amendment, which bars cruel and unusual punishment.

Taylor's attorneys asked the judge to issue an order restraining the Apothecary Shoppe from supplying the drug to the Department of Corrections. State officials have testified that they typically travel to Oklahoma to pick up the drug and pay for it in cash. (http://news.stlpublicradio.org/post/three-missouri-offices-are-responsible-controversial-execution-plans)

**Judge Orders Pharmacy To Not Sell Execution Drug**

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

**Explore This Document In Full-Screen**

~~Mode(http://apps.npr.org/documents/document.html?id=1017660-doc-no-2~~

The Apothecary Shoppe did not respond to a request for comment.

"An execution using compounded pentobarbital sodium, or other compounded drugs involves injecting a drug of unknown composition," Larry Sasich, a pharmacy consultant, wrote in the court filing. "This carries a substantial risk of causing the defendant pain and suffering."

Other states have faced controversy for recent executions as well. In Ohio, an inmate took more than 20 minutes to die and was said to have gasped several times during that time. An Oklahoma inmate's last words were "I feel my whole body burning."

Taylor was convicted of a 1989 abduction, rape and stabbing death of a 15-year-old girl.

**Updated 4:09 p.m., Thurs., Feb. 13 with governor's response.**

On Thursday, Gov. Jay Nixon said the Department of Corrections is prepared to proceed with this month's execution.

"I mean, the Department of Corrections is prepared to carry out the execution on Feb. 26, pursuant to the warrant issued by the Missouri Supreme Court," Nixon said, when asked by reporters.

The Democrat also said the state has acted properly in trying to keep the supplier a secret.

"It's important that they follow the law, and it's the law of the state that protects the privacy of certain parts of the process," Nixon said. "If folks want to shift that policy, just like that law that passed that allows for that privacy, then the legislature has the opportunity to do that."

(http://cpa.ds.npr.org/kwmu/audio/2014/02/Nixon_on_execution_2_13_(00mp3)1:09

There are a few possible ways the state would be able to proceed. One is that it could have bought the drug before the judge's order. Both the governor's office and the Department of Corrections refused to disclose if the state currently has possession of the execution drug.

The state also has a backup drug.

In a sworn deposition last month, a high-ranking state official revealed that the state has a supply of midazolam to carry out executions, in spite of earlier assurances that the state did not have the drug.

```
23      Q.   Okay.  Does the Department now maintain supplies
24  of Midazolam or Hydromorphone for execution purposes?
25      A.   No.
```

```
20      Q.   Since you gave that answer, do you have any
21  information to include to correct that answer?
22      A.   Yes; yes.
23      Q.   And what is that?
24      A.   I was reminded that we had purchased those items
25  as a backup.  Yes.
```

(http://mediad.publicbroadcasting.net/p/kwmu/files/201402/DormireMidazolam_0.JPG)
Enlarge image (http://mediad.publicbroadcasting.net/p/kwmu/files/201402/DormireMidazolam_0.JPG)

Midazolam was the drug Ohio used in a recent execution that took more than 20 minutes. Witnesses said the inmate gasped and snorted during that time.

If Missouri were to use its backup supply of midazolam, the state would have to change the protocol, which currently allows only for pentobarbital.

**Updated 4:49 p.m., Fri., Feb. 14 with the Apothecary Shoppe's response.**

In a filing Friday afternoon, the Apothecary Shoppe asked the judge to keep documents about it confidential.

"Here, the legally protectable interests of defendant and the state of Missouri far outweigh the public interest in disclosure of the confidential documents," the Apothecary Shoppe wrote. "Missouri law expressly protects from disclosure the identities of members of an execution team."

The Apothecary Shoppe cited being a member of the execution team as a reason the documents should be sealed but also attempted to obfuscate if it is supplying.

"Whether that allegation is accurate or not, the aforementioned statute would apply with respect to inquiries into the identities involved in a given execution team and their various roles," the Shoppe's attorneys wrote.

But public records have already named the Apothecary Shoppe as the pharmacy selling the state its drugs. And the lawsuit pertains to the pharmacy supplying the state of Missouri with its execution drug, so they would have little reason to fight the suit if the pharmacy wasn't the supplier.

"It has the potential to cause public protest" if the documents were disclosed, the

Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 192 of 331

Apothecary Shoppe said.

Missourians for Alternatives to the Death Penalty have been intermittently holding a vigil outside the pharmacy for the past couple of weeks.

*Follow Chris McDaniel on Twitter:* @csmcdaniel (http://twitter.com/csmcdaniel)

**TAGS:** death penalty (/term/death-penalty)

**Related Content:**



**Death Penalty**

After Controversy Surrounding Executions, State Officials Testify Before House Committee (/post/after-

**Death Penalty**

Three Missouri Offices Are Responsible For Controversial Execution Plans (/post/three-missouri-offices-

**0 Comments**    St. Louis Public Radio      Login ▾

Sort by Best ▾        Share    Favorite ★

Start the discussion…

Be the first to comment.

Subscribe    Add Disqus to your site

# EXHIBIT D

# theguardian

<div style="border:1px solid #ccc; padding:10px;">Search</div>

# I witnessed Ohio's execution of Dennis McGuire. What I saw was inhumane

I don't know how any objective observer could come up with any conclusion other than that injection was an evil way to go



**Lawrence Hummer**
theguardian.com, Wednesday 22 January 2014 13.51 EST

The last time I celebrated mass with Dennis McGuire, who was executed by the state of Ohio last week using an experimental two-drug concoction, it was the feast of the epiphany that marks the bringing of gifts to the newborn Jesus by the magi.

McGuire was one of just over a dozen Catholics among Ohio's 147 death row inmates who come to mass weekly in Chillicothe Correctional Institution. As part of the sacrament of anointing, I asked the others to pass by and lay hands on McGuire as a way of giving our brother back to the Lord as a symbolic gift. When I turned round to face them with the oils, I found the other 12 standing around him, surrounding him as though they were offering him back to the Lord. Tears were streaming down McGuire's face. That was the first time I'd ever seen him show physical signs of emotion.

I first began to visit Mcguire in November. He told me about the evil act he had committed, the murder in 1989 of a young woman Joy Stewart who was pregnant and whose unborn child also died. He confessed his sin to me, and expressed sorrow for what he had done. I said he should pray for forgiveness from the woman he had killed, and from that unborn child, and over the course of the final eight weeks, I know that he did.

After that, I had to deal with him as I do anyone else who repents: as a forgiven sinner. It can be very difficult for people not in the religion to accept that with regard to a murderer, but the faith is clear: once forgiven, you are forgiven, no matter how heinous the sin.

On the day of his execution, last Thursday, I gave him his last sacraments at Southern Ohio Correctional Facility, which lodges the "death house". Shortly before the execution

was due to start, his son, daughter and daughter-in-law, who were with him at the time, asked me to come with them as witness. McGuire also said he wanted me there as his spiritual adviser.

I felt nauseous before I entered the room, as I had never seen an execution before. As the execution got underway, the nausea passed and was replaced by an intense feeling that I wanted to get out of that room, away from the horrendous act that was playing out before me.

I've seen people die many times before: in nursing homes, families I've known, my own mother. In most settings I've found death to be a very peaceful experience. But this was something else. By my count it took 26 minutes for McGuire to be pronounced dead.

We sat down in the death house – McGuire's children and daughter-in-law in the front row and me in the row behind them. At about 10.15am he was brought in and strapped to the gurney. With his arms spread and, not to put too fine a point on it, I whispered to his daughter that he looked as though he were on the cross.


Dennis McGuire. Photograph: AP

He made his final statement. He said thank you to Joy Stewart's family who had offered him some words of comfort in a letter they had written to him, and he told his children that he loved them and would see them in heaven. They began to put lines into him. That was unsettling, as from what I could observe they seemed to find it hard to get insert the IV and there seemed to be blood coming from his right arm.

At 10.27am, the syringe containing the untested concoction of midazolam and hydromorphone was injected into him. At 10.30am, three minutes into the execution, he lifted his head off the gurney, and said to the family who he could see through the window: "I love you, I love you." Then he lay back down.

At about 10.31am, his stomach swelled up in an unusual way, as though he had a hernia or something like that. Between 10.33am and 10.44am – I could see a clock on the wall of the death house – he struggled and gasped audibly for air.

I was aghast. Over those 11 minutes or more he was fighting for breath, and I could see both of his fists were clenched the entire time. His gasps could be heard through the

glass wall that separated us. Towards the end, the gasping faded into small puffs of his mouth. It was much like a fish lying along the shore puffing for that one gasp of air that would allow it to breathe. Time dragged on and I was helpless to do anything, sitting helplessly by as he struggled for breath. I desperately wanted out of that room.

For the next four minutes or so a medical tech listened for a heart beat on both sides of his chest. That seemed to drag on too, like some final cruel ritual, preventing us from leaving. Then, at 10.53am, the warden called the time of death, they closed the curtains, and that was it.

I came out of that room feeling that I had witnessed something ghastly. I was relieved to be out in the fresh air. There is no question in my mind that Dennis McGuire suffered greatly over many minutes. I'd been told that a "normal" execution lasted five minutes – this experimental two-drug concoction had taken 26 minutes. I consider that inhumane.

His family had been exposed to something horrendous. They cried and sobbed, held each other, held onto my hand, and at times turned away to hug each other so they didn't have to watch. And then there's the family of Joy Stewart, who I think were sitting next to us on the other side of a wall. I pray for them because I know they too have been through hell and back. My heart goes out to them, but I don't see how his death will bring them peace. All it means is that they witnessed somebody else die.

I have opposed the death penalty since I studied philosophy in college 40 years ago. My objection is based on a simple principle: all human beings are created with the ability to change, from what is not yet to what is, and that's as true in the womb as it is heading for the tomb. There can always be repentance.

To interrupt that process is to deny people the chance to repent of what they have done. Capital punishment is simply a way of society avoiding the possibility of changing lives. I'm not advocating the release of any of Ohio's death row inmates into society – they have all committed heinous acts, and society must be protected from them. But by incarcerating them, they pose no more threat. Everybody wants to play God instead of believing in him. That applies to the murderer as much as to all of us. In my opinion, the death penalty is nothing more than an exercise in vengeance that rightly should be reserved to the lord.

Putting my opposition to the death penalty to one side, there remains what I saw with my own eyes last Thursday. I don't know how any objective observer could come up with any conclusion other than that was an evil act.

Now that almost a week has passed, and I've had time to reflect, I ask that the governor

of Ohio or the legislature end the death penalty in this state. It serves no purpose. People must seize this culture of death and stop it.

On Monday, I came to the prison for my usual weekly mass. I asked the remaining Catholic inmates whether they wanted to know what had happened to their brother. Most said they did, so I told them straight out, sparing them few details.

Some of them came up to me after the mass to talk. Ironically, they began to console me, saying that they were sorry that I had been forced to go through such a terrible experience. I found myself oddly comforted by that. I know they were being genuine – I've been with them long enough to sense when I am being played. For me, that underlines a vital truth: that even among men who have done such brutal things, redemption can be found.



**Get the best of Comment is free**

The most shared comment, analysis and editorial articles delivered every weekday lunchtime.

**Sign up for the Comment is free email**

## More from the Guardian What's this?

Nude Indian election posters: Not your usual buttoned-up political stunt 11 Feb 2014

Alex Salmond responds angrily to Osborne's rejection of currency union 13 Feb 2014

David Bailey: 'Cockneys don't cry. It's not for me, all that whingeing and moaning' 15 Feb 2014

Let's unpack the debate over a nearly-naked man statue at a women's college 11 Feb 2014

Dumb Starbucks was the perfect crime, but Starbucks was smart to play dumb 12 Feb 2014

## More from around the web What's this?

Best Places to Retire To (Bring Your Challenges)

Stop Paying So Much For Your Hotel Room. 4 Simple Steps to Cheaper Rates (A Luxury Travel Blog)

Jay Leno Revisits His Roots: Working the Grill at McDonald's (CBS News)

Bulldozer Clearing Snow Kills a Pregnant Woman (The New York Times)

The Hidden Effects of Clutter (Contentverse)

# Ads by Google

Online College Programs

AA, BA, BS, MA, MS, & PhD Degrees Search 100's of Accredited Schools

www.degreesearch.org

Escape from America

6 Places to Protect and Grow Your Wealth as US Spirals Out of Control

www.sovereign-investor.com

Nursing School Online

Earn Your RN To BSN in 3 Semesters. Online, Affordable & User Friendly!

www.chamberlain.edu

© 2014 Guardian News and Media Limited or its affiliated companies. All rights reserved.

;

# EXHIBIT E

SET EDITION: U.S. | INTERNATIONAL | MÉXICO | ARABIC

TV: CNN | CNNi | CNN en Español | HLN

**CNN** Justice

This text should b

SEARCH

Home | TV & Video | CNN Trends | U.S. | World | Politics | **Justice** | Entertainment | Tech | Health | Living | Travel | Opinion | iReport | Money › | Sports ›

# Controversial execution in Ohio uses new drug combination

By **Dana Ford** and **Ashley Fantz**, CNN
updated 1:01 PM EST, Fri January 17, 2014

SHARE THIS

Recommend ⟨47k⟩

Print
Email
More sharing




Son of executed Ohio man breaks silence

**STORY HIGHLIGHTS**

**NEW:** Execution was "a failed, agonizing experiment," attorney says

**NEW:** A medical expert questions why the process took 24 minutes

Convicted killer Dennis McGuire reportedly says "I'm going to heaven"

Facing shortages, states are scrambling to find new drug protocols

ADVERTISEMENT

**360 Savings**℠

**CapitalOne** Bank
MEMBER FDIC



Witness: Inmate gasped during execution

Why should executions be humane?

**(CNN)** -- Ohio inmate Dennis McGuire appeared to gasp and convulse for roughly 10 minutes before he died Thursday by lethal injection using a new combination of drugs, reporters who witnessed it said.

McGuire was convicted in 1994 of the rape and murder of 22-year-old Joy Stewart, who was seven months pregnant. Her relatives were at Southern Ohio Correctional Facility in Lucasville to witness his death, according to tweets from television reporter Sheila Gray.

McGuire's "children and daughter-in-law were crying and visibly upset," Gray tweeted.

She said McGuire, before the drugs took effect, thanked Stewart's family for a letter he apparently received.

"To my children, I'm sorry. I love you. I'm going to heaven and I'll see you there when you come," McGuire reportedly said, according to CNN affiliate WDTN.

Columbus Dispatch reporter Alan Johnson said that the whole execution process took 24 minutes, and that McGuire appeared to be gasping for air for 10 to 13 minutes.

"He gasped deeply. It was kind of a rattling, guttural sound. There was kind of a snorting through his nose. A couple of times, he definitely appeared to be choking," WDTN quoted Johnson as saying.

The convicted murderer was pronounced dead at 10:53 a.m. ET.

*Snake*

*Jennifer Lopez*

*Earth*

*Identical Quadrupl...*

**More from CNN Video:**

This text should b


Actor continues custody battle for son


Daredevil falls from balloon tightrope


No flowers yet? Blame the snow!


Shocking discovery in burrito


Shani Davis seeks Olympics three-peat


SI's swimsuit cover girl is a real doll

**More from CNN:**



Killer executed in Ohio

The execution generated controversy because, like many states, Ohio has been forced to find new drug protocols after European-based manufacturers banned U.S. prisons from using their drugs in executions -- among them, Danish-based Lundbeck, which manufactures pentobarbital.

According to Ohio's corrections department, the state used a combination of the drugs midazolam, a sedative; and the painkiller hydromorphone.

Both the length of time it took for McGuire to die and his gasping are not typical for an execution, said Howard Nearman, an anesthesiologist at University Hospitals Case Medical Center in Cleveland.

"Why it took 24 minutes, I really can't tell you," he said. "It just makes you wonder -- what was given? What was the timing, and what were the doses?"

In an opinion piece written for CNN this week, a law professor noted that McGuire's attorneys argued he would "suffocate to death in agony and terror."

"The state disagrees. But the truth is that no one knows exactly how McGuire will die, how long it will take or what he will experience in the process," wrote Elisabeth A. Semel, clinic professor of law and director of the Death Penalty Clinic at U.C. Berkeley School of Law.

Speaking on behalf of McGuire's legal team, attorney Allen Bohnert called on the governor to impose a moratorium on future executions because of what took place Thursday.

"At this point, it is entirely premature to consider this execution protocol to be anything other than a failed, agonizing experiment," he said in a statement.

"The people of the State of Ohio should be appalled at what was done here today in all of our names. Ohio, like its citizens, must follow the law. The state has failed."

CNN's Sonny Hostin said that McGuire's execution will likely spark debate over whether how inmates react to the use of the drugs constitutes cruel and unusual punishment prohibited by the U.S. Constitution.

"Whenever there's a change in the lethal injection process clearly it's subject to legal proceedings and perhaps we will see those," Hostin said.

Ohio ran out of pentobarbital, which is a narcotic and sedative barbiturate, in September, according to JoEllen Smith, spokeswoman for the Ohio Department of Rehabilitation and Correction.

In response to that shortage, the department amended its execution policy to allow for the use of midazolam and hydromorphone.

Stewart's body was discovered by hikers near a creek in southwestern Ohio in February of 1989. Her throat was cut and she had been sodomized.

Death penalty states scramble for lethal injection drugs

There are currently 138 men and one woman on death row in Ohio.

The state was set to execute death row inmate Ron Phillips using the new drug combination last year, but Gov. John Kasich granted the convicted killer a stay of execution pending a review of a




**Ex-New Orleans Mayor Ray Nagin guilty after courtroom 'belly flop'**

**Woman accused in Craigslist slaying tells newspaper: I've killed lots of...**

### From Around the Web:




**10 actors who killed people in real life**
Death and Taxes

**Why You're Probably Being Overcharged for Your Car Insurance**
Lifestyle Journal




**A Pimp Is Suing Nike for Not Warning That His Shoes Could Be Used as...**
Vice

**Ohio: 3 adults arrested in extreme child abuse case after girl emails...**
Allvoices



Download a *free* audiobook today

LEARN MORE

audible
an amazon company

ADVERTISEMENT

Sponsored Links

**LifeLock® Official Site**
Protect yourself this tax season w/ our ID theft protection services

**Find Out if You are Eligible**
Millions of Californians can now get financial help with their insurance bills.

**Penny Stocks Make Money!**
California Find out how to beat the recession with penny stocks.

**40% off Your Order Today**
Save on Photo Books, Calendars, and More. Use promo code PREZ40.

Buy a link here

possible organ donation to his family members.

Death penalty in the U.S. gradually declining

Serial killer Joseph Franklin executed after hours of delay

A death row interview

CNN's Joe Sutton, Ross Levitt and Deborah Feyerick contributed to this report.

## From Around the Web

- **Why is this American President ignored despite his great work?** The Daily Beast
- **Being fooled on craigslist is common** Instant Checkmate
- **Terrell Owens' New Wife Hospitalized After Apparent Suicide Attempt** Hello Beautiful
- **Florida Man's Fiancée Contradicts Parts of His Testimony in Killing of Teenager** The New York Times
- **High Fructose Corn Syrup and Sugar: How the Media Got it Wrong** Forbes
- **Man jumps to his death rather than continue shopping with his girlfriend** DramaFever

## More from CNN

- **Teen killed after shooting several people, including ATF agent, police say**
- **Parents killed girl by making her drink too much grape soda, water, authorities say**
- **Arrest in 40-year-old murder case**
- **Bus riders subdue attacker, help avert collision; 24 injured**
- **Attorneys: Fetus of pregnant, brain-dead wife is 'distinctly abnormal'**
- **Florida teen in X-rated videos can return to school after suspension**

Recommended by 

**Sponsored Links**

**LifeLock® Official Site**
Protect yourself this tax season w/ our ID theft protection services

**Find Out if You are Eligible**
Millions of Californians can now get financial help with their insurance bills.

**Penny Stocks Make Money!**
California Find out how to beat the recession with penny stocks.

Buy a link here

**18254 Comments**          CNN                                              Ⓓ Login ▾

Sort by Best ▾                                              Share ⬆    Favorite ★

     Join the discussion…

  This comment is awaiting moderation. Show comment.
              This comment is awaiting moderation.

        This comment is awaiting moderation. Show comment.
                  This comment is awaiting moderation.

            This comment is awaiting moderation. Show comment.
                      This comment is awaiting moderation.

                This comment is awaiting moderation. Show comment.
                          This comment is awaiting moderation.

                This comment is awaiting moderation. Show comment.
                          This comment is awaiting moderation.

                This comment is awaiting moderation. Show comment.
                          This comment is awaiting moderation.

                This comment is awaiting moderation. Show comment.
                          This comment is awaiting moderation.

              This comment is awaiting moderation. Show comment.


This comment is awaiting moderation.


This comment is awaiting moderation. **Show comment**.
This comment is awaiting moderation.


**Paul Evans** → Mpeasman · a month ago
If if if if .... its all a question of where or how you draw the line.

The system is not perfect therefore it WILL be the case that an innocent person will be killed by the process. I can never support a system that could result in the death on an innocent person (you may be different). Because of that position find I cannot support the process. This is simple logic.
96 ∧ | 13 ∨ · Reply · Share ›


**nyboy** → Paul Evans · a month ago
I think your logic fails you when you take it to the extreeme cases like the Fort Hood shooter, Colorado theater shooter, etc. There is absolutely no doubt in those cases unless you have a distorted view of reality.
72 ∧ | 5 ∨ · Reply · Share ›


**Paul Evans** → nyboy · a month ago
And where to draw the line is something that I have struggled with so I would rather err on the side of caution. The issue is how do you encode that in law?
17 ∧ | 3 ∨ · Reply · Share ›


**cyborg_destruct** → Paul Evans · a month ago
Maybe allow the appeals process to have a limit of three years and then stop? Sounds like a reasonable amount of time. Although I think three years in a real prison would make me want to commit suicide rather than be with the animals, and I typically love animals! LOL
Not the human kind of animals however.
12 ∧ | 4 ∨ · Reply · Share ›


**James** → cyborg_destruct · a month ago
What about all of the people who have been exonerated after 3 years?
15 ∧ | 1 ∨ · Reply · Share ›


**DoctorFeelgoodMD** → James · a month ago
I live in Texas and strongly believe in the death penalty for convicted murders and other crimes. It acts as a deterrent for one. Second, we the people are not going to spend hundreds of thousands of dollars keeping scum alive by housing them. The death penalty is not cruel or unfair. We as humans have carried this out since the beginning and should continue to do so until the end of time. Do the crime and face the consequences. If new drugs don't work, shooting squad works great.
35 ∧ | 7 ∨ · Reply · Share ›


**James** → DoctorFeelgoodMD · a month ago
You aren't really making any arguments here. All you're doing is stating your opinions.

Where is the evidence that it deters crime?

We the people, pay for prisons to protect society from the prisoners. If you've heard 6th graders debate the death penalty you would know it's more expensive to put someone to death than to put someone away for life.

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 204 of 331

In the beginning, humans didn't wipe after they pooped. Just because something went on in the past doesn't mean it should continue. You could use the same argument for slavery and war.

If the firing squad worked great the executioners wouldn't need a blank to convince themselves that it wasn't their bullet that killed the prisoner.

22 ∧ | 4 ∨ • Reply • Share ›


**Help_Me_Obi_Wan** ↪ James • a month ago

It may or may not deter crime, who knows? But there is a 100% certainty that someone who has been executed will NEVER commit another crime.

27 ∧ | 2 ∨ • Reply • Share ›


**James** ↪ Help_Me_Obi_Wan • a month ago

Can't the same be said for people in prison for life?

8 ∧ | 7 ∨ • Reply • Share ›


**Help_Me_Obi_Wan** ↪ James • a month ago

NO! Prisoner on prisoner violence or prisoner on correction officer violence, up to and including more killing. I'm not sure you have heard, but sometimes prisoners escape. I don't think most of the ones that escape spend the rest of there lives reading the Bible and helping old ladies cross the street.

17 ∧ | 2 ∨ • Reply • Share ›


**James** ↪ Help_Me_Obi_Wan • a month ago

I'm not sure if you've heard, but very few prisoners escape, and it's up to the law enforcement community to stop it from happening.

Also, almost all fugitive prisoners have less than a few days before they get caught and a whole lifetime to read the bible.

10 ∧ | 3 ∨ • Reply • Share ›


**Help_Me_Obi_Wan** ↪ James • a month ago

So, In the few days before they get caught, they are model citizens. Man, I would love to know what kind of drugs you're taking.

7 ∧ | 1 ∨ • Reply • Share ›


**James** ↪ Help_Me_Obi_Wan • a month ago

Nope, they aren't, and no one said they were.

4 ∧ | 1 ∨ • Reply • Share ›


**zipper** ↪ Help_Me_Obi_Wan • 13 days ago

obviously no substances that promote clear thinking!

∧ | ∨ • Reply • Share ›


**Larry Wilson** ↪ James • 23 days ago

The problem being that some of those that DID escape have killed others while on the run. Recent case here in Arizona, they killed while running!

2 ∧ | ∨ • Reply • Share ›


**James** ↪ Larry Wilson • 23 days ago

Don't let them escape. What were violent offenders doing in a medium security prison?

∧ | 1 ∨ • Reply • Share ›


**zipper** ↪ James • 13 days ago

"don't let them escape." -man, you sound like a juvenile!! ask your mama to change your diaper, and go watch the Cartoon Network instead of posting your dribble here!

 **zipper** → James · 13 days ago

maybe YOU haven't heard about all the convicts that get released
due to "good behavior," or "overcrowding." many commit crimes
within days, sometimes hours, of release. rape and murder are
very common instances.
why are you so pro-criminal, James? i don't hear a word from you
in sympathy for their victims.

1 ∧ | ∨ · Reply · Share ›

 **Sally Frederick-Tudor** → James · a month ago

Hell NO! Save taxpayers money by execution and not housing and
feeding them for years is a lot cheaper, no doubt about that!!

5 ∧ | 1 ∨ · Reply · Share ›

 **blurp** → Sally Frederick-Tudor · a month ago

States without the death penalty have lower murder rates than the
ones with the death penalty (source: deathpenalty <dot>.org), and it
cost approximately 3 times as much to execute a person as it does
to house them in a single cell for 40 years (Source: Dallas Daily
News)</dot>

7 ∧ | 1 ∨ · Reply · Share ›

 **maineiac123** → blurp · a month ago

My goodness, are you nuts? To talk about facts instead of beliefs?

5 ∧ | ∨ · Reply · Share ›

 **Kim Kacer** → maineiac123 · 24 days ago

lol

∧ | ∨ · Reply · Share ›

 **Why** → blurp · 6 days ago

A recent study in Canada showed that putting salt on the roads
reduced accidents. Eager to get on the joy train, Texas put lots of
salt on the roads and nothing happened.

Understand WHAT statistics mean, not just quote them.

∧ | ∨ · Reply · Share ›

 **zipper** → blurp · 13 days ago

really? now why do you suppose that is? it is not logical.

∧ | ∨ · Reply · Share ›

 **James** → Sally Frederick-Tudor · a month ago

It costs more money to execute them. How intellectually lazy can
people be nowadays?

5 ∧ | ∨ · Reply · Share ›

 **Help_Me_Obi_Wan** → James · a month ago

It costs very little to execute someone. The cost are the lawyer's
fees for appeal after appeal after appeal after appeal after
appeal...are you starting to understand how it works?

3 ∧ | ∨ · Reply · Share ›

 **maineiac123** → Help_Me_Obi_Wan · a month ago

And those appeals are a part of the due process and must be
figured into the cost. Are you starting to understand how due
process works? Most likely not.

2 ∧ | 1 ∨ · Reply · Share ›

 **Help_Me_Obi_Wan** → maineiac123 · a month ago

There is due process and complete idiocy. When you become the

Case 2:12-cv-04209-BP  Document 353  Filed 02/18/14  Page 206 of 331

victim, maybe your views will change. My guess you are someone
who is a lawyer (not likely) or someone who has spent there lives
on the wrong side of the justice system.

2 ∧    ∨  •  Reply  •  Share ›



**zipper** → Help_Me_Obi_Wan · 13 days ago

he is right in that, at the present time, that is the law; and that's the
Entire problem.....the law needs changing.
eliminate automatic appeals; that is absurdity! execution of
sentence needs to be carried out swiftly, barring solid grounds for
appeal. will be a deterrent and will reverse the insane cost profile
presently in effect.

∧  │  ∨  •  Reply  •  Share ›



**maineiac123** → zipper · 13 days ago

Sure eliminate automatic appeals and kill quickly right? The fact
that you most likely will kill an innocent person now and then
doesn't matter does it? All you have to do is look at the number of
people who's convictions have been overturned for a number of
reasons including the fact they were innocent to start with to see
the problem with the limitation of appeals. Nope, like so many
others posting here you're simply bloodthirsty. I'm sure though that
you have no problems telling a woman what to do with her body
when it comes to abortion.

∧  │ 1  ∨  •  Reply  •  Share ›



**maineiac123** → Help_Me_Obi_Wan · a month ago

You quite obviously have no idea what due process is as you keep
demonstrating. No more posts from me to you because I prefer to
comment to those who are sufficiently intelligent to understand.

∧  │  ∨  •  Reply  •  Share ›



**CTed** → maineiac123 · 24 days ago

They don't need to be. Due process is served by conviction by a
jury and 1 appeal.

∧  │  ∨  •  Reply  •  Share ›



**Larry Wilson** → Help_Me_Obi_Wan · 23 days ago

are you saying these lawyer's are not dong this for free? I guess
they just want more tax payers to pay for their crimes too.

∧  │  ∨  •  Reply  •  Share ›



**DoctorFeelgoodMD** → James · a month ago

You look like an ex-con.

2 ∧  │ 2  ∨  •  Reply  •  Share ›



**Dillon** → DoctorFeelgoodMD · a month ago

and you sound like a very very shallow person...

2 ∧    ∨  •  Reply  •  Share ›



**DoctorFeelgoodMD** → Dillon · a month ago

No one is talking to you so mind your own business please.
Amazes me how people defend mass murderers and have no
regard for victims of his horrendous crimes.

1 ∧  │ 2  ∨  •  Reply  •  Share ›



**Larry Wilson** → DoctorFeelgoodMD · 23 days ago

Too many think that when the victim has been killed, they don't
have rights anymore. So they let the criminals have all the right the
victim used to have then. It like when A vampire sucks all the blood
from their victims. My problem is just one......A killer has no rights
except to die when he's executed......he can take his time and die
quickly. That is up to him......he has that right only!

1 ︿ | ⌄ • Reply • Share ›

 **Kim Kacer** → DoctorFeelgoodMD • 24 days ago
Obviously, you're not an MD... advice is how that should be spelled,
Anyone w/ an MD would know that.

1 ︿ | 2 ⌄ • Reply • Share ›

 **Kim Kacer** → James • 24 days ago
Ummm... by chance have you heard of the "Tea Party"?

︿ | 3 ⌄ • Reply • Share ›

 **zipper** → Kim Kacer • 13 days ago
@ Kim Kacer--- Really! you're implying that any member of any
Tea Party is intellectually deficient?

1 ︿ | ⌄ • Reply • Share ›

 **infadelicious** → zipper • 13 days ago
Kim has read Alinsky's rules for radicals. No argument or defence
for your own stupidity? Deflection.

1 ︿ | ⌄ • Reply • Share ›

Load more comments

 Subscribe         Add Disqus to your site

 **53°** HI 60°  LO 41°
**Atlanta, GA**  Weather forecast





Home | Video | CNN Trends | U.S. | World | Politics | Justice | Entertainment | Tech | Health | Living | Travel | Opinion | iReport | Money | Sports
Tools & widgets | RSS | Podcasts | Blogs | CNN mobile | My profile | E-mail alerts | Desktop Alerts | CNN shop | Site map | Contact us

© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.
Terms of service | Privacy guidelines | AdChoices ▷ | Advertise with us | About us | Work for us | Help
CNN Newsource | License Footage

CNN en ESPAÑOL | CNN México | CNN Chile | CNN Expansión
العربية | 日本語 | Türkçe
CNN TV | HLN | Transcripts |

# EXHIBIT F

**» Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Ohio governor delays planned execution using two-drug method

Fri, Feb 7 2014

By Kim Palmer

CLEVELAND (Reuters) - Ohio on Friday delayed its next scheduled execution to complete a review of a new two-drug combination that left a condemned inmate convulsing and appearing to struggle for breath for several minutes as he was put to death in January.

Gregory Lott, 52, had been scheduled to die March 19 by a lethal injection of the same combination of the sedative midazolam and the pain killer hydromorphone that Ohio had used in the January execution.

Ohio Governor John Kasich delayed Lott's execution date to November to give the state prison department time to complete a review of that execution, spokesman Rob Nichols said.

Lott was convicted and sentenced to death for the killing of John McGrath, 82, who was set on fire in 1986.

Ohio and other states that have the death penalty have increasingly been forced to look for alternate drugs and sources of drugs for executions as pharmaceutical companies have raised objections to their products being used in capital punishment.

Ohio turned to the two-drug combination to execute Dennis McGuire in mid-January. Witnesses said McGuire appeared to be gasping for breath before he died. It was the first time the combination had been used to execute an inmate in the United States.

McGuire's children, who witnessed the execution, have sued Ohio, alleging the state violated his Constitutional right for protection against cruel and unusual punishment.

The delay in Lott's execution came days after a federal judge ordered Louisiana to delay by at least 90 days the execution of inmate Christopher Sepulvado.

Louisiana had also planned to use a combination of midazolam and hydromorphone to execute Sepulvado, who was convicted of killing his 6-year-old stepson.

(Reporting by Kim Palmer in Cleveland; Editing by David Bailey, Eric M. Johnson and Ken Wills)

© Thomson Reuters 2013. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 210 of 331

# EXHIBIT G

# Louisiana execution postponed to study lethal drugs

Rick Jervis, USA TODAY  (/staff/1130/rick-jervis) *8:26 p.m. EST February 3, 2014*



SHARE

157
CONNECT

35
TWEET
(https://twitter.com/intent/tweet?url=http://usat.ly/1kHH3vk&text=Louisiana%20execution%20p

*(Photo: Kiichiro Sato, AP)*

The execution of a Louisiana man scheduled for this week has been postponed for three months while attorneys on both sides grapple with what combination of lethal drugs will lead to his death.

After meeting with a federal judge in Baton Rouge on Monday, attorneys for both sides agreed that the lethal-injection execution of Christopher Sepulvado, scheduled for Wednesday, should be delayed to further review the drug protocol.

The delay is the latest in a nationwide series of controversies and legal disputes over a shortage of lethal injection drugs. Prisons have had to reformulate their lethal drug recipes after European drugmakers stopped shipping barbiturates and sedatives used in executions, raising a constitutional question of inmates' right to be free of cruel and unusual punishment.

A hearing on the constitutionality of Louisiana's proposed new protocol — a mixture of midazolam, a sedative, and hydromorphone, a painkiller — is scheduled for April 7, where lawyers for the inmate will present pharmacologists and other experts to challenge the state's lethal cocktail, said Gary Clements, a lawyer for Sepulvado.

"We have severe questions," Clements said. "We want to make sure they're giving us all the information they have."

Sepulvado, 70, was convicted of the 1992 murder of his 6-year-old stepson in Mansfield, La. Prosecutors said he beat the boy and stabbed him with a screwdriver before dunking him in a scalding hot bath.

In a statement issued Monday, officials of the Louisiana Department of Public Safety and Corrections said, "The Department has been committed throughout the entire process to following the court's direction and carrying out the sentence humanely and in accordance with the law."

Other states are facing similar challenges. The family of an Ohio inmate executed last month is suing the state and a drug company, claiming Dennis McGuire was a victim of "cruel and unusual punishment" when he appeared to "writhe in pain" for 26 minutes before succumbing to the injected drugs. McGuire was injected with a similar mixture of midazolam and hydromorphone.

And the Georgia Supreme Court is reviewing a case of a death row inmate who is challenging a state law shielding the identity and methods of companies that make the state's lethal injection drugs.

The new combinations of drugs raise questions of inmates' rights to know what drugs will lead to their deaths and avoid "cruel and unusual punishment," said Richard Dieter, executive director of the Death Penalty Information Center, a Washington, D.C., organization that opposes the death penalty. But prisons are being guarded with that information so as to not scare away more drugmakers, he said.

"Citizens, even convicted inmates, have an elementary right to know what's being done to them," Dieter said. "You have a right to humane treatment."

For the past 30 years, U.S. prison officials used mostly sodium thiopental to carry out more than 1,000 lethal-injection executions, he said. But in 2011, U.S. manufacturer Hospira stopped making the drug, citing complaints from officials in Italy, where the drug was made, that it was being used in capital punishment. Most prisons switched to pentobarbital until its Danish maker, Lundbeck, restricted its sale for executions, Dieter said.

Louisiana ran out of its stock of pentobarbital and said last week it would switch to the midazolam-hydromorphone combination, prompting the court hearing.

As prisons' drug stocks dwindle, some states are considering reverting to previous methods, such as the electric chair or even a firing squad, said Tania Tetlow, a Tulane University Law School professor and former federal prosecutor. States switched to the more palatable lethal injection in the 1970s, but the electric chair and firing squad were never ruled unconstitutional by the Supreme Court, she said.

As more states wrestle with lethal injection legality, the high court may revisit the death penalty issue, Tetlow said. "It's an awkward conversation to have," she said. "Even people who support the death penalty don't want to talk about the means."

SHARE

**35**

157    TWEET

CONNECT    (https://twitter.com/intent/tweet?url=http://usat.ly/1kHH3vk&text=Louisiana%20execution%20postponed%20to%20study%20leth



**USA NOW**



Murder by craigslist: Latest killing | USA NOW craigslist-latest-killing-usa-now/)

Feb 17, 2014

# EXHIBIT H

```
1                 IN THE UNITED STATES DISTRICT COURT

                     WESTERN DISTRICT OF MISSOURI

2                          CENTRAL DIVISION

3

4    DAVID ZINK, et al.,              )

                                      )

5          Plaintiffs,                )

                                      )

6    vs.                              ) No. 2:12-CV-4209-BP

                                      )

7    GEORGE A. LOMBARDI, et al.,      )

                                      )

8          Defendants.                )

9

10

11

12

13                 DEPOSITION OF GEORGE LOMBARDI

14            TAKEN ON BEHALF OF THE PLAINTIFFS

15                      JANUARY 17, 2014

16

17

18

19

20

21

22

23

24

25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 215 of 331

1                    I N D E X

2                                              PAGE

3  EXAMINATIONS

4          Direct Examination by Ms. Carlyle        5

5

6

7  EXHIBITS

8          (PLAINTIFF'S)

9  (1)    Preparation and Administration of         19
          Chemicals for Lethal Injection Document

10
   (2)    Affidavit of George Lombardi              22

11
   (3)    Third Supplemental Declaration of         28

12        Dr. Larry Sasich

13 (4)    Second Supplemental Declaration of        29
          Dr. Larry Sasich

14
   (5)    Certificate of Analysis – 11/14/2013      30

15
   (6)    Certificate of Analysis – 12/10/2013      30

16
   (7)    Memorandum – Dr. Markway – 11/15/2013     37

17
   (8)    Report of Dr. Dorothy Lewis               38

18
   (9)    Lombardi's Interrogatory Responses        18

19
   (10)   Chronology of Execution                   47

20
   (11)   Chemical Log – 11/20/2013                 52

21
   (12)   Chemical Log – 12/11/2013                 52

22

23 (EXHIBITS ATTACHED)

24

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 216 of 331

```
 1               IN THE UNITED STATES DISTRICT COURT

                 WESTERN DISTRICT OF MISSOURI

 2                      CENTRAL DIVISION

 3

 4   DAVID ZINK, et al.,              )

                                      )

 5        Plaintiffs,                 )

                                      )

 6   vs.                              ) No. 2:12-CV-4209-BP

                                      )

 7   GEORGE A. LOMBARDI, et al.,      )

                                      )

 8        Defendants.                 )

 9

10       DEPOSITION OF GEORGE LOMBARDI, produced, sworn and examined

11   on January 17, 2014, between the hours of eight o'clock in the

12   forenoon and five o'clock in the afternoon of that day, at the

13   Offices of Missouri Department of Corrections, 2729 Plaza

14   Drive, Jefferson City, Missouri 65102, before Ashley C. High,

15   Registered Professional Reporter, Certified Shorthand Reporter

16   (IL) and Certified Court Reporter (MO), in a certain cause now

17   pending in the United States District Court, Western District

18   of Missouri, Central Division, between DAVID ZINK, et al.,,

19   Plaintiffs, vs. GEORGE A. LOMBARDI, et al.,, Defendants; on

20   behalf of the Plaintiffs.

21

22

23

24

25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 217 of 331

```
 1                  A P P E A R A N C E S

 2

 3        FOR PLAINTIFFS BARNETT, CLAYTON L. TAYLOR AND ZINK:

 4             ELIZABETH UNGER CARLYLE, ESQ.

               LAW OFFICE OF ELIZABETH CARLYLE

 5             6011 Oak Street

               Kansas City, MO 64113

 6             (816) 525-6540

 7

 8

 9        FOR THE DEFENDANTS:

10             SUSAN BORESI, ESQ.

               DAVID HANSEN, ESQ.

11             MICHAEL SPILLANE, ESQ.

               ANDREW BAILEY, ESQ.

12             OFFICE OF THE ATTORNEY GENERAL

               207 W. High Street

13             Jefferson City, MO 65101

               (573) 751-3321

14

15

16

          COURT REPORTER:

17

               ASHLEY C. HIGH, RPR, CSR(IL), CCR(MO)

18             MIDWEST LITIGATION SERVICES

               711 North Eleventh Street

19             St. Louis, MO 63101

               (314) 644-2191

20             (800) 280-3376

21

22

23

24

25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 218 of 331

1              IT IS HEREBY STIPULATED AND AGREED by

2   and between counsel for the Plaintiffs and counsel

3   for the Defendants that this deposition may be taken

4   in shorthand by Ashley C. High, a Registered

5   Professional Reporter, Certified Shorthand Reporter

6   (IL) and Certified Court Reporter (MO), and

7   afterwards transcribed into typewriting; and the

8   signature of the witness is expressly reserved.

9   (PLAINTIFF'S EXHIBITS 1 THROUGH 12 WERE MARKED FOR

10  IDENTIFICATION.)

11              *    *    *    *    *

12              GEORGE LOMBARDI,

13  of lawful age, produced, sworn and examined on

14  behalf of the Plaintiffs, deposes and says:

15  (DEPOSITION STARTED AT 1:09 P.M.)

16              DIRECT EXAMINATION

17  BY MS. CARLYLE:

18      Q.   **Mr. Lombardi, I know you've had your**

19  **deposition taken many times before.**

20      A.   Uh-huh.

21      Q.   **I don't think we've ever met in that**

22  **context, so let me just say to you that when I ask**

23  **you a question, I'm really not trying to confuse**

24  **you, although I may do that inadvertently.  If what**

25  **I'm asking isn't clear, please tell me that, and**

1   **I'll rephrase it.**

2          A.   I'll do that.  Thank you.

3          **Q.   And otherwise I'm going to, I guess**

4   **sort of, assume that you think you understand me.**

5          A.   Okay.

6          **Q.   Okay, thank you.**

7          MR. HANSEN:  Elizabeth, before we get

8   started, Sue is going to be handling the witness in

9   this.  But since we talked about the issue about the

10  discovery disclosures of the documents, let's do

11  that on the record before we get-going with that.

12          MS. CARLYLE:  Okay.

13          MR. HANSEN:  You had sent an e-mail --

14  we had discussed in Mr. Dormire's deposition on --

15  two days ago on Wednesday the 15th, that we would

16  produce the -- reproduce the documents that we had

17  earlier produced that had been redacted with

18  number -- phone numbers and addresses and items that

19  did not relate to our assertion of state secrets or

20  the execution team members.  And I told you would we

21  would provide those to you.

22          You had sent an e-mail then yesterday morning

23  on the 16th saying that you expected to have those

24  today.  I was in court all day yesterday, but -- and

25  I was working on producing a set of redacted

1  numbered pages for the protocol that we worked on

2  Wednesday evening.  I and the Department have not

3  had time to go through all those other documents and

4  unredact those numbers and addresses and produce

5  those here today.

6       As I told you when you arrived this afternoon,

7  we will produce those in the next ten business days,

8  I believe is what Mr. Briesacher told me.  Some of

9  those documents have to be obtained again from the

10  institution in order to produce them without

11  redactions.

12       In the meantime, if you need any of those

13  phone numbers or addresses, you tell me and we will

14  get those for you immediately.  I suspect that we

15  can do it within hours if you need them.

16       And so the record is clear, the only thing --

17  I believe the only thing that have been redacted are

18  personal cell phone numbers, addresses, and the

19  names themselves have not been redacted.  So as the

20  records exist now you can look at those records,

21  identify who the person is, and whether or not you

22  need that address or that phone number.

23       So if you do, either today for this

24  deposition, or Monday in order to conduct some

25  investigation, whatever it is, you just let us know,

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 221 of 331

1    and we will get those as soon as we can.  Certainly

2    before we produce everything else.  So that's what

3    we're able to do.

4              MS. CARLYLE:  Okay.  Well, my response

5    to that, for the record, again is that when the

6    documents were produced, they were overdue, and now

7    they -- then they were withdrawn for almost two

8    weeks, and were even more overdue, and now they're

9    having to be reproduced in proper form.

10        It's not acceptable to wait ten days.  And

11   it's not acceptable for us to have to call you when

12   we want information that's still on the documents.

13        I will confer with my co-counsel to determine

14   whether we want to bring that to the Judge's

15   attention and ask for a direct -- that that be

16   sooner or impose other sanctions.

17        So -- actually, let -- while we're still

18   talking about pieces of paper.  What's the status of

19   what -- for one of a better term we're calling the

20   non-public protocols that you and I worked on the

21   other night, but there was some difficulty about the

22   page numbers?

23              MR. HANSEN:  Let's make a record on

24   that --

25              MS. CARLYLE:  Yes, let's do that.

1          MR. HANSEN:  -- since it happened at

2    the conclusion of the deposition of Mr. Dormire.

3          MS. CARLYLE:  After the conclusion

4    really.

5          MR. HANSEN:  And after our court

6    reporter left.

7          MS. CARLYLE:  Okay.

8          MR. HANSEN:  We produced for you on

9    Wednesday morning at -- I believe you arrived at --

10         MS. CARLYLE:  11:00.

11         MR. HANSEN:  -- 11 o'clock for the

12   deposition that was to begin at 1 o'clock.  We

13   provided you what had we identified as three

14   different protocols that we had referenced in

15   production of documents saying -- in our response

16   said we would make those available for you,

17   attorneys eyes only, but no copies to be made,

18   because we believe that they were entitled to

19   protection under the protective order established in

20   -- I believe it was either Order 110 or 112.

21         We made those available to you, and you had an

22   opportunity to review those at that time prior to

23   the deposition, and in fact you marked two of them

24   as exhibits at the deposition and used them.

25         At the -- one of those -- they began on

1    page -- we did go ahead and Bates stamp those pages,

2    and they began Bates stamp page number 2405 and I

3    believe ended on 2687.  And they consist of what we

4    have referred to as the draft Franklin execution

5    protocol, which ended up being marked as Exhibit 8,

6    I believe.

7         Then there also was the actual Franklin

8    protocol that was developed during the execution of

9    Mr. Franklin, which did not get marked as an

10   exhibit.  And then there is the Nicklasson protocol

11   that I believe was marked as Exhibit 9.

12        At the conclusion of the deposition, you

13   indicated that you wanted to take with you copies of

14   portions of those protocol, and it had been our

15   position that we did not want those to leave until

16   we had -- until it was -- we agreed what we believed

17   was privileged or closed and what was not.

18        At that time, we worked it out.  We sat down,

19   I think we took an hour -- ended up being like two

20   hours, I think.  You looked through all those

21   protocols, you identified which pages that you

22   believed you did not have an interest in, most of it

23   related to security issues, perimeter security other

24   things.  You separated those out, and you identified

25   on those three protocols -- actually, it was just

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**     **Phone: 1.800.280.3376**     **Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 224 of 331

1    the two protocols --

2              MS. CARLYLE:  Just the two, yes.

3              MR. HANSEN:  You didn't look at Exhibit

4    8 -- you looked at the Franklin protocol, that had

5    not been marked, the actual Franklin protocol and

6    you looked at the Nicklasson protocol.

7         We removed the pages that you said you did not

8    want, that you were not interested in.  And then I

9    went through them and identified the things, along

10   with Mr. Dormire, we identified the items that we

11   felt were -- needed to be protected, that related to

12   safety and security.

13        I showed you those things that we needed to

14   redact, mostly they were equipment and items that

15   were to be used by officers.  We redacted those.  We

16   made photocopies.  As it turned out, the first set

17   of photocopies you could still see through some of

18   the permanent marker, so we had to mark them out

19   again, photocopy an additional time, and as we put

20   the final set together for you to take we realized

21   that the copier did not copy some of the Bates

22   stamps numbers at the bottom of the page.  So rather

23   than take another half hour and try to recopy it,

24   we -- you went ahead and hook those pages so that

25   you could prepare for the deposition, and I told you

1    that I would go back and make sure those redactions

2    were done properly -- or accurately and on pages

3    that had the Bates stamp numbers, which we've done.

4    I spent all morning doing that.

5         I have with me now a copy of the redacted

6    pages that we agreed that you could take, and

7    excluding the pages that you identified that you did

8    not have an interest in or did not need.

9         And so the record is clear, too, I went ahead

10   on the Franklin protocol, that had been marked as

11   Exhibit 8, which was just the draft, I went ahead

12   and removed corresponding pages that ended up being

13   in the actual protocol that we ended up going

14   through, okay?

15              MS. CARLYLE:  Okay.

16              MR. HANSEN:  I've got that here today.

17   I'm going to give it to you right now.  It's both a

18   hard copy and it's on disc.

19              MS. CARLYLE:  Okay.  Well, two things.

20   Well, first of all, let me kind of -- I think most

21   of what you said is accurate.  I want to be clear on

22   -- make the record clear on a few of comments you

23   made.

24        First of all, I was -- at 11 o'clock on

25   Wednesday, before the 1 o'clock deposition, I was

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 226 of 331

1    given approximately 220 pages of materials to

2    review.  In fact, between 11 o'clock and the time I

3    really needed to get something to eat before the

4    deposition, I was able to review the draft Franklin

5    protocol and the actual Franklin protocol.  I just

6    didn't have to time to review the Nicklasson

7    protocol, and I didn't.  So really before the

8    deposition I did -- I mean, I knew I had the

9    Nicklasson protocol, but I never saw it.

10         After the -- after the deposition we discussed

11   -- my proposal to you was that you determine what

12   pages you thought were sensitive and present those

13   to me to see if I could do without them.

14         You told me that you could not do that until

15   today.  I was not willing to wait until today to

16   have any further access to those documents, so I

17   then undertook to determine what I didn't think I

18   needed.  Eventually you then went through the

19   documents again and decided that there were other

20   pages you thought were really sensitive, you showed

21   them to me, and as I recall at least the majority of

22   them I agreed that I really didn't need those either

23   and we took them out.  And then you made some

24   redactions on some of them that I thought that I did

25   need.

1      But you know, the matters you wanted to

2  redact, which concerned, as I recall, key ring

3  numbers and equipment were not at that point

4  information that I thought I needed, so I certainly

5  didn't object at that point to your redacting them.

6      And then I think what you said about the

7  copying machine excitement was pretty -- was

8  accurate.

9      So I guess my position now is what I think

10 would be helpful would be a list from you of what I

11 didn't want.  I certainly didn't have time to make

12 such a list at the time.

13          MR. HANSEN:  I failed to state on the

14 record, which is my oversight, is that I'm going to

15 do a redaction log or a privilege log.

16          MS. CARLYLE:  Okay.

17          MR. HANSEN:  And I would hope to have

18 it done today, but because I was out of town in

19 court in a hearing yesterday, it was all I could do

20 to reconstruct the Bates number and produce them for

21 you here today.

22      I will get to you some time next week the

23 redaction or privileged log, which will identify not

24 only the pages that you did not receive, but it will

25 also describe the information that was redacted on

1   pages you did receive.

2           MS. CARLYLE:  Okay.  That's helpful.

3   And as I said, I mean in good faith, I really think

4   that's information I probably don't need, but number

5   one, I'm only one of a rather large team of lawyers.

6       And number two, the circumstances under which I

7   had to review this on Wednesday were not conducive

8   to careful considered decisions about anything, so I

9   mean it's possible that once we have that log and

10  once everybody has -- the other attorneys have taken

11  a look at the documents, you know, that we may --

12  you know, we may want to argue about that.  You

13  know, I can't guarantee that we won't.

14      I guess what I'm saying is I would ask that

15  you not take what we did Wednesday night as

16  conclusive on what we're entitled, because I didn't

17  have time to make that decision.

18          MR. HANSEN:  I just wanted to

19  accurately state what occurred for the record, and I

20  think we've done that.

21          MS. CARLYLE:  And the other thing I

22  want to say is that I understand that you take the

23  position that these document are covered by an

24  earlier protective order.  We are treating the

25  documents as attorneys eyes only as a courtesy to

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com         Phone: 1.800.280.3376              Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 229 of 331

1  you at this point.  We do not think there's a

2  protective order covering these documents.  We think

3  the protective order that was issued covered the

4  documents that were issued then and really has no

5  real relevance to this entirely different set of

6  documents.

7      So if you want to seek a protective order

8  specifically for these documents, I suggest you do

9  so, because we don't acknowledge that the documents

10  you've provided are covered by a protective order.

11          MR. HANSEN:  Let's -- we've got the

12  Director here, let's go ahead and begin the

13  deposition, because we can discuss that via phone

14  conversations or e-mails later about what we need to

15  do about that, we can do that next week, so let's go

16  ahead and start the deposition.

17          MS. BORESI:  Before we start the

18  deposition I have one quick thing that want to say.

19  Plaintiff's counsel continually makes references to

20  the defendant's attorneys producing the documents

21  late.

22      It's my observation that the Request for

23  Production were filed in October after discovery had

24  closed, without leave of court, and without seeking

25  any permission from the court to shorten any time

1    for discovery.

2         In addition, the overwhelming majority of the

3    documents that were produced relate specifically to

4    the Franklin execution that occurred on

5    November 20th, 2013 and the Nicklasson execution

6    that occurred on December the 10th, 2013.

7         And so, it's hard to imagine how we could have

8    produced those documents any sooner than when they

9    were generated contemporaneously with those

10   executions.  That's all I have to say.

11             MS. CARLYLE:  Okay.  And I guess my

12   only response to that, again for the record, is that

13   if the attorneys for the defendants believed that

14   the discovery requests, which were indeed made after

15   discovery had closed, but after also after we had

16   filed -- an amended complaint had been granted, if

17   they believed that those discovery requests were

18   improper it was incumbent upon them to make that

19   objection within the period for responding to those

20   requests for productions.  And it's going to be our

21   position that since such an objection was not made

22   during that time, it was waived.  Okay?

23             MS. BORESI:  (Nodded head.)

24   BY MS. CARLYLE:

25        Q.   Mr. Lombardi, I'm going to show you

1    what's been marked as Plaintiff's Exhibit 9, and ask

2    you can tell us what that is, please?

3        A.    Yes.   This is my Answers to the first

4    set of Interrogatories from -- on the David Zink

5    lawsuit.

6            MR. HANSEN:  Off the record.

7    (THERE WAS AN OFF-THE RECORD DISCUSSION BETWEEN

8    COUNSEL.)

9    BY MS. CARLYLE:

10        Q.    And Mr. Lombardi, when did you sign

11    those responses?

12        A.    The 7th day of January 2014.

13        Q.    Okay.  Did you personally draft the

14    text of the responses?

15        A.    No.

16        Q.    When did you first see the text that

17    was drafted?

18        A.    I don't recall.

19        Q.    Was it before December 27th?

20        A.    I don't recall.

21        Q.    You have no idea when you saw it?

22        A.    Ma'am, there are thousands of pieces of

23    paper that cross my desk, and I don't recall when I

24    saw that.

25        Q.    Okay.  Let me now show you what's been

1    marked as Plaintiff's Exhibit 1, and ask you what

2    that is, please?

3         A.   It's a document concerning the

4    preparation and the distribution of chemicals for

5    legal injection.

6         Q.   Is it the document that's currently in

7    use by the Department?

8         A.   I have to check through and read.  Yes,

9    I believe it is.

10        Q.   You do believe it is?  So the -- I'm

11   going to draw your attention to -- and by the way,

12   for the record, let me say that these documents are

13   a part of the production of documents that we

14   received.  The numbers are -- the production of

15   documents that we received on January 10th.  The

16   numbers are AG02246 through 2248.

17        Let me draw your attention to the second page,

18   which is 2247, subsection B, and ask you again is

19   this the document -- is this the protocol, for one

20   of a better word, that's currently in use?

21        A.   Are you asking me about subsection B?

22        Q.   Yes.  I'm asking you if that's

23   currently part of the execution protocol of the

24   State of Missouri.

25        A.   I'm sorry, no, it is not.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 233 of 331

1        Q.    So have you seen this document before?

2        A.    I can't recall if I have or not.

3        Q.    Okay.  Are you involved in any way in

4    determining execution protocols?

5        A.    Yes, I am.

6        Q.    Okay.  Before an execution protocol was

7    made public, would you see it?

8        A.    Yes.

9        Q.    Okay.  But you don't if you've ever

10   seen this one?

11       A.    I can't recall this specific

12   information.

13       Q.    Okay.  Now, subsection B --

14   subsection -- the way these paragraphs is numbered

15   is a little odd -- but on page 2247, subsection B,

16   discusses the use of Midazolam and Hydromorphone as

17   execution drugs.

18       A.    Yes.

19       Q.    On 2246, the paragraphs beginning

20   capital A discuss Pentobarbital, correct?

21       A.    Correct.

22       Q.    Has the Missouri Department of

23   Corrections ever conducted an execution with

24   Midazolam and Hydromorphone?

25       A.    It has not.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 234 of 331

Page 21

1          Q.    Are you aware whether the Missouri

2    Department of Corrections currently owns Midazolam

3    or Hydromorphone for use in an execution?

4          A.    I believe we have the drug, but there

5    will be use of it in an execution.

6          Q.    Why will there be no use of it in an

7    execution?

8          A.    Because we have no intention to do

9    that.  We have Pentobarbital that we use.

10          Q.    Well, I -- the subsection B says that

11    if the Department Director -- which is you, correct?

12          A.    Right.

13          Q.    Determines that a sufficient quantity

14    of Pentobarbital is not available, then

15    Hydromorphone or Midazolam will be used.  Are you

16    saying that --

17          A.    And I'm testifying right now to tell

18    you that will not be the case.  We will not use

19    those drugs.

20          Q.    Okay.  Specifically, you won't use them

21    in the execution of Herbert Smulls if it occurs?

22          A.    That's correct.

23          Q.    Okay.  Were the Hydromorphone and

24    Midazolam now in the Department of Corrections's

25    possession purchased at your direction?  Was it your

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 235 of 331

1    decision to buy them?

2         A.   You know, I don't recall that.  I don't

3    recall whether I did or didn't.

4         Q.   Well, who else would have?

5         A.   It would either have been myself or

6    Director Dormire.

7         Q.   So if Mr. Dormire testified on

8    Wednesday that it wasn't he, does it mean it was

9    probably you?

10        A.   It was probably me.

11        Q.   Okay.  Do you know whether those drugs

12   are compounded drugs or ordinary approved

13   manufactured drugs, the ones that are now in the

14   Department's possession?

15        A.   I don't know the nature of those drugs.

16   To the best of my knowledge, they are not

17   compounded, but are available drugs.

18        Q.   Do you know who supplies them?

19        A.   I do not.

20        Q.   Okay.  Let me show you what's been

21   marked as Exhibit 2, and ask you what that is,

22   please?

23        A.   It's my affidavit referencing the Zink

24   case.

25        Q.   An affidavit -- well, when did you sign

1    it?

2              A.    December 5, 2013.

3              Q.    Okay.  And in general, what's the

4    subject matter of that affidavit?

5              A.    It has to do primarily with the

6    identity of members of the execution team.

7              Q.    Is this a document that you drafted, or

8    was it drafted for you to review and approve?

9              A.    It was drafted for me.

10             Q.    In this affidavit you -- it, in fact,

11   declared certain information to be state secrets; is

12   that correct?

13             A.    Correct.

14             Q.    Why did you believe -- now, in the

15   Missouri Statutes there is a statute providing for

16   secrecy of the identity of members of the -- of

17   people who participate in executions, correct?

18             A.    Yes.

19             Q.    Okay.  Why did you believe that there

20   was a state secret privilege needed in addition to

21   that statute?

22             MS. BORESI:  I'll object on grounds of

23   attorney/client privileged information.

24             MS. CARLYLE:  I'm asking for his

25   personal belief.  I'm not asking what you --

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 237 of 331

1          MS. BORESI:  And if that personal

2   belief was based on information that he received

3   from legal counsel in the context of his

4   representation, it's privileged information.

5          MS. CARLYLE:  So are you directing him

6   not to answer?

7          MS. BORESI:  Yes.

8          MS. CARLYLE:  Okay.

9   BY MS. CARLYLE:

10         **Q.   What evidence do you have that there is**

11   **any threat to the personal safety of individuals**

12   **involved in the execution team?**

13         A.   There's some history in other places in

14   regard to that issue.  It is a chance that I am not

15   willing to take to have our individuals who are

16   involved in this process be harassed or threatened

17   by anybody in regard to their participation in the

18   execution process.

19         **Q.   But in terms of evidence that the**

20   **physical safety of such people has been compromised,**

21   **are you aware of any evidence of that?**

22         A.   Well, since we've never ever let that

23   information out, we've done that purposely so that

24   that will never happen.

25         **Q.   Well, isn't it true that the identity**

1    of someone who in earlier litigation was called John

2    Doe 1 was made public several years ago?

3        A.   I don't recall that.

4        Q.   And that there was a -- there was news

5    coverage, which I think has been referred to by your

6    counsel in pleadings in this case that identify the

7    current nurse M2?

8        A.   I don't recall that.

9        Q.   Okay.  Do you -- are you aware that

10   either of them have been harmed physically because

11   of their participation as a -- in the execution

12   team?

13       A.   I'm not aware one way or the other.

14       Q.   Okay.  Is it improper in your view for

15   a professional association to discipline or expel

16   members of that association who don't follow the

17   ethical guidelines of that association?

18       A.   I don't have any position on that.

19       Q.   Is it improper for the public to

20   express its dissatisfaction with businesses who sell

21   chemicals for legal injection?

22       A.   Could you repeat that, please?

23            MS. BORESI:  Objection, relevance.

24            THE WITNESS:  I'm sorry?

25            MS. BORESI:  I objected on grounds of

1  relevance. But you can answer, if you have an

2  opinion.

3         THE WITNESS: Would you ask me again,

4  please?

5         MS. CARLYLE: Sure.

6  BY MS. CARLYLE:

7     **Q.   Is it improper for the public to**

8  **express its dissatisfaction with businesses who sell**

9  **chemicals for legal injection?**

10    A.   I have no position on that either.

11    **Q.   So you think -- are you familiar with**

12 **First Amendment?**

13    A.   Somewhat.

14    **Q.   Okay.  Do you think that it's improper**

15 **for members of the public to express their opinions**

16 **about anything they want to express their opinions**

17 **about?**

18         MS. BORESI: I'm going to object on

19 grounds of relevance, and also that it calls

20 somewhat for a legal conclusion.

21         MS. CARLYLE: Okay.

22         MS. BORESI: It's also a vague

23 question. I'm not sure what you mean by the use of

24 the word "improper". Do you mean unlawful?

25         MS. CARLYLE: No.

1          MS. BORESI:  If you can answer --

2          THE WITNESS:  Well, you know --

3          MS. BORESI:  If you understand the

4    question, you can answer.

5          THE WITNESS:  -- members of the public

6    have the right to express their opinion, that would

7    be my answer.

8    BY MS. CARLYLE:

9          Q.   Okay.  In that case, is it proper in

10   your view to use a state secrets privilege to avoid

11   those expressions of opinion by not telling them who

12   they can express them to?

13         MS. BORESI:  I object it calls for a

14   legal conclusion.

15         MS. CARLYLE:  Are you directing him not

16   to answer?

17         MS. BORESI:  He can answer, if he has

18   an opinion, but he's not an attorney.

19         THE WITNESS:  I'm not a lawyer, I don't

20   know the answer to that question.

21   BY MS. CARLYLE:

22         Q.   Now you say in your affidavit -- let me

23   see if I can find it here -- on pages 3 and 4, you

24   say that you do not -- you do not plan to use

25   chemicals to -- for executions that are not pure,

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 241 of 331

1      potent and sterile.  Do you see what I'm looking at?

2           A.   Yes.

3           Q.   Are you aware of the expert affidavit

4      of Dr. Larry Sasich filed in this case that the

5      chemicals used for the executions of Mr. Franklin,

6      Mr. Nicklasson and Mr. Smulls had expired before

7      those executions occurred?

8           A.   No, I am not.

9           Q.   Okay.  Let me show you what's been

10     marked as Exhibit 3, and let me ask you if you've

11     seen that document before?

12          A.   I don't know -- no, I've not seen this

13     before.

14          Q.   Okay.  I'll state for the record that

15     Exhibit 3 is the Third Supplemental Declaration of

16     Larry D. Sasich filed in the -- in Case Number

17     13-3699 in the 8th Circuit Court of Appeals -- and

18     I'm reading from the bottom of the document -- on

19     December 31st, 2013, which is Case Number 13-3699

20     being the -- Mr. Lombardi's mandamus action in the

21     Court of Appeals.

22          So this is a document that's been filed in a

23     case that you have pending in the Court of Appeals,

24     but you've not seen it; is that correct?

25          A.    No, I haven't.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 242 of 331

1          Q.   Okay.  Well, let me give you a minute

2    to take a look at it.

3          A.   Okay.

4          Q.   Okay.  If you look at page 2 of that

5    document, the last paragraph --

6          A.   Uh-huh.

7          Q.   -- and actually I misspoke, because

8    this document actually doesn't say anything about

9    Mr. Smulls's execution with drugs.

10         But the last paragraph, does it not indicate

11   that the compounded drug has -- that was used for

12   Mr. Franklin had reached its beyond use date, and

13   that the one to be used for Mr. Nicklasson would

14   reach its beyond use date before he was executed?

15              MS. BORESI:  And I'll object to the

16   question, the document speaks for itself.

17              THE WITNESS:  I agree that the document

18   speaks for itself, yes.

19   BY MS. CARLYLE:

20         Q.   Do you agree that's what it says?  I'm

21   going to ask you if you understand that that's what

22   it says.

23         A.   Yes.

24         Q.   Okay.  Let me show you what's marked as

25   Exhibit 4, and ask you if you've seen that document

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 243 of 331

1    before?

2         A.   No, I haven't.

3         Q.   I'll recite for the record that this

4    document was also filed on December 31st, 2013 in

5    Case Number 13-3699 in the 8th Circuit in the case

6    in which Mr. Lombardi is a petitioner for mandamus.

7         And let me ask you then since you haven't seen

8    it before to read over it, please.

9         A.   Okay.

10        Q.   Let me now also hand you what has been

11   marked as Exhibits 5 and 6.  And I will state for

12   the record that Exhibit 5 is a page from discovery

13   that was produced on January 10th, numbered AG01266.

14        Exhibit 6 is another page from that same set of

15   discovery produced on January 10th, AG02059.  Have

16   you seen these before?

17        A.   No.

18        Q.   Okay.  Let me call -- let me ask you to

19   take a look at Exhibit 5.  The -- well, first of

20   all, will you tell us for the record just by heading

21   and title what this appears to be?

22        A.   5 says Certificate of Analysis.

23        Q.   And what's the product that's being

24   analyzed?  I think it's in the upper left-hand

25   corner.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 244 of 331

1          A.   1.5794 gm USED.

2          **Q.   In the upper left-hand corner.**

3          A.   Oh.

4               MS. BORESI:  I'm going to object again,

5     the document speaks for itself.

6               MS. CARLYLE:  I'm just trying to get on

7     the record what he's looking at, so that when

8     someone is talking about this later we'll know we're

9     all talking about the same thing.

10              MS. BORESI:  But you have it marked as

11    an exhibit, which will be attached to the

12    deposition, so since you've referred to the document

13    exhibit number --

14              MS. CARLYLE:  Well, humor me.

15    BY MS. CARLYLE:

16         **Q.   What's being analyzed on this document?**

17         A.   Pentobarbital sodium USP CII it looks

18    like.

19         **Q.   Okay.  And similarly, Exhibit 6, what**

20    **is that?**

21         A.   That's a Certificate of Analysis.

22         **Q.   And what's the description of this --**

23    **of the --**

24         A.   S-Pentobarbital Sodium 50mg/mL Inj Sol.

25         **Q.   Okay.  Let me ask you to look at the**

 1   last line of exhibit -- the last two lines of

 2   Exhibit 5, and just so we'll all be clear, please

 3   read them aloud for me.

 4          A.   At the very bottom of the page?

 5          Q.   Yep.

 6          A.   "The above test results have been

 7   obtained by our supplier or in our quantity

 8   controlled laboratory.  This analysis is not to be

 9   construed as a warranty expressed or implied."

10          Q.   Okay.  And at the bottom of -- the line

11   at the bottom of Exhibit 6, just above where it says

12   page 1 of 2, on the lower left-hand corner.

13          A.   I can't read.  I'm sorry, I would need

14   glasses.

15          Q.   Okay.

16          A.   I can't read it.

17          MS. CARLYLE:  Well, can we agree, those

18   of us who can read it, that it says:  Results above

19   relate only to the sample that was tested?  Because

20   I want Mr. Lombardi to know that that's what it

21   says.

22          MS. BORESI:  Sure.

23          MS. CARLYLE:  Okay.  And he says he

24   can't read, so we can't rely on his being able to do

25   that.  And believe me, I understand the problem,

1    but --

2              THE WITNESS:  Okay.

3    BY MS. CARLYLE:

4         Q.   Okay.  Having looked at those four

5    documents, the two declarations of Dr. Sasich and

6    these two analyses, are you confident that -- are

7    you nonetheless confident that the drugs that have

8    been used in the last two executions and the one

9    that will be used in the upcoming execution are

10   pure, potent and sterile?

11        A.   I do.

12        Q.   Okay.  Why is that?

13        A.   Because the lab tested it, and I feel

14   very comfortable about that.  I don't know who this

15   is.  I don't know anything about him.  He doesn't

16   mean anything to me.

17        Q.   Well, have you obtained -- well,

18   actually I could show you his curriculum vitae as a

19   doctor of pharmacy for a long time.

20        A.   I am comfortable that the analysis that

21   was done by the lab meets the criteria that we are

22   concerned about potency and so forth.

23        Q.   Okay.  In particular Exhibit 6 says by

24   its terms that the results relate only to the sample

25   that was tested.  Of course, the sample that was

1    **tested was not used for the execution, was it?**

2          A.   The sample that was tested -- it came

3    from the batch that --

4          **Q.   Well, maybe it did and maybe it didn't.**

5    **We can't tell from this document, but certainly the**

6    **sample that was tested was not used, was it?**

7          A.   I would say again that the

8    understanding I had is that it was a sample from the

9    batch that we are using.

10             MS. BORESI:  And Elizabeth, excuse me,

11   I should have gone back a few questions when we

12   started talking about the testing results for this

13   particular batch of chemicals, we'd ask that it be

14   placed in the confidential section of the

15   deposition.

16             MS. CARLYLE:  The Certificate of

17   Analysis?

18             MS. BORESI:  Yes.

19             MS. CARLYLE:  The Certificate of

20   Analysis has been provided in five different

21   Sunshine Law --

22             MS. BORESI:  That's fine.

23             MS. CARLYLE:  -- releases.

24             MS. BORESI:  That's what we're asking,

25   and you can object if you want, but that's what

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 248 of 331

1   we're asking.

2              MS. CARLYLE:  Okay.  So you want the

3   exhibit to be confidential is what you're saying?

4              MS. BORESI:  And the testimony -- the

5   relevant testimony.

6              MS. CARLYLE:  Well, that's going to be

7   little -- well, we can try.

8              MS. BORESI:  Okay.

9              MR. SPILLANE:  If I could speak.  I was

10  concerned that we might be getting into information

11  in an answer that might reveal that lab.  That's my

12  concern, and so --

13             MS. CARLYLE:  This is really all I'm

14  going to ask him.  I'm not going to ask him anything

15  that leads -- that tries to lead.  I'm asking him

16  simply to talk about the results of the analysis.

17       And I mean, if you want that to be

18  confidential, I guess it can be, but I'm really not

19  going to do that.  So you want the -- the --

20             MR. SPILLANE:  (Nodded head.)

21             MS. CARLYLE:  No, okay.

22  BY MS. CARLYLE:

23         Q.    To your knowledge, does the Department

24  of Corrections supply the lab with product to be

25  tested, or does the pharmacy do that?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 249 of 331

1          A.    The pharmacy does that.

2          **Q.    Okay.  So the material that is supplied**

3    **to the Department of Corrections is clearly not the**

4    **same exact chemical that was supplied to the lab,**

5    **because the lab has that, true?  Does that make**

6    **sense, because it's compound --**

7          A.    No, doesn't make sense.

8          **Q.    Okay.  Well, if I'm a pharmacy and I**

9    **make 10 grams plus 30 milliliters of Pentobarbital,**

10   **and I give 30 milliliter to the lab so they can test**

11   **it, and I give the other 10 grams to the Department**

12   **of Corrections, because Mr. Dormire says what he**

13   **gets is 10 grams, not 10 grams plus testing**

14   **quantity, then what the lab tests is not what the**

15   **Department gets, correct?**

16              MS. BORESI:  I object, it's asking him

17   to make a conclusion as to how the chemicals are

18   prepared and how the chemicals are divided, and I

19   don't know that he has the personal knowledge to

20   make that conclusion.

21              MS. CARLYLE:  Well, he's already

22   told us that the lab gets -- that the pharmacy sends

23   the drugs to the lab to test, so he clearly knows

24   that.

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 250 of 331

1    BY MS. CARLYLE:

2        Q.   So all I'm asking for, I guess, is a

3    common sense conclusion that if you send something

4    to someone to test -- I mean, do you think they got

5    it back?

6        A.   I have no idea.

7        Q.   Okay.  And do you that a Certificate of

8    Analysis that says:  This analysis is not to be

9    construed as a warranty, expressed or implied, is

10   something you nonetheless rely on?

11       A.   What was the last part of your

12   question?

13       Q.   Do you think that an analysis like No.

14   5, which says:  This analysis is not to be construed

15   as a warranty, expressed or implied, is nonetheless

16   an analysis that you're willing to rely on?

17       A.   Yes, it is.

18       Q.   Okay.  If you learned that, in fact,

19   the chemicals that are being supplied to the

20   Department of Corrections are not pure, potent and

21   sterile, would you direct that they not be used?

22       A.   Yes.

23       Q.   I'm going to show you what's been

24   marked as Exhibit 7, and ask you if you can tell us

25   what that is, please?

1      A.   Yes.

2      **Q.   What is it?**

3      A.   It's a memorandum to me from Dr. Greg

4  Markway, our chief psychologist, about

5  Mr. Franklin's understanding of the upcoming

6  execution.

7      **Q.   Okay.  Now, Dr. Markway recites in this**

8  **memorandum that he has reviewed documentation**

9  **provided by Jessica Sutton relating to**

10  **Mr. Franklin's competency, correct?**

11     A.   Yes.

12     **Q.   Did you yourself review that**

13  **documentation?**

14     A.   I had the information with me at the

15  time, I believe.

16     **Q.   Okay.  Let me show you Exhibit 8.**

17  **Exhibit 8 is a -- I'm sorry, just again so we'll be**

18  **clear about this.  Exhibit 7 is a document from the**

19  **discovery produced on July [sic] 9th -- January 9th**

20  **of 2014.**

21        MS. BORESI:  May I have a copy?

22        MS. CARLYLE:  Oh, I thought -- here it

23  is.

24        MS. BORESI:  Thank you.

25        MS. CARLYLE:  This is 7.

```
 1              MS. BORESI:  Oh, I'm sorry, I thought

 2   said 8.

 3              MS. CARLYLE:  I skipped back to 7,

 4   because I realized I hadn't identified it.

 5              MS. BORESI:  Gotcha.

 6              MR. HANSEN:  Could you provide a Bates

 7   stamp number, please, for 7?

 8              MS. CARLYLE:  I was just about to do

 9   that when she asked for it, yes.  7 is AG01177.  And

10   that is from the set that was produced on

11   January 9th and received on January 10th.

12              MR. HANSEN:  Let's just refer to it as

13   January 10th --

14              MS. CARLYLE:  Okay.

15              MR. HANSEN:  -- when we're referencing

16   the Bates stamp numbers.  We can agree to that.

17              MS. CARLYLE:  That's fine with me.

18   BY MS. CARLYLE:

19        Q.   Now, let me give Ms. Boresi Exhibit 8.

20   Exhibit 8 is Bates stamp number AG01182, and that's

21   a portion of the material provided by Ms. Sutton, is

22   it not?

23        A.   Apparently.

24        Q.   Okay.  Do you remember reviewing this

25   document?
```

1          A.   I don't remember.

2          Q.   Okay.  It begins on 1182 and it ends on

3    1184.  And let me ask you to take a look at

4    page 1184, please?

5          A.   1184?

6          Q.   1184, the last page.

7          A.   Okay.

8          Q.   Specifically, the paragraph that is --

9    the third paragraph from the end beginning:  The

10   observations of Ms. Herndon.

11         A.   Okay.

12         Q.   Dr. Dorothy Lewis, the psychiatrist who

13   wrote that document, doesn't agree with Dr. Markway,

14   does she?

15         A.   Apparently.

16         Q.   Dr. Markway -- turning back to

17   Exhibit 7 -- says that he has found no evidence that

18   Mr. Franklin is aware of the reason for his

19   scheduled execution.

20         A.   Is unaware.

21         Q.   Is unaware, I'm sorry.  That

22   Mr. Franklin is unaware of the reason for his

23   scheduled execution.

24        Now, as part of your duties as Director of the

25   Department of Corrections when there is a doubt

1    about an individual's competency to be executed,

2    you're directed to put some procedures into place --

3         A.   Right.

4         Q.   -- correct?  And as a matter of fact,

5    that's what Ms. Herndon had asked you to do and --

6    or Ms. Sutton and Ms. Herndon had asked you to do in

7    their letter?

8         A.   And that's why I relied on Dr. Markway,

9    my chief psychologist, to take a look at all the

10   material and make a recommendation to me, which he

11   did.

12        Q.   Okay.  Well, what Dr. Markway said was

13   that he found no evidence that Mr. Franklin is aware

14   -- unaware of the reason for his scheduled

15   execution.  Do you believe that to be the complete

16   standard for competency?

17        A.   And he says also in here that he's

18   aware of his scheduled execution, that he wants to

19   live, and the reason for participating in the appeal

20   process, which to me is further information that

21   seems to indicate that he knows what's going on.

22        Q.   Okay.  Are you familiar with the

23   section -- Missouri Statute Section 552.060.1, which

24   says that no person condemned to death shall be

25   executed if as a result of mental disease or defect

Page 42

1    he lacks capacity to understand the nature and

2    purpose of the punishment about to be imposed upon

3    him or matters of extenuation, arguments for

4    executive clemency or reasons why the sentence

5    should not be carried out.  Does that sound

6    familiar?

7            A.    Yes.

8            Q.    Okay.  Do you believe that Dr.

9    Markway's recommendation to you encompasses all

10   those elements?

11           A.    Yes, I do.

12           Q.    Who made the final decision to use

13   Pentobarbital for Missouri executions?

14           A.    I did.

15           Q.    Was that chemical under consideration

16   before the Governor's statement withdrawing the

17   Propofol protocol?

18           A.    Under consideration?

19           Q.    Uh-huh.

20           A.    I don't believe it was.

21           Q.    Let's go back to Exhibit 9, which is

22   your response to the Interrogatories.  You were

23   asked in the first Interrogatory to describe in

24   detail the process for determining whether a person

25   or entity will be designated as a member of the

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 256 of 331

1    execution team.

2         I'm looking at page 2.  And your answer was:

3    If the person or entity performs functions or duties

4    as defined by the Department's execution protocol

5    that meet the definition of a member of the

6    execution team, the person or entity is designated

7    as such.

8         Do you -- who decided that the pharmacy that

9    supplies the Pentobarbital, the person who wrote the

10   prescription and the laboratory, met the definition

11   of members of the execution team?

12        A.   I did after consultation with legal

13   counsel.

14        Q.   Okay.  Was the pharmacy that provided

15   Propofol --

16             THE WITNESS:  Just a minute.  They're

17   discussing.

18             MS. CARLYLE:  I'm sorry.

19   (THERE WAS A PAUSE IN THE PROCEEDINGS.)

20             MS. BORESI:  We can go on the record.

21   A point of clarification, the testing laboratory has

22   not been designated as a member of the execution

23   team, the prescribing doctor and the compounding

24   pharmacy has been.

25             MS. CARLYLE:  Okay.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 257 of 331

1    BY MS. CARLYLE:

2         **Q.   Was the pharmacy which provided**

3    **Propofol a member of the execution team?**

4         A.   I'm sorry?

5         **Q.   The pharmacy which provided the**

6    **Propofol --**

7         A.   No.

8         **Q.   Okay.  Was the pharmacy that provided**

9    **Thiopental, Pancuronium bromide --**

10        A.   No.

11        **Q.   No, okay.  Now, the statutory**

12   **definition of execution team hasn't changed, has it?**

13        A.   Not that I'm aware of.

14        **Q.   So why was it that you made a change in**

15   **designation to include suppliers that you had never**

16   **previously done?**

17        A.   Because we believed that this was the

18   method by which we would be able to get an execution

19   drug, and so therefore those who were involved with

20   this, we felt like had to be part of the team.

21        If they weren't then -- and that their

22   knowledge would -- became obvious as to who they

23   were, it would, in fact, impede the ability for us

24   to carry out the statutory mandate of executions.

25        **Q.   Okay.  Now, when you were talking about**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 258 of 331

1    that you used the word "we", and I'm not sure if

2    that was the imperial we, or if there were other

3    people involved.  If there were, who were they?

4         A.   Well, obviously when we make moves like

5    this we take under consideration legal counsel, but

6    I make the final decision.

7         Q.   Okay.  But besides you and legal

8    counsel, was there anyone else that you consulted

9    with about that issue?

10        A.   No.

11        Q.   Has the Department of Corrections

12   consulted with the Missouri Department of Pharmacy

13   about the legality of the method for obtaining drugs

14   and the drugs used?

15        A.   The Department of Corrections has not.

16        Q.   Is the pharmacy from which the

17   Pentobarbital is obtained registered as a

18   clearinghouse with the Food and Drug Administration?

19        A.   A clearinghouse?

20        Q.   Uh-huh.

21        A.   I don't know that.

22        Q.   Has the Department of Corrections had

23   any contact with the FDA, which is the Food and Drug

24   Administration, the Drug Enforcement Administration,

25   or DEA or any other federal authorities about the

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 259 of 331

1    legality of the execution method, or the method of

2    the use of those drugs?

3         A.   No.

4         Q.   A couple of kind of -- sort of

5    ministerial questions.  One of the things we've

6    noticed in the designations or pseudonyms applied to

7    people is that there appears not to be an M4.  Do

8    you know who is or was M4?

9         A.   I don't recall.

10        Q.   Okay.  What's Mr. Briesacher's title?

11        A.   Chief Counsel for the Missouri

12   Department of Corrections.

13        Q.   And to whom does he report?

14        A.   Me.

15        Q.   Okay.  Were you involved in any

16   discussions about whether or not the lab, pharmacy

17   and prescriber needed separate counsel in this case?

18        A.   No.

19        Q.   Who would make that decision?

20        A.   About whether they would?

21        Q.   Whether they would be represented by

22   the Attorney General, or whether they should have

23   separate counsel.

24        A.   It's under advice of counsel.

25        Q.   And the counsel are the Attorney

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 260 of 331

1   General's Office?

2       A.  I don't know that.  I don't know.  I

3   don't know where -- as I said before, I don't know

4   where that decision was made, if at all.

5       Q.  Okay.  Obviously then, it's not your

6   decision?

7       A.  I did not make the decision.

8       Q.  Okay.

9           MS. CARLYLE:  Can we go off the record

10  for a minute?

11  (THERE WAS AN OFF-THE RECORD DISCUSSION BETWEEN

12  COUNSEL.)

13  BY MS. CARLYLE:

14      Q.  I've handed you what's -- Mr. Lombardi,

15  what's been marked as Exhibit 10, and that is

16  number -- that is pages from discovery actually

17  produced in a somewhat different form on Wednesday,

18  January 15th, produced in final form today,

19  January 17th, the page numbers are AG02653 -- 52 and

20  AG02653.

21      Let me ask you first to look at the entry at

22  the top of page 2652, the first page of this

23  exhibit, for 11:15, which directs that you or your

24  designee advised Terry Russell, who is the warden of

25  the Eastern Reception Diagnostic and Correctional

1    Center, correct?

2         A.   Yes.

3         Q.   Advises him that Allen Nicklasson may

4    be escorted to the execution room if no stay is in

5    place and no legal activity is in progress to

6    prevent the execution.

7         A.   Yes.

8         Q.   And I know this didn't happen on

9    this -- in Mr. Nicklasson's case at 11:15, because

10   at 11:15, in fact, there was a stay in place, was

11   there not?

12        A.   Yes, I believe that was so.

13        Q.   Okay.  In Mr. Nicklasson's case, was it

14   you, or was it a designee who actually made the

15   decision about when he would be escorted to the

16   execution chamber?

17        A.   Me.

18        Q.   And how did you decide that no stay was

19   in place and no legal activity was in progress to

20   prevent the execution?

21        A.   As I always do, I would ask the

22   Attorney General, and the Attorney General would

23   share with me that there was nothing --

24        Q.   Okay.

25        A.   -- and so that being the case, then I

1    went ahead and gave the order.

2        **Q.   Okay.  And who specifically in the case**

3    **of Mr. Nicklasson did you speak to in the Attorney**

4    **General's Office to get that advice?**

5        A.   Actually, Chief Counsel Matt Briesacher

6    spoke to Attorney General directly, and then shared

7    that with me.

8        **Q.   The Attorney General, Mr. Koster?**

9        A.   Yes.

10        **Q.   So you actually spoke to**

11   **Mr. Briesacher, Mr. Briesacher spoke to Mr. Koster?**

12        A.   Yes.

13        **Q.   Were you aware at that time that**

14   **Mr. Nicklasson was escorted to the execution**

15   **chamber, that in fact there was a motion for a stay**

16   **pending -- or a request for a stay pending before**

17   **the 8th Circuit Court of Appeals that day?**

18        A.   I don't recall that.  I relied totally

19    on the Attorney General to tell me if there's any

20    reason why we should not order this to occur.

21        **Q.   Well, I think there are two -- there**

22   **are two inquiries that are referenced in this**

23   **chronology.  And the first one here is that the --**

24   **Mr. Nicklasson wouldn't be escorted to the execution**

25   **chamber if no stay is in place and no legal activity**

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 263 of 331

1    is in progress.

2         Later you are asked -- you are directed to

3    inquire whether there's a legal reason why he can't

4    be executed.  Do you make any distinction --

5         A.   I do not.

6         Q.   -- between those two?

7         A.   I do not.

8         Q.   Okay.  So as far as you're concerned

9    the fact that there is a motion before a court for a

10   stay, even if you are aware of it, if counsel told

11   you that wasn't a problem, it wouldn't bother you?

12        A.   If the Attorney General, the highest

13   law enforcement man in the state, tells me that

14   there's no impediment to this execution, then I act

15   accordingly.

16        Q.   Is there a record of the time that it

17   was determined that Mr. Nicklasson and Mr. Franklin

18   should be escorted to the execution room?

19        A.   I believe there is.

20        Q.   Okay.

21             MS. CARLYLE:  And because I don't think

22   I have it, and I'm wondering what it is, and whether

23   it can be produced.

24             MS. BORESI:  I believe you have been

25   produced all documents with regard to the execution

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 264 of 331

1    chronology.

2              MS. CARLYLE:  Okay.

3              MS. BORESI:  I don't believe that there

4    is any kind of a chronological record kept in the

5    area where the director or Mr. Briesacher sit during

6    the execution --

7              THE WITNESS:  Right.

8              MS. BORESI:  Okay.  I believe

9    chronological logs are kept in the location where

10   the inmates are.

11   BY MS. CARLYLE:

12        **Q.   So you and Mr. Briesacher don't keep**

13   **chronological logs yourself?**

14        A.   No.

15        **Q.   Or nobody keeps them for you?**

16        A.   No.

17              MS. CARLYLE:  Mr. Boresi, I'm going

18   show to you what has been marked Exhibits 11 and 12,

19   because I didn't realize I was going to use them as

20   exhibits until after I got here, and I don't have

21   triplicate copies, so if you'll take a look at it

22   before I show them to Mr. Lombardi -- I want you to

23   have a chance to look at them before I show them to

24   Mr. Lombardi.

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 265 of 331

1  BY MS. CARLYLE:

2       Q.  Mr. Lombardi, I've handed you two

3  documents, one marked Exhibit 11 and one marked

4  Exhibit 12.  And if you would -- first of all, could

5  you look at the lower right-hand corner and tell me

6  the AG0 number on Exhibit 11?

7       A.  722.

8       Q.  Okay.  And Exhibit 12?

9       A.  2023.

10      Q.  Now, can you tell me -- those are two

11  different documents, but they're -- would it be fair

12  to say that they're the same form, one pertaining to

13  Mr. Nicklasson, and one pertaining to Mr. Franklin?

14      A.  Correct.

15          MR. HANSEN:  Which exhibit numbers are

16  we on?

17          MS. CARLYLE:  We're on 11 and 12, which

18  aren't on your list.

19          MR. HANSEN:  Right, that's why I'm

20  trying to make sure.  And then one was 2023.  And

21  what's the other one?

22          THE WITNESS:  722.

23          MR. HANSEN:  Thank you.

24  BY MS. CARLYLE:

25      Q.  And both of those are -- record the

1    chemicals that were used in the execution, correct?

2         A.   Yes.

3         Q.   And both of them mention the use of a

4    chemical called Versed?

5         A.   Yes.

6         Q.   Do you know what that was used for?

7         A.   Yes, it's used as a sedative in

8    advance, either the offender requests it, or the

9    physician decides that it's should be used.

10        Q.   Okay.  When you say "in advance", when

11   in advance?

12        A.   In advance of the execution process.

13        Q.   Okay.  Do you know how long in advance?

14        A.   I don't remember in this particular

15   case.  I don't know.

16        Q.   And you've been through other

17   executions --

18        A.   Yes.

19        Q.   -- correct?  And were sedatives used in

20   previous protocols also?

21        A.   Yes.

22        Q.   Okay.  So is there a variation in how

23   long before the execution --

24        A.   It's usually a few hours before, if a

25   person requests it in particular.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 267 of 331

Page 54

1      Q.   Okay.  So the -- if the sedative was

2  administered a few hours before, would it have been

3  administered by M2 and M3?

4      A.   I don't recall.

5      Q.   If it were administered a few hours

6  before it would not have been administered in the

7  execution chamber, it would have been administered

8  in the holding cell?

9      A.   Yeah, I don't remember that.  You know,

10  it would vary over the years as to when this was

11  done.

12      Q.   And this time, you just don't remember

13  at all?

14      A.   No.

15      Q.   What provision is made for the offender

16  in the holding cell to have confidential visits with

17  attorneys or clergy?

18      A.   I think they're allowed to come down

19  there up to a point -- you know, I don't know the

20  detail about that.

21      Q.   I guess the operative word, though, was

22  "confidential".  Ordinarily visitors in the holding

23  cell are visiting with the prisoner in the presence

24  of officers, correct?

25      A.   Yes.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 268 of 331

1      Q.   Okay.  So what provision, if any, is

2   there for clergy or counsel to have confidential

3   visits with a prisoner in the holding cell?

4      A.   You know, I don't know that detail.  I

5   leave that to my staff.

6      Q.   Do you think it would be appropriate

7   for that to be able to happen?

8      A.   Yes, within security reasons.

9      Q.   Okay.

10     A.   It would be a case by case basis,

11  depending on the security of the situation and the

12  individual.

13     Q.   Okay.  Now, the holding cell in Bonne

14  Terre is physically set up so that there's a barrier

15  between -- a solid barrier between the prisoner and

16  any visitor, correct?

17     A.   And any what?

18     Q.   And any visitor of any kind?

19     A.   I believe that's so.

20     Q.   Okay.

21          MS. CARLYLE:  If we can take a, say,

22  five-minute break, I think I may be done, but I'd

23  like to consult with remote counsel.

24          MS. BORESI:  Sure.

25          MS. CARLYLE:  Okay.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 269 of 331

1    (THERE WAS A BREAK.)

2    BY MS. CARLYLE:

3         Q.   I actually have a couple more

4    questions.  Back to exhibits, the last two exhibits.

5         A.   11 and 12?

6         Q.   11 and 12.  I'm wondering, the drug

7    Versed is not in the execution protocol as a --

8    specifically as a chemical used, is it?

9         A.   No.

10        Q.   Okay.  Why is it on the log?

11        A.   I'm sure it's because that's the drugs

12   throughout the evening that are used.

13        Q.   Okay.  And according to -- can I see

14   those just for a moment?  I wish I had more copies

15   of them.  According to the signatures of M2 and M3,

16   do you believe that -- they acknowledge that some

17   drugs were used and some were returned or discarded?

18        A.   I'm sorry?

19        Q.   What that documents is that some drugs

20   were used and some were -- I think one of them says

21   returned, and the other one says discarded, or

22   something like that.

23        A.   Yes.

24        Q.   Okay.  Are you aware that M2 and M3

25   don't personally oversee the destruction of those

```
 1    drugs that aren't used?

 2         A.   Yes.

 3         Q.   Okay.  Who does?

 4         A.   They're done the next day.

 5         Q.   Okay.  By whom?

 6         A.   By staff.

 7         Q.   What staff?

 8         A.   I'm not sure exactly who does that.

 9         Q.   Okay.  Is it regular staff at ERDCC?

10         A.   I don't -- to answer, I don't know who

11    does it.

12         Q.   Okay.  Is it done at ERDCC?  That's

13    where the drugs are at the time --

14         A.   I believe that's so, but I can't tell

15    you unequivocally that that's the case.  I do know

16    that they are destroyed.

17         Q.   And who does know?

18         A.   Probably Mr. Dormire.

19         Q.   Okay.

20         A.   Or Mr. -- the warden.

21         Q.   Mr. Russell?

22         A.   Mr. Russell.

23         Q.   Have you ever seen any documentation of

24    the actual destruction?

25         A.   No.
```

1          MS. CARLYLE:  At this point, I would

2    pass the witness.

3          MS. BORESI:  I have no questions.  And

4    he would like to review and sign.

5          MR. HANSEN:  While we're still on the

6    record, I need to take up the issue of the protocol

7    document production which I talked about on the

8    record at the beginning of this deposition.

9          MS. CARLYLE:  Sure.

10          MR. HANSEN:  Two things.  During the

11    course of this deposition, I have been going through

12    those records just to insure that nothing that

13    needed to be redacted needs to be redacted, and I

14    have identified two things that need to be redacted

15    from that, which need to be done by my secretary

16    because we're doing it on the electronic copy.

17       So I'm not going to give you this today, even

18    though I said on the record earlier I was going

19    to --

20          MS. CARLYLE:  I'll come with you and we

21    can do it today, and I'll --

22          MR. HANSEN:  Well, we can do that if we

23    have an agreement that these are going to be

24    protected and treated as confidential documents.

25          MS. CARLYLE:  By confidential documents

1    you mean what?

2              MR. HANSEN:  Pursuant -- well, in the

3    same respect that they were ordered to be

4    confidential under the Court's earlier order, Order

5    112 or 110.

6              MS. CARLYLE:  Okay.  Let me get that

7    up.

8              MR. HANSEN:  But you, after I had

9    stated that I was going to give them to you, you

10   indicated on the record that you do not believe that

11   there was any protective order in effect, and so

12   we're unwilling to provide those documents --

13             MS. CARLYLE:  Okay.  Let me take a look

14   at 110.

15             MR. HANSEN:  Is it 110 or 112?

16             MR. SPILLANE:  I think 112 may be

17   dispositive, but I think 110 is smaller and 112 is

18   more detailed.

19             MR. HANSEN:  I think I actually have a

20   copy of it.

21             MS. CARLYLE:  I think I do, too.

22   Right, this is the general protective order --

23   okay -- so yeah, I mean if that's the protection you

24   want, I don't have a problem with that.  I thought

25   that there was something --

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 273 of 331

1          MR. SPILLANE:  There is a document -- I

2   believe it's Document 101 that talks about only

3   specific pages that should be disclosed --

4          MS. CARLYLE:  Right.

5          MR. SPILLANE:  -- and there's a list of

6   them, I believe in Document 101.  And I'm not sure

7   whether Dave is talking about Document 112 or 101.

8          MR. HANSEN:  Well, we did not track

9   precisely the same page numbers and categories that

10  are contained in Order 101, so I don't want to just

11  rely on 101.

12      And there was another provision, I believe,

13  and I think you're more familiar with it than I am,

14  Mike, that said that if there were documents that we

15  believe that for safety and security purposes we

16  needed to designated as confidential --

17          MR. SPILLANE:  I believe that's 112.

18          MS. CARLYLE:  That's 112.

19          MR. HANSEN:  -- that we could.

20          MS. CARLYLE:  And I don't have any

21  problem with using 112 to make these confidential.

22          MR. HANSEN:  Okay.  Well, earlier you

23  had said that you didn't believe that protected them

24  --

25          MS. CARLYLE:  Okay.

1          MR. HANSEN:  --  and I'm just -- I want

2    to make it clear on the record, that if the position

3    of plaintiffs is that they're not going to be

4    protected, we will not disclose them.

5          MS. CARLYLE:  Okay.  Hang on then.  And

6    I'm sorry, I think I misspoke.  You and I had had

7    discussions yesterday about what I think -- what is

8    101, which is a document that governed some other

9    documents that simply weren't these documents at

10   all, that were reviewed in camera by the Court long

11   before you became active in the case.

12       And the Court took a look at that document and

13   said:  Okay, of these documents these pages are

14   relevant to the lawsuit at that time.

15       What we're saying is that document reflects

16   the Court's review a totally different set of pieces

17   of paper.  But on the other hand -- and I think

18   there was specific -- you know, there was specific

19   things about that.

20       But what I was saying here is if you want to

21   designate them as confidential under 112, we will

22   treat them as confidential under 112.  We don't have

23   any problem with that.

24          MR. SPILLANE:  I just want to say, I

25   think the document -- when you say "completely

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 275 of 331

1   different", I think it was essentially the same

2   document, it was an earlier version of the closed

3   portion of the protocol, but the page numbers were

4   different.

5              MS. CARLYLE:  Well, the problem is,

6   Mike, it was a version of the closed portion of the

7   Thiopental protocol.  The page numbers -- not only

8   the page numbers, but all sorts of things were

9   different --

10             MR. SPILLANE:  Right.

11             MS. CARLYLE:  -- it was just a whole --

12  it was just -- and it didn't contain the materials

13  that were specific to Franklin and Nicklasson, which

14  are in these.  It just wasn't the same document, and

15  I don't think it applies to this document.

16             MR. SPILLANE:  I think only a small

17  portion of it dealt with a specific drug, but that's

18  my thought.  But I think the page numbers are

19  different -- and I think most of the headings are

20  the same, except the specific drug stuff is

21  different, which is a tiny portion of it.

22             MS. CARLYLE:  Right, but --

23             MR. HANSEN:  We just have a differing

24  opinion about whether or not they were similar

25  documents --

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334**
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 276 of 331

```
 1                  MS. CARLYLE:  Yeah.

 2                  MR. HANSEN:  -- and it's a subjective

 3   thing.  The framework's the same, but there were

 4   differences, so we can leave it at that.  But as

 5   long as you're committing to the protection of the

 6   protocol that we're going to produce -- the protocol

 7   pages that we're going to produce, and that is

 8   protected as confidential under 112, then we can do

 9   that.

10                  MS. CARLYLE:  Okay.

11                  MR. HANSEN:  And then what we can do

12   is, I can do this relatively quickly.  Go back to my

13   office, have my secretary -- she and I will redact

14   those at least two additional pages.  I have about

15   15 more I have to double check.  And we can then

16   print them off and produce them on another disc and

17   give that you today.

18                  MS. CARLYLE:  Okay.  As I said, I'm

19   perfectly willing to go with you and do that.  You

20   don't have to go back over there and then come back

21   come over here with it.

22                  MR. HANSEN:  Yeah, that's fine.  We'll

23   work out those details when we're off the record.

24                  MS. CARLYLE:  Okay.  We can go off.

25   (THE DEPOSITION WAS CONCLUDED AT 2:41 P.M.)
```

1          MS. CARLYLE:  Back on the record for a

2   minute here.  Let me state for the record that I

3   acknowledge that the defendants have designated

4   the -- frankly, I'm a little uncomfortable referring

5   to them as non-public protocols when Mr. Dormire

6   said that was not what they were.

7          MR. HANSEN:  I'm not sure what you're

8   referring to.

9          MS. CARLYLE:  Well, he said in his

10  Interrogatories that there was no non-public

11  protocol.  And then we showed him these documents,

12  and we said:  Are they the non-public protocol, and

13  he said no.

14         MR. HANSEN:  Well, I think you're -- I

15  think you're misinterpreting what he said.  And I

16  don't think -- I don't think you're using the same

17  terms as he's familiar with, because --

18         MS. CARLYLE:  I understand that.

19         MR. HANSEN:  -- there is the public

20  protocol.  And we as attorneys have continued to

21  describe the full protocol as the non-public

22  protocol, so I think there may have been failure to

23  communicate there, but I don't think there's any

24  mystery about what pages and what document we're

25  talking about.

    1              MS. CARLYLE:  Okay.  Well, what I

    2    acknowledge then that the two -- the three

    3    documents, the draft, the Franklin documents, and

    4    the Nicklasson's documents have been designated by

    5    the defendants confidential pursuant to Document 101

    6    [sic], the protective order, entered by the District

    7    Judge on May 31st, 2013 and --

    8              MR. HANSEN:  112.

    9              MS. CARLYLE:  You're right, 112.  I'm

   10    really glad you're here.  You've been keeping me in

   11    line for the last three days.

   12              MR. HANSEN:  Well, I'm just here to

   13    help you, in addition to other things.

   14              MS. CARLYLE:  Right.  112, which was

   15    signed on July 23rd of 2013, and we will maintain

   16    those protections.

   17         In the event that we believe that we need to

   18    request a change, we will follow the procedures set

   19    out in that order for asking the Judge to lift them,

   20    but until there's an order that those protections

   21    are lifted, we acknowledge that they have been

   22    delivered to us as confidential documents

   23              MR. HANSEN:  Thank you.  And just so

   24    it's clear on the record that this does also apply

   25    to -- because it's the same documents, basically the

1  set that we delivered to you late on Wednesday

2  evening at the conclusion of Mr. Dormire's

3  deposition.

4           MS. CARLYLE:  I'm trying to remember if

5  I've done anything with them since then that's

6  inconsistent with that.

7           MR. HANSEN:  I assume you've just

8  shared them with the other lawyers.

9           MS. CARLYLE:  I haven't shared them

10  with anyone but other lawyers, yeah.

11           MR. HANSEN:  And so, I would think that

12  that would be okay.  And if you would just make sure

13  the other lawyers understand --

14           MS. CARLYLE:  Certainly, yeah.  As a

15  matter of fact, thinking about it, I had scanned

16  them and was -- yeah, okay.

17           MR. HANSEN:  Just so it's clear on the

18  record, because they are the same documents

19  basically --

20           MS. CARLYLE:  Yes, yes.

21           MR. HANSEN:  -- we do have that

22  agreement that the ones that were provided --

23  because it was our agreement that they were

24  confidential on Wednesday.

25           MS. CARLYLE:  To be perfectly honest,

1    Mr. Hansen, I don't think that was our agreement,

2    but I'm willing to make it now.

3             MR. HANSEN:  Okay.  I just wanted that

4    clear on the record.  Thank you.  And again, you

5    will make sure that all plaintiff's attorney of

6    record are aware of that.

7             MS. CARLYLE:  Yes.  The protective

8    order may say that someone had -- that we have to

9    file acknowledgments, I can't remember.  If it does,

10   we will.

11       I believe the protective order, either this

12   one or a subsequent order says that we can provide

13   that information to our experts, so we may end up

14   doing that, if that's what the order say.

15            MR. SPILLANE:  That's my recollection

16   as being accurate, but I don't have it memorized.

17            MR. HANSEN:  We can look at the order.

18   I think we can both agree, that we'll comply with

19   it.

20            MS. CARLYLE:  Right.  Yeah.  I'm just

21   saying that the expert part of it may not be in

22   Document 112, it may be in something subsequent.

23            MR. HANSEN:  Understood.

24            MS. CARLYLE:  I sort of remember that

25   we had --

**MIDWEST LITIGATION SERVICES**
**www.midwestlitigation.com**      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 281 of 331

1          MR. SPILLANE:  I think it's 112.  I

2    think we did something afterwards.

3          MS. CARLYLE:  Let's see here.

4          MR. HANSEN:  We can find it.

5          MS. BORESI:  Do we need to be on the

6    record for this?

7          MR. HANSEN:  We are on the record.

8          MS. BORESI:  But I'm wondering if we

9    need to continue to be on the record.

10          MS. CARLYLE:  Actually, page 7 of

11    Document 112 says that it can be provided to named

12    counsel for the parties, counsel's partners,

13    associates and support staff and outside consultants

14    and experts, any person agreed on in writing by all

15    counsel in the lawsuit, court employees, court

16    reporters and persons preparing transcripts of

17    depositions and witnesses.

18          MR. HANSEN:  Is that the same order

19    that directed that we were to work together to reach

20    an agreement on confidentiality and disseminating

21    the documents?  No, that related to the identity

22    of --

23          MS. CARLYLE:  That's a different order.

24          MR. HANSEN:  That's right.  Okay.

25    We're done.

1              MS. CARLYLE:  Okay.  Off the record.

2    (THE DEPOSITION WAS CONCLUDED AT 2:46 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 283 of 331

1                    CERTIFICATE OF REPORTER

2      STATE OF MISSOURI )

                       ) ss.

3      CITY OF ST. LOUIS )

4

5         I, Ashley C. High, a Registered Professional Reporter and

6      Certified Court Reporter (MO) do hereby certify that the

7      witness whose testimony appears in the foregoing deposition

8      was duly sworn by me; that the testimony of said witness was

9      taken by me to the best of my ability and thereafter reduced

10     to typewriting under my direction; that I am neither counsel

11     for, related to, nor employed by any of the parties to the

12     action in which this deposition was taken, and further that I

13     am not a relative or employee of any attorney or counsel

14     employed by the parties thereto, nor financially or otherwise

15     interested in the outcome of the action.

16

17                    _____

18                    Certified Court Reporter for

19                    The State of Missouri

20

21

22

23

24

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 284 of 331

```
 1              MIDWEST LITIGATION SERVICES

 2   January 20, 2014

 3   SUSAN BORESI, ESQ.
     OFFICE OF THE ATTORNEY GENERAL
 4   207 W. High Street
     Jefferson City, MO 65101
 5
     IN RE: DAVID ZINK, et al. vs. GEORGE A. LOMBARDI,
 6        et al.

 7   Dear Ms. BORESI,

 8   Please find enclosed your copies of the deposition of
     GEORGE LOMBARDI taken on January 17, 2014 in the
 9   above-referenced case. Also enclosed is the original
     signature page and errata sheets.
10
     Please have the witness read your copy of the
11   transcript, indicate any changes and/or corrections
     desired on the errata sheets, and sign the signature
12   page before a notary public.

13   Please return the errata sheets and notarized
     signature page to ELIZABETH UNGER CARLYLE for
14   filing prior to trial date.

15   Sincerely,

16
17   ASHLEY C. HIGH, RPR, CSR(IL), CCR(MO)
18
19   Enclosures
20
21
22
23
24
25
```

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 285 of 331

```
1                    ERRATA SHEET

     Witness Name: GEORGE LOMBARDI

2    Case Name: DAVID ZINK, et al. vs. GEORGE A. LOMBARDI,

             et al.

3    Date Taken: JANUARY 17, 2014

4

5    Page #_____   Line #_____

6    Should read: _____

7    Reason for change: _____

8

9    Page #_____   Line #_____

10   Should read: _____

11   Reason for change: _____

12

13   Page #_____   Line #_____

14   Should read: _____

15   Reason for change: _____

16

17   Page #_____   Line #_____

18   Should read: _____

19   Reason for change: _____

20

21   Page #_____   Line #_____

22   Should read: _____

23   Reason for change: _____

24

25   Witness Signature: _____
```

1   STATE OF _____)

2

3   COUNTY OF _____)

4

5   I, GEORGE LOMBARDI, do hereby certify:

6           That I have read the foregoing deposition;

7           That I have made such changes in form

8   and/or substance to the within deposition as might

9   be necessary to render the same true and correct;

10          That having made such changes thereon, I

11  hereby subscribe my name to the deposition.

12          I declare under penalty of perjury that the

13  foregoing is true and correct.

14          Executed this _____ day of _____,

15  20___, at _____.

16

17

18

19                          _____

20                          GEORGE LOMBARDI

21

22                          _____

23                          NOTARY PUBLIC

24  My Commission Expires:

25

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 287 of 331

## A

**ability** 44:23
70:9
**able** 8:3 13:4
32:24 44:18
55:7
**above-referenc...**
71:9
**acceptable** 8:10
8:11
**access** 13:16
**accurate** 12:21
14:8 67:16
**accurately** 12:2
15:19
**acknowledge**
16:9 56:16 64:3
65:2,21
**acknowledgme...**
67:9
**act** 50:14
**action** 28:20
70:12,15
**active** 61:11
**activity** 48:5,19
49:25
**actual** 10:7 11:5
12:13 13:5
57:24
**addition** 17:2
23:20 65:13
**additional** 11:19
63:14
**address** 7:22
**addresses** 6:18
7:4,13,18
**administered**
54:2,3,5,6,7
**Administration**
2:9 45:18,24,24
**advance** 53:8,10
53:11,12,13
**advice** 46:24 49:4
**advised** 47:24
**Advises** 48:3
**affidavit** 2:10
22:23,25 23:4

23:10 27:22
28:3
**afternoon** 3:12
7:6
**age** 5:13
**ago** 6:15 25:2
**agree** 29:17,20
32:17 39:16
40:13 67:18
**agreed** 5:1 10:16
12:6 13:22
68:14
**agreement** 58:23
66:22,23 67:1
68:20
**AG0** 52:6
**AG01177** 39:9
**AG01182** 39:20
**AG01266** 30:13
**AG02059** 30:15
**AG02246** 19:16
**AG02653** 47:19
47:20
**ahead** 10:1 11:24
12:9,11 16:12
16:16 49:1
**al** 1:4,7 3:4,7,18
3:19 71:5,6
72:2,2
**Allen** 48:3
**allowed** 54:18
**aloud** 32:3
**amended** 17:16
**Amendment**
26:12
**analyses** 33:6
**analysis** 2:14,15
30:22 31:21
32:8 33:20
34:17,20 35:16
37:8,8,13,14,16
**analyzed** 30:24
31:16
**ANDREW** 4:11
**and/or** 71:11
73:8
**answer** 24:6 26:1

27:1,4,7,16,17
27:20 35:11
43:2 57:10
**Answers** 18:3
**anybody** 24:17
**Apparently**
39:23 40:15
**appeal** 41:19
**Appeals** 28:17,21
28:23 49:17
**appears** 30:21
46:7 70:7
**applied** 46:6
**applies** 62:15
**apply** 65:24
**appropriate** 55:6
**approve** 23:8
**approved** 22:12
**approximately**
13:1
**area** 51:5
**argue** 15:12
**arguments** 42:3
**arrived** 7:6 9:9
**Ashley** 3:14 4:17
5:4 70:5 71:17
**asked** 39:9 41:5,6
42:23 50:2
**asking** 5:25
19:21,22 23:24
23:25 34:24
35:1,15 36:16
37:2 65:19
**assertion** 6:19
**associates** 68:13
**association** 25:15
25:16,17
**assume** 6:4 66:7
**attached** 2:23
31:11
**attention** 8:15
19:11,17
**attorney** 4:12
27:18 46:22,25
48:22,22 49:3,6
49:8,19 50:12
67:5 70:13 71:3

**attorneys** 9:17
15:10,25 16:20
17:13 54:17
64:20
**attorney/client**
23:23
**authorities** 45:25
**available** 9:16,21
21:14 22:17
**avoid** 27:10
**aware** 21:1 24:21
25:9,13 28:3
40:18 41:13,18
44:13 49:13
50:10 56:24
67:6

## B

**B** 19:18,21 20:13
20:15 21:10
**back** 12:1 34:11
37:5 39:3 40:16
42:21 56:4
63:12,20,20
64:1
**BAILEY** 4:11
**BARNETT** 4:3
**barrier** 55:14,15
**based** 24:2
**basically** 65:25
66:19
**basis** 55:10
**batch** 34:3,9,13
**Bates** 10:1,2
11:21 12:3
14:20 39:6,16
39:20
**began** 9:25 10:2
**beginning** 20:19
40:9 58:8
**begins** 40:2
**behalf** 1:14 3:20
5:14
**belief** 23:25 24:2
**believe** 7:8,17 9:9
9:18,20 10:3,6
10:11 19:9,10

21:4 23:14,19
32:25 38:15
41:15 42:8,20
48:12 50:19,24
51:3,8 55:19
56:16 57:14
59:10 60:2,6,12
60:15,17,23
65:17 67:11
**believed** 10:16,22
17:13,17 44:17
**best** 22:16 70:9
**better** 8:19 19:20
**beyond** 29:12,14
**Bonne** 55:13
**Boresi** 4:10 16:17
17:23 23:22
24:1,7 25:23,25
26:18,22 27:1,3
27:13,17 29:15
31:4,10 32:22
34:10,18,22,24
35:4,8 36:16
38:21,24 39:1,5
39:19 43:20
50:24 51:3,8,17
55:24 58:3 68:5
68:8 71:3,7
**bother** 50:11
**bottom** 11:22
28:18 32:4,10
32:11
**break** 55:22 56:1
**Briesacher** 7:8
49:5,11,11 51:5
51:12
**Briesacher's**
46:10
**bring** 8:14
**bromide** 44:9
**business** 7:7
**businesses** 25:20
26:8
**buy** 22:1

## C

**C** 3:14 4:1,17 5:4

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com Phone: 1.800.280.3376 Fax: 314.644.1334
Case 2:12-cv-04209-BP Document 353 Filed 02/18/14 Page 288 of 331

70:5 71:17
**call** 8:11 30:18
**called** 25:1 53:4
**calling** 8:19
**calls** 26:19 27:13
**camera** 61:10
**capacity** 42:1
**capital** 20:20
**careful** 15:8
**Carlyle** 2:4 4:4,4
5:17 6:12 8:4
8:25 9:3,7,10
11:2 12:15,19
14:16 15:2,21
17:11,24 18:9
23:24 24:5,8,9
26:5,6,21,25
27:8,15,21
29:19 31:6,14
31:15 32:17,23
33:3 34:16,19
34:23 35:2,6,13
35:21,22 36:21
37:1 38:22,25
39:3,8,14,17,18
43:18,25 44:1
47:9,13 50:21
51:2,11,17 52:1
52:17,24 55:21
55:25 56:2 58:1
58:9,20,25 59:6
59:13,21 60:4
60:18,20,25
61:5 62:5,11,22
63:1,10,18,24
64:1,9,18 65:1
65:9,14 66:4,9
66:14,20,25
67:7,20,24 68:3
68:10,23 69:1
71:13
**carried** 42:5
**carry** 44:24
**case** 21:18 22:24
25:6 27:9 28:4
28:16,19,23
30:5,5 46:17

48:9,13,25 49:2
53:15 55:10,10
57:15 61:11
71:9 72:2
**categories** 60:9
**cause** 3:16
**CCR(MO)** 4:17
71:17
**cell** 7:18 54:8,16
54:23 55:3,13
**Center** 48:1
**Central** 1:2 3:2
3:18
**certain** 3:16
23:11
**certainly** 8:1
14:4,11 34:5
66:14
**Certificate** 2:14
2:15 30:22
31:21 34:16,19
37:7 70:1
**Certified** 3:15,16
5:5,6 70:6,18
**certify** 70:6 73:5
**chamber** 48:16
49:15,25 54:7
**chance** 24:14
51:23
**change** 44:14
65:18 72:7,11
72:15,19,23
**changed** 44:12
**changes** 71:11
73:7,10
**check** 19:8 63:15
**chemical** 2:20,21
36:4 42:15 53:4
56:8
**chemicals** 2:9
19:4 25:21 26:9
27:25 28:5
34:13 36:17,18
37:19 53:1
**chief** 38:4 41:9
46:11 49:5
**chronological**

51:4,9,13
**chronology** 2:19
49:23 51:1
**CII** 31:17
**Circuit** 28:17
30:5 49:17
**circumstances**
15:6
**City** 3:14 4:5,13
70:3 71:4
**clarification**
43:21
**CLAYTON** 4:3
**clear** 5:25 7:16
12:9,21,22 32:2
38:18 61:2
65:24 66:17
67:4
**clearinghouse**
45:18,19
**clearly** 36:3,23
**clemency** 42:4
**clergy** 54:17 55:2
**closed** 10:17
16:24 17:15
62:2,6
**come** 54:18 58:20
63:20,21
**comfortable**
33:14,20
**comments** 12:22
**Commission**
73:24
**committing** 63:5
**common** 37:3
**communicate**
64:23
**competency**
38:10 41:1,16
**complaint** 17:16
**complete** 41:15
**completely** 61:25
**comply** 67:18
**compound** 36:6
**compounded**
22:12,17 29:11
**compounding**

43:23
**compromised**
24:20
**concern** 35:12
**concerned** 14:2
33:22 35:10
50:8
**concerning** 19:3
**CONCLUDED**
63:25 69:2
**conclusion** 9:2,3
10:12 26:20
27:14 36:17,20
37:3 66:2
**conclusive** 15:16
**condemned**
41:24
**conducive** 15:7
**conduct** 7:24
**conducted** 20:23
**confer** 8:13
**confident** 33:6,7
**confidential**
34:14 35:3,18
54:16,22 55:2
58:24,25 59:4
60:16,21 61:21
61:22 63:8 65:5
65:22 66:24
**confidentiality**
68:20
**confuse** 5:23
**consideration**
42:15,18 45:5
**considered** 15:8
**consist** 10:3
**construed** 32:9
37:9,14
**consult** 55:23
**consultants**
68:13
**consultation**
43:12
**consulted** 45:8
45:12
**contact** 45:23
**contain** 62:12

**contained** 60:10
**contemporane...**
17:9
**context** 5:22 24:3
**continually**
16:19
**continue** 68:9
**continued** 64:20
**controlled** 32:8
**conversations**
16:14
**copier** 11:21
**copies** 9:17 10:13
51:21 56:14
71:8
**copy** 11:21 12:5
12:18 38:21
58:16 59:20
71:10
**copying** 14:7
**corner** 30:25
31:2 32:12 52:5
**correct** 20:20,21
21:11,22 23:12
23:13,17 28:24
36:15 38:10
41:4 48:1 52:14
53:1,19 54:24
55:16 73:9,13
**Correctional**
47:25
**corrections** 3:13
20:23 21:2
35:24 36:3,12
37:20 40:25
45:11,15,22
46:12 71:11
**Corrections's**
21:24
**corresponding**
12:12
**counsel** 5:2,2
16:19 18:8 24:3
25:6 43:13 45:5
45:8 46:11,17
46:23,24,25
47:12 49:5

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 289 of 331

50:10 55:2,23
68:12,15 70:10
70:13
counsel's 68:12
COUNTY 73:3
couple 46:4 56:3
course 33:25
58:11
court 1:1 3:1,16
3:17 4:16 5:6
6:24 9:5 14:19
16:24,25 28:17
28:21,23 49:17
50:9 61:10,12
68:15,15 70:6
70:18
courtesy 15:25
Court's 59:4
61:16
coverage 25:5
covered 15:23
16:3,10
covering 16:2
co-counsel 8:13
criteria 33:21
cross 18:23
CSR(IL) 4:17
71:17
current 25:7
currently 19:6,20
19:23 21:2
curriculum
33:18

_____
**D**

**D** 2:1 28:16
**date** 29:12,14
71:14 72:3
**Dave** 60:7
**David** 1:4 3:4,18
4:10 18:4 71:5
72:2
**day** 3:12 6:24
18:12 49:17
57:4 73:14
**days** 6:15 7:7
8:10 65:11

**DEA** 45:25
**dealt** 62:17
**Dear** 71:7
**death** 41:24
**December** 17:6
18:19 23:2
28:19 30:4
**decide** 48:18
**decided** 13:19
43:8
**decides** 53:9
**decision** 15:17
22:1 42:12 45:6
46:19 47:4,6,7
48:15
**decisions** 15:8
**Declaration** 2:11
2:13 28:15
**declarations** 33:5
**declare** 73:12
**declared** 23:11
**defect** 41:25
**defendants** 1:8
3:8,19 4:9 5:3
17:13 64:3 65:5
**defendant's**
16:20
**defined** 43:4
**definition** 43:5
43:10 44:12
**delivered** 65:22
66:1
**Department** 3:13
7:2 19:7 20:22
21:2,11,24
35:23 36:3,11
36:15 37:20
40:25 45:11,12
45:15,22 46:12
**Department's**
22:14 43:4
**depending** 55:11
**deposes** 5:14
**deposition** 1:13
3:10 5:3,15,19
6:14 7:24 9:2
9:12,23,24

10:12 11:25
12:25 13:4,8,10
16:13,16,18
31:12 34:15
58:8,11 63:25
66:3 69:2 70:7
70:12 71:8 73:6
73:8,11
**depositions**
68:17
**describe** 14:25
42:23 64:21
**description**
31:22
**designate** 61:21
**designated** 42:25
43:6,22 60:16
64:3 65:4
**designation**
44:15
**designations**
46:6
**designee** 47:24
48:14
**desired** 71:11
**desk** 18:23
**destroyed** 57:16
**destruction**
56:25 57:24
**detail** 42:24
54:20 55:4
**detailed** 59:18
**details** 63:23
**determine** 8:13
13:11,17
**determined**
50:17
**Determines**
21:13
**determining** 20:4
42:24
**developed** 10:8
**Diagnostic** 47:25
**differences** 63:4
**different** 9:14
16:5 34:20
47:17 52:11

61:16 62:1,4,9
62:19,21 68:23
**differing** 62:23
**difficulty** 8:21
**direct** 2:4 5:16
8:15 37:21
**directed** 41:2
50:2 68:19
**directing** 24:5
27:15
**direction** 21:25
70:10
**directly** 49:6
**director** 16:12
21:11 22:6
40:24 51:5
**directs** 47:23
**disc** 12:18 63:16
**discarded** 56:17
56:21
**discipline** 25:15
**disclose** 61:4
**disclosed** 60:3
**disclosures** 6:10
**discovery** 6:10
16:23 17:1,14
17:15,17 30:12
30:15 38:19
47:16
**discuss** 16:13
20:20
**discussed** 6:14
13:10
**discusses** 20:16
**discussing** 43:17
**DISCUSSION**
18:7 47:11
**discussions** 46:16
61:7
**disease** 41:25
**dispositive** 59:17
**dissatisfaction**
25:20 26:8
**disseminating**
68:20
**distinction** 50:4
**distribution** 19:4

**District** 1:1,1 3:1
3:1,17,17 65:6
**divided** 36:18
**Division** 1:2 3:2
3:18
**doctor** 33:19
43:23
**document** 2:9
15:23 19:3,6,19
20:1 23:7 28:11
28:18,22 29:5,8
29:16,17,25
30:4 31:5,12,16
34:5 38:18
39:25 40:13
58:7 60:1,2,6,7
61:8,12,15,25
62:2,14,15
64:24 65:5
67:22 68:11
**documentation**
38:8,13 57:23
**documents** 6:10
6:16 7:3,9 8:6
8:12 9:15 13:16
13:19 15:11,25
16:2,4,6,8,9,20
17:3,8 19:12,13
19:15 33:5
50:25 52:3,11
56:19 58:24,25
59:12 60:14
61:9,9,13 62:25
64:11 65:3,3,4
65:22,25 66:18
68:21
**Doe** 25:2
**doing** 12:4 58:16
67:14
**Dormire** 9:2
11:10 22:6,7
36:12 57:18
64:5
**Dormire's** 6:14
66:2
**Dorothy** 2:17
40:12

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 290 of 331

double 63:15
doubt 40:25
Dr 2:12,13,16,17
  28:4 33:7 38:3
  38:7 40:12,13
  40:16 41:8,12
  42:8
draft 10:4 12:11
  13:4 18:13 65:3
drafted 18:17
  23:7,8,9
draw 19:11,17
Drive 3:14
drug 21:4 29:11
  44:19 45:18,23
  45:24 56:6
  62:17,20
drugs 20:17
  21:19 22:11,12
  22:13,15,17
  29:9 33:7 36:23
  45:13,14 46:2
  56:11,17,19
  57:1,13
duly 70:8
duties 40:24 43:3

**E**

E 2:1 4:1,1
earlier 6:17
  15:24 25:1
  58:18 59:4
  60:22 62:2
Eastern 47:25
eat 13:3
effect 59:11
eight 3:11
either 7:23 9:20
  13:22 22:5
  25:10 26:10
  53:8 67:11
electronic 58:16
elements 42:10
Eleventh 4:18
Elizabeth 4:4,4
  6:7 34:10 71:13
employed 70:11

70:14
employee 70:13
employees 68:15
enclosed 71:8,9
Enclosures 71:19
encompasses
  42:9
ended 10:3,5,19
  12:12,13
ends 40:2
enforcement
  45:24 50:13
entered 65:6
entirely 16:5
entitled 9:18
  15:16
entity 42:25 43:3
  43:6
entry 47:21
equipment 11:14
  14:3
ERDCC 57:9,12
errata 71:9,11,13
  72:1
escorted 48:4,15
  49:14,24 50:18
ESQ 4:4,10,10
  4:11,11 71:3
essentially 62:1
established 9:19
et 1:4,7 3:4,7,18
  3:19 71:5,6
  72:2,2
ethical 25:17
evening 7:2
  56:12 66:2
event 65:17
Eventually 13:18
everybody 15:10
evidence 24:10
  24:19,21 40:17
  41:13
exact 36:4
exactly 57:8
Examination 2:4
  5:16
EXAMINATI...

2:3
examined 3:10
  5:13
excitement 14:7
excluding 12:7
excuse 34:10
executed 29:14
  41:1,25 50:4
  73:14
execution 2:19
  6:20 10:4,8
  17:4,5 19:23
  20:4,6,17,23
  21:3,5,7,21
  23:6 24:12,18
  25:11 29:9 33:9
  34:1 38:6 40:19
  40:23 41:15,18
  43:1,4,6,11,22
  44:3,12,18 46:1
  48:4,6,16,20
  49:14,24 50:14
  50:18,25 51:6
  53:1,11,23 54:7
  56:7
executions 17:10
  23:17 27:25
  28:5,7 33:8
  42:13 44:24
  53:17
executive 42:4
exhibit 10:5,10
  10:11 11:3
  12:11 18:1 19:1
  22:21 28:10,15
  29:25 30:12,14
  30:19 31:11,13
  31:19 32:1,2,11
  33:23 35:3
  37:24 38:16,17
  38:18 39:19,20
  40:17 42:21
  47:15,23 52:3,4
  52:6,8,15
exhibits 2:7,23
  5:9 9:24 30:11
  51:18,20 56:4,4

exist 7:20
expected 6:23
expel 25:15
expert 28:3 67:21
experts 67:13
  68:14
expired 28:6
Expires 73:24
express 25:20
  26:8,15,16 27:6
  27:12
expressed 32:9
  37:9,15
expressions
  27:11
expressly 5:8
extenuation 42:3
eyes 9:17 15:25
e-mail 6:13,22
e-mails 16:14

**F**

fact 9:23 13:2
  23:10 37:18
  41:4 44:23
  48:10 49:15
  50:9 66:15
failed 14:13
failure 64:22
fair 52:11
faith 15:3
familiar 26:11
  41:22 42:6
  60:13 64:17
far 50:8
FDA 45:23
federal 45:25
feel 33:13
felt 11:11 44:20
file 67:9
filed 16:23 17:16
  28:4,16,22 30:4
filing 71:14
final 11:20 42:12
  45:6 47:18
financially 70:14
find 27:23 68:4

71:8
fine 34:22 39:17
  63:22
first 11:16 12:20
  12:24 18:3,16
  26:12 30:19
  42:23 47:21,22
  49:23 52:4
five 3:12 34:20
five-minute
  55:22
follow 25:16
  65:18
Food 45:18,23
foregoing 70:7
  73:6,13
forenoon 3:12
form 8:9 47:17
  47:18 52:12
  73:7
forth 33:22
found 40:17
  41:13
four 33:4
framework's
  63:3
Franklin 10:4,7
  10:9 11:4,5
  12:10 13:4,5
  17:4 28:5 29:12
  40:18,22 41:13
  50:17 52:13
  62:13 65:3
Franklin's 38:5
  38:10
frankly 64:4
full 64:21
functions 43:3
further 13:16
  41:20 70:12

**G**

general 4:12 23:3
  46:22 48:22,22
  49:6,8,19 50:12
  59:22 71:3
General's 47:1

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 291 of 331

**H**

half 11:23
hand 30:10 61:17
handed 47:14
    52:2
handling 6:8
Hang 61:5
Hansen 4:10 6:7
    6:13 8:23 9:1,5
    9:8,11 11:3
    12:16 14:13,17
    15:18 16:11
    18:6 39:6,12,15
    52:15,19,23
    58:5,10,22 59:2
    59:8,15,19 60:8
    60:19,22 61:1
    62:23 63:2,11
    63:22 64:7,14
    64:19 65:8,12
    65:23 66:7,11
    66:17,21 67:1,3
    67:17,23 68:4,7
    68:18,24
happen 24:24
    48:8 55:7
happened 9:1
harassed 24:16
hard 12:18 17:7
harmed 25:10
head 17:23 35:20
heading 30:20
headings 62:19
hearing 14:19
help 65:13
helpful 14:10
    15:2
Herbert 21:21
Herndon 40:10
    41:5,6
High 3:14 4:12
    4:17 5:4 70:5
    71:4,17
highest 50:12
history 24:13
holding 54:8,16
    54:22 55:3,13

49:4
generated 17:9
George 1:7,13
    2:10 3:7,10,19
    5:12 71:5,8
    72:1,2 73:5,20
getting 35:10
get-going 6:11
give 12:17 29:1
    36:10,11 39:19
    58:17 59:9
    63:17
given 13:1
glad 65:10
glasses 32:14
gm 31:1
go 7:3 10:1 12:1
    16:12,15 42:21
    43:20 47:9
    63:12,19,20,24
going 6:3,8 12:13
    12:17 14:14
    17:20,25 19:11
    26:18 29:21
    31:4 35:6,14,14
    35:19 37:23
    41:21 51:17,19
    58:11,17,18,23
    59:9 61:3 63:6
    63:7
good 15:3
Gotcha 39:5
governed 61:8
Governor's
    42:16
grams 36:9,11,13
    36:13
granted 17:16
Greg 38:3
grounds 23:22
    25:25 26:19
guarantee 15:13
guess 6:3 14:9
    15:14 17:11
    35:18 37:2
    54:21
guidelines 25:17

honest 66:25
hook 11:24
hope 14:17
hour 10:19 11:23
hours 3:11 7:15
    10:20 53:24
    54:2,5
humor 31:14
Hydromorphone
    20:16,24 21:3
    21:15,23

**I**

idea 18:21 37:6
IDENTIFICA...
    5:10
identified 9:13
    10:21,24 11:9
    11:10 12:7 39:4
    58:14
identify 7:21
    14:23 25:6
identity 23:6,16
    24:25 68:21
IL 3:16 5:6
imagine 17:7
immediately 7:14
impede 44:23
impediment
    50:14
imperial 45:2
implied 32:9 37:9
    37:15
impose 8:16
imposed 42:2
improper 17:18
    25:14,19 26:7
    26:14,24
inadvertently
    5:24
include 44:15
inconsistent 66:6
incumbent 17:18
indicate 29:10
    41:21 71:11
indicated 10:13
    59:10

individual 55:12
individuals 24:11
    24:15
individual's 41:1
information 8:12
    14:4,25 15:4
    20:12 23:11,23
    24:2,4,23 35:10
    38:14 41:20
    67:13
Inj 31:24
injection 2:9 19:5
    25:21 26:9
inmates 51:10
inquire 50:3
inquiries 49:22
institution 7:10
insure 58:12
intention 21:8
interest 10:22
    12:8
interested 11:8
    70:15
Interrogatories
    18:4 42:22
    64:10
Interrogatory
    2:18 42:23
investigation
    7:25
involved 20:3
    24:12,16 44:19
    45:3 46:15
issue 6:9 24:14
    45:9 58:6
issued 16:3,4
issues 10:23
items 6:18 11:10
    11:14

**J**

January 1:15
    3:11 18:12
    19:15 30:13,15
    38:19 39:11,11
    39:13 47:18,19
    71:2,8 72:3

individual 55:12

Jefferson 3:14
    4:13 71:4
Jessica 38:9
John 25:1
Judge 65:7,19
Judge's 8:14
July 38:19 65:15

**K**

Kansas 4:5
keep 51:12
keeping 65:10
keeps 51:15
kept 51:4,9
key 14:2
kind 12:20 46:4
    51:4 55:18
knew 13:8
know 5:18 7:25
    14:1 15:11,12
    15:13 22:2,11
    22:15,18 27:2
    27:20 28:12
    31:8 32:20
    33:14,15 36:19
    45:21 46:8 47:2
    47:2,3,3 48:8
    53:6,13,15 54:9
    54:19,19 55:4,4
    57:10,15,17
    61:18
knowledge 22:16
    35:23 36:19
    44:22
knows 36:23
    41:21
Koster 49:8,11

**L**

L 4:3
lab 33:13,21
    35:11,24 36:4,5
    36:10,14,22,23
    46:16
laboratory 32:8
    43:10,21
lacks 42:1

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 292 of 331

large 15:5
Larry 2:12,13
  28:4,16
late 16:21 66:1
law 4:4 34:21
  50:13
lawful 5:13
lawsuit 18:5
  61:14 68:15
lawyer 27:19
lawyers 15:5
  66:8,10,13
lead 35:15
leads 35:15
learned 37:18
leave 10:15 16:24
  55:5 63:4
left 9:6
left-hand 30:24
  31:2 32:12
legal 19:5 24:3
  25:21 26:9,20
  27:14 43:12
  45:5,7 48:5,19
  49:25 50:3
legality 45:13
  46:1
Lethal 2:9
letter 41:7
let's 6:10 8:23,25
  16:11,12,15
  39:12 42:21
  68:3
Lewis 2:17 40:12
lift 65:19
lifted 65:21
line 32:1,10
  65:11 72:5,9,13
  72:17,21
lines 32:1
list 14:10,12
  52:18 60:5
litigation 4:18
  25:1 71:1
little 20:15 35:7
  64:4
live 41:19

location 51:9
log 2:20,21 14:15
  14:15,23 15:9
  56:10
logs 51:9,13
Lombardi 1:7,13
  2:10 3:7,10,19
  5:12,18 17:25
  18:10 30:6
  32:20 47:14
  51:22,24 52:2
  71:5,8 72:1,2
  73:5,20
Lombardi's 2:18
  28:20
long 33:19 53:13
  53:23 61:10
  63:5
look 7:20 11:3
  15:11 29:2,4
  30:19 31:25
  40:3 41:9 47:21
  51:21,23 52:5
  59:13 61:12
  67:17
looked 10:20
  11:4,6 33:4
looking 28:1 31:7
  43:2
looks 31:17
Louis 4:19 70:3
lower 32:12 52:5

M
machine 14:7
maintain 65:15
majority 13:21
  17:2
man 50:13
mandamus 28:20
  30:6
mandate 44:24
manufactured
  22:13
mark 11:18
marked 5:9 9:23
  10:5,9,11 11:5

12:10 18:1 19:1
  22:21 28:10
  29:24 30:11
  31:10 37:24
  47:15 51:18
  52:3,3
marker 11:18
Markway 2:16
  38:4,7 40:13,16
  41:8,12
Markway's 42:9
material 36:2
  39:21 41:10
materials 13:1
  62:12
Matt 49:5
matter 23:4 41:4
  66:15
matters 14:1
  42:3
Ma'am 18:22
mean 13:8 15:3,9
  22:8 26:23,24
  33:16 35:17
  37:4 59:1,23
meet 43:5
meets 33:21
member 42:25
  43:5,22 44:3
members 6:20
  23:6,16 25:16
  26:15 27:5
  43:11
memorandum
  2:16 38:3,8
memorized 67:16
mental 41:25
mention 53:3
met 5:21 43:10
method 44:18
  45:13 46:1,1
MICHAEL 4:11
Midazolam
  20:16,24 21:2
  21:15,24
MIDWEST 4:18
  71:1

Mike 60:14 62:6
milliliter 36:10
milliliters 36:9
ministerial 46:5
minute 29:1
  43:16 47:10
  64:2
misinterpreting
  64:15
Missouri 1:1 3:1
  3:13,14,18
  19:24 20:22
  21:1 23:15
  41:23 42:13
  45:12 46:11
  70:2,19
misspoke 29:7
  61:6
MO 3:16 4:5,13
  4:19 5:6 70:6
  71:4
moment 56:14
Monday 7:24
morning 6:22 9:9
  12:4
motion 49:15
  50:9
moves 45:4
mystery 64:24
M2 25:7 54:3
  56:15,24
M3 54:3 56:15,24
M4 46:7,8

N
N 2:1 4:1
name 72:1,2
  73:11
named 68:11
names 7:19
nature 22:15
  42:1
necessary 73:9
need 7:12,15,22
  12:8 13:22,25
  15:4 16:14
  32:13 58:6,14

58:15 65:17
  68:5,9
needed 11:11,13
  13:3,18 14:4
  23:20 46:17
  58:13 60:16
needs 58:13
neither 70:10
never 13:9 24:22
  24:24 44:15
news 25:4
Nicklasson 10:10
  11:6 13:6,9
  17:5 28:6 29:13
  48:3 49:3,14,24
  50:17 52:13
  62:13
Nicklasson's
  48:9,13 65:4
night 8:21 15:15
Nodded 17:23
  35:20
non-public 8:20
  64:5,10,12,21
North 4:18
notarized 71:13
notary 71:12
  73:23
noticed 46:6
November 17:5
number 6:18
  7:22 10:2 14:20
  15:4,6 28:16,19
  30:5 31:13 39:7
  39:20 47:16
  52:6
numbered 7:1
  20:14 30:13
numbers 6:18
  7:4,13,18 8:22
  11:22 12:3 14:3
  19:14,16 39:16
  47:19 52:15
  60:9 62:3,7,8
  62:18
nurse 25:7

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 293 of 331

## O

**Oak** 4:5
**object** 14:5 23:22
  26:18 27:13
  29:15 31:4
  34:25 36:16
**objected** 25:25
**objection** 17:19
  17:21 25:23
**observation**
  16:22
**observations**
  40:10
**obtained** 7:9
  32:7 33:17
  45:17
**obtaining** 45:13
**obvious** 44:22
**obviously** 45:4
  47:5
**occur** 49:20
**occurred** 15:19
  17:4,6 28:7
**occurs** 21:21
**October** 16:23
**odd** 20:15
**offender** 53:8
  54:15
**office** 4:4,12 47:1
  49:4 63:13 71:3
**officers** 11:15
  54:24
**Offices** 3:13
**OFF-THE** 18:7
  47:11
**Oh** 31:3 38:22
  39:1
**okay** 6:5,6,12 8:4
  9:7 12:14,15,19
  14:16 15:2
  17:11,22 18:13
  18:25 20:3,6,9
  20:13 21:20,23
  22:11,20 23:3
  23:19 24:8 25:9
  25:14 26:14,21
  27:9 28:9,14

29:1,3,4,24
  30:9,18 31:19
  31:25 32:10,15
  32:23 33:2,4,12
  33:23 35:2,8,21
  36:2,8 37:7,18
  38:7,16 39:14
  39:24 40:2,7,11
  41:12,22 42:8
  43:14,25 44:8
  44:11,25 45:7
  46:10,15 47:5,8
  48:13,24 49:2
  50:8,20 51:2,8
  52:8 53:10,13
  53:22 54:1 55:1
  55:9,13,20,25
  56:10,13,24
  57:3,5,9,12,19
  59:6,13,23
  60:22,25 61:5
  61:13 63:10,18
  63:24 65:1
  66:12,16 67:3
  68:24 69:1
**once** 15:9,10
**ones** 22:13 66:22
**operative** 54:21
**opinion** 26:2
  27:6,11,18
  62:24
**opinions** 26:15
  26:16
**opportunity** 9:22
**order** 7:10,24
  9:19,20 15:24
  16:2,3,7,10
  49:1,20 59:4,4
  59:11,22 60:10
  65:6,19,20 67:8
  67:11,12,14,17
  68:18,23
**ordered** 59:3
**Ordinarily** 54:22
**ordinary** 22:12
**original** 71:9
**outcome** 70:15

**outside** 68:13
**overdue** 8:6,8
**oversee** 56:25
**oversight** 14:14
**overwhelming**
  17:2
**owns** 21:2
**o'clock** 3:11,12
  9:11,12 12:24
  12:25 13:2

## P

**P** 4:1,1
**page** 2:2 8:22
  10:1,2 11:22
  19:17 20:15
  29:4 30:12,14
  32:4,12 40:4,6
  43:2 47:19,22
  47:22 60:9 62:3
  62:7,8,18 68:10
  71:9,12,13 72:5
  72:9,13,17,21
**pages** 7:1 10:1,21
  11:7,24 12:2,6
  12:7,12 13:1,12
  13:20 14:24
  15:1 27:23
  47:16 60:3
  61:13 63:7,14
  64:24
**Pancuronium**
  44:9
**paper** 8:18 18:23
  61:17
**paragraph** 29:5
  29:10 40:8,9
**paragraphs**
  20:14,19
**part** 19:13,23
  37:11 40:24
  44:20 67:21
**participate** 23:17
**participating**
  41:19
**participation**
  24:17 25:11

**particular** 33:23
  34:13 53:14,25
**parties** 68:12
  70:11,14
**partners** 68:12
**pass** 58:2
**PAUSE** 43:19
**penalty** 73:12
**pending** 3:17
  28:23 49:16,16
**Pentobarbital**
  20:20 21:9,14
  31:17 36:9
  42:13 43:9
  45:17
**people** 23:17
  24:20 45:3 46:7
**perfectly** 63:19
  66:25
**performs** 43:3
**perimeter** 10:23
**period** 17:19
**perjury** 73:12
**permanent** 11:18
**permission** 16:25
**person** 7:21
  41:24 42:24
  43:3,6,9 53:25
  68:14
**personal** 7:18
  23:25 24:1,11
  36:19
**personally** 18:13
  56:25
**persons** 68:16
**pertaining** 52:12
  52:13
**petitioner** 30:6
**pharmacy** 33:19
  35:25 36:1,8,22
  43:8,14,24 44:2
  44:5,8 45:12,16
  46:16
**phone** 6:18 7:13
  7:18,22 16:13
**photocopies**
  11:16,17

**photocopy** 11:19
**physical** 24:20
**physically** 25:10
  55:14
**physician** 53:9
**pieces** 8:18 18:22
  61:16
**place** 41:2 48:5
  48:10,19 49:25
**placed** 34:14
**places** 24:13
**plaintiffs** 1:5,14
  3:5,19,20 4:3
  5:2,14 61:3
**plaintiff's** 2:8 5:9
  16:19 18:1 19:1
  67:5
**plan** 27:24
**Plaza** 3:13
**pleadings** 25:6
**please** 5:25 18:2
  19:2 22:22
  25:22 26:4 30:8
  32:2 37:25 39:7
  40:4 71:8,10,13
**plus** 36:9,13
**point** 14:3,5 16:1
  43:21 54:19
  58:1
**portion** 39:21
  62:3,6,17,21
**portions** 10:14
**position** 10:15
  14:9 15:23
  17:21 25:18
  26:10 61:2
**possession** 21:25
  22:14
**possible** 15:9
**potency** 33:22
**potent** 28:1 33:10
  37:20
**precisely** 60:9
**preparation** 2:9
  19:4
**prepare** 11:25
**prepared** 36:18

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 294 of 331

preparing 68:16
prescriber 46:17
prescribing 43:23
prescription 43:10
presence 54:23
present 13:12
pretty 14:7
prevent 48:6,20
previous 53:20
previously 44:16
primarily 23:5
print 63:16
prior 9:22 71:14
prisoner 54:23 55:3,15
privilege 14:15 23:20 27:10
privileged 10:17 14:23 23:23 24:4
probably 15:4 22:9,10 57:18
problem 32:25 50:11 59:24 60:21 61:23 62:5
procedures 41:2 65:18
PROCEEDIN... 43:19
process 24:16,18 41:20 42:24 53:12
produce 6:16 7:4 7:7,10 8:2 14:20 63:6,7,16
produced 3:10 5:13 6:17 8:6 9:8 17:3,8 30:13,15 38:19 39:10 47:17,18 50:23,25
producing 6:25 16:20
product 30:23

35:24
production 9:15 16:23 19:13,14 58:7
productions 17:20
professional 3:15 5:5 25:15 70:5
progress 48:5,19 50:1
proper 8:9 27:9
properly 12:2
Propofol 42:17 43:15 44:3,6
proposal 13:11
protected 11:11 58:24 60:23 61:4 63:8
protection 9:19 59:23 63:5
protections 65:16,20
protective 9:19 15:24 16:2,3,7 16:10 59:11,22 65:6 67:7,11
protocol 7:1 10:5 10:8,10,14 11:4 11:5,6 12:10,13 13:5,5,7,9 19:19,23 20:6 42:17 43:4 56:7 58:6 62:3,7 63:6,6 64:11,12 64:20,21,22
protocols 8:20 9:14 10:21,25 11:1 20:4 53:20 64:5
provide 6:21 39:6 59:12 67:12
provided 9:13 16:10 34:20 38:9 39:21 43:14 44:2,5,8 66:22 68:11

providing 23:15
provision 54:15 55:1 60:12
pseudonyms 46:6
psychiatrist 40:12
psychologist 38:4 41:9
public 20:7 25:2 25:19 26:7,15 27:5 64:19 71:12 73:23
punishment 42:2
purchased 21:25
pure 27:25 33:10 37:20
purpose 42:2
purposely 24:23
purposes 60:15
pursuant 59:2 65:5
put 11:19 41:2
P.M 5:15 63:25 69:2

_____
**Q**
quantity 21:13 32:7 36:14
question 5:23 26:23 27:4,20 29:16 37:12
questions 34:11 46:5 56:4 58:3
quick 16:18
quickly 63:12

_____
**R**
R 4:1
reach 29:14 68:19
reached 29:12
read 19:8 30:8 32:3,13,16,18 32:24 71:10 72:6,10,14,18 72:22 73:6

reading 28:18
real 16:5
realize 51:19
realized 11:20 39:4
really 5:23 9:4 13:3,7,20,22 15:3 16:4 35:13 35:18 65:10
reason 40:18,22 41:14,19 49:20 50:3 72:7,11,15 72:19,23
reasons 42:4 55:8
recall 13:21 14:2 18:18,20,23 20:2,11 22:2,3 25:3,8 46:9 49:18 54:4
receive 14:24 15:1
received 19:14 19:15 24:2 39:11
Reception 47:25
recite 30:3
recites 38:7
recollection 67:15
recommendation 41:10 42:9
reconstruct 14:20
recopy 11:23
record 6:11 7:16 8:5,23 12:9,22 14:14 15:19 17:12 18:6,7 19:12 28:14 30:3,12,20 31:7 43:20 47:9,11 50:16 51:4 52:25 58:6,8,18 59:10 61:2 63:23 64:1,2 65:24 66:18 67:4,6 68:6,7,9

69:1
records 7:20,20 58:12
redact 11:14 14:2 63:13
redacted 6:17,25 7:17,19 11:15 12:5 14:25 58:13,13,14
redacting 14:5
redaction 14:15 14:23
redactions 7:11 12:1 13:24
reduced 70:9
refer 39:12
referenced 9:14 49:22
references 16:19
referencing 22:23 39:15
referred 10:4 25:5 31:12
referring 64:4,8
reflects 61:5
regard 24:14,17 50:25
registered 3:15 5:4 45:17 70:5
regular 57:9
relate 6:19 17:3 32:19 33:24
related 10:23 11:11 68:21 70:11
relating 38:9
relative 70:13
relatively 63:12
releases 34:23
relevance 16:5 25:23 26:1,19
relevant 35:5 61:14
relied 41:8 49:18
rely 32:24 37:10 37:16 60:11
remember 39:24

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 295 of 331

40:1 53:14 54:9
54:12 66:4 67:9
67:24
**remote** 55:23
**removed** 11:7
12:12
**render** 73:9
**repeat** 25:22
**rephrase** 6:1
**report** 2:17 46:13
**reporter** 3:15,15
3:16 4:16 5:5,5
5:6 9:6 70:1,5,6
70:18
**reporters** 68:16
**representation**
24:4
**represented**
46:21
**reproduce** 6:16
**reproduced** 8:9
**request** 16:22
49:16 65:18
**requests** 17:14
17:17,20 53:8
53:25
**reserved** 5:8
**respect** 59:3
**responding**
17:19
**response** 8:4 9:15
17:12 42:22
**responses** 2:18
18:11,14
**result** 41:25
**results** 32:6,18
33:24 34:12
35:16
**return** 71:13
**returned** 56:17
56:21
**reveal** 35:11
**review** 9:22 13:2
13:4,6 15:7
23:8 38:12 58:4
61:16
**reviewed** 38:8

61:10
**reviewing** 39:24
**right** 12:17 21:12
21:17 27:6 41:3
51:7 52:19
59:22 60:4
62:10,22 65:9
65:14 67:20
68:24
**right-hand** 52:5
**ring** 14:2
**room** 48:4 50:18
**RPR** 4:17 71:17
**Russell** 47:24
57:21,22

_____
**S**

**S** 4:1
**safety** 11:12
24:11,20 60:15
**sample** 32:19
33:24,25 34:2,6
34:8
**sanctions** 8:16
**Sasich** 2:12,13
28:4,16 33:5
**sat** 10:18
**saw** 13:9 18:21
18:24
**saying** 6:23 9:15
15:14 21:16
35:3 61:15,20
67:21
**says** 5:14 21:10
29:20,22 30:22
32:11,18,21,23
33:23 36:12
37:8,14 40:17
41:17,24 56:20
56:21 67:12
68:11
**scanned** 66:15
**scheduled** 40:19
40:23 41:14,18
**second** 2:13
19:17
**secrecy** 23:16

**secret** 23:20
**secretary** 58:15
63:13
**secrets** 6:19
23:11 27:10
**section** 34:14
41:23,23
**security** 10:23,23
11:12 55:8,11
60:15
**sedative** 53:7
54:1
**sedatives** 53:19
**see** 11:17 13:13
18:16 20:7
27:23 28:1
56:13 68:3
**seek** 16:7
**seeking** 16:24
**seen** 20:1,10
28:11,12,24
29:25 30:7,16
57:23
**sell** 25:20 26:8
**send** 37:3
**sends** 36:22
**sense** 36:6,7 37:3
**sensitive** 13:12
13:20
**sent** 6:13,22
**sentence** 42:4
**separate** 46:17
46:23
**separated** 10:24
**SERVICES** 4:18
71:1
**set** 6:25 11:16,20
16:5 18:4 30:14
39:10 55:14
61:16 65:18
66:1
**share** 48:23
**shared** 49:6 66:8
66:9
**SHEET** 72:1
**sheets** 71:9,11,13
**shorten** 16:25

**shorthand** 3:15
5:4,5
**show** 17:25 18:25
22:20 28:9
29:24 33:18
37:23 38:16
51:18,22,23
**showed** 11:13
13:20 64:11
**sic** 38:19 65:6
**sign** 18:10 22:25
58:4 71:11
**signature** 5:8
71:9,11,13
72:25
**signatures** 56:15
**signed** 65:15
**similar** 62:24
**similarly** 31:19
**simply** 35:16
61:9
**Sincerely** 71:15
**sit** 51:5
**situation** 55:11
**skipped** 39:3
**small** 62:16
**smaller** 59:17
**Smulls** 21:21
28:6
**Smulls's** 29:9
**sodium** 31:17,24
**Sol** 31:24
**solid** 55:15
**somewhat** 26:13
26:20 47:17
**soon** 8:1
**sooner** 8:16 17:8
**sorry** 19:25
25:24 32:13
38:17 39:1
40:21 43:18
44:4 56:18 61:6
**sort** 6:4 46:4
67:24
**sorts** 62:8
**sound** 42:5
**speak** 35:9 49:3

**speaks** 29:16,18
31:5
**specific** 20:11
60:3 61:18,18
62:13,17,20
**specifically** 16:8
17:3 21:20 40:8
49:2 56:8
**spent** 12:4
**SPILLANE** 4:11
35:9,20 59:16
60:1,5,17 61:24
62:10,16 67:15
68:1
**spoke** 49:6,10,11
**ss** 70:2
**St** 4:19 70:3
**staff** 55:5 57:6,7
57:9 68:13
**stamp** 10:1,2
12:3 39:7,16,20
**stamps** 11:22
**standard** 41:16
**start** 16:16,17
**started** 5:15 6:8
34:12
**state** 6:19 14:13
15:19 19:24
23:11,20 27:10
28:14 30:11
50:13 64:2 70:2
70:19 73:1
**stated** 59:9
**statement** 42:16
**States** 1:1 3:1,17
**status** 8:18
**statute** 23:15,21
41:23
**Statutes** 23:15
**statutory** 44:11
44:24
**stay** 48:4,10,18
49:15,16,25
50:10
**sterile** 28:1 33:10
37:21
**STIPULATED**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 296 of 331

5:1
**Street** 4:5,12,18
71:4
**stuff** 62:20
**subject** 23:4
**subjective** 63:2
**subscribe** 73:11
**subsection** 19:18
19:21 20:13,14
20:15 21:10
**subsequent**
67:12,22
**substance** 73:8
**Sue** 6:8
**sufficient** 21:13
**suggest** 16:8
**Sunshine** 34:21
**Supplemental**
2:11,13 28:15
**supplied** 36:2,4
37:19
**supplier** 32:7
**suppliers** 44:15
**supplies** 22:18
43:9
**supply** 35:24
**support** 68:13
**sure** 12:1 26:5,23
32:22 45:1
52:20 55:24
56:11 57:8 58:9
60:6 64:7 66:12
67:5
**SUSAN** 4:10
71:3
**suspect** 7:14
**Sutton** 38:9
39:21 41:6
**sworn** 3:10 5:13
70:8
**S-Pentobarbital**
31:24

**T**
**take** 10:13 11:20
11:23 12:6
15:15,22 24:15

29:2 30:19 40:3
41:9 45:5 51:21
55:21 58:6
59:13
**taken** 1:14 5:3,19
15:10 70:9,12
71:8 72:3
**talk** 35:16
**talked** 6:9 58:7
**talking** 8:18 31:8
31:9 34:12
44:25 60:7
64:25
**talks** 60:2
**TAYLOR** 4:3
**team** 6:20 15:5
23:6 24:12
25:12 43:1,6,11
43:23 44:3,12
44:20
**tell** 5:25 7:13
18:2 21:17
30:20 34:5
37:24 49:19
52:5,10 57:14
**telling** 27:11
**tells** 50:13
**ten** 7:7 8:10
**term** 8:19
**terms** 24:19
33:24 64:17
**Terre** 55:14
**Terry** 47:24
**test** 32:6 36:10
36:23 37:4
**tested** 32:19
33:13,25 34:1,2
34:6 35:25
**testified** 22:7
**testifying** 21:17
**testimony** 35:4,5
70:7,8
**testing** 34:12
36:13 43:21
**tests** 36:14
**text** 18:14,16
**thank** 6:2,6

38:24 52:23
65:23 67:4
**thereon** 73:10
**thereto** 70:14
**thing** 7:16,17
15:21 16:18
31:9 63:3
**things** 10:24 11:9
11:13 12:19
46:5 58:10,14
61:19 62:8
65:13
**think** 5:21 6:4
10:19,20 12:20
13:17 14:6,9
15:3,20 16:1,2
25:5 26:11,14
30:24 37:4,13
49:21 50:21
54:18 55:6,22
56:20 59:16,17
59:19,21 60:13
61:6,7,17,25
62:1,15,16,18
62:19 64:14,15
64:16,16,22,23
66:11 67:1,18
68:1,2
**thinking** 66:15
**Thiopental** 44:9
62:7
**third** 2:11 28:15
40:9
**thought** 13:12,20
13:24 14:4
38:22 39:1
59:24 62:18
**thousands** 18:22
**threat** 24:11
**threatened** 24:16
**three** 9:13 10:25
65:2,11
**time** 7:3 9:22
10:18 11:19
13:2,6 14:11,12
14:22 15:17
16:25 17:22

33:19 38:15
49:13 50:16
54:12 57:13
61:14
**times** 5:19
**tiny** 62:21
**title** 30:21 46:10
**today** 6:24 7:5,23
12:16 13:15,15
14:18,21 47:18
58:17,21 63:17
**told** 6:20 7:6,8
11:25 13:14
36:22 50:10
**top** 47:22
**totally** 49:18
61:16
**town** 14:18
**track** 60:8
**transcribed** 5:7
**transcript** 71:11
**transcripts** 68:16
**treat** 61:22
**treated** 58:24
**treating** 15:24
**trial** 71:14
**tries** 35:15
**triplicate** 51:21
**true** 24:25 36:5
73:9,13
**try** 11:23 35:7
**trying** 5:23 31:6
52:20 66:4
**turned** 11:16
**turning** 40:16
**two** 6:15 8:7 9:23
10:19 11:1,2
12:19 15:6 32:1
33:5,6,8 49:21
49:22 50:6 52:2
52:10 56:4
58:10,14 63:14
65:2
**typewriting** 5:7
70:10

**U**

**Uh-huh** 5:20
29:6 42:19
45:20
**unaware** 40:20
40:21,22 41:14
**uncomfortable**
64:4
**understand** 6:4
15:22 27:3
29:21 32:25
42:1 64:18
66:13
**understanding**
34:8 38:5
**Understood**
67:23
**undertook** 13:17
**unequivocally**
57:15
**UNGER** 4:4
71:13
**United** 1:1 3:1,17
**unlawful** 26:24
**unredact** 7:4
**unwilling** 59:12
**upcoming** 33:9
38:5
**upper** 30:24 31:2
**use** 19:7,20 20:16
21:3,5,6,9,18
21:20 26:23
27:10,24 29:12
29:14 42:12
46:2 51:19 53:3
**USP** 31:17
**usually** 53:24

**V**
**vague** 26:22
**variation** 53:22
**vary** 54:10
**Versed** 53:4 56:7
**version** 62:2,6
**view** 25:14 27:10
**visiting** 54:23
**visitor** 55:16,18
**visitors** 54:22

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:12-cv-04209-BP    Document 353    Filed 02/18/14    Page 297 of 331

vitae 33:18
vs 1:6 3:6,19 71:5
  72:2

**W**

W 4:12 71:4
wait 8:10 13:15
waived 17:22
want 8:12,14
  10:15 11:8
  12:21 14:11
  15:12,22 16:7
  16:18 26:16
  32:20 34:25
  35:2,17,19
  51:22 59:24
  60:10 61:1,20
  61:24
wanted 10:13
  14:1 15:18 67:3
wants 41:18
warden 47:24
  57:20
warranty 32:9
  37:9,15
wasn't 22:8
  50:11 62:14
way 19:11 20:3
  20:14 25:13
Wednesday 6:15
  7:2 9:9 12:25
  15:7,15 22:8
  47:17 66:1,24
week 14:22 16:15
weeks 8:8
went 11:9,24
  12:9,11 13:18
  49:1
weren't 44:21
  61:9
Western 1:1 3:1
  3:17
we'll 31:8 32:2
  38:17 63:22
  67:18
we're 8:3,17,19
  15:16 31:8

34:24 35:1
39:15 52:17
58:5,16 59:12
61:15 63:6,7,23
64:24 68:25
we've 5:21 12:3
  15:20 16:11
  24:22,23 46:5
willing 13:15
  24:15 37:16
  63:19 67:2
wish 56:14
withdrawing
  42:16
withdrawn 8:7
witness 5:8 6:8
  25:24 26:3 27:2
  27:5,19 29:17
  33:2 43:16 51:7
  52:22 58:2 70:7
  70:8 71:10 72:1
  72:25
witnesses 68:17
wondering 50:22
  56:6 68:8
word 19:20
  26:24 45:1
  54:21
work 63:23
  68:19
worked 7:1 8:20
  10:18
working 6:25
wouldn't 49:24
  50:11
writing 68:14
wrote 40:13 43:9

**X**

X 2:1

**Y**

yeah 54:9 59:23
  63:1,22 66:10
  66:14,16 67:20
years 25:2 54:10
Yep 32:5

yesterday 6:22
  6:24 14:19 61:7

**Z**

Zink 1:4 3:4,18
  4:3 18:4 22:23
  71:5 72:2

**1**

1 2:9 5:9 9:12
  12:25 19:1 25:2
  32:12
1.5794 31:1
1:09 5:15
10 2:19 36:9,11
  36:13,13 47:15
10th 17:6 19:15
  30:13,15 39:11
  39:13
101 60:2,6,7,10
  60:11 61:8 65:5
11 2:20 9:11
  12:24 13:2
  51:18 52:3,6,17
  56:5,6
11/14/2013 2:14
11/15/2013 2:16
11/20/2013 2:20
11:00 9:10
11:15 47:23 48:9
  48:10
110 9:20 59:5,14
  59:15,17
112 9:20 59:5,15
  59:16,17 60:7
  60:17,18,21
  61:21,22 63:8
  65:8,9,14 67:22
  68:1,11
1182 40:2
1184 40:3,4,5,6
12 2:21 5:9 51:18
  52:4,8,17 56:5
  56:6
12/10/2013 2:15
12/11/2013 2:21
13-3699 28:17,19

30:5
15 63:15
15th 6:15 47:18
16th 6:23
17 1:15 3:11 71:8
  72:3
17th 47:19
18 2:18
19 2:9

**2**

2 2:10 22:21 29:4
  32:12 43:2
2:12-CV-4209-...
  1:6 3:6
2:41 63:25
2:46 69:2
20 71:2 73:15
20th 17:5
2013 17:5,6 23:2
  28:19 30:4 65:7
  65:15
2014 1:15 3:11
  18:12 38:20
  71:2,8 72:3
2023 52:9,20
207 4:12 71:4
22 2:10
220 13:1
2246 20:19
2247 19:18 20:15
2248 19:16
23rd 65:15
2405 10:2
2652 47:22
2687 10:3
27th 18:19
2729 3:13
28 2:11
280-3376 4:20
29 2:13

**3**

3 2:11 27:23
  28:10,15
30 2:14,15 36:9
  36:10

31st 28:19 30:4
  65:7
314 4:19
37 2:16
38 2:17

**4**

4 2:13 27:23
  29:25
47 2:19

**5**

5 2:4,14 23:2
  30:11,12,19,22
  32:2 37:14
50mg/mL 31:24
52 2:20,21 47:19
525-6540 4:6
552.060.1 41:23
573 4:13

**6**

6 2:15 30:11,14
  31:19 32:11
  33:23
6011 4:5
63101 4:19
64113 4:5
644-2191 4:19
65101 4:13 71:4
65102 3:14

**7**

7 2:16 37:24
  38:18,25 39:3,7
  39:9 40:17
  68:10
7th 18:12
711 4:18
722 52:7,22
751-3321 4:13

**8**

8 2:17 10:5 11:4
  12:11 38:16,17
  39:2,19,20
8th 28:17 30:5
  49:17

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 298 of 331

**800** 4:20
**816** 4:6

---

**9**

**9** 2:18 10:11 18:1
  42:21
**9th** 38:19,19
  39:11

# EXHIBIT I





**Listen Live** ›                                                                              On Air Schedule     Programs A-Z     Donate

NPR Story
**SIU Names Randy Dunn President**

Winter Olympics
**How Many St. Louis-Born Athletes In The Winter Olympics, Ever? Just 11**

Gaslight Cabaret Festival
**Acclaimed Tom Waits Singer And Locals Ken Page, Tim Schall Kick Off Cabaret Festival**

**Death Penalty**                                                    9:58 PM SUN FEBRUARY 2, 2014

# After Supplying For Three Missouri Executions, Pharmacy Plans To Register In State

By CHRIS MCDANIEL (//PEOPLE/.DANAINFO=NEWS.STLPUBLICRADIO.ORG+CHRIS-MCDANIEL)

An Oklahoma compounding pharmacy has supplied Missouri with the drug it's used three times to execute inmates, despite the fact that the pharmacy isn't licensed here.

Now the Apothecary Shoppe is attempting to become licensed in Missouri.

According to records obtained by St. Louis Public Radio, the Oklahoma Board of Pharmacy received a letter from the Apothecary Shoppe on Jan. 13, when the pharmacy said it was planning on registering in both Missouri and Texas.

Last summer, the Apothecary Shoppe also offered to supply the execution drug to Louisiana. The pharmacy is not licensed there as well.


(https://v.pnwest.fd.org/p/kwmu/files/201401/.DanaInfo=mediad.publicbroadcasting.net+Pentobarbital.jpg)
(https://v.pnwest.fd.org/p/kwmu/files/201401/.DanaInfo=mediad.publicbroadcasting.net+Pentobarbital.jpg)
Enlarge image
*Credit via Flickr/Nottingham Vet School*

Compounding pharmacies are not regulated by the Food and Drug Administration, like drug manufacturers are. Instead, that responsibility is left to individual state boards of pharmacy. The drugs made by compounding pharmacies also have a significantly higher failure rate than those of manufactured drugs.

The pharmacy supplying Missouri with its execution drug has been criticized for several reasons: 1) for supplying to a state where it isn't licensed; 2) for making a drug that is essentially a copy of a manufactured drug (not allowed for compounding pharmacies); and 3) for relying on a controversial testing laboratory to verify the drug's effectiveness.

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 301 of 331

**Apothecary Shoppe Letter**

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

**Explore This Document In Full-Screen**

~~Mode (https://www.fd.org/documents/?DanaInfo=apps.api.document.html?~~

In a statement, the American Civil Liberties Union of Missouri said it would be a "positive step" for the Apothecary Shoppe to become licensed in Missouri.

"It would be an improvement from the legally questionable procedure of handing over a controlled substance to an individual who is not the patient or a medical professional to secretly courier the drug into Missouri," legal director Tony Rothert said. "It might allow the public to finally learn whether we can trust the quality of the drugs Missouri is using."

Missouri has pointed to an anonymous testing lab's reports to argue that the drug is potent and pure. The lab is Analytical Research Laboratories in Oklahoma City, OK; it had approved a batch of steroids for commercial use that ended up killing dozens in 2012. The deaths were an impetus behind recent congressional action on the regulatory practices for compounding pharmacies.

The Apothecary Shoppe has been cited in the past as well: one disciplinary action in 2006 and several warnings from the Oklahoma Board of Pharmacy.

The warnings are for a few different deficiencies, one of which is creating a drug that is essentially a copy of an FDA-approved drug.

<u>**FINAL ORDER**</u>

1.     Clear and convincing evidence establishes that Respondent Deril J. Lees is guilty on Counts I and II and Respondent The Apothecary Shoppe-Tulsa is guilty on Count III.

2.     Respondent Deril J. Lees is hereby ordered to pay a fine of one thousand dollars ($1000.00) for each count for a total fine of three thousand dollars ($3000.00).

3.     Respondent Deril J. Lees is further ordered to attend an approved one-day law seminar in the year 2006 over and above the fifteen (15) hours of continued education required for that year.

(https://vpnwest.fd.org/p/kwmu/files2014/02/4?DanaInfo=media.publicbroadcasting.net+Screen_Shot_2014-
Enlarge image (https://vpnwest.fd.org/p/kwmu/files/201402/,DanaInfo=media.publicbroadcasting.net+Screen_Shot_2014-02-
02_at_11.57.50_AM.png)

The board took disciplinary action in 2006, finding head pharmacist and owner Deril

Lees guilty of increasing the quantity of drugs dispensed. According to the Board of Pharmacy, "The staff pharmacists were also instructed to shred the original prescriptions."

In court filings over the past few months, Missouri has argued that the identity of the supplier must be kept secret. The Department of Corrections changed the protocol to hide the identity, a move Gov. Jay Nixon and Attorney General Chris Koster both supported.

The state has argued that if the Apothecary Shoppe's identity got out, the pharmacy wouldn't want to supply for executions anymore. The Apothecary Shoppe did not respond to a request for comment on whether or not they intend to continue.

Missouri's next execution is scheduled for Feb. 26.

*Follow Chris McDaniel on Twitter*: @csmcdaniel (https://vpnwest.fd.org/.DanaInfo=twitter.com+csmcdaniel)

**Apothecary Shoppe Disciplinary Action**

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

**Explore This Document In Full-Screen**

~~Mode(https://vpnwest.fd.org/documents/.DanaInfo=apps.smt document.html?~~

TAGS:   death penalty (/term/.DanaInfo=news.stlpublicradio.org+death-penalty)    the Apothecary Shoppe (/term/.DanaInfo=news.stlpublicradio.org+apothecary-shoppe)

## Related Content:



**Death Penalty**

Missouri Carries Out Execution After U.S. Supreme Court Removes Stays



**Death Penalty**

Three Missouri Offices Are Responsible For Controversial Execution Plans



**BEFORE THE STATE BOARD OF PHARMACY**
**STATE OF OKLAHOMA**

IN THE MATTER OF THE     )
COMPLAINT AGAINST:     )
                                 )
Deril J. Lees, D.Ph. #9635;     )     Case No. 779
The Apothecary Shoppe -Tulsa (2-4226)  )
3707 E. 51st St.     )
Tulsa, OK 74135     )

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER

This matter came for hearing on March 8, 2006, before the Oklahoma State Board of Pharmacy ("Board"). Board members Osborn, Richards, Spoon, Lassiter, Gourley and Hampton were present. President Osborn presided. Brinda K. White, Assistant Attorney General, served as prosecutor for the Board. Respondent Deril J. Lees appeared without counsel.

The Complaint in this matter is incorporated into this order by reference.

The Board hereby issues these Findings of Fact, Conclusions of Law and Final Order.

## FINDINGS OF FACT

1.     Respondent Deril J. Lees is a licensed pharmacist and owns and holds a pharmacy license for Respondent The Apothecary Shoppe - Tulsa in Tulsa, OK.

2.     Respondent Lees is the pharmacy manager for Respondent The Apothecary Shoppe - Tulsa.

3.     Respondent Lees established a policy instructing the staff pharmacists to increase the quantity dispensed on Promethazine and Tetracaine prescriptions for patients with certain insurance coverage without obtaining authorization from the prescribing physician. The staff pharmacists were also instructed to shred the original prescriptions.

1

4.    RX 185220, the original hard copy of the prescription, was prescribed for patient MW by Dr. Melita Tate for tetracaine lollipop with a quantity of two. RX185219, the telephone-order prescription for the same patient, showed the quantity of the tetracaine increased to ten.

5.    RX185282, the original hard copy of the prescription, was prescribed for patient RY by Dr. Melita Tate for tetracaine lollipop with a quantity of four. The prescription label shows that it was filled for a quantity of ten without authorization by the physician.

6.    RX185529, the original hard copy of the prescription, was prescribed for patient DW by Dr. Anthony Loehr for tetracaine sucker with a quantity of four. The prescription label shows that it was filled for a quantity of eight without authorization by the physician.

7.    Additional prescriptions were filled with an increased quantity without documentation of physician authorization for the increase.

8.    Title 59 O.S. § 353.24( 1) provides that it is unlawful to increase the quantity of drugs in any prescription.

9.    Respondent Lees established a policy instructing the staff pharmacists to reward customer loyalty by reducing third party copays.

## CONCLUSIONS OF LAW

1.    The Board has jurisdiction over this matter and over the Respondent pursuant to 59 O.S.Supp.2005, §§ 353.7 and 353.26.

2.    Any Finding of Fact which is properly a Conclusion of Law is hereby incorporated by reference and vice versa.

3.    Respondent Deril J. Lees has violated 59 O.S. § 353.26(A)(1)(h) by exercising conduct and habits inconsistent with the rules of professional conduct established by the Board, as

2

set forth in Count I of the Complaint.

4.      Respondent Deril J. Lees has violated OAC 535:10-3-1.1(1) by failing to conduct business as a pharmacist in conformity with all federal, state and municipal laws, as set forth in Count II of the Complaint.

5.      Respondent The Apothecary Shoppe-Tulsa has violated OAC 535:15-3-2(b)(1)(A) by failing to have a pharmacy manager who was responsible for all aspects of the operation related to the practice of pharmacy, including the supervision of all employees as they relate to the practice of pharmacy, as set forth in Count III of the Complaint.

6.      Pursuant to 59 O.S.Supp.2005, §353.7(11), the Board has authority to levy fines not to exceed One Thousand Dollars ($1000.00) for each violation, to reprimand, place on probation or suspend or revoke the permit of a registrant who violates any provision of the Oklahoma Pharmacy Act including the Board's rules.

7.      Based on the above Findings of Fact, Respondent is subject to disciplinary action pursuant to 59 O.S.Supp.2005, §§ 353.7 and 353.26.

## FINAL ORDER

1.      Clear and convincing evidence establishes that Respondent Deril J. Lees is guilty on Counts I and II and Respondent The Apothecary Shoppe-Tulsa is guilty on Count III.

2.      Respondent Deril J. Lees is hereby ordered to pay a fine of one thousand dollars ($1000.00) for each count for a total fine of three thousand dollars ($3000.00).

3.      Respondent Deril J. Lees is further ordered to attend an approved one-day law seminar in the year 2006 over and above the fifteen (15) hours of continued education required for that year.

3

4. Respondent Deril J. Lees is directed to view and require all staff pharmacists working for him to view an error correction video.

5. A letter of reprimand shall be placed in Respondent Deril J. Lees's file for one year beginning March 8, 2006.

6. Failure of Respondent Deril J. Lees to abide by any of the terms of this Order could result in suspension or revocation of his license or in any other disciplinary action allowed by the Oklahoma Pharmacy Act and the Board's rules.

All participating members vote "Aye".

Bryan Potter, Executive Director
Oklahoma State Board of Pharmacy

State of Oklahoma )
) ss.
County of Oklahoma )

Subscribed and sworn before me on this the 13th day of March, 2006.

RHONDA JENKINS
Cleveland County
Notary Public in and for
State of Oklahoma
Commission # 00003283 Expires 3/18/08

Notary Public

4

# OKLAHOMA STATE BOARD OF PHARMACY

4545 Lincoln Blvd, Ste 112, Oklahoma City, OK 73105-3413
Phone: 405-521-3815 / Fax: 405-521-3758

## WARNING NOTICE  (ISSUED TO PHARMACY)

Date: 16 FEB 2012      Time: 12:50 PM      Lic. No.: 2-5497

Name of Pharmacy (as shown on license):

THE APOTHECARY SHOPPE

6136 E 51ST STREET , TULSA , OK 74135
(number and street)           (city)           (zip)

DERIL JAMES LEES, JR   PIC/MANAGER , 14294
(name of person responsible for violation)           (reg. no.)

Notice is hereby given that you are not complying with the laws and/or rules and
the regulations and/or policies pertaining to the practice of pharmacy as follows:

VIOLATION OF OAC 535:15-10-12 Compounding for a prescriber's

office use(c)THE PREPARATION IS TO BE ADMINISTERED IN THE
OFFICE AND NOT DISPENSED TO THE PATIENT. THE PREPARATION
LABEL SHOULD STATE "FOR OFFICE USE ONLY-NOT FOR RESALE"

VIOLATION OF OAC 535:15-10-8 Drug Compounding Controls

(h) General Requirements: (1) Compounding a drug product
that is commercially available in the marketplace or that
is essentially a copy of an available FDA-approved drug
is generally prohibited unless patient therapy is
compromised

**#26068 for RECORD KEEPING**
COMPOUNDED PREPARATION FLUOROURACIL 5% EM CR 5GM SOLD TO
TULSA DERMATOLOGY CLINIC on 01/03/2012   The COMPOUNDED
PRODUCT WAS SOLD TO THE CLINIC AS A 240GM SIZE ZIPLOCK
BAGGY CONTAINING#48 5GM TUBES. THE LABEL ON THE ZIPLOCK
BAG DID NOT CONTAIN THE REQUIRED -NOT FOR RESALE-LANGUAGE
Additionally, THE 5GM TUBES INSIDE THE BAG DID NOT CARRY
ANY LANGUAGE STATING "FOR OFFICE USE ONLY-NOT FOR RESALE"
FLUOROURACIL 5% CREAM IS COMMERCIALLY AVAILABLE

The above violation(s) may be used as the basis for reprimand, probation,
revocation and/or suspension of your license.  You have 10 days to show
compliance by correcting the noted violation(s) and reporting such corrections to
the Board **IN WRITING.**

Issued By: _____
(Inspector/Compliance Officer)
BETTY J BELL, D.Ph.

I hereby acknowledge that the law, regulations and/or policy on which the above
warning notice was issued has been explained to me and that I have a copy of
this notice.

_____        2/16/12
(Signature)                        (Date)

(Original to Board, Copy to Licensee)

# The Apothecary Shoppe
## COMPOUNDING PHARMACY

6136 E 51st Street
Tulsa, OK 74135
(918) 665-2003

RECEIVED

FEB 23 2012

OK STATE BOARD
OF PHARMACY

February 21, 2012

Oklahoma State Board of Pharmacy
Attn: John Foust, Pharm.D., Executive Director
4545 Lincoln Blvd, Ste 112
Oklahoma City, OK 73105-3413

Dr. Foust,

This letter is in response to the warning notice issued by Inspector Betty Beil on 02/16/2012. I understand the law that governs this type of practice and we have not knowingly engaged in the selling of office use prescriptions that are sold or dispensed out of Doctors' offices for profit. We received a prior warning notice dated 01/25/12, and my position has not changed. I consider the first warning to be as one and the same as this "violation" seeing as the last time the "offending prescription" was dispensed was prior to my clarification of the law "Not for Resale" be stated. Prior to Inspector Beil's initial visit, we have dispensed compounded prescriptions to clinics labeled "For Office Use Only". Inspector Beil informed us that the statement "Not for Resale" is also required. We have taken corrective measures to ensure this violation does not occur again.

The second issue on this warning notice that this prescription of Fluorouracil 5% compounded into an emollient cream base is a copy of a commercially available product, however that claim is not valid. The doctors at this clinic have asked us to compound this cream using an emollient base due to the nature of the skin that this medication be applied, being that this base will provide a comedogenic effect. It is incorrect to state that a commercially available product could be substituted. Patient therapy would be compromised if the commercial product were dispensed.

The third and final issue on this warning notice that the individual tubes contained within the prescription "baggie" were not individually labeled with "For Office Use Only-Not for Resale" is an issue that we are working to correct. The prescription was dispensed with an appropriate "For Office Use Only" label on the delivered contents, due to us not being aware at the time of dispensing "Not For Resale" was left off. We will make corrections that individually packaged products independent of our

Page | 1



6136 E 51st Street
Tulsa, OK 74135
(918) 665-2003

prescription label will contain "For Office Use Only-Not For Resale" on each label. These packages are broken down to make it easy to have the product in each exam room.

We are not engaged in this type of practice and have been approached by several groups of physicians to compound medications for resale in their offices and to copy manufactured products for less cost, and we always decline. It is my viewpoint that prescriptions should be dispensed by the pharmacy to the patient and this clinic has obliged. In regards to the above referenced violation, the preparation was dispensed in the requested dispensing device so it may be easily used for administration prior to various procedures.

Professionally,

Deril J Lees Jr., Pharm.D. PIC. State License 14294

Case 2:12-cv-04209-BP   Document 353   Filed 02/18/14   Page 311 of 331

**OKLAHOMA STATE BOARD OF PHARMACY**
4545 Lincoln Blvd, Ste 112, Oklahoma City, OK 73105-3413
Phone: 405-521-3815 / Fax: 405-521-3758

## WARNING NOTICE

ISSUED TO PHARMACY

Date: 25 JAN 2012    Time: 11:00AM    Lic. No.: 2-5497

Name of Pharmacy (as shown on license):

THE APOTHECARY SHOPPE

6136 E 51st STREET , TULSA , OK 74135
(number and street)        (city)        (zip)

DERIL JAMES LEES, Jr , 14294
(name of person responsible for violation)        (reg. no.)

Notice is hereby given that you are not complying with the laws and/or rules and the regulations and/or policies pertaining to the practice of pharmacy as follows:

VIOLATION OF OAC 535:15-10-12. Compounding for a
prescriber's office use(c) THE PREPARATION IS TO BE
ADMINISTERED IN THE OFFICE AND NOT DISPENSED TO THE
PATIENT. THE PREPARATION LABEL SHOULD STATE "FOR OFFICE
USE ONLY-NOT FOR RESALE."
                    20. 10.  4%
COMPOUNDED PREPARATION BENZO.LIDO.TETRA CREAM SOLD TO
DR JEFF ALEXANDER, M.D., DERMATOLOGIST LOCATED AT
6565 S YALE IN TULSA, OKLAHOMA. THE COMPOUNDED PRODUCT,
CONTAINED PRESCRIPTION ONLY INGREDIENTS, WAS PURCHASED
BY A PATIENT FOR SELF-ADMINISTRATION. THE LABEL DID NOT
CONTAIN THE REQUIRED "FOR OFFICE USE ONLY-NOT FOR RESALE"
LANGUAGE ON THE PREPARATION"S LABEL IN VIOALTION OF
ABOVE.[LotNo. 09272010 BUD 03/26/2011]

The above violation(s) may be used as the basis for reprimand, probation, revocation and/or suspension of your license.  You have 10 days to show compliance by correcting the noted violation(s) and reporting such corrections to the Board **IN WRITING**.

Issued By: _____
(Inspector/Compliance Officer)
Betty J. Beil, D.Ph.

I hereby acknowledge that the law, regulations and/or policy on which the above warning notice was issued has been explained to me and that I have a copy of this notice.

_____ 14294 _____ 1/25/12
(Signature)        (Date)

(Original to Board, Copy to Licensee)

# The Apothecary Shoppe
## COMPOUNDING PHARMACY

6136 E 51st Street
Tulsa, OK 74135
(918) 665-2003

RECEIVED

JAN 3 0 2012

OK STATE BOARD
OF PHARMACY

January 27, 2012

Oklahoma State Board of Pharmacy
Attn: John Foust, Pharm.D., Executive Director
4545 Lincoln Blvd, Ste 112
Oklahoma City, OK 73105-3413

Dr. Foust,

This letter is in response to the warning notice issued by Inspector Betty Beil on 01/25/2012. I understand the law that governs this type of practice and we have not knowingly engaged in selling office use prescriptions to be sold or dispensed out of Doctors offices for profit. Prior to Inspector Beil's visit, we have dispensed compounded prescriptions to clinics labeled "For Office Use Only". Inspector Beil informed us that the statement "Not for Resale" is also required. We have taken corrective measures to ensure this violation does not occur again.

Further, we were not aware that physicians were reselling office use products dispensed by our pharmacy. In addition to updating our prescription label, we are communicating with all of the doctor's offices that we supply compounded prescriptions to, and we are ensuring the physicians are aware of this law.

We are not engaged in this type of practice and have been approached by several groups of physicians to compound medications for resale in their offices, and we always decline. It is my viewpoint that prescriptions should be dispensed by the pharmacy to the patient. In regards to the above referenced violation, the preparation was dispensed in the requested dispensing device so it may be easily used for administration prior to various procedures.

Professionally,

Deril J Lees Jr., Pharm.D. PIC. State License 14294

# EXHIBIT J

# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

No: 13-3664

David Zink, et al.

Allen L. Nicklasson

Appellant

John C. Middleton, et al.

v.

George A. Lombardi, et al.

Appellees

_____

Appeal from U.S. District Court for the Western District of Missouri - Jefferson City
(2:12-cv-04209-NKL)
_____

## AMENDED ORDER

The petition for rehearing en banc, the petition for rehearing by panel and the motion for stay of execution are denied as moot. Judge Duane Benton did not participate in the consideration or decision of this matter.

BYE, Circuit Judge, with whom KELLY, Circuit Judge, joins, dissenting.

At approximately 10:52 p.m. on December 11, 2013, Missouri executed Allen Nicklasson before this court had completed its review of Nicklasson's request for a stay of his execution, a request he brought in a pending action challenging the constitutionality of Missouri's execution protocol. That bears repeating. Missouri put Nicklasson to death before the federal courts had a final say on whether doing so violated the federal constitution.

Missouri has a well-documented history of attempting to execute death row inmates before the federal courts can determine the constitutionality of the executions. In 1983, Missouri set an execution date for Doyle Williams before the time had run for Williams to petition the Supreme Court for direct review of his conviction and death sentence. Supreme Court Justice Harry Blackmun stayed the execution, specifically advising Missouri that a "defendant must have at least one opportunity to present to the [Supreme Court] his claims that his death sentence has been imposed unconstitutionally." Williams v. Missouri, 463 U.S. 1301, 1301-02 (1983).

Just a few months later, however, Missouri set the execution dates of four death row inmates – Samuel Lee McDonald, Leonard Marvin Laws, Thomas Henry Battle, and George Clifton Gilmore – before the time had run for the filing and disposition of a petition for certiorari on direct review of the men's convictions and death

sentences.   In the order entering a stay of the executions, Justice Blackmun

unequivocally stated that

> [e]very defendant in a state court of this Nation who has a right of direct
> review from a sentence of death, no matter how heinous his offense may
> appear to be, is entitled to have that review before paying the ultimate
> penalty.  The right of review otherwise is rendered utterly meaningless.
> It makes no sense to have the execution set on a date . . . before
> [judicial] review is completed.

McDonald v. Missouri, 464 U.S. 1306, 1307 (1984).

Additionally, Justice Blackmun reminded Missouri of what he said in

Williams:

> I thought I had advised the Supreme Court of Missouri once before, in
> Williams, that, as Circuit Justice of the Circuit in which the State of
> Missouri is located, I, upon proper application, shall stay the execution
> of any Missouri applicant whose direct review of his conviction and
> death sentence is being sought and has not been completed.  I repeat the
> admonition to the Supreme Court of Missouri, and to any official within
> the State's chain of responsibility, that I shall continue that practice.  *The
> stay, of course, ought to be granted by the state tribunal in the first
> instance, but, if it fails to fulfill its responsibility, I shall fulfill mine.*

Id. (emphasis added).

Thirteen months after Justice Blackmun's admonition, Missouri set an

execution date for Walter Junior Blair.  Prior to his execution date, Blair had filed a

petition for writ of habeas corpus in federal district court. Blair then filed a motion

with the Missouri Supreme Court requesting a stay of his execution to give him a

meaningful opportunity to exercise his constitutional right of federal habeas review.

The Missouri Supreme Court nonetheless summarily denied the request for a stay.

A federal district court was thus required to step in and stay the execution. See Blair

v. Armontrout, 604 F. Supp. 723, 723 (W.D. Mo. 1985). In so doing, the court noted

that

> [b]y refusing the petitioner's request for a stay of execution, the Missouri
> Supreme Court has in effect authorized the execution of a condemned
> prisoner without affording him the opportunity to exercise his
> constitutional right of federal habeas corpus review. In so doing, the
> Missouri Supreme Court ignored its responsibility to stay executions
> while federal judicial review is pending.

Id. at 724. The district court reiterated the admonitions Justice Blackmun had given

Missouri in Williams and McDonald, and expressly held "[a] state prisoner sentenced

to death is constitutionally entitled to habeas corpus review," id. at 725, adding that

the principle of comity (i.e., federal courts first affording states the opportunity to

perform their constitutional duties) "will be jeopardized if the Missouri Supreme

Court continues to ignore its well-defined responsibility concerning requests for stays

of execution due to pending federal review. Since the Missouri Supreme Court has

failed to accept its responsibility, I shall accept mine." Id.

Less than a year after Blair, Missouri set January 6, 1986, as the execution date for Gerald M. Smith. At the time, Smith was a death row inmate whose competency was in question based upon his indecision about whether to pursue available state and federal remedies attacking his conviction and death sentence, or abandon his legal proceedings and proceed with his execution. Smith's brother, Eugene Smith, filed a next-friend petition in a Missouri state court seeking a determination of his brother's competency before Missouri proceeded with the execution; Eugene also filed a motion in the Missouri Supreme Court to stay the execution until his brother's competency could be determined. The Missouri Supreme Court summarily denied the request for a stay "in one line and without any explanation." Smith By and Through Smith v. Armontrout, 626 F. Supp. 936, 938 (W.D. Mo. 1986). After Eugene obtained a ruling in the state trial court that his next-friend petition was a valid action under Missouri law, the Missouri Supreme Court postponed the execution for nine days, but ultimately "issued an order which, in effect, stated that the next-friend [proceeding] . . . was a legal nullity and that no further extensions of Gerald Smith's execution date would be granted." Id.

Once again, a Missouri litigant was required to turn to the federal courts to ensure that Missouri complied with constitutional requirements mandated by the United States Supreme Court before carrying out an execution. See Rees v. Peyton,

384 U.S. 312, 313-14 (1966) (explaining the competency procedures which any court of this nation, state or federal, must follow when a death row inmate announces an intention to abandon further appeals and proceed with an execution).  In staying Missouri's execution of Gerald Smith until his competency could be determined, the federal district court stated "it becomes painfully obvious that the Missouri Supreme Court's refusal to stay Gerald Smith's execution pending a competency determination . . . had no basis in fact nor in law, but was merely an expedient way of washing its hands of the matter and passing the buck to the Federal courts." Smith, 626 F. Supp. at 940.  The district court further noted "[t]his is not the first time that the Missouri Supreme Court has passed the buck to the Federal courts by refusing to perform its legal obligation to stay an execution . . . when the law required a stay to permit post-conviction appeals to be heard in an orderly manner," id., and referred to the prior Williams, McDonald, and Blair cases.

    The district court also commented on the necessary and inevitable tension which exists between a state's choice to utilize death as a penalty on one hand, and the safeguards our Founding Fathers saw fit to include in our federal constitution on the other:

> This Court is aware that many members of the public are frustrated with what seems to be inordinate delay in the processing of appeals by death row inmates.  Indeed, many people believe that there should be no appeals whatsoever following the jury's imposition of the death

sentence. *The law, on the other hand, provides that certain procedures must be followed before a death sentence may be carried out.* Although it may not win a popularity contest in any given case, this scheme was adopted to ensure that *every individual would be accorded due process of law.*

<u>Id</u>. at 940 n.3 (emphasis added).

In May 2005, Missouri death row inmate Vernon Brown challenged the three-chemical protocol Missouri used in its executions at the time. Brown was one of the first death row inmates to participate in what subsequently became a multi-state challenge to this three-chemical protocol, incited in large part by the publication of an April 2005 article in the medical journal *The Lancet*. The article analyyzed autopsy toxicology results from forty-nine executions where the three-chemical sequence of sodium pentothal[1] (a sedative), pancuronium bromide (a paralytic), and potassium chloride (a very painful drug which induces a heart attack) was used to carry out the executions. The article's authors essentially concluded that in almost half of the autopsies examined (43%), the amount of sedative used in the executions would have been insufficient to render the inmate unconscious. "In other words, the use of this three-chemical sequence results in a possibility the person to whom it is administered will be conscious when the inherently painful potassium chloride takes effect, yet no one will know because of the paralytic effects of the pancuronium

---

[1]Sodium pentothal is sometimes referred to as thiopental.

bromide." Brown v. Crawford, 408 F.3d 1027, 1028 (8th Cir. 2005) (Bye, J., dissenting). The evidence Brown asked us to consider included the fact that nineteen states had passed laws banning the use of a similar protocol to euthanize animals. Brown alleged Missouri is "using a combination of chemicals they knew or should have known would cause an excruciating death when they were telling the public it was like putting a dog to sleep, when their own veterinarians would lose their licenses for using the same chemicals on a stray." Id. (quoting Brown v. Crawford, No. 4:05-VV-746-CEJ, Motions for Temporary Restraining Order at 19).

The article in *The Lancet* had been published just a month before Brown's execution date. He relied upon it to bring an eleventh-hour challenge to his execution, merely asking Missouri to disclose the level of sodium pentothal it would use in his execution before executing him – hardly an onerous request. In refusing to disclose information about the dosage levels used in its execution protocol, Missouri trumpeted the need to proceed with Brown's execution post haste in order to provide the families of the victims of his crimes with closure. Against my dissent, the Eighth Circuit said Missouri could execute Brown without first disclosing whether its protocol utilized an adequate dosage of sodium pentothal. Brown was strapped to a gurney at 11:30 p.m., and left there for three hours before a divided Supreme Court finally denied his request for a stay and allowed Missouri to proceed with his execution.

Missouri death row inmate Michael Anthony Taylor also challenged Missouri's use of the three-chemical protocol. In more reflective deliberations not burdened by the eleventh-hour nature of Vernon Brown's challenge, the federal courts handling Taylor's suit understandably recognized he, along with other Missouri death row inmates, were entitled to know the dosage levels Missouri used in its execution protocol before Missouri could execute them.

Taylor discovered numerous and significant problems with Missouri's execution protocol, including inconsistencies between the amounts of sodium pentothal Missouri claimed to be using in every execution, and chemical dispensary logs which showed much lower amounts of the sedative actually being used in several executions. See Taylor v. Crawford, No. 05-4173-CV-C-FJG, 2006 WL 1779035, at *3 (W.D. Mo. June 26, 2006). Incredibly, Missouri had not adopted a written protocol for its executions. Even more incredibly, Missouri gave unfettered discretion to an **admittedly dyslexic physician** to implement the state's unwritten protocol, **including the responsibility of correctly mixing the drugs used in executions**. Id. at *4-8. The district court's observations bear repeating here:

> After learning more about how executions are carried out in Missouri, through the interrogatories submitted to the John Doe defendants, reviewing the chemical dispensary logs, reviewing the videotape of the execution chamber and listening to the testimony of John Doe I, and to the testimony of the other expert witnesses at the June 12-13, 2006 hearing, it is apparent that there are numerous problems. For example,

there is no written protocol which describes which drugs will be administered, in what amounts and defines how they will be administered. John Doe I testified that he came up with the current protocol. John Doe I also testified that he felt that he had the authority to change or modify the formula as he saw fit. It is apparent that he has changed and modified the protocol on several occasions in the past. He has reduced the amount of thiopental given from 5.0 grams to 2.5 grams and has also changed the location on the inmate's body where the drugs were administered. It is obvious that the protocol as it currently exists is not carried out consistently and is subject to change at a moment's notice.

The Court is also concerned that John Doe I possesses total discretion for the execution protocol. Currently, there are no checks and balances or oversight, either before, during or after the lethal injection occurs. No one monitors the changes or modifications that John Doe I makes. John Doe I even testified that the Director of the Department of Corrections, Mr. Crawford, has no medical or corrections background, and that he is "totally dependent on me advising him." (John Doe Depo. p. 64).

In addition to the fact that there is no oversight and the responsibility for making changes or adjustments is completely vested in one individual, the Court also has concerns about John Doe I's qualifications. John Doe I readily admitted that he is dyslexic and that he has difficulty with numbers and oftentimes transposes numbers. John Doe I testified "it's not unusual for me to make mistakes. . . . But I am dyslexic and that is the reason why there are inconsistencies in my testimony. That's why there are inconsistencies in what I call drugs. I can make these mistakes, but it's not medically crucial in the type of work I do as a surgeon." (John Doe Depo. p. 25). The Court disagrees and is gravely concerned that a physician who is solely responsible for correctly mixing the drugs which will be responsible for humanely ending the life of condemned inmates has a condition which causes him confusion with regard to numbers. As the Court has learned, the process of mixing the three different drugs and knowing the correct amount of the drugs to dissolve in the correct amount of solution involves precise measurements and the ability to use, decipher, and not confuse numbers. Although John Doe I does not feel this is crucial in the type of work he does as a surgeon, it

is critical when one is mixing and dissolving chemicals for a lethal injection.

In addition, John Doe I testified that although he is not an anesthesiologist, he monitors the anesthetic depth of an inmate by observing the inmate's facial expression. However, as can be seen from the videotape of the execution chamber, when the inmate is lying on the gurney in the execution room, the inmate is facing away from the Operations room where John Doe I is located. Additionally, it is dark in the Operations room and there are blinds on the window which are partially closed and obstruct the view. This would make it almost impossible for John Doe I to observe the inmate's facial expression. This leads the Court to conclude that there is little or no monitoring of the inmate to ensure that he has received an adequate dose of anesthesia before the other two chemicals are administered.

Id. at *7-8. The district court ultimately concluded "Missouri's lethal injection procedure subjects condemned inmates to an unnecessary [and unacceptable] risk that they will be subject to unconstitutional pain and suffering when the lethal injection drugs are administered." Id. at *8. The district court ordered Missouri to prepare a new written protocol for the implementation of lethal injections to ensure compliance with the federal constitution. Id. The Eighth Circuit vacated the injunction entered by the district court to prevent Missouri from proceeding with any executions only after Missouri adopted a detailed written execution protocol, and indicated it would no longer use the services of the dyslexic physician. See Taylor v. Crawford, 487 F.3d 1072, 1077 n.3, 1082-85 (8th Cir. 2007).

II

With this history of Missouri's implementation of the death penalty in mind, I turn to Allen Nicklasson's now-moot challenge to Missouri's more recent, ever-changing execution protocol. Allen Nicklasson was one of a number of Missouri death row inmates who filed suit raising constitutional challenges against an execution protocol Missouri announced on May 15, 2012. The new protocol would utilize just a single drug, propofol, to carry out executions. The inmates filed their lawsuit in Missouri state court, but Missouri's choice to remove it triggered our federal review.

The inmates' challenge to Missouri's execution protocol is no longer about the use of propofol because Missouri has changed the protocol numerous times since May 2012, while still actively scheduling new executions. Joseph Franklin was also one of the death row inmates participating in this constitutional challenge to Missouri's execution protocol. Missouri scheduled, and completed, Franklin's execution on November 20, 2013, notwithstanding the fact it changed the execution protocol no less than five times between August 1, 2013, and November 20, 2103, with the last protocol change occurring just five days before Franklin was executed.

The issues currently involved in this protocol litigation include the fact that Missouri is resorting to secret compounding pharmacies to concoct copycat versions

of the drug pentobarbital to carry out its executions.  Applying <u>Hill v. McDonough</u>,

547 U.S. 573 (2006), the district court presiding over the protocol litigation entered

a stay of Franklin's execution after concluding the inmates showed "a significant

likelihood of success on the merits, a showing of irreparable harm in contrast to

relatively little harm to [Missouri], and no fault in the delay of their current case

pending before this Court."  <u>Zink v. Lombardi</u>, No. 2:12-CV-4209-NKL, 2013 WL

6080358, at *8 (W.D. Mo. Nov. 19, 2013).


With respect to the moving target Missouri kept presenting to the inmates by

constantly changing its execution protocol while still going forward with Franklin's

execution (and now Nicklasson's), the district court said

> [death penalty] litigation is not a game of chess.  <u>Hill</u> was intended to be
> a shield to protect defendants from abusive litigation practices by death row
> inmates.  But it was never intended to be used as a sword permitting
> defendants to disrupt and delay the litigation process and then complain
> that time is up.  Neither the Plaintiffs nor the Court have been able to
> address the merits of Plaintiffs' claim that the Defendants have adopted
> an execution protocol that violates the U.S. Constitution, because the
> Defendants keep changing the protocol that they intend to use.  It would
> be a substantial departure from the way in which law suits are generally
> handled by this Court, to allow Defendants to succeed with this strategy.
> Rather, the pending dispute between the parties should be resolved on
> the merits after a reasonable opportunity for both sides to be heard,
> followed by a prompt, final order resolving the dispute.  That is how it
> is normally done in America and it is a system that has worked quite
> well.

Id. at *6.

I agreed with the district court's analysis and voted to stay Franklin's execution. Although a majority of my colleagues disagreed, and Franklin was allowed to be executed, I still agree with the district court's analysis, which is why I voted to stay Nicklasson's execution as well.

My point, however, in this dissent from the denial of the petition for rehearing en banc of Nicklasson's request for a stay, is not to discuss or rehash the merits of the current protocol litigation. Rather, I feel obliged to say something because I am alarmed that Missouri proceeded with its execution of Allen Nicklasson before this court had even finished voting on Nicklasson's request for a stay. In my near fourteen years on the bench, this is the first time I can recall this happening. In litigation raising a constitutional challenge to his execution, a death row inmate sought a stay of his execution under Hill, and before the federal courts had issued a final decision on the pending request for a stay, Missouri carried out the execution.

While the current protocol litigation is not among the category of cases for which Nicklasson was entitled to an automatic stay of his execution, it was nonetheless a claim that Missouri would violate the federal constitution by executing him. As a result, Nicklasson was entitled to have this court complete its equitable review under Hill to determine whether he was entitled to a stay before Missouri

actually executed him.  By proceeding with Nicklasson's execution before our court had completed voting on his petition for rehearing en banc, Missouri violated the spirit, if not the letter, of the long litany of cases warning Missouri to stay executions while federal review of an inmate's constitutional challenge is still pending.

<div align="center">III</div>

Missouri's past history of scheduling executions before a death row inmate has exhausted his constitutional rights of review, using unwritten execution protocols, misrepresenting dosage levels for drugs used in lethal injections, and providing unfettered discretion to a dyslexic physician to mix the drugs and oversee its executions, has earned from this federal judge more than just a healthy judicial skepticism regarding Missouri's implementation of the death penalty.  Its current practice of using shadow pharmacies hidden behind the hangman's hood, copycat pharmaceuticals, numerous last-minute changes to its execution protocol, and finally, its act of proceeding with an execution before the federal courts had completed their review of an active request for a stay, has committed this judge to subjecting the state's future implementation of the penalty of death to intense judicial scrutiny, for the sake of the death row inmates involved as well as adversaries and advocates of capital punishment alike.

<div align="center">_____</div>

December 23, 2013

Order Entered at the Direction of the Court:
<u>Clerk, U.S. Court of Appeals, Eighth Circuit</u>
        /s/Michael E. Gans

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel for defendants, who are registered CM/ECF users here.

<div style="text-align: right;">

_s/ Matthew B. Larsen_

MATTHEW B. LARSEN
</div>